UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION


UNITED STATES OF AMERICA,          )
                                   )
                    Plaintiff,     )
                                   )
     VS.                           ) No: 1:18-CR-98(SNLJ/ACL)
                                   )
BARRETT C. SWAN,                   )
                                   )
                    Defendant.     )
_____   )


MOTION TO SUPPRESS EVIDENTIARY HEARING
BEFORE THE HONORABLE ABBIE CRITES-LEONI
JANUARY 11, 2019
CAPE GIRARDEAU, MISSOURI


FOR THE PLAINTIFF:

     KEITH D. SORRELL
     OFFICE OF U.S. ATTORNEY
     555 Independence, Room 3000
     Cape Girardeau, MO  63703
     (573) 334-3736


FOR THE DEFENDANT:

     JENNIFER L. BOOTH
     OFFICE OF FEDERAL PUBLIC DEFENDER
     325 Broadway, 2nd Floor
     Cape Girardeau, MO  63701
     (573) 339-0242


     Proceedings electronically recorded and transcribed by
mechanical stenography; transcript produced by computer.
_____

DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
Federal Official Court Reporter
111 South Tenth Street, Third Floor
St. Louis, MO  63102
(314) 244-7449

I N D E X

JANUARY 11, 2019

| Plaintiff's Witnesses: | Direct | Cross | Redirect | The Court |
|---|---|---|---|---|
| JONATHAN KEMP | 5 | 16 | 28 | 27 |
| BRIAN EGGERS | 30 | | | 41 |

1              (PROCEEDINGS BEGAN AT 10:10 AM.)

2              THE COURT:  This is the *United States of America*

3    *versus Barrett C. Swan*.  It's Case No. 1:18-98(SNLJ).

4              And so I guess as -- Can I speak with the Deputy

5    Marshal for just a moment?

6              (Pause)

7              THE COURT:  I just want to make you a little more

8    comfortable during the proceeding, Mr. Swan.

9              THE DEFENDANT:  Thank you.

10             THE COURT:  As a matter of routine, the Marshals will

11   keep some of that stuff on you when things are quick, but I

12   expect we're going to be in here for an hour or so, and I'd

13   much rather have you be a little bit more comfortable rather

14   than save time as you're going back through the facility, so.

15             THE DEFENDANT:  Thank you.

16             THE COURT:  You're welcome.

17             In any event, when we were here in court last, there

18   was a discussion about the fact you were considering engaging

19   the services of a different attorney.  And so I set a

20   deadline.  Isn't that right?

21             MS. BOOTH:  It is accurate, Your Honor.

22             THE COURT:  Okay.  I thought -- All of a sudden I

23   thought:  Well, maybe I remembered this wrong.  But I think

24   the deadline was January 4th for an attorney to enter.  And I

25   did have a phone conference with the attorneys last week, just

1    to get a status on things.

2          But for the record, I wanted to make sure to hear

3    from you the status on that and if you did ultimately change

4    your mind and decide that you're happy to proceed with

5    Ms. Booth representing you in this matter.

6          THE DEFENDANT:  Yes, ma'am.  I'm confident with

7    Mrs. Booth.

8          THE COURT:  Okay, very good.  So with that out of the

9    way, the purpose of the proceeding today is to address two

10   motions that have been filed on your behalf, Mr. Swan.  One is

11   a Motion To Suppress Evidence.  That's Document 35.  The

12   Government has filed a response.  That's Document 39.  And

13   then there's also a Motion to Sever Counts, Document 46, and

14   the Government filed a response, Document 47.  So as I

15   understand it, the Motion to Sever is simply being submitted

16   on the pleadings because it's solely a legal issue.  There's

17   no need for evidence to be presented.  Is that right?

18         MS. BOOTH:  That's correct.

19         THE COURT:  Okay.  And so I will be considering your

20   Motion to Sever, Mr. Swan.  But as I do understand it, with

21   regard to the Motion To Suppress Evidence, there is a need for

22   witness testimony to be offered.  And so there are witnesses

23   here in the courtroom.  And would you all like to make any

24   record before we begin?

25         MR. SORRELL:  Your Honor, just that the Government

5

```
 1    invokes the rule on witnesses.
 2              THE COURT:  Okay.
 3              MR. SORRELL:  We only have one witness, Mr. Kemp.
 4              THE COURT:  Okay.  And so with the rule on witnesses
 5    being invoked, if there are other witnesses expected or
 6    anticipated, those individuals should excuse themselves from
 7    the courtroom, and you'll be called when you are needed.
 8              All right, very good.
 9              And so, Mr. Sorrell, you may proceed.
10              MR. SORRELL:  Thank you.  I call Jonathan Kemp,
11    please.
12                  (The Witness, JONATHAN KEMP, Is Sworn.)
13              THE COURT:  And please feel free to adjust the
14    microphone however it's comfortable for you.  We want to make
15    sure that everybody can hear you clearly when you answer any
16    of the questions from the lawyers.
17              All right.
18              MR. SORRELL:  Thank you.
19              DIRECT EXAMINATION QUESTIONS BY MR. SORRELL:
20    Q    Would you state your name, please?
21    A    Jonathan Kemp.
22    Q    And would you spell ---
23              THE COURT:  And why don't you just go ahead and pull
24    it a little closer to you.
25              THE WITNESS:  Closer?
```

1          THE COURT:  Yes.  I know; it's ---

2          MR. SORRELL:  There you go.

3          THE COURT:  Don't be bashful.  That's all I'll say.

4    Just speak right into that microphone.

5          THE WITNESS:  All right.

6    Q    (By Mr. Sorrell)  And would you spell your last name for

7    the record?

8    A    Kemp, K-E-M-P.

9    Q    What agency do you work for?

10   A    City of Florissant.

11   Q    In a police department?

12   A    Yes, sir.

13   Q    Okay.  How long have you worked in that department?

14   A    Approximately four-and-a-half years.

15   Q    And what is your rank or your position with Florissant

16   Police Department?

17   A    Patrol officer.

18   Q    Now on August 1st, 2018, at around 3:20 AM, did you

19   happen -- were you working as a police officer?

20   A    Yes, sir.

21   Q    And if I can clear something up at the very beginning, I

22   believe the first sentence on your report says that the event

23   happened on August 8th.  Is that right?

24   A    Correct.

25   Q    But we're all -- The truth of the matter, it was on

1    August 1st.

2    A     Correct.

3    Q     Okay.  Now on that date at around 3:20 AM when you were

4    working, were you patrolling in your patrol car?

5    A     Yes, sir.

6    Q     Did you see -- have an occasion to see a red Ford Edge?

7    A     Yes, sir.

8    Q     And what caused you to notice that red Ford Edge?

9    A     I observed the vehicle violate a stop sign.

10   Q     And do you know what street address that was that the

11   violation occurred?

12   A     It was on the -- The stop sign's on Dunn Road just west

13   of St. Michael Court.

14   Q     Okay.  And then what did you do after seeing the Ford

15   Edge fail to stop at the stop sign?

16   A     Positioned my patrol vehicle behind the vehicle and

17   activated my emergency equipment.

18   Q     Did the Ford Edge stop soon after you activated your

19   emergency lights?

20   A     Yes, sir.

21   Q     And what did you do at that point?

22   A     Exited my patrol vehicle, walked up to the vehicle, made

23   contact with the occupants and spoke to the driver.

24   Q     And who was the driver?

25   A     Tiara Thorpe.

1    Q    And that's T-H-O-R-P-E?  Is that right?

2    A    Yes, sir.

3    Q    Okay.  Did you get any personal information from

4    Ms. Thorpe?

5    A    Yes, sir.  She provided me with a driver's license.

6    Q    Okay.  And was there a passenger in the car?

7    A    Yes, sir.

8    Q    Where was that passenger seated?

9    A    The front right seat.

10   Q    Was there anyone else in the car besides the passenger

11   and the driver?

12   A    No, sir.

13   Q    Was the passenger a male or a female?

14   A    A male.

15   Q    And did you ask that man for his identification?

16   A    Yes, sir.

17   Q    How did that man respond?

18   A    Stated that he did not have a driver's license on his

19   person or identification but provided me with a pedigree

20   orally.

21   Q    Okay.  And when you say a "pedigree," what are you

22   referring to in terms of what did he provide?

23   A    First/last name, date of birth and Social Security

24   Number.

25   Q    Okay.  Now are you able to check those items through a

1   department-issued computer that's in your patrol car?

2   A    Yes, sir.

3   Q    That is, you don't have to call back to a dispatcher and

4   relay that information by radio.

5   A    Correct.

6   Q    Okay.  And did you run that information that the

7   passenger, the male passenger, gave you through your patrol

8   car computer?

9   A    Yes, sir.

10  Q    And did you also run Ms. Thorpe's information?

11  A    Yes, sir.

12  Q    And what did you learn about Ms. Thorpe from your

13  computer?

14  A    That her license was valid and did not have any arrest

15  warrants.

16  Q    Okay.  And did the -- What did the computer tell you

17  about your male passenger's information?

18  A    The pedigree information did not match up with the person

19  depicted in the Department of Revenue picture.

20  Q    Okay.  And do you remember whether it was a difference of

21  male or female or age or race or ---

22  A    I believe it was a female is what the Social Security

23  Number came back to, was a female subject.

24  Q    Okay.  And what did you do at that point?

25  A    Made contact again with the passenger of the vehicle.

1    Q     And did you have a conversation with the passenger?

2    A     Yes, sir.

3    Q     And could you tell the Court what happened in that

4    conversation?

5    A     During the conversation, I spoke to him; advised him that

6    the information he provided was inconsistent with his

7    appearance and his person; gave him the opportunity to provide

8    me other pedigree information which he did.

9    Q     Okay.  Did you explain to the man what would happen in

10   the event that he was unable to provide correct information?

11   A     That we'd most likely have to go back to the Police

12   Department and get fingerprinted to be able to identify the

13   subject.

14   Q     Okay.  And did you say anything to the man about, "You

15   might as well make it easier on yourself"?

16   A     Yes, sir.

17   Q     Okay.  How did the man respond to your inquiries at that

18   point?

19   A     He provided me with a different name and Social Security

20   Number.

21   Q     And what did he tell you his name was?

22   A     Barrett Swan.

23   Q     And did this person give you another Social Security

24   Number?

25   A     Yes, sir.

```
1    Q    Okay.  And what did you do with that information?

2    A    I responded back to my patrol car and did a computer

3    inquiry of that information.

4    Q    Okay.  What did -- report did you get from your computer

5    about the Mr. Barrett Swan?

6    A    That he had an active federal arrest warrant.

7    Q    Okay.  And what did you do at that point?

8    A    I responded back up to the vehicle, made contact with

9    Mr. Swan again; requested that he exit the vehicle; advised

10   him that he was under arrest for his active warrant.

11   Q    Okay.  Did Mr. Swan actually step out of the car at your

12   request?

13   A    Yes, sir.

14   Q    And did you see anything that caught your attention when

15   Mr. Swan stood up?

16   A    Yes, sir.

17   Q    What was that?

18   A    While he was exiting the vehicle, there was a firearm on

19   the passenger seat where he was previously sitting.

20   Q    And when you say a "firearm," are you talking about a

21   handgun?

22   A    Yes, sir.

23   Q    And what did you do upon seeing the handgun?

24   A    Swan was handcuffed, and then I had secured the firearm

25   and -- Like at the same time, for safety, I asked Ms. Thorpe
```

1    to step out of the vehicle as well.

2    Q    Okay.  And did you take Mr. Swan to your Police

3    Department?

4    A    Yes, sir.

5    Q    And where would that have been?

6    A    The City of Florissant.

7    Q    Okay.  Now was there also some conversation between you

8    and Mr. Swan at the scene about him saying "good-bye" to

9    Ms. Thorpe?

10   A    Yes, sir.

11   Q    And can you relate to the Court what that was?

12   A    He had asked if he could say "good-bye" to Ms. Thorpe,

13   and I allowed her to walk back to the patrol vehicle where

14   they had a brief conversation, and he stated something to the

15   effect of "I'm done" or "I'm finished" while speaking with

16   her.

17   Q    Okay.  And this was in your presence?

18   A    Correct, sir.

19   Q    All right.  And then did Ms. Swan (sic) get in her -- get

20   in her car and leave?

21   A    Yes, sir.

22   Q    Did you issue tickets to her for the traffic offenses?

23   A    Yes, sir.

24   Q    And I believe there were three issued that morning.  Is

25   that right?

1    A    Yes, sir.

2    Q    A stop sign violation, an insurance violation and some --

3    another traffic violation.  Is that ---

4    A    Failure to register motor vehicle, sir.

5    Q    Is that dealing with the license plate?

6    A    Correct; the registration on the vehicle.  It had a

7    dealer plate on it, but when I did an inquiry of the VIN, it

8    had an expired temp tag registered to the vehicle.

9    Q    All right.  But she wasn't detained at the -- at the --

10   after you finished with her business.  Is that fair?

11   A    No, sir.

12   Q    Okay.  Now -- So you took Mr. Swan back to the Florissant

13   Police Department?

14   A    Yes, sir.

15   Q    And what was done with Mr. Swan at that location?

16   A    He was escorted into the holdover where I inventoried his

17   property; provided him a jumpsuit that he would change into,

18   and he was properly booked.

19   Q    Now what -- what is a hold -- the "holdover" that you

20   call it?  Can you describe what purpose it serves?

21   A    So we have a holdover where we hold persons before they

22   get either transferred to a county or to a different police

23   department for arrest warrants.

24   Q    It's basically just a temporary place for detainees to

25   stay?

14

1    A    Correct.

2    Q    Okay.  And did you complete your paperwork on the traffic

3    stop and the arrest?

4    A    Yes, sir.

5    Q    Now did you speak again with Mr. Swan?

6    A    I spoke to him while inventorying his property and

7    providing him that change of clothes, yes, sir.

8    Q    And when you say "inventorying his property," do you mean

9    personal effects in his pockets and things like that?

10   A    Yes, sir.

11   Q    Okay.  And what was the subject of that conversation?

12   Can you tell the Court what was said back and forth?

13   A    I told him that upon completion of the booking process,

14   that he would be escorted to an Interview Room and given the

15   opportunity to talk about the firearm.

16   Q    And how did Mr. Swan respond?

17   A    He stated to the effect of, "I'm not going to talk; we

18   both know what you found in the car, and I'd rather be in the

19   situation I'm in now than the situation that I was in in the

20   past when I was shot and didn't have anything on me."

21   Q    Okay.  And those words are the substance of what Mr. Swan

22   said.  Is that fair?

23   A    Yes, sir.

24   Q    It's not an actual quotation.

25   A    That's correct, sir.

1    Q    Okay.  I don't want to mislead the Court as to what --

2    what you recall about that.

3    A    Yes, sir.

4    Q    Now prior to Mr. Swan making the statement, did you ask

5    any question of Mr. Swan -- of Mr. Swan that would require

6    that answer?

7    A    No, sir.

8    Q    Did he -- Did he make that statement all as one

9    statement?

10   A    Yes, sir.

11   Q    Okay.  That is, there wasn't an intervening question on

12   your part.

13   A    No, sir.

14   Q    Did you continue to speak with Mr. Swan?

15   A    No.  He indicated that he did not want to speak.

16   Q    So basically that was the end of your contact with him?

17   A    Correct, sir.

18   Q    And did you put your -- that statement of Mr. Swan's oral

19   statement in your report?

20   A    I did not, sir.

21   Q    And any reason why you didn't?

22   A    I didn't -- At the time I didn't, I guess, fully

23   understand the relevance that it would ultimately play.

24   Q    All right.

25   A    So it was not entered into the report.

16

```
 1          MR. SORRELL:  Nothing further.  Thank you.

 2          THE COURT:  Okay.  Cross Examination?

 3          MS. BOOTH:  Thank you.

 4          CROSS EXAMINATION QUESTIONS BY MS. BOOTH:

 5   Q    Officer Kemp, good morning.

 6   A    Good morning.

 7   Q    When you removed Mr. Swan from the car, he was officially

 8   in custody; correct?

 9   A    He was not in hand -- I mean upon exiting the vehicle, he

10   was placed into handcuffs and advised he was under arrest,

11   correct.

12   Q    Okay.  So then he was no longer free to walk away.

13   A    Correct.

14   Q    Okay.  And at that point, Miranda rights weren't read to

15   him.

16   A    Correct.

17   Q    And Miranda rights were never read to Mr. Swan, correct?

18   A    Correct.

19   Q    Officer Kemp, as to the statement that you say Mr. Swan

20   made at the Florissant Police Department, Mr. Sorrell just

21   asked you; that statement that you've relayed to us isn't a

22   verbatim statement, correct?  It's just what you remember the

23   gist of what the statement was?

24   A    The first part is what I one hundred percent recall.  As

25   far as towards like the very end when it was referenced to
```

1  being the situation "now that I was -- when I was in

2  previously and didn't have anything on me," that part I do not

3  recall specifically.  I know it was to that effect, but in

4  reference to "We both know what you found inside of the

5  vehicle" was his statement, yes, ma'am.

6  Q    Okay.  So "We both know what you found inside of the

7  vehicle" was Mr. Swan's verbatim statement to you.

8  A    I believe so.

9  Q    Okay.  And you're confident about that.

10  A    Pretty confident, yes, ma'am.

11  Q    Okay.  But then as truth be told, the second part you

12  can't tell us verbatim the words but simply just the gist.

13  A    Correct.

14  Q    Okay.  And it's fair to say that these statements that

15  Mr. Swan made weren't memorialized by an audio recording or

16  anything like that.

17  A    Correct.

18  Q    And when he made these statements, you didn't write them

19  down immediately, correct?

20  A    Correct.

21  Q    So we are just going on your memory.

22  A    Correct.

23  Q    It's fair to say that your memory could be a little

24  flawed about the second part of that statement as far as the

25  order of words and which words were used?

18

1  A    Possibly.  Like I said, I believe that that was the

2  statement, but not verbatim, yes, ma'am.

3  Q    Okay.  So it's possible you could be a little mistaken.

4  A    Correct.

5  Q    And truth be told with the police report, you've already

6  admitted there is one mistake that happened in your memory

7  when making the police report; correct?

8  A    Yes, ma'am.

9  Q    The date -- The date of the actual incident?

10  A    Yes, ma'am.

11  Q    And, Officer Kemp, what was the date when you actually

12  made your police report in relation to arresting Mr. Swan on

13  August 1st?

14  A    I would have started the police report that same -- at

15  that same time or during that shift.

16  Q    Okay.  Would you happen to know the reason why you got

17  the date wrong?

18  A    No, I'm not sure to be honest.

19  Q    And when was it that you caught your mistake?

20  A    I think it was initially whenever I had received

21  something about the case and it -- and it -- getting set for

22  this occasion.  And while reviewing the case, I noticed that

23  there was a discrepancy between the General Info page that had

24  the correct date on it.  And then while reviewing my report, I

25  had reviewed all the documents and noticed a discrepancy

1    between the two at that time.  I don't know the exact date of

2    when that was, though.

3    Q    Okay.  Did you take any effort to make a correction or

4    file a supplemental report?

5    A    No, ma'am.

6    Q    And, Officer Kemp, after it came to light that this

7    statement was made by Mr. Swan, you realized that you had not

8    included that in your police report.  Is that correct?

9    A    Correct.

10   Q    At that point did anyone ask you to create a supplement

11   report to explain and memorialize when this statement happened

12   and the subject matter, that type of thing?

13   A    I believe whenever I was contacted by the agent and I

14   advised him of that statement, he stated that it was going to

15   be added to his report and that -- that it would be in that

16   report and nothing further in mine.

17   Q    And tell me again where in the Police Station this

18   statement was made by Mr. Swan.

19   A    So whenever you go into our holdover, there's an area

20   that has a couple of temporary holding cells and the booking

21   counter as well as an area that has lockers and the jumpsuits

22   that we change them into.  It was in that room where the

23   lockers and the jumpsuits are.

24   Q    Okay.  And Mr. Swan made his statement in response to you

25   saying, "We're finished with booking, and I'd like to take you

1  upstairs for an interview."  Can you tell me again what you

2  said prior to Mr. Swan making his statement?

3  A    So we were in the area where the lockers are and the

4  jumpsuits and was retrieving his items to start inventorying

5  his property, so the booking process was not complete yet.  He

6  still had to get changed into a jumpsuit and get booked into

7  the computer.  But I advised him -- Just like I typically do

8  with anybody if there's going to be an interview to take

9  place, I advise them that upon the completion of the booking

10  process, that they'll be escorted to the Interview Room to

11  speak further about the case involved.

12  Q    Okay.  And that's what you said to Mr. Swan.

13  A    Correct.

14  Q    Okay.  And then he responded with what you said he said.

15  A    Correct.

16  Q    Okay.  So this wasn't a situation where you were just at

17  the desk filling out some paperwork and Mr. Swan just

18  spontaneously said out of nowhere, "We both know what you

19  found in the car; I'm not going to talk," and whatever it is

20  that you've attributed to him as saying.  It wasn't simply

21  just a spontaneous statement, correct?

22  A    It was just -- It was in reference to my statement to

23  him, correct.

24  Q    Okay.  Officer Kemp, too, I'd like to talk about a few

25  other things that are important that may not be in your police

1    report so that we know if anything has been left out that's

2    critical.  The passenger, Tiara Thorpe, at the scene told you

3    that that firearm was hers, correct?

4    A    She said, yes, that the firearm was hers.

5    Q    Okay.  And we don't see that anywhere in your police

6    report.  Is that correct?

7    A    Correct.

8    Q    Is there a reason why you left out that information from

9    your police report?

10   A    No direct reason.  I advised her if she had the paperwork

11   and wanted to bring it up, that I would attach it to the

12   police report, but I never received no paperwork for the

13   firearm.

14   Q    And, again, when you got the information from Mr. Swan

15   that he had essentially given you the false identifying

16   information and you figured that out, when you came back to

17   the car to talk to him about that, did you remove him from the

18   car or was he simply sitting in the car and you're speaking to

19   him through the window about, "Please give me your real

20   identity or we're going to have to go get fingerprints"?

21   A    I initially was still talking to him at the vehicle.

22   Q    Okay.  So the only time he was removed from the vehicle

23   is when you came back the second time and realized he was

24   Barrett Swan because he had given you the real name --

25   A    Correct.

1    Q    -- and then removed him?

2    A    Correct.

3    Q    Okay.  And then when removing Mr. Swan from the car, of

4    course, you're always looking for firearms or weapons.  You're

5    trained to do that, correct?

6    A    Correct.

7    Q    Obviously for safety reasons.

8    A    Correct.

9    Q    Your safety and everyone's safety.  And initially you saw

10   the butt end of the gun by the seat belt area?

11   A    Correct.

12   Q    And it took you a second to realize that the gun wasn't

13   part of the seat belt, correct?

14   A    Correct.

15   Q    So -- But once you took a good look at it, you realized

16   the firearm.

17   A    Correct.

18   Q    Okay.  And so it was dark inside the car.

19   A    Other than the lighting, correct.

20   Q    Okay.  So even with the dome light on, you at first

21   thought that it was part of the seat belt.

22   A    Yeah.  With the way that he was exiting the vehicle and

23   the door ajar, you know, it's hard to kind of get in between

24   there and get a full view of the seat until he's fully exited,

25   if that -- if that kind of makes sense.

1  Q    Sure.  And so just so I understand, the gun was located

2  up against the left seat belt holder on the base of the seat.

3  Am I understanding that correctly?

4  A    More so up on top of the seat, but it was just -- Like I

5  said, I didn't know at first if it was like the seat belt

6  holder, if you will.  It was kind of like laying over, sitting

7  onto the seat.  Different vehicles have different parts of

8  that, so some of them just kind of hang there.  Some of them

9  are more upright.  So it's hard to tell at first.  And then

10 once he was fully outside of the vehicle, then I could observe

11 it.

12 Q    Okay.  But this wasn't a situation where he stepped out

13 of the vehicle and the firearm was just square in the middle

14 of the seat such that Mr. Swan was actually sitting squarely

15 on the firearm.

16 A    Correct.

17 Q    Okay.  Is it fair to say one of the reasons why you

18 didn't include these statements Mr. Swan made to you at the

19 Police Station in your police report is because the statements

20 didn't register in your mind that Mr. Swan was admitting

21 possession of the firearm?

22 A    Prior to me getting off that shift, I had spoke to the

23 agent in reference to the case and advised him of it, and he

24 had said that he was putting it in his report, and I hadn't

25 added it to my report or anything of the sort yet.  So he said

1    that he was going to add it into his.  I didn't see

2    necessarily a relevance to also add it into mine which I

3    should have.  I didn't, you know.  But it wasn't -- I wouldn't

4    say it was in relation to that.

5    Q    And then as far as you alerting Agent Eggers that

6    Mr. Swan had been arrested, you alerted him on August the 1st?

7    Would that be ---

8    A    I believe so, yes.  It would have been the same day as

9    the arrest.

10   Q    Okay, the same day.  Okay.  Did you make mention to

11   Agent Eggers that Tiara Thorpe had said the gun belonged to

12   her?

13   A    I do not recall specifically.

14   Q    Is there -- Would there be a reason why you wouldn't tell

15   the agent that?

16   A    No, no specific reason.

17   Q    And, again, so we can make sure we have everything in

18   your report accurate, there's nothing in your report that

19   indicates you sent the gun to the crime lab to be

20   fingerprinted, correct?

21   A    Correct.

22   Q    But you did send the gun to be analyzed for fingerprints?

23   A    Typically whenever -- Yes; yes.  Through our -- our

24   evidence room, they typically fingerprint any firearms that

25   come through.

1   Q    Okay.  And what did you learn about your request as to

2   whether or not there were any fingerprints on the firearm?

3   A    There were no fingerprints located.  Typically if they

4   locate any fingerprints, then they will document that.  When I

5   spoke to our Evidence Technician, there was no actual report

6   that was done indicating that there were no fingerprints

7   located on the firearm.

8   Q    And Mr. Swan's demeanor with you, Officer Kemp, he was

9   not combative or argumentative --

10  A    No.

11  Q    -- or rude or anything like that.

12  A    No.

13  Q    Okay.  And as to the evidence that he possessed, the

14  firearm, it's his proximity to it in the car?

15  A    Correct; the constructive possession of the firearm.

16  Q    You didn't recognize him make any furtive movements

17  toward the firearm or anything like that?

18  A    No, not -- not when I saw the vehicle, no, ma'am.

19       MS. BOOTH:  Just a moment, Your Honor.  I'd like to

20  touch base with Mr. Swan.

21       THE COURT:  Certainly.

22       (Pause)

23  Q    (By Ms. Booth)  Officer Kemp, we do have the Event Report

24  from Dispatch showing the times that you reported to the scene

25  and cleared the scene, correct?

26

```
1    A    Correct.

2    Q    So are you able to tell me, from the time you stopped the

3    car, how long Mr. Swan was in the car with the firearm before

4    you discovered it and retrieved it?

5    A    I believe on that report, from the time that his -- that

6    I stopped the vehicle until the time that his name was added

7    to the call, which would have been after I had located him

8    inside the computer as well as ran him over Dispatch, I

9    believe that timeframe is between ten to fifteen minutes.

10   Q    And, again, I just want to make certain I understand the

11   location of the firearm.  Again, it wasn't, obviously, square

12   in the middle of the right front passenger seat, correct?

13   A    Correct.

14   Q    Okay.  So it was toward the left edge of the front right

15   passenger seat back by the seat belt holster.  Is that fair to

16   say?

17   A    Correct.

18   Q    And it was more up on the edge of the seat?

19   A    Yeah, just kind of the edge of the seat towards the

20   center console, seat belt holder; that area right there.

21   Q    Okay.

22        MS. BOOTH:  All right, Officer Kemp.  Thank you.

23        THE WITNESS:  Thank you.

24        THE COURT:  Any Redirect, Mr. Sorrell?

25        MR. SORRELL:  No, Your Honor.
```

1          THE COURT:  Okay.  I have just a few brief questions

2     for you, Officer Kemp.

3          THE WITNESS:  Sure.

4                    EXAMINATION BY THE COURT:

5     Q    And you may have answered this and I just missed it.  But

6     you said that there were three tickets issued to Ms. Thorpe.

7     One of them was failure to register.  What were the other two?

8     A    Violated a stop sign and no insurance.

9     Q    Stop sign and no insurance, okay.  And then as far as the

10    time of your shift that night, what -- when did it start and

11    when did it end?

12    A    My shift, we go -- We do 12-hour shifts.  So 6:00 PM to

13    6:00 AM.

14    Q    Okay.  So Officer Eggers arrived before 6:00 AM?

15    A    He had contacted me via phone.

16    Q    Oh, it was a phone communication.

17    A    Yes, ma'am.

18    Q    Okay.  And then back to how this firearm was located when

19    you observed it in the right front passenger seat.  I

20    understand it was somehow leaning against the seat belt

21    holster.  Was the barrel of the gun pointing toward the

22    passenger door or how was the barrel of the gun, if you

23    remember?

24    A    I believe that that would be correct, where the butt end

25    would be facing toward the front side of the vehicle and the

1   barrel was along the back side of the seat, if that makes

2   sense.

3   Q    Oh, okay.  Okay.  So it was actually pointing forward.

4   A    Pointing -- Well, the barrel towards like the passenger

5   side door; the stock, the bottom butt of the gun facing

6   towards the front.

7   Q    Okay.  Okay.  So it was leaned on its side.

8   A    Correct, yeah, laying down on its side.

9   Q    Like laying down, all right.  Very good.

10            THE COURT:  Any further questions from either ---

11            MR. SORRELL:  May I?

12            THE COURT:  Yes, you may.

13            MR. SORRELL:  I'm sorry.

14            REDIRECT EXAMINATION QUESTIONS BY MR. SORRELL:

15   Q    Officer, where were you standing when you first observed

16   the -- the handgun?

17   A    When I first observed it?  So he was actually in the

18   vehicle, and I -- You know, the door was open.  So I was kind

19   of on the far side of the door with him exiting out.  So it

20   took me a second to fully be able to see that passenger seat.

21   Q    So is it fair to say that the door was between you and

22   Mr. Swan, --

23   A    Correct.

24   Q    -- the open car door?

25            Okay.  So you weren't inside the car when you first

```
 1    observed the pistol.

 2    A    Correct.

 3    Q    Okay.  And when you saw the butt end of it, how long did

 4    it take you to realize what that was?

 5    A    It wasn't but -- Because it was maybe a second away from

 6    him, you know, taking one more step and fully exiting the

 7    vehicle to see the rest of it.

 8    Q    And did you realize that the item was a firearm before

 9    you entered the vehicle?

10    A    Yes, sir.

11              MR. SORRELL:  Okay.  Nothing further.

12              THE COURT:  All right.  Ms. Booth?

13              MS. BOOTH:  I have nothing further.

14              THE COURT:  Okay.  Thank you, Officer Kemp.  You're

15    excused.

16              THE WITNESS:  Thank you.

17              MR. SORRELL:  No further evidence, Your Honor.

18              THE COURT:  Oh, that's right.

19              And so the Government rests.

20              And, Ms. Booth, I understand you have evidence.

21              MS. BOOTH:  I do, Your Honor.  I'd like to call

22    Brian Eggers, Agent Eggers.  He's in the hall.

23              THE COURT:  Okay.  And it sounds like Officer Kemp

24    may request that he report.

25              Would you mind, Officer Kemp?  Thank you.
```

```
 1              (The Witness, BRIAN EGGERS, Is Sworn.)

 2         THE COURT:  All right.  You may proceed.

 3         MS. BOOTH:  Thank you.

 4          DIRECT EXAMINATION QUESTIONS BY MS. BOOTH:

 5   Q    Sir, please state your name for the record.

 6   A    Brian Eggers.

 7   Q    And, Agent Eggers, you are employed with the ATF,

 8   correct?

 9   A    Yes.  Well, I'm employed by the City of Cape Girardeau as

10   a police officer and I'm a Task Force Officer for the ATF,

11   yes.

12   Q    All right.  And you had occasion, Agent Eggers, to speak

13   with Officer John Kemp from the Florissant Police Department

14   back in August of this year about the arrest of Barrett Swan,

15   correct?

16   A    Yes, ma'am.

17   Q    Okay.  So the way that unfolded is Officer Kemp called

18   you after Barrett Swan was arrested on the ATF warrant for his

19   arrest for felon in possession of a firearm.  Is that

20   accurate?

21   A    Yes, ma'am.

22   Q    Do you know the day that Officer Kemp contacted you?

23   A    I would have to check.

24   Q    Please.

25   A    I believe it was August 8th.
```

1    Q    And that date -- We've heard from Officer Kemp that

2    actually he was mistaken in his police report; that it wasn't

3    August the 8th that Mr. Swan was arrested.  It was actually

4    August the 1st.  So the fact that your police report reflects

5    August 8th, were you looking at his police report when you

6    were drafting your investigation report?

7         My question is:  If you could explain to me how that

8    date error also made its way into your report, if you know,

9    sir.

10   A    Yeah.  I guess I was under the impression that he was

11   picked up that night when -- when Officer Kemp called me and

12   said that he was arrested.

13   Q    Okay.  So it's your impression that Officer Kemp called

14   you immediately upon arresting Barrett Swan.

15   A    That's correct.

16   Q    Okay.  And ---

17   A    That's also when I was notified that the warrant was

18   (inaudible) as well.  We get -- We get notified from our JSOC,

19   ATF, that the warrant has been cleared.

20   Q    All right.  And then -- So Officer Kemp called you.  You

21   didn't call him; correct?

22   A    Correct.

23   Q    Now the contents of your conversation with him at that

24   time, was that like in the early morning hours, like 4:00 in

25   the morning?  5:00 in the morning?  Something like that?

1   A    Yes, ma'am.

2   Q    Okay.  So, Agent Eggers, how did you memorialize what

3   Officer Kemp was telling you?  What's your practice?  Do you

4   have a little recorder?  Do you write down notes?  How do you

5   keep track of what information Officer Kemp was giving you

6   over the phone?

7   A    Listen to him.

8   Q    Okay.  So just -- You didn't -- You didn't take any

9   notes.  It was simply memory.

10  A    No.  If I took any notes, it would have probably just

11  been probably stating his number to follow up, you know, once

12  I got to work the next morning.

13  Q    Okay.  So my next question was:  As far as when you made

14  your investigation summary of the event, the written form,

15  when was that?  Do you remember what day?

16  A    When did I write my report based off of what ---

17  Q    Yes.

18  A    The report was finalized on August 27th.

19  Q    So you wrote your report on August the 27th?

20  A    Yes, ma'am.

21  Q    Okay.  And in making your report, there was no notes you

22  referred to; you simply went from memory?

23  A    No, ma'am.  I believe I waited until I -- I got the

24  reports from Florissant Police Department.

25  Q    Okay.  So you used those reports in making sure that your

1    report was accurate.

2    A     Correct.

3    Q     Okay.  And so you are aware, Agent Eggers, that there is

4    a fact in your report that we don't find in Officer Kemp's

5    report, and that is the fact of statements that Mr. Swan made

6    to Officer Kemp, correct?

7    A     Correct.

8    Q     Was there ever a time when you received Officer Kemp's

9    report that you noticed that discrepancy and it caught your

10   attention?

11   A     No, ma'am.  That was -- That was a phone call that --

12   between Officer Kemp and myself when he told me that, what

13   Mr. Swan said.

14   Q     Okay.  And that phone call when Officer Kemp told you

15   that, that was when he called you in the early morning hours

16   of August the 1st, correct?

17   A     I don't remember if it was that phone call or subsequent

18   phone calls.

19   Q     Oh, okay.  All right.

20   A     It may have been the next day when I talked to him.  I

21   don't remember if it was that -- that phone call that morning

22   because from what I recall from that morning, I think it was a

23   fairly brief phone call because it was 3:00 or 4:00 in the

24   morning.

25   Q     Sure.  Okay.  I'm sorry, sir.  I didn't know that there

34

1    were subsequent phone calls.  So thank you for bringing that

2    to my attention.

3            So there was the first phone call on August the 1st

4    to say, "We have him and you're looking for him," obviously.

5    A    Yes, ma'am.

6    Q    Okay.  So -- And then after that, there were subsequent

7    phone calls, correct?

8    A    Yes, ma'am.

9    Q    Do you know how many?

10   A    Not very many; typical phone calls of, you know, police

11   reports and who can I contact to get this report; just all

12   normal administrative.

13   Q    Okay.  That makes sense.  And so you can't remember in

14   which one of those conversations it came up that Mr. Swan had

15   made a specific statement?

16   A    I don't remember which phone call.

17   Q    At some point, though, did you ever realize that that

18   statement was never included in Officer Kemp's police report?

19   A    Yes, ma'am, I did.

20   Q    And at what point was that?

21   A    I don't remember exactly when, but I did have a

22   conversation with Officer Kemp about -- about that.

23   Q    Okay.  And so when you saw the discrepancy and you were

24   prompted to circle back and talk to Officer Kemp about it,

25   obviously, you're being thorough, so you want all the facts to

1   be accurate.  But were you concerned in any way that -- that

2   his report wasn't accurate or that perhaps his memory wasn't

3   accurate of the event?

4   A    No, ma'am.

5   Q    And what did he say to you as far as why that statement

6   wasn't included in his report?

7   A    I believe we had a conversation about him adding that to

8   the report, and I didn't ask him why it wasn't included.

9   Q    Oh.  So you never asked him why it wasn't included.

10  A    No, ma'am.

11  Q    But you did -- You directed him to include it in his

12  report or make a supplement report?

13  A    Yeah.  I believe I asked him, "Hey, could you put that in

14  your -- you know, could you add that to a supplemental

15  report," yes.

16  Q    So you're -- you're correct about that.  You remember

17  that accurately.

18  A    Yes.

19  Q    Okay.  And did he ever do that?

20  A    To my knowledge, no, he did not.

21  Q    Did you ever have occasion to call him back and say, "Can

22  I have that supplement report, please," or did you ever have a

23  chance to talk to him again to say, "Officer Kemp, why haven't

24  you done what I've asked you to do"?

25  A    No, ma'am.

```
 1    Q    Is there a reason why you never circled back on him to

 2    ask that question?

 3    A    We had -- We had -- We had conversations about him adding

 4    that to the report.  I just -- I never got the report --

 5    Q    Okay.

 6    A    -- with any addition.

 7    Q    And at some point Special Assistant U.S. Attorney Angel

 8    Woodruff contacted you about this same thing; about, "Can we

 9    obtain a supplemental report indicating the circumstances of

10    that statement," correct?

11    A    Yes, ma'am.

12    Q    Did you have occasion, after speaking with Ms. Woodruff,

13    to contact Officer Kemp again or that didn't happen?

14    A    The conversations that I had with Officer Kemp would have

15    been probably right around that same timeline of when I talked

16    to Ms. Woodruff.

17    Q    Okay.  But still, you never received the supplemental

18    report.

19    A    I did not.

20    Q    Agent Eggers, you've been in law enforcement certainly

21    for a significant period of time, correct?

22    A    Yes.

23    Q    Can you tell me how many years?

24    A    Sixteen years in the Air Force I was in law enforcement,

25    and I've been with Cape Girardeau Police Department for
```

1   four-and-a-half years.

2   Q    So certainly you've written a lot of reports in your day

3   and understand that the reports have to be accurate and you're

4   not negligent in words that you use in your report, correct?

5   A    Correct.

6   Q    So if you could look at your report for me, and I would

7   like to look at Paragraph 3.  And I'll actually open this up

8   so then everyone can see what we're looking at, including

9   Judge Crites-Leoni.

10          Let's see.  What am I doing wrong here?  Is it

11  showing up on everyone's ---

12          THE COURT:  I think she's having to turn them on for

13  the monitors here.

14          MS. BOOTH:  We have technical difficulty.  I will

15  navigate around it.

16          THE COURT:  Okay.

17  A    Is this for the report dated 8-27?

18  Q    (By Ms. Booth)  I'm sorry, sir?

19          THE COURT:  I wonder if it's not pointed -- Maybe it

20  needs to be ---

21          MS. BOOTH:  Oh.

22          THE COURT:  Okay.  I have one monitor that does have

23  something but it looks like wood --

24          MS. BOOTH:  Yeah, okay.

25          THE COURT:  -- and I'm seeing the light.

```
 1              MS. BOOTH:  Yes.

 2              THE COURT:  Oh, and I'm seeing me now.

 3              MS. BOOTH:  Yes.  I think that the error is on my end

 4    and it's about to be corrected.  There we go.

 5              THE COURT:  There we go, okay.

 6              MS. BOOTH:  Okay.

 7              THE COURT:  Oh, it just went away.  There it is;

 8    magic.

 9              MS. BOOTH:  All right.  We're back.

10              THE COURT:  Are you able to see it?

11              THE WITNESS:  Yes, ma'am.

12              THE COURT:  Okay.  So Agent Eggers can see it as

13    well.

14              MS. BOOTH:  All right.

15    Q   (By Ms. Booth)  So, Agent Eggers, you've brought your

16    report today.  And, obviously, what I'm showing you on the

17    monitor, which I will mark as Defense Exhibit A, is a fair and

18    accurate representation of your report; correct?

19    A   Yes, it is.

20    Q   Okay.  So let's go down to Paragraph 3, and we'll look at

21    this sentence here.  "Kemp later attempted to conduct an

22    interview of Swan;" correct?

23    A   Yes.

24    Q   Okay.  Can you tell me what information Officer Kemp gave

25    you that you would make that conclusion he was attempting to
```

1    conduct an interview of Swan?

2    A    Officer Kemp told me that he tried to interview Mr. Swan.

3    Mr. Swan said that he didn't want to talk.  And so as he was

4    walking him back, wherever -- wherever -- I guess I'm assuming

5    up in Florissant, is when he made the statement that he made.

6    Q    Okay.  So in going back to your memory, certainly you're

7    remembering everything accurately.  We see this line in your

8    report, "Kemp later attempted to conduct an interview of

9    Swan," because that's what Officer Kemp told you.

10   A    Correct.

11   Q    "I" -- He said, "I attempted to conduct an interview of

12   Swan."

13   A    Yes, ma'am.

14   Q    Officer Kemp didn't say anything to you to the effect

15   that he just was talking about particulars during the booking

16   process and may take Barrett upstairs for interviewing, and

17   then Barrett just spontaneously uttered this statement,

18   anything like that.

19   A    He didn't give me details.  He just said he attempted an

20   interview.

21   Q    Okay.  Did you ever have occasion to ask Officer Kemp if

22   he ever gave Mr. Swan his *Miranda* rights prior to that

23   attempted interview?

24   A    I don't remember if we discussed *Miranda*.

25   Q    Okay.  Were you concerned at all about that at that point

1    or you're just simply taking the information that Officer Kemp

2    was giving you?

3    A    (Inaudible).

4    Q    Okay.  Agent Eggers, did Officer Kemp in any of the

5    subsequent conversations with you tell you that the passenger

6    of the car, Tiara Thorpe, told Officer Kemp at the scene,

7    "That gun is mine"?

8    A    No, ma'am.

9    Q    Did that ever come up?

10   A    No.

11   Q    Okay.  And have you had an opportunity to do an eTrace on

12   this firearm?

13   A    Yes, ma'am, I believe an eTrace was done, yes.

14   Q    Okay.  I don't have that paperwork.  Do you know the

15   result of the eTrace?  Can you tell us?

16   A    I do not have that with me.  I don't know.

17   Q    That -- Do you know if the gun came back to Tiara Thorpe?

18   That it was purchased by her?

19   A    I don't know.

20   Q    Okay.  But, of course, that's some information that you

21   can get for us.

22   A    I can get that.

23   Q    Okay.  And if for some reason we can't find it, it's not

24   difficult to do an eTrace again.

25   A    I don't know.

1   Q    Okay.  All right.  All right.  Just a moment, sir,

2   please.

3        (Pause)

4        MS. BOOTH:  I have nothing further for Agent Eggers,

5   Your Honor.

6        THE COURT:  Okay, very well.  Cross Examination?

7        MR. SORRELL:  No questions.

8        THE COURT:  Okay.  I just have a quick one.

9             EXAMINATION QUESTIONS BY THE COURT:

10  Q    This JSOC, what does "JSOC" stand for?

11  A    I'm not exactly certain.

12  Q    Okay.  But -- So the function of it, ---

13  A    It's -- The function of that is when we enter warrants

14  into -- into our system, we get notified when those

15  individuals are picked up.

16  Q    Okay.  And so I guess that's exactly the point.  So you

17  were the agent for Count 1 of the Indictment.  And so the

18  reason Kemp contacted you is because your name somehow was

19  associated with the warrant as the agent to be notified when

20  an arrest was made?

21  A    Yes, Your Honor.

22  Q    Okay, very good.

23       THE COURT:  That's all I have.  Thank you.  You're

24  excused.

25            Do you know what "JSOC" is?

1            MR. SORRELL:  No, I didn't.

2            THE COURT:  And I guess I would like just one

3    clarification maybe from counsel.

4            Between the pleadings and the facts stated and what

5    was relayed here, I understand there was a communication

6    between you and was it Special AUSA Woodruff about

7    supplementing the report?

8            MS. BOOTH:  Yes, Your Honor.

9            THE COURT:  Okay.  And so there's no dispute

10   regarding that communication happening.  And I guess Officer

11   Eggers was the person who made the communication with

12   Officer Kemp to see if he would prepare a supplemental report

13   at whatever date that was.

14           MS. BOOTH:  Yes, Your Honor.  I don't think that

15   there's a dispute between the Government and the Defense as to

16   whether Ms. Woodruff asked Agent Eggers, "Let's get a

17   supplement."  I believe that that's accurate, but Mr. Sorrell

18   can address that.  But I think that Agent Eggers even today

19   said that Ms. Woodruff had contacted him --

20           THE COURT:  Okay.

21           MS. BOOTH:  -- and asked him for a supplement report.

22           THE COURT:  Okay.

23           MR. SORRELL:  And I think that's -- that's accurate,

24   Judge, --

25           THE COURT:  All right.

1        MR. SORRELL:  -- although it didn't address any of

2   the suppression issues or the Fourth or Fifth or Sixth

3   Amendment issues.  So I didn't --

4        THE COURT:  Right.

5        MR. SORRELL:  -- I didn't address it in my response.

6        THE COURT:  Okay.

7        MR. SORRELL:  So -- But I think that's accurate.

8        THE COURT:  Okay.  And so you identified Defendant's

9   Exhibit A, but it has not been offered.

10        MS. BOOTH:  I just remembered that, Your Honor.

11        THE COURT:  Okay.

12        MS. BOOTH:  I'd like to offer Defendant's Exhibit A

13   into the record.

14        THE COURT:  Any objection, Mr. Sorrell?

15        MR. SORRELL:  No.

16        THE COURT:  Okay.  Defendant's A will be accepted

17   into evidence.

18        And there was no evidence from you.  Is that right?

19        MR. SORRELL:  No rebuttal.

20        THE COURT:  You have rebuttal?

21        MR. SORRELL:  No, I do not.

22        THE COURT:  Okay.  Okay.  I mean -- I'm sorry --

23   there weren't any exhibits.

24        MR. SORRELL:  Exhibits, yes.

25        THE COURT:  I used the wrong word.  Sorry about that.

```
 1    Thank you.  Yeah, you definitely presented some evidence,
 2    didn't you?
 3              MR. SORRELL:  Yes.
 4              THE COURT:  You had witness testimony.
 5              So with that, is there any further evidence,
 6    Ms. Booth?
 7              MS. BOOTH:  No, Your Honor, there isn't.
 8              THE COURT:  Okay.
 9              MR. SORRELL:  Judge, I'll order a transcript --
10              THE COURT:  Okay.
11              MR. SORRELL:  -- as soon as we -- as soon as I get
12    back to the office.  And I assume that Ms. Booth will want to
13    supply a brief.  I don't know, but if she does, I'd like to
14    respond.
15              MS. BOOTH:  I would like to do so.
16              THE COURT:  Okay, very well.  So once the transcript
17    is completed, how much time would you like, Ms. Booth, in
18    order to prepare your written post-hearing memorandum?
19              MS. BOOTH:  Your Honor, two weeks will be sufficient.
20              THE COURT:  Okay.  And then for you, Mr. Sorrell?
21    Would you like an additional two weeks after that?
22              MR. SORRELL:  Yes, Your Honor, please.
23              THE COURT:  Okay.  So two weeks for both sides is
24    fair.
25              And so what this means for you, Mr. Swan, is we're
```

1  still a distance away from getting an answer to your

2  questions, the issues that you've raised as to whether or not

3  your statement to Officer Kemp should be suppressed.  And so

4  it's going to take a little bit of time for that transcript to

5  be prepared.  Then Ms. Booth has two weeks to file her written

6  response, and Mr. Sorrell will have an additional two weeks.

7  So we're looking at over a month already.  And then I have to

8  consider what everybody has argued.

9        THE DEFENDANT:  Okay.

10        THE COURT:  So it's going to be a little while.

11        THE DEFENDANT:  What -- What exactly -- What do I

12  have to submit?  What is being submitted?

13        THE COURT:  So regular practice is for the lawyers,

14  after having heard the evidence and testimony of the

15  individuals who have knowledge of the underlying conduct that

16  you've challenged, for them to write about it and argue how

17  the law applies to those facts.  So I'll want to hear both

18  sides, what their theories are; I mean for you and Ms. Booth,

19  why those statements should be suppressed.

20        THE DEFENDANT:  Yes, ma'am.

21        THE COURT:  And then Mr. Sorrell will have an

22  opportunity because we know he disagrees.  He hasn't conceded.

23  He's conceded one part of the statement.  He said that your

24  statement you're not going to talk, the Government has no

25  intention of offering that evidence at trial.  So it's the --

```
1    the rest of your statement that the Government is interested
2    in presenting as evidence during the trial.  So they will
3    defend why they believe it will be proper for that statement
4    to be admitted into evidence.
5             So I will wait and consider the arguments of both
6    sides before I actually make a decision and a recommendation
7    to your trial judge.
8             THE DEFENDANT:  Yes, ma'am.
9             THE COURT:  Does that make sense?
10            THE DEFENDANT:  Yes, ma'am.
11            THE COURT:  Okay.  Do you have any other questions?
12            THE DEFENDANT:  No, ma'am.
13            THE COURT:  Anything further from either attorney?
14            MR. SORRELL:  No, Your Honor.  Thank you.
15            THE COURT:  All right, very well.  So, like I said,
16   it's going to take a little while.  It's going to be at least
17   two months, probably somewhere around there, before you have
18   an answer to the question, but I know we'll all act as quickly
19   as we can.  It just takes some time.
20            So for now, you will be remanded to the custody of
21   the Marshals, and Court is adjourned.  Thank you, all.
22            MR. SORRELL:  Thank you, Judge.
23            (Hearing adjourned at 11:10 AM.)
24
25
```

CERTIFICATE OF OFFICIAL REPORTER


        I, Deborah A. Kriegshauser, Federal Official Realtime

Court Reporter, in and for the United States District Court

for the Eastern District of Missouri, do hereby certify that

pursuant to Section 753, Title 28, United States Code, that

the foregoing is a true and correct transcript of the

stenographically-reported proceedings held in the

above-entitled matter and that the transcript page format is

in conformance with the regulations of the Judicial Conference

of the United States.

        Dated this 17th day of January, 2019.



                        /s/ Deborah A. Kriegshauser
                        _____
                        DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
                        FEDERAL OFFICIAL COURT REPORTER