IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.   1:18CR00098 SNLJ (ACL) |
| | ) | |
| BARRETT C. SWAN, | ) | |
| | ) | |
| Defendant. | ) | |

## POST SUPPRESSION HEARING BRIEF

In support of his previously filed motion to suppress illegally obtained evidence, Barrett Swan states the following in light of the testimony heard at the suppression hearing:

**Barrett Swan's statements were obtained in violation of his Fifth Amendment rights:**

Officer Jonathan Kemp obtained incriminating statements during an attempt to interview Mr. Swan about the subject gun without first advising Mr. Swan of his Miranda rights.  As such, Mr. Swan's motion to suppress should be granted.  There is no dispute that Mr. Swan was in custody when the alleged statements at issue were made, and there is no dispute that Mr. Swan was never advised of his Miranda rights.  *See* Transcript (hereinafter "TR") p. 16 lines 9-18.  The issue is whether Mr. Swan's statements were the product of express questioning or words or conduct that Officer Kemp should have known were reasonably likely to elicit an incriminating response from Mr. Swan.

**Facts, law and analysis:**

According to Officer Kemp's testimony at the hearing, he never made an attempt to actually interview Mr. Swan about the gun and kept the questioning of Mr. Swan confined to routine, biographical and booking topics immediately prior to Mr. Swan making the alleged

1

statements at issue:

> Q: Now did you speak again with Mr. Swan?
> A: I spoke with him while inventorying his property and providing him with a change of clothes, yes, sir.
> Q: And when you say "inventorying his property," do you mean personal effects in his pockets and things like that?
> A: Yes, sir.
> Q: Okay.  And what was the subject of that conversation?  Can you tell the Court what was said back and forth?
> A: I told him upon completion of the booking process, that he would be escorted to an Interview Room and given the opportunity to talk about the firearm."
> Q: And how did Mr. Swan respond?
> A: He stated to the effect of, "I'm not going to talk; we both know what you found in the car, and I'd rather be in the situation I'm in now than the situation that I was in in the past when I was shot and didn't have anything on me."
> Q: Okay.  And those words are the substance of what Mr. Swan said.  Is that fair?
> A: Yes, sir.
> Q: It's not an actual quotation.
> A: That's correct, sir.
> Q: Okay.  I don't want to mislead the Court as to what – what you recall about that.
> A: Yes, sir.
> Q: Now prior to Mr. Swan making the statement, did you ask any question of Mr. Swan – of Mr. Swan that would require that answer?
> A: No, sir.
> Q: Did he – did he make that statement all as one statement?
> A: Yes, sir.
> Q: Okay.  That is, there wasn't an intervening question on your part?
> A: No, sir.
> Q: Did you continue to speak with Mr. Swan?
> A.  No.  He indicated that he did not want to speak.
> Q: So basically that was the end of your contact with him?
> A: Correct, sir.

TR p. 14 lines 5 through p.15 line 17.

On cross examination, Officer Kemp testified that this conversation occurred in the "holdover area" of the police station where the lockers and jumpsuits are located.  *See* TR p. 19 lines 17-23.

However, according to a witness called by the defense, ATF Agent Brian Eggers, Officer

2

Kemp told Agent Eggers a different version of events regarding the circumstances under which Mr. Swan made the alleged statements. According to Officer Eggers, Officer Kemp actually attempted to interview Mr. Swan while walking Mr. Swan back to some location while Mr. Swan was in Officer Kemp's custody:

> Q: So, Agent Eggers, you've brought your report here today. And, obviously, what I'm showing you on the monitor, which I will mark as Defense Exhibit A, is a fair and accurate representation of your report?
> A: Yes, it is.
> Q: Okay. So let's go down to paragraph 3, and we'll look at this sentence here. "Kemp later tried attempted to conduct an interview of Swan;" correct?
> A: Yes.
> Q: Okay. Can you tell me what information Officer Kemp gave you that you would make that conclusion he was attempting to conduct an interview of Swan?
> A: Officer Kemp told me that he tried to interview Mr. Swan. Mr. Swan said that he didn't want to talk. And so as he was walking him back, wherever – wherever – I guess I'm assuming up in Florissant, is when he made the statement that he made.
> Q: Okay. So in going back to your memory, certainly you're remembering everything accurately. We see this line in your report, "Kemp later attempted to conduct an interview of Swan," because that's what Officer Kemp told you.
> A: Correct.
> Q: "I" – "He said, "I attempted to conduct an interview of Swan."
> A: Yes, ma'am.
> Q: Officer Kemp didn't say anything to you to the effect that he just was talking about particulars during the booking process and may take Barrett upstairs for interviewing, and then Barrett just spontaneously uttered this statement, anything like that?
> A: He didn't give me details. He just said he attempted an interview.
> TR p. 38 line 15 through p. 39 line 20.

Officer Kemp's testimony about whether he was actually in the process of formally interviewing Mr. Swan about the gun is at odds with ATF Agent Eggers' testimony about what

3

information was relayed to him by Officer Kemp.  According to Officer Kemp, he didn't include Mr. Swan's statement in a police narrative because Officer Kemp did not recognize the relevance of the statement (*See* TR p. 15 lines 18-23).  It is not plausible that Officer Kemp would not recognize that the alleged statement was relevant evidence to show knowledge and intent to possess the subject gun.  On cross examination, Officer Kemp expounded on another reason why he didn't include Mr. Swan's statement and the particulars surrounding the environment in which the statement was made:

> Q:  And, Officer Kemp, after it came to light that this statement was made by Mr. Swan, you realized that you had not included that in your police report.  Is that correct?
> A:  Correct.
> Q:  At that point did anyone ask you to create a supplement report to explain and memorialize when this statement happened and the subject matter, that type of thing?
> A:  I believe whenever I was contacted by the agent and I advised him of the statement, he stated that it was going to be added to his report and that –that it would be in that report and nothing further in mine.
> TR p. 19 lines 6-16.

However, according to ATF Agent Eggers, he asked Officer Kemp to specifically add the circumstances surrounding the statement made by Mr. Swan in a supplemental report upon realizing that Officer Kemp never included that information in his police narrative.  *See* TR p. 34 line 17 through p. 35 line 20.  Agent Eggers specifically remembers asking Officer Kemp to forward a supplemental report when Agent Eggers was asked to obtain a supplemental report by Special Assistant U.S. Attorney Angel Woodruff.  *See* TR p. 36 lines 7-19.

Whether the alleged statements were made while Officer Kemp was in the process of obtaining routine data and not the product of any type of attempt to question Mr. Swan about guilt is a key point.  It is well settled that routine biographical data is exempted from Miranda coverage.

*U.S. v. Brown*, 101 F.3d 1272, 1274 (8th Cir. 1996) (citations omitted).  However, "A question is an interrogation if it is 'reasonably likely to elicit' incriminating information.  *Pennsylvania v. Muniz*, 496 U.S. 582, 600-01 (1990).  The exception for routine information necessary for basic identification and booking purposes does not apply when "the government agent should reasonably be aware that the information sought…is directly relevant to the substantive offense charged."  *Brown* at 1274 (quoting *U.S. v. McLaughlin*, 777 F2d 388, 391-92 (8th Cir. 1985)).

    If Agent Eggers is to be believed, and the alleged statements were made during a formal attempt by Officer Kemp to interview Mr. Swan, the lack of Miranda warnings prevents the government from using the statements against Mr. Swan.  Agent Eggers testimony should be believed.   It makes no sense why Officer Kemp would not include Mr. Swan's alleged statements in a police narrative unless the narrative of how the statements came to be is tainted with untruth.  It is difficult to believe that Officer Kemp is telling the truth that he was advised by Agent Eggers to not worry about including the circumstances of the alleged statements in a supplemental police narrative when Agent Eggers specifically testified that he requested a supplemental report from Officer Kemp and received no reply.   Officer Kemp's credibility is also affected by the fact that he cannot explain why he put the wrong date of Mr. Swan's arrest in the police narrative when the narrative was allegedly written on the same day Mr. Swan was arrested.  *See* TR p. 18 lines 5-18.  Officer Kemp's credibility is also effected by the fact that he left out this piece of critical exculpatory evidence from his police narrative:   The fact that the driver of the car, Tiara Thorpe, admitted to Officer Kemp that the seized firearm was hers.  *See* TR p. 20 line 24 through p. 21 line 13.   The fact that Officer Kemp never relayed the information about Tiara Thorpe to Agent Eggers despite having several conversations with Agent Eggers discussing the facts of the case is concerning.  *See* TR p. 24 lines 10-16 and p. 40 lines 4-10.   It is concerning because the failure to do so indicates that Officer Kemp's ability to tell or remember the complete truth is flawed.

5

**Conclusion**:

Officer Kemp's testimony as to how Mr. Swan's alleged statements were produced it not credible when compared to the credible testimony of ATF Agent Eggers.  Mr. Swan's statements were the product of Officer Kemp's attempt to interview Mr. Swan about the gun just as Agent Eggers testified at the suppression hearing.  As such, and because no Miranda warnings were given prior to the statements being uttered, the statements were obtained in violation of Mr. Swan's Fifth Amendment rights.  Mr. Swan requests the Court grant his motion to suppress illegally obtained evidence.

Respectfully submitted,

/s/Jennifer L. Booth
Jennifer L. Booth
Assistant Federal Public Defender
325 Broadway, 2nd Floor
Cape Girardeau, Missouri 63701
Telephone: (573) 339-0242
Fax: (573) 339-0305
E-mail: Jennifer_booth@fd.org

ATTORNEY FOR DEFENDANT

**CERTIFICATE OF SERVICE**

I hereby certify that on January 31, 2019, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon Angel Woodruff, Assistant United States Attorney.

/s/Jennifer L. Booth

Jennifer L. Booth