IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 1:18CR00098 SNLJ |
| | ) | |
| BARRETT C. SWAN, | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S POST-HEARING MEMORANDUM**

Comes now the United States of America, by and through its attorneys, Jeffrey B. Jensen, United States Attorney for the Eastern District of Missouri, and Keith D. Sorrell, Assistant United States Attorney for said District, and for its Post-Hearing Memorandum, states as follows:

This Memorandum is to address the issues raised by Barrett Swan in his Post Suppression Hearing Brief (DCD 54) as to whether a statement that he made to his arresting officer should be suppressed. The Government contends that the contested portion of the statement was voluntary, and not in response to interrogation. Swan contends that the statement was "the product of express questioning or words or conduct that Officer Kemp should have known were reasonably likely to elicit an incriminating response from Mr. Swan." (DCD 54, Swan's Post Suppression Hearing Brief, p. 1)

TESTIMONY AT SUPPRESSION HEARING

Jonathan Kemp testified for the Government at the suppression hearing.  Kemp is a patrol officer for the City of Florissant, Missouri, and has been for over four years.  He was on patrol around 3:20 a.m. on August 1, 2018, near a stop sign on Dunn Road.  Kemp observed that a red Ford Edge vehicle failed to stop at that stop sign.  Kemp turned on his emergency lights on his patrol car and pulled the Edge over.  (Tr. pp. 5-7)

Kemp exited his patrol vehicle and walked up to the Edge.  He made contact with the driver, Tiara Thorpe.  Thorpe provided her drivers' license at Kemp's request.  Kemp noticed that there was a male passenger seated in the right front passenger seat of the Edge.  Kemp asked that man for his identification.  The man responded that he did not have a drivers' license but told the officer his first and last name, his date of birth and his social security number.  Kemp returned to his patrol car to check the identities of the driver and passenger of the Edge.  Kemp was able to enter their information on the computer in his patrol car.  He learned that Thorp's drivers' license was valid and that she did not have any arrest warrants.  (Tr. pp. 8-9)

Kemp did not have the same result with the passenger's information.  Kemp learned that the identity of the information provided by the Edge passenger was different from the obvious appearance of the passenger.  Kemp believed that the social security information provided by the male passenger turned out to be the information for a female.  Kemp walked back to the Edge to speak with the male passenger again.  Kemp told the man that his information was inconsistent with the man's appearance and asked the man to provide his information.  Kemp explained that, if he was unable to provide correct information, that Kemp would take the man to the police station for fingerprinting and identification.  Kemp told the man that "You might as well make it easier on yourself."  (Tr. pp. 9-10)

At this point, the man told Kemp that his name was Barrett Swan and provided another social security number.  Kemp went back to his patrol car to enter that information on his computer.  He quickly learned that there was an active federal arrest warrant for Barrett Swan. Kemp went back to the Edge and contacted Swan.  Kemp requested that Swan step out of the Edge and told Swan that he was arrest for the active arrest warrant.  Swan stepped out of the car. At the time that Swan stepped out of the car, Kemp was standing on the outside of the passenger door, with the door between him and Swan.  (Tr. pp. 10-11, 28)

When Swan stepped out of the car, Kemp looked at the seat where Swan had been sitting. He observed the butt end of a pistol on that seat.  The barrel of the pistol was pointing toward the passenger door.  Kemp placed Swan in handcuffs and secured the pistol.  Swan asked if he could say good bye to Thorpe.  Kemp agreed and allowed Thorpe to walk back to the patrol car to speak to Swan.  During that conversation, Swan made the statement to Thorpe that "I'm done" or "I'm finished."  Kemp issued traffic citations to Thorpe.  Thorpe then got in her car and drove away.  Kemp transported Swan to the Florissant police headquarters.  (Tr. pp. 11-13, 22, 27, 28)

Swan was taken to the "holdover" room at the police station.  The "holdover" room is where the officers hold persons who are going to be transferred to the county jail or a different police department.  Kemp completed his paperwork on the traffic stop and re-contacted Swan in the holdover room.  Kemp took an inventory of Swan's personal effects and provided Swan with a change of clothes.  (Tr. pp. 13-14)

After completing the property inventory and dressing Swan, Kemp told Swan that Swan would be escorted to an interview room and given the opportunity to talk about the firearm. Swan responded by making a statement to the effect of: "I'm not going to talk.  We both know

3

what you found in the car and I'd rather be in the situation I'm in now than the situation that I was in in the past when I was shot and didn't have anything on me." Prior to Swan making this statement, Kemp had not asked any questions about the firearm. Kemp did not interrupt the statement reported above; Swan make the statement as one continuous statement. Kemp did not make any further attempt to speak with Swan. Kemp did not report Swan's statement in his report. Kemp did not give Swan a Miranda warning at any time during the events reported above. (Tr. pp. 14-16, 20)

Cape Girardeau Police Officer Brian Eggers testified at the request of Swan. Eggers is also an ATF Task Force officer. Eggers spoke to Officer Kemp about Swan's arrest. Eggers initially believed that he spoke to Kemp on August 8, but later agreed that he spoke to Kemp on the night of Swan's arrest, which was August 1. Eggers did not take any notes about this conversation; he simply tried to remember the conversation for his reporting purposes. Eggers finalized his report of the arrest on August 27. That report was generated from Eggers' memory and by Eggers' reviewing Kemp's police reports. (Tr. pp. 30-33)

Eggers noted that Kemp did not include Swan's statement in Kemp's report. Eggers believed that he requested that Kemp write a supplemental report and include the statement. Kemp did not write any supplemental report. (Tr. pp. 35)

In Eggers' report of his conversation with Kemp, Eggers reported that "Kemp later attempted to conduct an interview of Swan." Eggers reported that Kemp orally told him that Kemp tried to interview Swan and that Swan didn't want to talk. (Tr. pp. 38-39)

ARGUMENT

4

The main point of contention for this motion appears to be whether an officer's "attempt" to obtain an interview amounts to statements that are reasonably likely to elicit incriminating information.  Swan argues that even an attempt to obtain an interview amounts to conduct that is designed to elicit incriminating information.  In doing so, Swan focuses on the characterization of the process as an attempted interview and ignores the words spoken by the officer.  Swan's argument to this effect is certainly not supported by any authority as to that point.  Swan does not cite even one case where an officer's request for an interview has been held to be reasonably likely to elicit an incriminating response.  In fact, the relevant authority focuses on the officers words and conduct and whether those words or conduct would reasonably be expected to generate a responsive answer from the defendant.

*Miranda,* 384 U.S. at 444, 86 S.Ct. 1602 (1966), prohibits the government from introducing into evidence statements made by the defendant during a custodial interrogation unless the defendant has been previously advised of his fifth amendment privilege against self-incrimination and right to an attorney.  The requirements of *Miranda* arise only when a defendant is both in custody and being interrogated.  *United States v. Head,* 407 F.3d 925, 928 (8th Cir.2005).  Interrogation includes both direct questioning by officers and words or actions that officers should know are "reasonably likely to elicit an incriminating response from the suspect."  *Id.*  (quoting *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682 (1980)).  Voluntary statements that are not in response to interrogation are admissible with or without the giving of *Miranda* warnings.  *Head,* 407 F.3d at 928.

One case with facts similar to Swan's is *United States v. Head*, 407 F.3d 925 (8th Cir. 2005).  Head was arrested by tribal officers for his participation in an assault.  While Head was in custody at the Red Lake Tribal Jail, an FBI agent came to talk with Head.  The agent told

Head that Head had been charged with tribal offenses, but that he was not currently charged with federal offenses.  The agent then told Head that the agent wanted to talk with Head about what had happened earlier that morning.  Head responded that he had "only been involved in capturing and holding a drug dealer, Alex Garcia, for the police," and that Garcia had tried to kidnap his daughter.  *Id.* at 927.  After his arrest on federal charges, Head filed a motion to suppress that statement.  The district court denied Head's motion to suppress the statement.  The *Head* Court affirmed the district court's decision, noting:

> . . . Agent Egelhof had no reason to know that informing Head that he wanted "to talk to him about what had occurred that morning" would elicit an incriminating response.  Accordingly, although Head was in custody, Agent Egelhof's statement to him did not constitute an interrogation.

*Head*, 407 F.3d at 929.

A similar situation arose in *United States v. Jackson*, 2015 WL 13344108 (D. North Dakota Aug. 5, 2015).  Jackson had been arrested on tribal charges for an assault in Indian country.  Jackson was transported to a jail and held there.  Federal agents came to visit with Jackson.  They obtained some personal biographical information from Jackson, as well as swabbing Jackson's fingers for blood evidence.  While the swabs were being collected, an agent asked Jackson about the events that occurred earlier that same day.  Jackson responded that he would rather have an attorney present when he discussed that subject.  The agents did not ask any other questions of Jackson.  However, just after telling the agents that he wanted an attorney present for any interview, Jackson stated that he had been "slamming" methamphetamine for several days.  Jackson made some more statements that tended to incriminate him.  *Id.* at * 1.

After his arrest, Jackson moved to suppress the statements reported above.  The district court found as follows:

> Based upon the totality of the record, it cannot be said that Agents Coulter, Bennett, and White should have known that their conversation with Jackson was reasonably likely to elicit an incriminating response.
>
> . . .
>
> Here, the Court similarly concludes FBI Special Agent Bennett had no reason to know the general inquiry into the events of the evening could elicit an incriminating response.  If fact, Agent Bennett's question did not elicit an incriminating response on the part of Jackson.  Such a statement by Agent Bennett, clearly indicating a desire to initiate a discussion about events surrounding the arrest, does not [ ] constitute an "interrogation" for purposes of *Miranda.*

*Jackson*, 2015 WL 13344108, * 3.

Swan's facts present the identical situation where the officer merely informed Swan that he would like to talk about the evening's events in the interrogation room.  That statement by Officer Kemp was merely a statement of fact and was not a question seeking incriminating responses.  In fact, Swan responded by stating that he did not want to make a statement.  If Swan would have followed his own direction and stopped speaking at that point, there would not be any evidence to suppress.  But Swan continued to speak, at his own choice.  His statement that he is now attempting to suppress is simply a volunteered statement.  It was not in response to any question posed by Kemp.  Other cases discuss the point that a defendant's voluntary response to an officer's statement of fact is not suppressible as a response to interrogation.

In *United States v. Barnes*, 195 F.3d 1027, 1029 (8th Cir. 1999), the defendant had invoked his right to remain silent.  Following that invocation, the officers told Barnes that he was going to be booked for possession of a firearm.  Barnes replied that he didn't think so.  The officer asked what Barnes meant by that statement.  Barnes replied that it was not illegal for him to have a gun while he was a convicted felon.  Barnes filed a motion to suppress that statement. The *Barnes* Court found that Barnes' statements were spontaneous and that the officer's remark to Barnes that Barnes was going to be charged with possession of the firearm was a statement of fact, not the functional equivalent of interrogation.  *Id.*

In *United States v. McGlothen*, 556 F.3d 698 (8th Cir. 2009), a police officer told McGlothen that he was going to be charged with being a felon in possession of a firearm.  Upon hearing those words, McGlothen stated that the gun was his and that he bought it for protection. *Id.* at 700.  Later, McGlothen moved to suppress that statement.  The *McGlothen* Court found that the officers words indicating that McGlothen was to be charged with possession of the firearm were statements of fact, and not the functional equivalent of interrogation.  *Id.* at 702.

In *United States v. Howard*, 532 F.3d 755 (8th Cir. 2008), Howard moved to suppress statements made by him after the officers placed him under arrest and while he was in the police station.  At that time, the officers told Howard that they were in the area he was in because of complaints about gang activity and shots being fired.  Howard then made an incriminating statement about his activities, prior to any *Miranda* warning.  The *Howard* Court found that the officers statements were not interrogation and were not designed to elicit an incriminating response.  *Id.* at 762.

A similar situation arose in *United States v. Londondio*, 420 F.3d 777 (8th Cir. 2005).  In that case, the defendant was arrested with four other persons for controlled substance offenses. Co-defendant Jaramillo spoke both English and Spanish and the other four defendants spoke Spanish.  The officers asked Jaramillo to assist them in booking the other four defendants by translating their answers to routine booking questions.  During that process, Jaramillo stated that he had been promised money in exchange for his role in the cocaine transaction.  *Id.* at 783. Later, Jaramillo moved to suppress that statement, arguing that the officers' use of him to interpret "was a police strategy designed to elicit an involuntary and incriminating statement.  *Id.* The district court, and the Eighth Circuit disagreed.  The Court noted that the only question asked of Jaramillo was whether he was willing to assist in the bookings of his co-defendants.  *Id.* The Court found that "Nothing in the record indicates that Olson anticipated that his request for assistance would cause Jaramillo to make an incriminating remark."  *Id.*  Further, nothing in the record indicated that the officers intended to circumvent *Miranda* by obtaining Jaramillo's assistance in the booking procedure.  *Id.* at 784.

Officer Kemp's statement that he would be taking Swan to an interview room and given the opportunity to talk about the firearm is simply a statement of fact.  It was not a question and was not an attempt to have Swan talk about the event at that time.  There was no interrogation, and therefore, no requirement of a *Miranda* warning.

Swan attempts to escape this conclusion by claiming that Officer Eggers reported that the statements were made by Swan "during a formal attempt by Officer Kemp to interview Mr. Swan."  (DCD 54, Swan's Post Suppression Hearing Brief, p. 4)  This is a mis-characterization of what was occurred.  At the time of Officer Kemp's statement of fact, there was no "interview" being conducted, and therefore, no requirement of a *Miranda* warning.  The procedural

safeguards of *Miranda* are not automatically required when a suspect is simply in custody. *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980).   Officer Kemp did inform Swan that he was going to a place where they could talk about the event, but no interrogation had taken place at that point.

Swan focuses on his characterization that there was an "attempted interview" going on at the time that Officer Kemp made his statement of fact.  Swan mostly ignores whether Kemp's statement was interrogation for purposes of *Miranda*, primarily because the overwhelming weight of authority is against his position.  An examination of Kemp's statement clearly reveals that it was a statement of fact and was clearly not interrogation.  Since the statement was not interrogation, Swan's statement is admissible as a volunteered statement, even without a prior *Miranda* warning.

Respectfully submitted,

JEFFREY B. JENSEN
UNITED STATES ATTORNEY

/s/ Keith D. Sorrell
KEITH D. SORRELL, #38283MO
ASSISTANT UNITED STATES ATTORNEY
555 Independence, 3rd Floor
Cape Girardeau, MO 63703
(573) 334-3736

## CERTIFICATE OF SERVICE

I hereby certify that on February 14, 2019, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the following:

Jennifer Booth
Attorney for Defendant

/s/ Keith D. Sorrell
KEITH D. SORRELL, #38283MO
ASSISTANT UNITED STATES ATTORNEY