1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF MISSOURI
2               SOUTHEASTERN DIVISION

3    UNITED STATES OF AMERICA,

4          Plaintiff,

5          vs.              Cause No. 1:18CR98 SNLJ

6    BARRETT C. SWAN,

7          Defendant.
     ===============================================
8               TRIAL DAY 1 OF 2
                 PAGES 1 - 294
9
     BEFORE THE HONORABLE STEPHEN N. LIMBAUGH, JR.
10            UNITED STATES DISTRICT JUDGE

11               JULY 8, 2019

12   ===============================================

                 APPEARANCES
13
     For Plaintiff:
14
     Mr. Keith D. Sorrell
15   Ms. Angel Woodruff
     Assistant United States Attorneys
16   555 Independence, Room 3000
     Cape Girardeau MO 63703
17
     For Defendant:
18
     Ms. Jennifer L. Booth
19   Mr. Scott Tilsen
     Assistant Federal Public Defenders
20   325 Broadway
     2nd Floor
21   Cape Girardeau MO 63701

22               Reported by:

23   Alison M. Garagnani, CCR #475, CSR, RMR, CRR
                Official Court Reporter
24          United States District Court
            555 Independence, Room 3100
25            Cape Girardeau, MO 63703
                 (573) 331-8832

                        1

I N D E X

Page

July 8, 2019

Pretrial Motions                                              6

Trial:

Venire panel sworn and instructions read                    12

Government's Voir Dire Examination by                       23
Mr. Sorrell
Defendant's Voir Dire Examination by                        44
Ms. Booth

Jury Sworn and Instructions Read                            62

Government's Opening Statement by                           76
Ms. Woodruff
Defendant's Opening Statement Ms. Booth                     86

GOVERNMENT'S EVIDENCE:

KYLE EVANS:
    DIRECT EXAMINATION BY MS. WOODRUFF                      106
    CROSS-EXAMINATION BY MS. BOOTH                          129

RODNEY EDWARDS:
    DIRECT EXAMINATION BY MS. WOODRUFF                      141
    CROSS-EXAMINATION BY MS. BOOTH                          150
    REDIRECT EXAMINATION BY MS. WOODRUFF                    154

GABRIEL YODER:
    DIRECT EXAMINATION BY MS. WOODRUFF                      155
    CROSS-EXAMINATION BY MS. BOOTH                          167

BRETT HELLMANN:
    DIRECT EXAMINATION BY MS. WOODRUFF                      175
    CROSS-EXAMINATION BY MS. BOOTH                          199
    REDIRECT EXAMINATION BY MS. WOODRUFF                    204

STEVEN FOWLER:
    DIRECT EXAMINATION BY MS. WOODRUFF                      209
    CROSS-EXAMINATION BY MS. BOOTH                          212
    REDIRECT EXAMINATION BY MS. WOODRUFF                    214

KRISTY PENNINGTON:
    DIRECT EXAMINATION BY MR. SORRELL                       214

1

<u>I N D E X   C O N T I N U E D</u>

<u>Page</u>

2

JONATHAN KEMP:

3    DIRECT EXAMINATION BY MR. SORRELL            222
     DIRECT EXAMINATION CONTINUED BY             237

4  MR. SORRELL
     CROSS-EXAMINATION BY MS. BOOTH              253

5    REDIRECT EXAMINATION BY MR. SORRELL         273

6  BRIAN EGGERS:
     DIRECT EXAMINATION BY MR. SORRELL           277

7    CROSS-EXAMINATION BY MS. BOOTH              285

8  Government Rests                              288

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## EXHIBIT INDEX

Government's

| Exhibit | Description | Id | Rec'd |
|---------|-------------|-----|-------|
| 1 | Photo | 125 | |
| 2 | Photo | 126 | |
| 3 | Photo | 178 | |
| 4 | Photo | 165 | |
| 5 | Photo | 166 | |
| 7 | Photo | 186 | |
| 8 | Photo | 187 | |
| 9 | Box | 189 | |
| 10 | Aerial Map | 111 | |
| 11 | Box | 243 | |
| 12 | Indictment | 283 | |
| 13 | Trace Report | 127 | |
| 14 | CAD Report | 218 | |
| 15 | Summary Log | 230 | |
| 16 | DVD | 217 | |

Deft's

| Exhibit | Description | Id | Rec'd |
|---------|-------------|-----|-------|
| A | Map | 129 | |
| B | Photo | 138 | |
| C | Photo | 174 | |
| D | Photo | 170 | |
| F | Photo | 201 | |
| O | Florissant Police Department Incident Report | 270 | |
| R | ATF Trace Report | 263 | |

4

1    (THE FOLLOWING PROCEEDINGS WERE HELD

2    IN OPEN COURT AND WITH THE DEFENDANT PRESENT:)

3    (THE PROCEEDINGS BEGAN AT 9:10 A.M.)

4

5    **T R I A L**

6

7    The trial began on Monday the 8th day of

8    July, 2019, and concluded on Tuesday the 9th day

9    of July, 2019, before the Honorable Stephen N.

10   Limbaugh, United States District Judge, of the

11   Eastern District of Missouri, Southeastern

12   Division, before a jury and one alternate juror,

13   who were impaneled, selected and sworn.

14        THE COURT:  Good morning.

15        MR. SORRELL:  Good morning.

16        MS. BOOTH:  Good morning.

17        THE COURT:  This case is the United

18   States of America versus Barrett C. Swan.  The

19   Case Number is 18-CR-098.

20        The Government is present by

21   Assistant United States Attorney Keith Sorrell

22   and Assistant United States Attorney Angel

23   Woodruff.

24        The Defendant is present by counsel

25   Jennifer Booth and Scott Tilsen.

1          You are Barrett Swan; is that right?

2          THE DEFENDANT:  Yes, sir.

3          THE COURT:  This matter is set today

4    for a jury trial.  And so we'll have a pretrial

5    conference at this time.

6          MR. SORRELL:  Yes, Your Honor.

7          THE COURT:  The first matter is the

8    Government's filing this week of a notice of

9    intent to rely on 404(b) evidence pertaining to

10   the previous conviction of the felony offense,

11   and in particular the -- it's a firearm offense.

12         MR. SORRELL:  Yes.  Yes, Your Honor.

13         THE COURT:  So is there any

14   objection to that?

15         MS. BOOTH:  No, sir, there is not.

16   And prior to that exhibit being given to the jury

17   Mr. Sorrell and I know we need to use a little

18   bit of whiteout to address a few things, but --

19         THE COURT:  A redaction, you mean?

20         MS. BOOTH:  Yes, sir.

21         THE COURT:  Okay.

22         MR. SORRELL:  There's been a

23   reference to other counts of conviction in the

24   judgment, and we're going to take that out.

25         THE COURT:  Right.  That was all set

1    out in your notice.

2                    MR. SORRELL:  Right.

3                    THE COURT:  Okay.  So the next thing

4    is the Government's motion in limine for

5    determination of admissibility of impeaching

6    information.

7                    I'll allow you to address that, but

8    I think that the motion is well taken.  Do you

9    intend to try to impeach on the DWI offense or

10   whatever it was?

11                   MS. BOOTH:  No, Your Honor.

12                   THE COURT:  So there's no objection

13   then to that motion in limine?

14                   MS. BOOTH:  Correct.

15                   THE COURT:  That's granted as well

16   then.

17                   Any other pretrial matters for the

18   Government?

19                   MR. SORRELL:  No, Your Honor.  Thank

20   you.

21                   THE COURT:  Is the Government ready

22   for trial?

23                   MR. SORRELL:  Yes, sir.

24                   THE COURT:  One thing I would like,

25   though, for purposes of voir dire if you have a

1    witness list so that I can ask the jury if they

2    know any of the witnesses.

3                    MR. SORRELL:  Oh, yes, I believe so,

4    Judge.  Yes.

5                    THE COURT:  Are there any pretrial

6    matters for Defendant?  And before you go into

7    that I do note that you have a request for voir

8    dire questions to ask about racial animus.  I'm

9    not going to ask that, but I'll allow you to ask

10   that question.

11                   MS. BOOTH:  Yes, sir.

12                   THE COURT:  Any other pretrial

13   matters then?

14                   MS. BOOTH:  Judge, would it be all

15   right if my paralegal assistant Julie Dyer sat --

16                   THE COURT:  Yes.

17                   MS. BOOTH:  -- at the table during

18   the voir dire process?

19                   THE COURT:  Yes.

20                   MS. BOOTH:  Thank you.

21                   THE COURT:  Any other pretrial

22   matters for Defendant then?

23                   MS. BOOTH:  Sir, we have stipulated

24   testimony, but that's something we can take up

25   later.  I don't think that's something we have to

1   take up now.

2               THE COURT:  Okay.

3               MS. BOOTH:  Or we can.

4               MR. SORRELL:  We have certain

5   agreements, Your Honor, for stipulated testimony

6   of the exhibits basically for each side we've

7   already agreed that may be admitted.  So we've

8   tried to streamline this process as much as

9   possible, but we can take those matters up if

10  there's any question.  But we've already tried to

11  reduce the amount of foundation questions that

12  would be asked by each side.

13              THE COURT:  All right.  Let's do

14  this, too, then when we have our jury selection,

15  why don't you introduce who's sitting with you at

16  the counsel table.  Same with you, if you can

17  identify your paralegal.

18              MR. SORRELL:  Yes, sir.

19              THE COURT:  So is the Defendant

20  ready for trial?  I think I asked that before.

21              MS. BOOTH:  Yes, sir.  If you'll

22  give me one moment.

23              THE COURT:  Sure.

24              MS. BOOTH:  I want to -- yes, sir,

25  we're ready.

1           THE COURT:  Okay.  I think that's

2    all I need then.  So unless there's any other

3    matters that need to be brought to the Court's

4    attention, we'll ask the jury to come in, and

5    we'll be in recess until then.

6           MR. SORRELL:  Thank you.

7           THE COURT:  Okay.  Thank you.

8           (Proceedings stood in temporary

9    recess.)

10           (Proceedings resumed in open court.)

11           THE COURT:  Good morning, ladies and

12    gentlemen.  My name is Steve Limbaugh, Junior.

13    I'm the resident United States District Judge

14    here in Cape Girardeau.

15           I welcome you to your United States

16    courthouse.  The courthouse is now 11 years old,

17    but it is still one of the most high tech state

18    of the art courthouses in the world.  We're very

19    fortunate to have this facility here in Cape

20    Girardeau.  Otherwise, you'd have to go to

21    St. Louis for your jury service, and all the

22    litigants and the witnesses and everybody

23    involved in the case would have to go up there

24    too.

25           So in any event, during recesses

1   there is a judicial history room just off the

2   entrance that you might be interested in.  The

3   courthouse here is something that I hope you'll

4   visit under other circumstances, one of which is

5   naturalization ceremonies that we have at least

6   once a year.  If you've never seen a

7   naturalization ceremony, it's a very inspiring,

8   uplifting experience, and we have that down in

9   the atrium.

10              But, anyway, I hope you'll make

11  yourself at home down in the public areas and the

12  jury assembly room and the judicial history room.

13              (Instructions Read to the Venire

14  Panel.)

15              THE COURT:  With that, we are about

16  to begin the trial of a criminal case.  This is a

17  prosecution brought by the United States

18  Government against the Defendant Barrett Swan.

19              We will begin with jury selection.

20  And during this part of the trial, I will ask you

21  some questions, and the attorneys will ask you

22  some questions for the purpose of determining

23  whether any of you has any knowledge of the case

24  or the people involved in it and whether you have

25  any feelings about the issues involved in the

1    case that would make it difficult for you to give

2    both sides a fair trial.

3                    Our questions will initially be

4    directed to you as a group, but we will also ask

5    questions of you individually.  We're not trying

6    to embarrass you or invade your privacy by asking

7    these questions.  They're necessary, though, to

8    determine whether or not you would listen to the

9    evidence impartially, follow the law and be fair

10   to both sides.

11                   If you feel uncomfortable answering

12   a question in front of the group, let me know

13   that, and you can come up to the bench off to the

14   side here and give your answer later.

15                   Please understand that you are not

16   permitted to withhold information that is asked

17   of you.  So the first order of business then is

18   for you to take an oath promising to give true

19   and complete answers to our questions, and you

20   must live up to that oath.  So please rise now

21   and be sworn in by the Court Clerk.

22                   (Venire panel sworn and instructions

23   read.)

24                   THE COURT:  Please be seated.

25                   In front of me is our court reporter

1    who is recording everything that is said during

2    these proceedings.  So to make sure that we have

3    an accurate record I must ask you, first, please

4    give your name and badge number when you're

5    answering a question.  And, second, speak loudly

6    and clearly so that everyone can hear you.

7              You will not be allowed to leave the

8    courtroom until we take a recess, but if you need

9    to leave sooner than that, let me know, and I'll

10   try to accommodate you.

11             My first question then is whether

12   any of you have a vision or a hearing problem or

13   some other physical or mental condition that

14   might affect your service on the jury.  Anybody

15   have any problem like that?

16             VENIREPERSON 12:  I have a problem.

17             THE COURT:  Okay.  Juror Number 12.

18             VENIREPERSON 12:  Wilma Berger.  I

19   have problems with my eyes.  I have an eye doctor

20   appointment tomorrow.

21             THE COURT:  Okay.  I'll make a note

22   of that.  You can see the witness stand and the

23   witnesses here, I suppose, can't you?

24             VENIREPERSON 12:  Yes.

25             THE COURT:  And the lawyers would be

1   up at the podium.

2              VENIREPERSON 12:  Yes.

3              THE COURT:  So you should be okay

4   I'm thinking?

5              VENIREPERSON 12:  Yes, I think so.

6              THE COURT:  All right.  Thank you.

7   But I'll make note of that anyway.

8              Someone else?  Yes, Juror Number 4.

9              VENIREPERSON 4:  Juror Number 4.

10             THE COURT:  You may be seated.  The

11  people in the back gallery, I'll need you to

12  stand, but you-all here who are in front don't

13  need to stand unless we can't hear you otherwise.

14             VENIREPERSON 4:  My name is James

15  Rickus.  I'm legally blind in my left eye.

16             THE COURT:  Okay.  Do you think

17  that's going to affect your service, though?

18             VENIREPERSON 4:  I don't think so,

19  sir.

20             THE COURT:  Okay.  Anyone else?

21             (No Response.)

22             THE COURT:  The trial is expected to

23  last two days.  So knowing that, does anyone have

24  any serious and overriding personal situations or

25  commitments at home or at work or otherwise that

1    might prevent you from giving your undivided

2    attention to the proceedings, such as a child

3    who's very ill or a doctor's appointment that

4    cannot be rescheduled?

5              And I'll make a note of your eye

6    doctor's appointment then.

7              So anyone else, knowing now that we

8    have a two-day trial?

9              And Juror Number 11.

10             VENIREPERSON 11:  Megan Stafford.  I

11   have no child care tomorrow for my baby.

12             THE COURT:  Is there a way you can

13   make other arrangements?

14             VENIREPERSON 11:  I've tried.

15             THE COURT:  Okay.  I'll make a note,

16   but --

17             Anyone else?  Juror Number 24.

18             VENIREPERSON 24:  24, Kelly Minghi.

19   I do have child care today but not tomorrow for

20   my two young children, and I'm also supposed to

21   appear in court with a friend tomorrow for an

22   adoption hearing.

23             THE COURT:  Okay.  I'll make a note

24   of that too.

25             Anyone else?

1                    (No Response.)

2                    THE COURT:  The Defendant has been

3      charged in a document that is called an

4      indictment.  The indictment is just an

5      accusation.  It is not proof of anything.

6                    In this case the Defendant, Barrett

7      Swan, is charged with being a felon in possession

8      of a firearm.  This incident is alleged to have

9      occurred on May 26th of last year in Cape

10     Girardeau County.

11                   So with that information has any one

12     of you heard or read anything about this case?

13                   I see no hands.

14                   Does any member of the panel know

15     the attorneys for the Government?  And I'll

16     introduce them now.  It's Assistant United States

17     Attorney Keith Sorrell and Assistant United

18     States Attorney Angel Woodruff.  Any of you know

19     either Mr. Sorrell or Ms. Woodruff?

20                   You may be seated.

21                   MR. SORRELL:  Judge.

22                   THE COURT:  Oh, I'm sorry.  In the

23     back.

24                   VENIREPERSON 40:  I know Mr. -- Tony

25     Chilton, Juror Number 40.  I know Mr. Sorrell.

1  His daughter is married to my cousin.

2  　　　　　THE COURT:  Say that again?

3  　　　　　MR. SORRELL:  His daughter is

4  married to my cousin.

5  　　　　　THE COURT:  Okay.  Do you know him

6  personally, though?

7  　　　　　VENIREPERSON 40:  Not personally,

8  no.

9  　　　　　THE COURT:  So you don't even have

10 an acquaintance really with him?

11 　　　　　VENIREPERSON 40:  I know who he is.

12 　　　　　THE COURT:  Okay.  Well, let me ask

13 you this, though.  Do you think that you can set

14 aside your knowledge of Mr. Sorrell and be

15 absolutely fair both to the Defendant and to the

16 Government?

17 　　　　　VENIREPERSON 40:  Yes, sir.

18 　　　　　THE COURT:  You're certain about

19 that?

20 　　　　　VENIREPERSON 40:  Yes, pretty

21 certain.

22 　　　　　THE COURT:  Well --

23 　　　　　VENIREPERSON 40:  As certain as I

24 can be.

25 　　　　　THE COURT:  Okay.  That's fine.

1    Thank you.

2              Anybody else know any of the other

3    two lawyers?

4              Mr. Sorrell, do you want to

5    introduce the other gentlemen at your table?

6              MR. SORRELL:  Yes, sir.  It's Brian

7    Eggers who's a task force officer with the Bureau

8    of Alcohol, Tobacco and Firearms.

9              THE COURT:  Anybody know this

10   gentleman then?

11             (No Response.)

12             THE COURT:  Let me go through the

13   other people who are in the United States

14   Attorney's Office here in Cape Girardeau.  Paul

15   Hahn is another one.  Tim Willis.  Jack Koester.

16   Any of you know any of those other lawyers who

17   are Assistant United States Attorneys in the Cape

18   Girardeau office?

19             I see no hands.

20             Does anybody know anybody associated

21   or affiliated with the United States Attorney's

22   Office here in Cape Girardeau?

23

24             (No Response.)

25             THE COURT:  Does anybody know any

1    Assistant United States Attorneys anywhere?  I'll

2    ask it that way then.

3              I see no -- I see no hands.

4              All right.  Now, representing the

5    Defendant is Jennifer Booth and Scott Tilsen.

6    Would you both stand.  They're both lawyers in

7    Cape Girardeau.  And I'll ask for your client to

8    stand, Mr. Barrett Swan.

9              Do any of you know either Ms. Booth,

10   Mr. Swan or Mr. Tilsen?

11              (No Response.)

12              THE COURT:  All right.  You may be

13   seated then.

14              And I believe your paralegal is

15   going to sit with you as well?

16              MS. BOOTH:  Yes, Your Honor.  My

17   paralegal, her name is Julie Dyer.

18              THE COURT:  Any of you know any of

19   these people then?

20              All right.  I see no hands.

21              I'm going to go through a list of

22   persons who might possibly be called as witnesses

23   in the case to see if any of you know any of

24   these persons.

25              First is Patrolman Kyle Evans,

19

1    Sergeant Rodney Edwards, Patrolman Gabriel Yoder,

2    Corporal Brett Hellmann, Steven Fowler, Patrolman

3    Jonathan Kemp, Christy Pennington.  And I've also

4    already asked you about Officer Brian Eggers at

5    the table.

6                    Any of you know any of those people?

7                    (No Response.)

8                    THE COURT:  I'll keep going then.

9    Ebony Stigall.  Shavion.  Is that the right

10   pronunciation?

11                   MS. BOOTH:  Yes, sir.

12                   THE COURT:  Shavion Reed or Tiara

13   Thorpe.  Anybody know any of those persons?

14                   I see no hands then.

15                   The Defendant has been accused of

16   committing a crime, but the accusation is not

17   proof that he is guilty.  Is there anyone who

18   does not understand that concept?

19                   (No Response.)

20                   THE COURT:  Let me ask you this:

21   Does anyone have an opinion at this point about

22   whether the Defendant is guilty or not guilty?

23   Anyone have an opinion about that?

24                   (No Response.)

25                   THE COURT:  Because you should not

20

1   have an opinion.

2           Next, I will instruct you that under

3   the law the Government is required to prove the

4   Defendant's guilt beyond a reasonable doubt.  Is

5   there anyone who would not follow that

6   instruction?

7           Again, I see no hands.

8           I will also instruct you that under

9   the law the Defendant is not required to prove

10   that he is innocent.  Instead he is presumed

11   innocent.  And as such he is not required to

12   testify or call any witnesses.

13           Is there anyone who would not follow

14   that instruction?

15           Again, I see no hands.

16           I will also instruct you that the

17   Defendant has a right not to testify.  And if the

18   Defendant decides not to testify, you may not

19   make any adverse inference about his failure to

20   testify.  In other words, you cannot hold that

21   against him.

22           Is there anyone who would not follow

23   that instruction?

24           I see no hands.

25           Next, is there anyone who cannot for

1   whatever reason follow all these instructions

2   that I've read to you and all the other

3   instructions that I'll give to you?  Anyone who

4   cannot follow these instructions?

5           (No Response.)

6           THE COURT:  But let me ask a harder

7   question.  Will each of you follow the Court's

8   instructions whether you agree with them or not?

9   And with that I would hope I would see all hands.

10          All right.  Thank you.  Anybody

11  disagree with that proposition?

12          (No Response.)

13          THE COURT:  Do any of you hold any

14  opinion or belief that might keep you from being

15  a fair and impartial juror in this case?

16          Again, I see no hands.

17          Do any of you have any religious,

18  moral or ethical beliefs that would prevent you

19  from serving on the jury and making a decision in

20  this case that would prevent you, in other words,

21  from sitting in judgment on another person?

22          I see no hands again.

23          And with that counsel for the

24  Government may inquire.

25          MR. SORRELL:  Thank you.

1    Government's Voir Dire Examination by Mr. Sorrell

2              MR. SORRELL:  Counsel.  Ladies and

3    gentlemen, my name is Keith Sorrell, and I work

4    on for the United States of America with the

5    Department of Justice or the Attorney General's

6    Office.

7              You're all qualified to be jurors in

8    this particular case, but there may be reasons

9    why you shouldn't be a juror in this particular

10   case.  So I'll ask a few questions, if I may,

11   about your background and anything that might

12   come up.

13             For example, the statutes of the

14   United States make it a crime for a person who's

15   been previously convicted of a felony -- that is

16   a crime punishable by a term of imprisonment that

17   could exceed one year.  It makes it a crime for

18   that person to possess a firearm.  Does anybody

19   disagree that that ought to be a crime or have a

20   strong feeling one way or the other about whether

21   that that ought to be a crime punishable by the

22   United States?

23             I see no hands.

24             This case will proceed in two

25   counts.  Mr. Swan is charged with two different

1    possessions of two different guns at two

2    different times.  The first event occurred in

3    Cape Girardeau, Missouri.  The second event

4    occurred in Florissant, Missouri, but that will

5    be considered by you here today.

6              Now, does everybody understand you

7    should consider those two events completely

8    separately in terms of deciding whether a person

9    is -- Mr. Swan is guilty or not guilty?  That is,

10   you shouldn't use your finding on one count to

11   determine your finding on the other count.  Does

12   that make sense?

13             (No Response.)

14             MR. SORRELL:  Would anybody be

15   unable to do so?

16             (No Response.)

17             MR. SORRELL:  Does everybody

18   understand that you're to treat every witness the

19   same in terms of how you view them?  That is,

20   whether they're wearing a uniform of a police

21   officer or they're just a citizen that they're

22   all to be treated exactly the same by you.  That

23   I would suggest is that they start out with no

24   finding of credibility by the jury, that you

25   start out just simply deciding what you're going

1     to hear from each witness.

2               Will everyone agree to do that?  And

3     is there anyone here who can't do that?

4               (No Response.)

5               MR. SORRELL:  That is, we want you

6     to treat each and every witness exactly the same

7     regardless of their status, regardless of their

8     occupation.  If there is anyone who will not do

9     that, please let me know.

10               (No Response.)

11               MR. SORRELL:  And is there anyone

12     here who's had a bad experience with a police

13     officer, someone who's had some sort of event

14     that occurred that they thought they were treated

15     unfairly, whether it be a traffic stop, a

16     conversation on the side of the highway, or

17     anything like that?  Anyone who feels like

18     they've been unfairly picked out or unfairly

19     maligned by an officer?

20               I don't see any hands.

21               Is there anyone on the panel who has

22     been arrested for a felony offense, not

23     necessarily convicted, but just arrested?

24               This one may get a few more answers.

25               THE COURT:  There's a --

1          MR. SORRELL:  Oh, I'm sorry.  Juror

2     Number 22, Troy Fiedler; is that right?

3          VENIREPERSON 22:  Fiedler.

4          MR. SORRELL:  Fiedler?  Would you

5     stand up, please, so the court reporter -- and so

6     you were arrested for a felony offense?

7          VENIREPERSON 22:  Yes.

8          MR. SORRELL:  And what offense was

9     that?

10         VENIREPERSON 22:  Domestic assault.

11         MR. SORRELL:  Was that recently?

12         VENIREPERSON 22:  2012.

13         MR. SORRELL:  Okay.  So that case

14    has been resolved at this time?

15         VENIREPERSON 22:  Uh-huh.

16         MR. SORRELL:  Do you believe you

17    were treated fairly by the court system regarding

18    your arrest for that offense?

19         VENIREPERSON 22:  Not from the State

20    attorney, no.

21         MR. SORRELL:  Okay.  What county was

22    that in?

23         VENIREPERSON 22:  Scott.

24         MR. SORRELL:  Scott.  And that was

25    in 2012?

1                    VENIREPERSON 22:  Uh-huh.

2                    MR. SORRELL:  Okay.  All right.  Is

3     there anything about that experience that will

4     cause you a problem hearing the evidence in this

5     case?

6                    VENIREPERSON 22:  No.

7                    MR. SORRELL:  You're shaking your

8     head no; is that right?

9                    VENIREPERSON 22:  Yes, sir.

10                   MR. SORRELL:  Okay.  Thank you.  I

11    don't have any other questions.

12                   Thank you, Judge.

13                   Are there any other members of the

14    panel who have been arrested for a felony

15    offense?

16                   (No Response.)

17                   MR. SORRELL:  Is there anyone on the

18    panel who's had a close family member arrested or

19    convicted of a felony offense?

20                   And by a close family member what

21    I'm looking for or what I'm defining that as is a

22    father, a mother, a daughter, a son, a brother, a

23    sister or an aunt or an uncle.

24                   Anybody first in the jury pool, no

25    one here has had a relative arrested for a felony

1    offense?

2              Then not on the first row but the

3    second row we have some.

4              Let me start with Juror Number 24.

5              THE COURT:  Just a second.  There is

6    one hand.

7              MR. SORRELL:  Oh, I'm sorry.  I'm

8    sorry.  Juror Number 2, and what family member,

9    please?

10             VENIREPERSON 2:  My son.

11             MR. SORRELL:  And what was he

12   arrested for?

13             VENIREPERSON 2:  Drugs.

14             MR. SORRELL:  Drugs.  And was that

15   in federal court or state court?

16             VENIREPERSON 2:  State court.

17             MR. SORRELL:  Okay.  How long ago?

18             VENIREPERSON 2:  About five years

19   ago.

20             MR. SORRELL:  Okay.  Has his case

21   resolved?

22             VENIREPERSON 2:  Yes.

23             MR. SORRELL:  And do you believe

24   that your son was treated fairly by the criminal

25   justice system?

1          VENIREPERSON 2:  I believe he was.

2          MR. SORRELL:  Okay.  And I take it

3    that was resolved to your satisfaction?

4          VENIREPERSON 2:  It was resolved.

5          MR. SORRELL:  Okay.  All right.

6    Would that event affect your ability to hear

7    evidence in this case?

8          VENIREPERSON 2:  No.

9          MR. SORRELL:  Okay.  Thank you very

10   much.

11          All right.  Juror Number 24, I

12   believe you're the next number.  Is that Kelly

13   Minghi?

14          VENIREPERSON 24:  Yes.

15          MR. SORRELL:  And what family member

16   do you have that was arrested?

17          VENIREPERSON 24:  I had an uncle.

18   He's since deceased, though.

19          MR. SORRELL:  I'm sorry?

20          VENIREPERSON 24:  He's since

21   deceased, but it was an uncle.

22          MR. SORRELL:  And what was his

23   offense?

24          VENIREPERSON 24:  Manslaughter.

25          MR. SORRELL:  What county?

1          VENIREPERSON 24:  It was in
2   St. Charles County.
3          MR. SORRELL:  St. Charles.  And do
4   you believe he was treated fairly by the criminal
5   justice system?
6          VENIREPERSON 24:  Yes.
7          MR. SORRELL:  And would anything
8   about that event cause you any problems in
9   hearing evidence and reaching a verdict in this
10  case?
11         VENIREPERSON 24:  No.
12         MR. SORRELL:  Okay.  Thank you.
13         Juror Number 19, would you stand up
14  please.
15         VENIREPERSON 19:  My son.
16         MR. SORRELL:  Okay.  And what was
17  your son arrested for?
18         VENIREPERSON 19:  Property damage I
19  think it was.
20         MR. SORRELL:  Okay.  What county?
21         VENIREPERSON 19:  Cape.
22         MR. SORRELL:  And has his case been
23  resolved?
24         VENIREPERSON 19:  Yes.
25         MR. SORRELL:  How long ago was that?

1      VENIREPERSON 19:  It's been about 10

2  years ago.

3      MR. SORRELL:  Would that event cause

4  you any problems in hearing evidence in this case

5  and coming to a verdict?

6      VENIREPERSON 19:  No.

7      MR. SORRELL:  Okay.  Thank you.

8      Then the next row, Number 29; is

9  that right?

10      VENIREPERSON 29:  My son.  Wayne

11  Montgomery.

12      MR. SORRELL:  Okay.

13      VENIREPERSON 29:  As far as this

14  matter as far as state, because I didn't think

15  about it until I raised my hand, it was in

16  Louisiana.

17      MR. SORRELL:  Oh, no, that's fine.

18  And what relative was it again?

19      VENIREPERSON 29:  My son.

20      MR. SORRELL:  And what was the

21  offense?

22      VENIREPERSON 29:  Second degree

23  assault.

24      MR. SORRELL:  Okay.  And that was in

25  Indiana?

1                 VENIREPERSON 29:  No, Louisiana.

2                 MR. SORRELL:  Louisiana.  I'm sorry.

3  And was -- is his case resolved?

4                 VENIREPERSON 29:  Oh, yeah.

5                 MR. SORRELL:  And how long ago was

6  that?

7                 VENIREPERSON 29:  A year ago.

8                 MR. SORRELL:  And would anything

9  about that event affect your ability to hear

10  evidence and come to a just verdict in this case?

11                VENIREPERSON 29:  No.

12                MR. SORRELL:  Okay.  Thank you.

13                Anyone else in the last row?

14                Yes, sir, Juror Number 31.

15                VENIREPERSON 31:  Charlie Houston.

16                MR. SORRELL:  I'm sorry?

17                VENIREPERSON 31.  Charlie Houston.

18                MR. SORRELL:  Yes.  Yes, sir.  And

19  what relative?

20                VENIREPERSON 31:  My brother.

21                MR. SORRELL:  Pardon me?

22                VENIREPERSON 31:  Brother.

23                MR. SORRELL:  And what was he

24  arrested for?

25                VENIREPERSON 31:  Drugs.

1              MR. SORRELL:  Was that a state or

2    federal case?

3              VENIREPERSON 31:  Federal.

4              MR. SORRELL:  And what's his name?

5              VENIREPERSON 31:  Johnny Lochran.

6              MR. SORRELL:  Oh, okay.  Was that

7    disposed of here in this courthouse?

8              VENIREPERSON 31:  Yes.

9              MR. SORRELL:  How long ago was that?

10             VENIREPERSON 31:  '97.

11             MR. SORRELL:  I'm sorry?

12             VENIREPERSON 31:  '97.

13             MR. SORRELL:  Okay.  And do you

14   believe that your brother was treated fairly by

15   the criminal justice system?

16             VENIREPERSON 31:  No.

17             MR. SORRELL:  Would that cause you a

18   problem hearing evidence in this case?

19             VENIREPERSON 31:  I doubt it.

20             MR. SORRELL:  I'm sorry?

21             VENIREPERSON 31:  I doubt it.

22             MR. SORRELL:  Okay.  You doubt that

23   it would cause you a problem or doubt that you

24   could?

25             And there's no right or wrong

1    answer.  It may be that you harbor an ill will

2    toward the justice system that would affect your

3    view of the evidence.  And that's -- would that

4    be fair to suggest?

5              VENIREPERSON 31:  Yes.

6              MR. SORRELL:  Okay.  So you think

7    you might be tainted a little bit by what

8    happened to your brother?

9              VENIREPERSON 31:  Yes.

10             MR. SORRELL:  Okay.  That's fair

11   enough.  Thank you.

12             Anyone else?

13             Ma'am, number 14?

14             VENIREPERSON 14:  Yeah.  Sandra St.

15   Clair.

16             MR. SORRELL:  Yes, ma'am.

17             VENIREPERSON 14:  My grandson was

18   convicted of drugs.

19             MR. SORRELL:  Was that state or

20   federal?

21             VENIREPERSON 14:  I think it was

22   state.  I don't remember.

23             MR. SORRELL:  All right.  And how

24   long ago was it?

25             VENIREPERSON 14:  Oh, it's been

1    about 12, maybe 12 years.

2              MR. SORRELL:   And has -- that case

3    has resolved itself?

4              VENIREPERSON 14:   Oh, yeah.

5              MR. SORRELL:   Do you believe that

6    your grandson was treated fairly by the criminal

7    justice system?

8              VENIREPERSON 14:   Yes, I do.

9              MR. SORRELL:   Would that case affect

10   your ability to hear evidence in this case?

11             VENIREPERSON 14:   No, sir.

12             MR. SORRELL:   Okay.   Thank you.

13             Anyone else?

14             Sir, Number 3.

15             VENIREPERSON 3:   Don Anderson.   I've

16   had a couple of nephews arrested and sent to

17   prison drugs and probably assault too.

18             MR. SORRELL:   And which relative was

19   that?   Which relative was what?

20             VENIREPERSON 3:   What?

21             MR. SORRELL:   What relative was

22   that?

23             VENIREPERSON 3:   They're nephews.

24             MR. SORRELL:   Okay.   Would that

25   affect your ability to hear evidence in this

```
 1    case?
 2                    VENIREPERSON 3:  No, I don't think
 3    so.
 4                    MR. SORRELL:  Okay.  And how long
 5    ago was that?
 6                    VENIREPERSON 3:  I really don't know
 7    what their ages are.
 8                    MR. SORRELL:  More than 10 years?
 9                    VENIREPERSON 3:  They're in their
10    thirties and forties now, but they're still doing
11    the same things.
12                    MR. SORRELL:  So it's been a while?
13                    VENIREPERSON 3:  Yeah, but it won't
14    cause problems.
15                    MR. SORRELL:  Okay.  Thank you.
16                    Anyone else?
17                    (No Response.)
18                    MR. SORRELL:  Does anyone here have
19    prior jury experience; that is, have you sat on a
20    jury before?
21                    Juror Number 7.
22                    VENIREPERSON 7:  Yeah.  My name is
23    Zach Cypret.
24                    MR. SORRELL:  Yes, sir.
25                    VENIREPERSON 7:  I sat on a jury, I
```

1    think it was in April, for the circuit court.

2                    MR. SORRELL:  In Cape County?

3                    VENIREPERSON 7:  Yeah.  It was a

4    criminal case.

5                    MR. SORRELL:  And without telling me

6    what the verdict was, were you able to reach a

7    verdict?

8                    VENIREPERSON 7:  We were.

9                    MR. SORRELL:  Were you the

10   foreperson?

11                   VENIREPERSON 7:  I was not.

12                   MR. SORRELL:  Okay.  Thank you.

13                   Ma'am, Juror Number -- is it 5?

14                   VENIREPERSON 5:  5, yes.

15                   MR. SORRELL:  All right.

16                   VENIREPERSON 5:  Magen Paukner.  I

17   sat on a jury in Ripley County, a criminal case.

18                   MR. SORRELL:  And were you able to

19   reach a verdict?

20                   VENIREPERSON 5:  Yes.

21                   MR. SORRELL:  How long ago was that?

22                   VENIREPERSON 5:  Probably 11 years

23   ago.

24                   MR. SORRELL:  Okay.  Thank you.

25                   Anyone else in the jury box?

1          Juror Number 13.

2          VENIREPERSON 13:  Chris Barnes.  I

3    was part of the grand jury in Scott County two

4    years ago.

5          MR. SORRELL:  Okay.  All right.  Is

6    there anything about that experience that would

7    cause you a problem hearing evidence in this

8    case?

9          VENIREPERSON 13:  No.

10         MR. SORRELL:  Anyone else?  Juror

11   Number --

12         VENIREPERSON 20:  Arthur Wilhite,

13   Juror Number 20.  I was part of a jury on a child

14   abuse case in the County under Judge Ben Lewis.

15         MR. SORRELL:  So that was a criminal

16   case?

17         VENIREPERSON 20:  Yes.

18         MR. SORRELL:  Were you able to reach

19   a verdict?

20         VENIREPERSON 20:  Yes.

21         MR. SORRELL:  And were you the

22   foreperson?

23         VENIREPERSON 20:  No, I was not.

24         MR. SORRELL:  Okay.  Thank you.

25         VENIREPERSON 20:  Thank you.

1          MR.  SORRELL:   Anyone else?   Juror

2     Number 21.

3               VENIREPERSON 21:   Chris Jeffries.

4               MR.  SORRELL:   Yes.

5               VENIREPERSON 21:   It was a criminal

6     case in Butler County last year, the middle of

7     last year.

8               MR.  SORRELL:   Were you able to reach

9     a verdict?

10              VENIREPERSON 21:   Yes.

11              MR.  SORRELL:   Thank you.

12              Juror Number 17.

13              VENIREPERSON 17:   Yes.   Susan

14    Kammler.   I was on a jury in Perry County in

15    probably 1992 or '93.

16              MR.  SORRELL:   All right.   Was that a

17    criminal case or a civil case?

18              VENIREPERSON 17:   I think it was a

19    criminal.

20              MR.  SORRELL:   And were you able to

21    reach a verdict?

22              VENIREPERSON 17:   Yes.

23              MR.  SORRELL:   Were you the

24    foreperson?

25              VENIREPERSON 17:   No.

1          MR. SORRELL:  Thank you.

2          Anyone else in the first row back

3     here?

4          In the second row, Juror Number 23.

5          VENIREPERSON 23:  Leonard Boggs.

6          MR. SORRELL:  Yes, sir.

7          VENIREPERSON 23:  I was an alternate

8     juror here --

9          MR. SORRELL:  Okay.

10          VENIREPERSON 23:  -- maybe 20 years

11     ago.

12          MR. SORRELL:  So you weren't -- you

13     didn't reach a verdict, or at least you didn't

14     participate?

15          VENIREPERSON 23:  I was just an

16     alternate.

17          MR. SORRELL:  Was that a criminal

18     trial?

19          VENIREPERSON 23:  Yes, sir.

20          MR. SORRELL:  Thank you.

21          Anyone down that row?

22          Juror Number 26, would you stand,

23     please.  Thank you.

24          VENIREPERSON 26:  Steve Ackman.  I

25     was -- I've been on three juries in Jefferson

1  County and one in federal court in St. Louis.

2  MR. SORRELL:  Okay.  Were those all

3  criminal trials or civil trials?

4  VENIREPERSON 26:  No.  They were two

5  civil and one criminal in Jefferson County and

6  one civil in St. Louis.

7  MR. SORRELL:  And were you the

8  foreperson of any of those panels?

9  VENIREPERSON 26:  On two of them I

10  was the foreperson.

11  MR. SORRELL:  Okay.  And were you

12  able to reach verdicts in the cases that you --

13  VENIREPERSON 26:  Yes.

14  MR. SORRELL:  You were?

15  VENIREPERSON 26:  Yes.

16  MR. SORRELL:  Okay.  Thank you.

17  Anyone else going down that second row?

18  And how about the third row?

19  Ma'am, Juror Number --

20  VENIREPERSON 33:  33, Valerie

21  Bollinger.

22  MR. SORRELL:  Valerie Bollinger?

23  VENIREPERSON 33:  Yes.  I served on

24  a jury in Scott County last fall.

25  MR. SORRELL:  Was that a criminal

1  case or civil?

2          VENIREPERSON 33:  Criminal.

3          MR.  SORRELL:   And did you reach a

4  verdict?

5          VENIREPERSON 33:  Yes.

6          MR.  SORRELL:   And were you the

7  foreperson?

8          VENIREPERSON 33:  No, I was not.

9          MR.  SORRELL:   Thank you.

10          There was another hand.   Yes, Juror

11  Number 36.

12          VENIREPERSON 36:   Wyatt Wagner.

13  I've been summoned three times and just served on

14  one jury.

15          MR.  SORRELL:   And were all three

16  then in state court?

17          VENIREPERSON 36:   Two in Stoddard

18  County and one here.

19          MR.  SORRELL:   Okay.   Was one summons

20  here recently?

21          VENIREPERSON 36:   Today.

22          MR.  SORRELL:   I'm sorry?

23          VENIREPERSON 36:   Today.

24          MR.  SORRELL:   Oh, okay.   That's

25  fine.   Okay.   That's fine.   Thank you.   That

1   would be fine.

2              And then the last juror on that

3   row I believe 38.

4              VENIREPERSON 38:  38.  A criminal

5   case in Ste. Genevieve County last August,

6   reached a verdict, and I was not the foreman.

7              MR. SORRELL:  Okay.  Thank you.

8              Anyone else from the last two

9   gentlemen?

10             (No Response.)

11             MR. SORRELL:  For all the people

12  that raised their hands on that last question, is

13  there anything about that process of sitting

14  through a jury trial and resolving that issue is

15  there anything about that that would cause you a

16  problem in reaching a verdict in this case?

17             Thank you.  I didn't see any hands.

18             Does everybody realize that the

19  only -- the only thing you're expected to do is

20  come up with a verdict on whether a person is --

21  Mr. Swan is not guilty or guilty of an offense?

22  That is, you're not expected to play any role in

23  terms of sentencing Mr. Swan if you find that

24  he's guilty of one or both of those offenses.

25  Does everybody understand that your role is just

1    not -- you don't have anything to do with the
2    sentencing issue?
3                    (No Response.)
4                    MR. SORRELL:   Does anyone have a
5    problem with that?
6                    (No Response.)
7                    MR. SORRELL:   Thank you.
8                    Thank you, Judge.
9                    THE COURT:   Ms. Booth.
10                   MS. BOOTH:   Thank you, Your Honor.
11    Defendant's Voir Dire Examination by Ms. Booth
12                   MS. BOOTH:   Good morning, everyone.
13                   I'm sure you-all noticed by the
14   Judge's tone that today is a very serious day for
15   Mr. Swan and also for the Government, and he has
16   given you specific instructions that must be
17   followed.
18                   And my question for you is the
19   instructions that he's given, do you believe that
20   it's wise to follow those, or do you believe it's
21   foolish?
22                   For example, do you believe that the
23   instruction that you must presume Mr. Swan
24   innocent unless and until the Government presents
25   evidence that leaves you firmly convinced of

1    guilt, do you believe it's foolish for the Court

2    to give you that instruction?  Do you feel that

3    that feels like a smokescreen for a guilty person

4    to hide behind, or do you believe that the Court

5    has given you that instruction to prevent the

6    possibility of a wrongful conviction?

7                    (No Response.)

8                    MS. BOOTH:  We have some jurors here

9    today who have served on a criminal trial, and

10   I'm sure you all have an opinion on the matter.

11   Do you feel that the jury instruction that you've

12   been given are wise?  Does anyone have an opinion

13   on that?

14                   (No Response.)

15                   MS. BOOTH:  Does anyone feel that

16   they're foolish?

17                   (No Response.)

18                   MS. BOOTH:  For our jurors who have

19   been on a criminal trial before, is there

20   anything about that experience that left you

21   disheartened about the process?

22                   (No Response.)

23                   MS. BOOTH:  Do you believe that when

24   the instructions are followed, everything works

25   accordingly as it should and justice at the end

1    of the day is served, be it guilty or not guilty?

2              (No Response.)

3              MS. BOOTH:  I believe we've had a

4    juror or two on a civil trial before.  May I see

5    the hands on a civil trial?

6              Yes, sir.  Juror Number --

7              VENIREPERSON 26:  26, Steve Ackman.

8              MS. BOOTH:  Yes, sir.  Juror

9    Number 26, you sat on both a civil trial as well

10   as a criminal trial?

11             VENIREPERSON 26:  That is correct.

12             MS. BOOTH:  And the evidence burden

13   on both those matters is different.  The Court

14   today has instructed you that for a guilty

15   verdict in a criminal matter the Government must

16   prove guilt beyond a reasonable doubt.  That's a

17   different burden than at the civil level.  The

18   criminal is higher.

19             Sir, do you agree that that's wise?

20   Would you be able to follow that instruction?

21             VENIREPERSON 26:  Yes, I do.

22             MS. BOOTH:  And at a civil trial

23   what was at stake for the parties?  Was it -- was

24   it money?

25             VENIREPERSON 26:  It was money.

1          MS. BOOTH:  Yes, sir.  And in a

2     criminal trial what is at stake for the

3     Defendant?

4               VENIREPERSON 26:  Freedom.

5          MS. BOOTH:  Yes, sir.  Does everyone

6     understand that?

7               (No Response.)

8          MS. BOOTH:  Does anyone think that

9     the burden for the Government to prove guilt

10    should be lower, that it shouldn't be that you're

11    left firmly convinced beyond a reasonable doubt

12    of the Defendant's guilt?  Should it be lower?

13              (No Response.)

14         MS. BOOTH:  Today you've heard that

15    Mr. Swan -- the matter we're dealing with is

16    felon -- convicted felon in possession of a

17    firearm.

18              Now, I can tell by looking at

19    everyone's face that you all understand that is

20    very serious, and you'll follow the jury

21    instructions, but we are talking about firearms

22    here today.

23              So my question is is there anyone

24    here who has had an experience or has an opinion

25    about firearms that in all honesty you can say to

1  me, Ms. Booth, I have had a loved one injured by

2  firearms.  I feel very strongly against firearms.

3  Whatever it may be about firearms, something

4  that's bothering you that will distract you today

5  from the evidence or from your duty as jurors if

6  you're selected on this case.

7              Is there anyone who's had firearms

8  significantly impact their life?

9              I see no hands.

10             Mr. Swan is black or

11 African-American, and I anticipate that several

12 witnesses for Mr. Swan, they will also be black

13 or African-American.  Is there anyone here who

14 that would affect you adversely, that because of

15 some issue with race that you won't be able to

16 follow the Judge's instructions?  Does anyone

17 feel that way?

18             (No Response.)

19             MS. BOOTH:  And, again, if any of

20 the questions I'm asking you it will be difficult

21 to raise your hand and say in front of anybody

22 and everybody, be it the question about firearm

23 violence in your family or in your neighborhood

24 or the question on race, you can always speak to

25 the Judge in private at a later time when not in

1    front of everyone.

2              Witnesses will take the witness

3    stand today, and they will swear to tell the

4    truth and nothing but.  Is there anyone that

5    believes that simply because the oath is taken

6    and the witness is sitting in the witness chair

7    that it's impossible for that person to lie?

8              (No Response.)

9              MS. BOOTH:  Has everyone here had

10   enough life experience to know when they're not

11   being told the truth?

12             (No Response.)

13             MS. BOOTH:  Is there anyone who

14   feels that they wouldn't be able to critically

15   examine what a witness is saying to tell them

16   whether or not they're telling the truth?

17             (No Response.)

18             MS. BOOTH:  We will also have

19   several police officers testify here today.  Does

20   anyone have any police officers who are family

21   members or good friends or good neighbors?

22             I see several hands.

23             All right.  And, sir, here, Juror

24   Number 4.

25             VENIREPERSON 4:  James Rickus.

1           MS. BOOTH:  Yes, sir.

2           VENIREPERSON 4:  I have two cousins

3    and who are on the force in the State of Florida.

4           MS. BOOTH:  All right.  And you're

5    certainly close to your cousins, and you have a

6    lot of respect for them?

7           VENIREPERSON 4:  Uh-huh.

8           MS. BOOTH:  And I'm certain you have

9    a lot of respect for them because they do their

10   job with integrity.  Sir, if police officers

11   testify here today and you are a juror, will you

12   be able to critically analyze their testimony to

13   see if, perhaps, they're mistaken or not telling

14   the truth?

15          VENIREPERSON 4:  Yes.

16          MS. BOOTH:  Will you automatically

17   assume that they will be telling the truth or

18   can't be mistaken?

19          VENIREPERSON 4:  No.

20          MS. BOOTH:  And for the other jurors

21   who've raised your hand about police officers in

22   your family or close friends, my same question to

23   all of you.  Is there anyone who says it's

24   impossible for a police officer to be mistaken

25   about a fact or it's impossible that a police

1   officer may not tell the whole truth?

2                   (No Response.)

3                   MS. BOOTH:  For those of you who are

4   selected for the jury after the evidence has been

5   presented to you and the parties close their

6   cases, you will have the opportunity to

7   deliberate.  And I know several of our jurors

8   here today have already been through that

9   process.

10                  And that is a process where it's not

11  time to be meek.  Jurors may disagree with each

12  other.  You may have strong arguments or

13  discussions about the evidence.

14                  Is there anyone here who believes

15  that they would not be able to participate

16  respectfully with other jurors in the

17  deliberations because they'd be too timid to take

18  their stand and say what they feel about a case?

19  Is there anyone who just cannot make their

20  opinion known if it's against the grain of other

21  people?

22                  (No Response.)

23                  MS. BOOTH:  Again, as the Court has

24  told you, also Mr. Sorrell has told you, and I

25  will tell you as well, today's matter is very

1   serious.  If there's anything that we haven't

2   discussed here today that would make you unfair

3   to either party to the Government or to the

4   Defendant, please let us know.  Is there anything

5   that we haven't asked you?

6               (No Response.)

7               MS. BOOTH:  Thank you for your time.

8               THE COURT:  Ladies and gentlemen,

9   we'll need a recess of about 20 or 25 minutes to

10  reduce your number to the 12 who will hear the

11  case plus one alternate.  So I'll ask you to go

12  back down to the first floor in the jury assembly

13  room.

14              And during this time, do not discuss

15  this case among yourselves or with others or

16  permit anyone to discuss it in your presence.  Do

17  not form or express any opinion about the case

18  until it's given to you to you decide.

19              Thanks for your patience.  We'll

20  call you back up just as soon as possible.

21              So please go back to the jury

22  assembly room on the first floor.

23              (Proceedings resumed in open court

24  outside the presence of the jury.)

25              THE COURT:  Okay.  I'm going to

1    excuse Juror Number 12 because she said she

2    couldn't serve two days and has an eye doctor

3    appointment tomorrow.

4                    I'm also going to excuse Juror

5    Number 11, Megan Stafford, who said that she has

6    a child care problem that cannot be solved.

7                    And also Juror Number 24 who also

8    had a child care problem that could not be

9    solved.

10                   And so with that are there any

11   strikes for cause for the Government?

12                   MR. SORRELL:  Your Honor, I think

13   yours were 11, 12 and 24; is that right?

14                   THE COURT:  Yes.

15                   MR. SORRELL:  Okay.  Judge, we would

16   ask to strike for cause Number 31, Mr. Houston.

17                   THE COURT:  Any objection?

18                   MS. BOOTH:  I'm sorry, sir, is that

19   juror number who?

20                   THE COURT:  31.  He said that his

21   brother was convicted of drugs about seven years

22   ago and was not treated fairly, and he would be

23   tainted a little bit if he had to serve on the

24   jury.

25                   MS. BOOTH:  No objection.

1          THE COURT:   31 is stricken for
2     cause.

3               Next?

4               MR. SORRELL:   No other strikes, Your
5     Honor.  Thank you.

6               THE COURT:   Any strikes for cause
7     for Defendant?

8               MS. BOOTH:   Your Honor, Mr. Tony
9     Chilton who would be Juror Number 40, which is
10    the gentleman who has, I believe, a cousin
11    somehow married or connected with Mr. Sorrell's
12    family.  Though Mr. Chilton said that --

13              THE COURT:   That's fine.  I'm going
14    to excuse him anyway because we're not going to
15    need him.

16              MS. BOOTH:   Right.

17              THE COURT:   He's the last one.  So
18    I'll excuse him.

19              MS. BOOTH:   Sir, if you would just
20    give me a moment, please.

21              THE COURT:   Sure.

22              MS. BOOTH:   No, sir.  No other
23    strikes for cause.

24              THE COURT:   Okay.  So I'm going to
25    give 10 strikes to the Defendant, six to the

1    Government, and we'll have one alternate.  And
2    we'll have three from which to choose the one
3    alternate.  So we've stricken four, so that
4    leaves 36.  And we'll need 10 plus 6 plus 12,
5    which is 28.  Plus three more for alternate.  So
6    we need to qualify 31.
7                    (A discussion was held off the
8    record.)
9                    THE COURT:  Okay.  We'll go back on
10   the record.  I think that you can make your
11   strikes up to Juror Number 32, Catherine Mouser.
12   And then the alternate will be selected from
13   Jurors 33, 34 and 35.  So each side will have one
14   strike each among those, 33, 34 and 35 jurors.
15                   And then I will excuse Juror 36, 37,
16   38 and 39 as well as 40, which I already excused.
17   And that should be the right calculation.
18                   MR. SORRELL:  I believe it is,
19   Judge.
20                   MS. BOOTH:  Yes, Your Honor.
21                   THE COURT:  Okay.
22                   MR. TILSEN:  Yes, Your Honor.
23                   THE COURT:  All right.  So we'll be
24   in recess while you make your strikes.
25                   Anything you want to discuss before?

1           MR. SORRELL:  No, Your Honor.

2           THE COURT:  All right.  Thank you.

3           (Proceedings stood in temporary

4    recess.)

5           (Proceedings resumed in open court

6    outside the presence of the jury.)

7           THE COURT:  The Court Clerk has

8    advised me that one of the prospective jurors has

9    a problem and wants to talk to me, so bring her

10   in, and we'll have a bench conference.

11          Ma'am, do you want to come up.

12          Mr. Sorrell, Ms. Booth, you can come

13   up.

14          (Proceedings were held at sidebar,

15   outside the hearing of the jury.)

16          THE COURT:  You're Juror Number 19?

17          VENIREPERSON 19:  Yes.

18          THE COURT:  You had something you

19   want to stay?

20          VENIREPERSON 19:  Yes.

21          THE COURT:  Speak into the

22   microphone.

23          VENIREPERSON 19:  I think my brother

24   has been charged with the same thing as the

25   Defendant has been charged with.

1      THE COURT:  Being a felon in

2   possession of a firearm?

3      VENIREPERSON 19:  Yes.  And I think

4   it was back in probably '93.  But I have had no

5   contact with any of my siblings after my father

6   passed away in '97.  When we buried him, I buried

7   them too.

8      THE COURT:  Any questions?

9      MR. SORRELL:  Would that affect your

10   ability to hear evidence in this case?

11      VENIREPERSON 19:  Not at all.

12      MR. SORRELL:  Was he treated fairly

13   as far as you know?

14      VENIREPERSON 19:  As far as I know

15   and I'm concerned, yes.

16      MR. SORRELL:  Okay.  That's all.

17      VENIREPERSON 19:  I mean --

18      MS. BOOTH:  Juror Number 19, the

19   fact that your brother was accused of that do you

20   feel that the Government wouldn't accuse my

21   client of that if he really wasn't probably

22   guilty?  Can you presume innocence even though

23   you have some strong feelings about your brother?

24      VENIREPERSON 19:  Sure.  I could.

25   If you guys show the evidence, I mean, they got

1  to prove to me that they actually done it, which

2  I know my brother did do it.

3          MS. BOOTH:  Yes, ma'am.

4          VENIREPERSON 19:  So I know he is

5  guilty.

6          MS. BOOTH:  Thank you.

7          THE COURT:  Thank you.

8          (Proceedings resumed in open court

9  outside the presence of the jury.)

10          THE COURT:  Counsel, I don't think

11  that there's any need for concern about Juror 19.

12  She just wanted to give some more information

13  about a relative who had been convicted.  Do you

14  agree?

15          MR. SORRELL:  I do.

16          THE COURT:  Do you agree, Ms. Booth?

17          MS. BOOTH:  I agree.

18          THE COURT:  So where are we on your

19  strikes?

20          MR. TILSEN:  There's a list

21  somewhere.

22          THE CLERK:  Yes.  I have it.  I was

23  just waiting to find out if we were going to

24  have --

25          THE COURT:  Okay.

1          MR. TILSEN:  It's always wise to

2    check and make sure that is there.

3          (A discussion was held off the

4    record.)

5          MR. TILSEN:  Your Honor, can the

6    marshals take my client back to the men's room?

7    They have a bathroom right there.

8          THE COURT:  Sure.

9          MR. TILSEN:  As long as the jurors

10   aren't here.

11         THE COURT CLERK:  33 is your

12   alternate strike?

13         MR. TILSEN:  Yes.

14         THE CLERK:  So I have the jurors as

15   Number 2, Marshall; Number 6, Barnett; Number 8,

16   Baker; Number 9, Edwards; Number 10, Jordan;

17   Number 16, Gilboe; 18, Anderson; 19, Mayberry;

18   21, Jeffries; 26, Ackman; 27 Jones; 28 Kight.

19   And then the alternate as 35 Carroll.

20         MR. SORRELL:  Yes, Your Honor.  Yes,

21   ma'am.

22         THE COURT:  The Government agrees?

23         MR. SORRELL:  Yes.

24         THE COURT:  The defense agrees.

25         MS. BOOTH:  Sir, I apologize.  I

1    didn't hear some of the front numbers because it

2    was a little soft.  May I hear those numbers

3    again?

4                    THE COURT CLERK:  Sure.

5                    MS. BOOTH:  Just the numbers are

6    fine.

7                    THE CLERK:  2, 6, 8, 9, 10, 16, 18,

8    19, 21, 26, 27, 28 and 35 as the alternate.

9                    MS. BOOTH:  Correct.

10                   THE COURT:  Okay.  So before

11   bringing the jury back in I had one question

12   about the instructions that were submitted by the

13   Government, and that is on it's Instruction

14   Number 2 in the initial instructions, and it's

15   based on Eighth Circuit 1.02, but it talks a lot

16   about -- it talks about some of the elements are

17   stipulated to.  I want to make sure that is an

18   agreed on instruction.  It's actually an optional

19   instruction.  But is that agreed on by the

20   Government and Defendant?

21                   MS. BOOTH:  Yes, sir.

22                   MR. SORRELL:  Yes, Your Honor.

23                   THE COURT:  Okay.  And the other

24   thing, too, is that we'll try to get in opening

25   statements before we take a lunch break.

1          MR. SORRELL:  Yes.

2          THE COURT:  And so with that we can

3     bring the jury panel in, and we'll seat them in

4     the back, and then we'll call them one by one to

5     be seated in the jury box itself.  So if you want

6     to take a quick break, now is the time to do it.

7          MR. SORRELL:  And we'll invoke the

8     rule on witnesses, and I think the defense would

9     too.

10          MS. BOOTH:  Yes, sir.

11          THE COURT:  So the rule on witnesses

12     is invoked.

13          MR. SORRELL:  Thank you, Your Honor.

14          (Proceedings stood in temporary

15     recess.)

16          (Proceedings resumed in open court.)

17          THE COURT:  Ladies and gentlemen, as

18     your name is called please take a seat in the

19     jury box at the direction of the clerk.

20          THE COURT CLERK:  Juror Number 1,

21     Pearline Marshall.

22          Juror Number 2, Andrew Barnett.

23          Juror Number 3, Steven Ray Baker,

24     Junior.

25          Juror Number 4, Elizabeth Edwards

1   Sexton.
2                   Juror Number 5, Eden Jordan.
3                   Juror Number 6, Diane (sic.) Gilboe.
4                   Juror Number 7, Adrian Anderson.
5                   Juror Number 8, Sandra Mayberry.
6                   Juror Number 9, Christopher
7   Jeffries.
8                   Juror Number 10, Steven Ackman.
9                   Juror Number 11, Wanda Jones.
10                  Juror Number 12, Sherry Kight.
11                  Juror Number 13, Lisa Carroll.
12                  THE COURT:  Ladies and gentlemen,
13  those of you who were not called are excused at
14  this time.  I want to thank you for your service.
15  You'll be paid for the entire day.
16                  I do want to tell you, though, that
17  this is a public proceeding, and you are invited
18  to watch any or all of this trial as you may
19  wish.  Thank you again for your service.
20  Otherwise, you're excused.
21                  All right.  Ladies and gentlemen,
22  please rise and be sworn in by the Court clerk.
23                  (Jury Sworn and Instructions Read.)
24                  THE COURT:  This is Instruction
25  Number 1:  Ladies and gentlemen, I will take a

1    few moments now to give you some initial

2    instructions about this case and about your

3    duties as jurors.  At the end of the trial I will

4    give you further instructions.  I may also give

5    you instructions during the trial.

6              Unless I specifically tell you

7    otherwise, all the instructions, both those I

8    give you now and those I give you later, are

9    equally binding on you and must be followed.

10             You must leave your cell phone, PDA,

11   blackberry, smart phone, iPhone and any other

12   wireless communication devices in the jury room

13   during the trial, and you may only use them

14   during breaks.

15             However, you are not allowed to have

16   cell phones in the jury room during your

17   deliberations.  You may give the cell phone to

18   the bailiff or deputy clerk for safekeeping just

19   before you start the deliberations then.

20             This is a criminal case brought

21   against the Defendant by the United States

22   Government.  The defendant is charged with being

23   a felon in possession of a firearm in two

24   separate counts.  Those charges are set forth in

25   what is called an indictment, which reads in

1   relevant part as follows:  Count 1, on or about
2   May 26th, 2018, in Cape Girardeau County within
3   the Southeastern Division of the Eastern District
4   of Missouri, Barrett C. Swan, the Defendant
5   herein, did possess in and affecting interstate
6   commerce, to wit:  A Smith & Wesson, Model SD9VE,
7   nine-millimeter handgun, Serial Number HEN9114,
8   and had previously thereto been convicted in any
9   court of a crime punishable by imprisonment for a
10  term exceeding one year.
11                  In Count 2, on or about August 1st,
12  2018, in St. Louis County, within the Eastern
13  District of Missouri, Barrett C. Swan, the
14  Defendant herein, did possess in and affecting
15  interstate commerce a firearm, to wit:  A Smith &
16  Wesson Model M&P 9 Shield, nine-millimeter
17  semi-automatic handgun, Serial Number LDE1400
18  and had previously thereto been convicted in any
19  court of a crime punishable by imprisonment for a
20  term exceeding one year.
21                  You should understand that an
22  indictment is simply an accusation.  It is not
23  evidence of anything.  The Defendant has pleaded
24  not guilty and is presumed to be innocent unless
25  and until proved guilty beyond a reasonable

64

1    doubt.  It will be your duty to decide from the

2    evidence whether the Defendant is guilty or not

3    guilty of the crimes charged.

4              From the evidence you will decide

5    what the facts are.  You're entitled to consider

6    that evidence in the light of your own

7    observations and experiences in the affairs of

8    life.  You may use reason and common sense to

9    draw deductions or conclusions from facts that

10   have been established by the evidence.

11             You will then apply those facts to

12   the law that I will give you in these and in my

13   other instructions, and in that way reach your

14   verdict.  You're the sole judges of the facts,

15   but you must follow my instructions whether you

16   agree with them or not, and you have taken an

17   oath to do so.

18             Do not allow sympathy or prejudice

19   to influence you.  The law demands of you a just

20   verdict unaffected by anything except the

21   evidence, your common sense and the law as I give

22   it to you.

23             You should not take anything I may

24   say or do during the trial as indicating what I

25   think of the evidence or what I think your

1    verdict should be.

2              Finally, please remember that only

3    this Defendant, not anyone else, is on trial here

4    and that this Defendant is on trial only for the

5    crimes charged, not for anything else.

6              Instruction Number 2:  In order to

7    help you follow the evidence I will now give you

8    a brief summary of the elements of the crimes

9    charged which the Government must prove beyond a

10   reasonable doubt to make its case.

11             One, the Defendant had been

12   convicted of a crime punishable by imprisonment

13   for more than one year.

14             Two, the Defendant knew that he had

15   been convicted of a crime punishable by

16   imprisonment for more than one year.

17             Three, after that the Defendant

18   knowingly possessed a firearm.

19             And, four, the firearm was

20   transported across the state line at some time

21   during or before the Defendant's possession of

22   it.

23             Only the third element is disputed

24   in this trial.  That is whether the Defendant

25   knowingly possessed a firearm for each charge.

1            The Defendant and the Government has

2    stipulated that the other elements are proven.

3            You should understand, however, that

4    what I have just given you is only a preliminary

5    outline.  At the end of the trial I will give you

6    a final instruction on these matters.  If there's

7    any difference between what I just told you and

8    what I tell you in the instructions I give you at

9    the end of the trial, the instructions given at

10   the end of the trial must govern you.

11           Instruction Number 3:  I mentioned

12   the word "evidence."  "Evidence" includes the

13   testimony of witnesses, documents and other

14   things received as exhibits, any facts that have

15   been stipulated, that is, formally agreed to by

16   the parties and any facts that have been

17   judicially noticed, that is, facts which I say

18   that you may but are not required to accept as

19   true even without evidence.

20           Certain things are not evidence.  I

21   shall list those things for you now.  One,

22   statements, arguments, questions and comments by

23   lawyers representing the parties in the case are

24   not evidence.

25           Two, objections are not evidence.

1    Lawyers have a right to object when they believe

2    something is improper.  You should not be

3    influenced by the objection.  If I sustain an

4    objection to a question, you must ignore the

5    question and must not try to guess what the

6    answer might have been.

7              Three, testimony that I strike from

8    the record or tell you to disregard is not

9    evidence and must not be considered.

10             Four, anything you see or hear about

11   this case outside the courtroom is not evidence

12   unless I specifically tell you otherwise during

13   the trial.  Furthermore, a particular item of

14   evidence is sometimes received for a limited

15   purpose only.  That is, it can be used by you

16   only for one particular purpose and not for any

17   other purpose.  I will tell you when and if that

18   occurs and instruct you on the purposes for which

19   the item can and cannot be used.

20             Finally, some of you may have heard

21   the terms "direct evidence" and "circumstantial

22   evidence."  You're instructed that you should not

23   be concerned with those terms.  The law makes no

24   distinction between direct and circumstantial

25   evidence.  You should give all the evidence the

1     weight and value you believe it is entitled to
2     receive.

3                    Instruction Number 4:  In deciding
4     what the facts are you may have to decide what
5     testimony you believe and what testimony you do
6     not believe.  You may believe all of what a
7     witness said or only part of it or none of it.

8                    In deciding what testimony of any
9     witness to believe consider the witness's
10    intelligence, the opportunity the witness had to
11    have seen or heard the things testified about,
12    the witness's memory, any motives that witness
13    may have for testifying a certain way, the manner
14    of the witness while testifying, whether that
15    witness said something different at an earlier
16    time, the general reasonableness of the testimony
17    and the extent to which the testimony is
18    consistent with other evidence that you believe.

19                    Instruction Number 5:  During the
20    trial, it may be necessary for me to talk with
21    the lawyers out of the hearing the of the jury
22    either by having a bench conference here while
23    the jury is present in the courtroom or by
24    calling a recess.  Please understand that while
25    you are waiting we are working.

1           The purpose of these conferences is

2    to decide how certain evidence is to be treated

3    under the rules of evidence and to avoid

4    confusion and error.  We will, of course, do what

5    we can to keep the number and length of these

6    conferences to a minimum.

7           Instruction Number 6:  At the end

8    of the trial you must make your decision based on

9    what you recall of the evidence.  You will not

10   have a written transcript to consult, and it may

11   not be practical for the court reporter to read

12   or play back lengthy testimony, so you must pay

13   close attention to the testimony as it is given.

14          Instruction Number 7:  To ensure

15   fairness, you must obey the following rules:

16   First, do not talk or communicate among

17   yourselves about this case or about anyone

18   involved with it until the end of the case when

19   you go to the jury room to decide on your

20   verdict.

21          Second, do not talk with anyone else

22   about this case or about anyone involved with it

23   until the trial has ended and you have been

24   discharged as jurors.

25          Third, when you are outside the

1    courtroom, do not let anyone tell you anything

2    about the case or about anyone involved with it

3    until the trial has ended and your verdict has

4    been accepted by me.

5            If someone should try to talk to you

6    about the case during the trial, please report it

7    to the bailiff or deputy clerk.

8            Fourth, during the trial, you should

9    not talk with or speak to any of the parties,

10   lawyers, or witnesses involved in the case.  You

11   should not even pass the time of day with any of

12   them.  It is important not only that you do

13   justice in this case but also that you give the

14   appearance of doing justice.

15           So if a person from one side of the

16   lawsuit sees you talking to a person from the

17   other side, even if it is simply to pass the time

18   of day, an unwarranted and unnecessary suspicion

19   about your fairness might be aroused.

20           If any lawyer, party or witness does

21   not speak to you in the hall or when you ride the

22   elevator or the like, it is because they're not

23   supposed to talk to you or visit with you.

24           Fifth, it may be necessary for you

25   to tell your family, close friends, teachers

1    co-workers or employer about your participation

2    in this trial. You can explain to them when you

3    are required to be in court, but you must warn

4    them not to ask you any questions about the case

5    or tell you anything they know or think they know

6    about the case or discuss the case in your

7    presence.

8             You must not communicate with anyone

9    or post information about the parties, witnesses,

10   participants, charges, evidence or anything else

11   related to the case.

12           You must not tell anyone anything

13   about your deliberations in the case until after

14   I accept your verdict or until I give you

15   specific permission to do so.

16           If you discuss the case with someone

17   other than the other jurors during the

18   deliberations, it could create a perception that

19   you have clearly decided the case or that you may

20   be influenced in your verdict by their opinions.

21   That would not be fair to the parties, and it may

22   result in the verdict being thrown out and the

23   case having to be retried.

24           During the trial, while you were in

25   the courthouse, and after you leave for the day,

72

1    do not provide any information to anyone by any

2    means about this case.  Thus, for example, do not

3    talk face-to-face or use any electronic device or

4    media, such as the telephone, a cell or smart

5    phone, Blackberry, PDA, computer, the internet,

6    any internet service, any text or instant

7    messaging service, any internet chat room, blog,

8    or website like Facebook, MySpace, YouTube or

9    Twitter, or any other way to communicate to

10   anyone any information about this case until I

11   accept your verdict.

12            Sixth, do not do any research on the

13   internet in libraries, in newspapers or any other

14   way to make any investigation about this case on

15   your own.

16            Do not visit or view any place

17   discussed in this case and do not use internet

18   programs or any other device to search for or to

19   view any place discussed in the testimony.

20            Also, do not research any

21   information about this case, the law or people

22   involved, including the parties, the witnesses

23   and the lawyers.

24            Seventh, do not read any news

25   stories or articles in print or on the internet

1    or in any blog about the case or about anyone

2    involved with it or listen to any radio or

3    television reports about the case or about anyone

4    involved with it.

5                    I do not know whether there might be

6    any news reports in the case, but if there are,

7    you might inadvertently find yourself reading or

8    listening to something before you could do

9    anything about it.

10                   The parties have a right to have the

11   case decided only on the evidence they know about

12   and that has been introduced here in court.  If

13   you do some research or investigation or

14   experiment that we don't know about, then your

15   verdict may be influenced by inaccurate,

16   incomplete or misleading information that has not

17   been tested by the trial process, including the

18   oath to tell the truth and by cross-examination.

19                   All of the parties are entitled to a

20   fair trial rendered by an impartial jury, and you

21   must conduct yourself so as to maintain the

22   integrity of the trial process.

23                   If you decide a case based on

24   information not presented in court, you will have

25   denied the parties a fair trial, and you will

1  have done an injustice.

2              You are required to abide by these

3  rules, and you have taken an oath to do so.

4  Failure to follow these instructions may result

5  in the case having to be retried and could result

6  in you being held in contempt of court.

7              Eighth, do not make up your mind

8  during the trial about what the verdict should

9  be.  Keep an open mind until after you have gone

10  to the jury room to decide the case and you and

11  your fellow jurors have discussed the evidence.

12              Instruction Number 7:  The trial

13  will proceed in the following manner:

14              First, the Government will make an

15  opening statement. Next, the Defendant's attorney

16  may, but does not have to, make an opening

17  statement.  An opening statement is not evidence

18  but is simply a summary of what the attorney

19  expects the evidence to be.

20              The Government will then present its

21  evidence, and counsel for the Defendant may

22  cross-examine.  Following the Government's case,

23  the Defendant may, but does not have to, present

24  evidence or to testify or to call witnesses.  If

25  the Defendant calls witnesses, the Government may

1    cross-examine them.

2              After the presentation of the

3    evidence is completed, the Court will instruct

4    you further on the law.

5              The attorneys will then make their

6    closing arguments to summarize and interpret the

7    evidence for you.  As with opening statements,

8    closing arguments are not evidence.

9              After that, you will retire to

10   deliberate on your verdict.

11             Counsel for the Government, you may

12   proceed with your opening statement.

13             MS. WOODRUFF:  Thank you, Your

14   Honor.

15          Government's Opening Statement

16             MS. WOODRUFF:  May it please the

17   Court.

18             Ladies and gentlemen, the evidence

19   that you will hear in this case when boiled down

20   to its bare bones is all about one man, and that

21   man is the Defendant, Barrett Swan.

22             Mr. Swan, as you heard, is a

23   convicted felon.  That means that he is

24   absolutely prohibited from possessing any firearm

25   of any type for any reason.

1                    And yet on two different occasions

2       in 2018 when police encountered Mr. Swan he was

3       found to be in possession of a gun on both of

4       those occasions, so he is charged with two

5       counts.  Count 1 is felon in possession of a

6       firearm.  And, as you've heard, Count 2 is also

7       felon in possession of a firearm.

8                    I anticipate the evidence that you

9       will hear today as to Count 1 will be that on

10      May 26th of 2018, right around 3:40 in the

11      morning, a number of officers from the Cape

12      Girardeau Police Department were down in the area

13      of the Mississippi River bridge.  It's actually

14      just a few blocks from here.

15                   They were down there in response to

16      investigating a different offense, nothing that

17      has to do with Mr. Swan.  But they could see the

18      Mississippi River bridge.  And they heard the

19      very distinctive sound of somebody just flooring

20      their gas pedal.  It's a sound that everybody is

21      aware of.

22                   And so the officers looked over

23      towards the bridge, and they see a dark colored

24      passenger car just fly into Missouri from the

25      Illinois side.  One of those officers, Officer

1    Brotz, he noticed that the speed of the vehicle
2    was 90 miles an hour in a 45 miles per hour zone.
3                    Another officer, Patrolman Kyle
4    Evans, he called on the speeding car to dispatch.
5    And then he attempts to catch up to that car.  So
6    he is driving in kind of a parallel path to the
7    direction of the car trying to catch up to it.
8                    He does eventually get behind it,
9    and he sees that it is a black Dodge Charger, a
10   passenger car.  He notes the license plate
11   number, but, as it turns out, he is actually
12   familiar with this car, because it belongs to
13   someone who lives in his neighborhood, Barrett
14   Swan.
15                   So Patrolman Evans turns on his
16   police lights, turns on his siren, and he
17   attempts to just pull the car over for speeding,
18   but the car does not stop.  And instead it keeps
19   going.
20                   Patrolman Evans will tell you that
21   he was pursuing what should have been a simple
22   speeding ticket stop.  He was pursuing this black
23   Dodge Charger in this residential neighborhood,
24   and they got up to speeds around 70 at this
25   point.

78

1           Now, the driver of that Charger

2    tried to maneuver a turn at Henderson and Good

3    Hope and lost control of their car.  So the car

4    crashes, and it hits a parked motor vehicle.

5    It's not a huge crash, but it's enough to stop

6    that Dodge Charger.

7           So Patrolman Evans, he's right

8    behind him, he sees the crash.  He gets out of

9    his car, and he sees the driver's side door open,

10   and he sees Barrett Swan get out of the driver's

11   side door.

12           He recognizes him on sight.  Again,

13   they live close to one another.  And he called

14   down to him, Barrett, stop.  Well, Mr. Swan

15   turns, he looks back at him, and he takes off

16   running.  So Patrolman Evans is now pursuing him

17   on foot yelling his name, calling him by name

18   telling him to stop, but Mr. Swan keeps running.

19   Patrolman Evans sees him look back, and he keeps

20   on going.

21           Now, another officer had joined the

22   pursuit, and he was behind Patrolman Evans' car,

23   and that is Sergeant Rodney Edwards.  Sergeant

24   Edwards will tell you that he arrived on scene.

25   He didn't see the crash, but he did see Barrett

1    Swan get out of the driver's seat, leave the
2    driver's side door wide open, sees him take off
3    running.  He sees Patrolman Evans chasing him on
4    foot.  And Sergeant Edwards, he doesn't get out
5    at that point.  He stays in his car.  And so he
6    is following along trying to keep an eye on
7    Barrett Swan and trying to see which direction
8    he's traveling in.
9              Eventually he sees him kind of
10   double back.  Sergeant Edwards then does get out
11   of his car, and he finds Barrett Swan hiding in
12   some tall brush next to a house.  He approaches
13   him at that point.  And he tells him, Don't move.
14   He then takes Mr. Swan into custody and handcuffs
15   him.
16             At this point just three minutes
17   have passed.  Three minutes from the time the
18   officers heard that speeding car and called it in
19   until Mr. Swan was taken into custody.  It
20   happened so fast.
21             Now, back at the scene of the
22   Charger another officer has arrived, and that's
23   Patrolman Yoder.  So Yoder pulls up.  He sees
24   Patrolman Evans' car parked behind the Dodge
25   Charger.  And he approaches the Dodge carefully,

1    of course.  Driver's side door is still wide

2    open.  There's no one else around.

3                And as he gets up to the car, there,

4    just plain as day, in the open pocket of the

5    driver's side door he sees a handgun.  It's a

6    Smith & Wesson nine-millimeter semi-automatic

7    firearm.

8                So Patrolman Yoder takes possession

9    of that gun, and he renders it safe, which means

10   he unloads it.  And he finds that it's loaded

11   with 15 bullets in the magazine and one bullet in

12   the chamber.

13               So he unloads the gun.  He places it

14   on a driver's side seat.  Of course, no one else

15   is in the car.  And he looks through the car to

16   see if there are any other weapons.  There is

17   not.  He finds just a couple of cards with Mr.

18   Swan's name on it, a little bit of marijuana and

19   a couple of cell phones, some business cards.

20               And he just collects all of those

21   items and puts them in the driver's side seat so

22   the evidence technician that night, Corporal

23   Brett Hellmann, can easily collect the evidence,

24   take pictures of it and take pictures of the

25   scene.

1          So Mr. Swan then on May 26th is

2     transported to the Cape Girardeau Police

3     Department under arrest for those offenses.  And

4     through the normal course of things he's

5     eventually taken into custody.

6          Now, fast forward, it's about two

7     months later.  Mr. Swan has been charged in

8     federal court with felon in possession of a

9     firearm for the events of May 26th, and there's a

10    warrant outstanding for his arrest.

11         And so it was on August 1st of 2018,

12    this time in Florissant, Missouri, around the

13    St. Louis area, but also within the Eastern

14    District of Missouri, Patrolman Jonathan Kemp

15    with the Florissant Police Department, he's just

16    on regular patrol, and he sees a Ford Edge commit

17    a minor traffic violation having to do with a

18    stop sign.

19         So he conducts a traffic stop, and

20    the car stops no problem.  Now, it's about 3:40

21    in the morning.  And so Officer Kemp, he

22    approaches the Ford Edge to make contact with

23    whoever is inside, and he sees that there are two

24    people.  One is the driver Tiara Thorpe.  She is

25    the owner of the car.  And he also sees a front

82

1    seat passenger, an adult male.

2              So Officer Kemp asks both occupants

3    for identification.  Tiara Thorpe turns hers over

4    without an issue, but her male passenger said, I

5    don't have any ID on me.  So instead he just

6    verbally gives a name, a date of birth and a

7    Social Security Number.  That is very unique

8    information to each of us in this country.

9              So when Officer Kemp goes back to

10   his computer in the patrol car, he runs both of

11   the names for this computer, and sure enough

12   Tiara Thorpe comes up no issues, but the name and

13   the information given by the male passenger, it

14   pops up a picture of somebody who is not that

15   male passenger.

16             So Officer Kemp goes back to the

17   car, and he has a short conversation with the

18   passenger saying, Who are you?  And eventually

19   the man says that his name is Barrett Swan.

20             So the officer, he's not familiar

21   with Mr. Swan at all.  He didn't know he has a

22   warrant.  So he has to go back to his patrol car

23   and run that information through, and then he

24   learns that Barrett Swan has a federal warrant

25   out for his arrest.

1              So Officer Kemp goes back to the car
2     after he confirms the warrant, and he asks
3     Mr. Swan to step out.  Now, it's dark out, and
4     Officer Kemp is standing right there.  As
5     Mr. Swan starts to get out of the car, he's
6     looking inside, and he sees what at first he
7     thinks is part of the seatbelt housing right
8     there at the hip, but as Mr. Swan fully steps out
9     the officer sees that it's actually a handgun.
10    So he immediately asks the driver Tiara Thorpe to
11    also step out.
12             So Barrett Swan is then handcuffed.
13    He's secured.  Then Officer Kemp returns to the
14    Ford Edge.  And there in that front passenger
15    seat where Mr. Swan had been seated he finds a
16    handgun.
17             Now, the way that gun was positioned
18    it wasn't like square in the center of the seat.
19    Instead it was kind of by his hip pointed towards
20    the motor.  And then the barrel would have been
21    behind him at that crease where the back meets
22    the seat where Mr. Swan had been seated.
23             So the officer seizes that firearm.
24    He finds it is loaded.  And then it's also a
25    Smith & Wesson nine-millimeter semi-automatic

1    handgun, obviously a different one than the one

2    in Cape.  But the officer takes possession of

3    that gun.  He, of course, takes possession of

4    Mr. Swan.  And he transports Mr. Swan to the

5    Florissant Police Department.

6              When they get there, he starts the

7    booking process, and he tells Mr. Swan, Hey, once

8    we get you booked in I'm going to take you to an

9    interview room and give you a chance to tell me

10   about that gun I found.  And Mr. Swan told him,

11   We both know what you found in the car.

12             And he goes on to say something to

13   the effect of I would rather be in this situation

14   that I'm in right now than the one I found myself

15   in in the past where I was shot, and I didn't

16   have anything on me.  So those two detailed

17   events are what give rise to Counts 1 and 2.

18             You will also hear evidence that Mr.

19   Swan has a prior felony conviction for felon in

20   possession of a firearm.  Now that offense is

21   from 2006.  And you can consider it for

22   Mr. Swan's intent on these two firearms as well

23   as the lack of action on the state in his

24   possession of the two firearms he's charged with

25   today.

1            So after you hear all the evidence,

2   I will come back, and I will ask that you find

3   Barrett Swan guilty of Count 1, felon in

4   possession of a firearm for possession of a

5   nine-millimeter semi-automatic handgun on May

6   26th, 2018 here in Cape Girardeau and also guilty

7   of Count 2 for felon in possession of a firearm

8   for possessing a Smith & Wesson, nine-millimeter

9   semi-automatic handgun in Florissant, Missouri.

10  Thank you.

11            THE COURT:  Ms. Booth.

12            MS. BOOTH:  Thank you, Your Honor.

13         Defendant's Opening Statement

14            MS. BOOTH:  There is an old saying,

15  and it goes like this:  Ignorance is bliss and

16  what you don't know can't hurt you, but that is

17  not true.  Anyone who has lived enough life to

18  experience life's ups and downs knows that it is

19  critically important at all times to be aware of

20  the circumstances of your surroundings.  Be alert

21  and be aware.  Don't get caught off guard,

22  because, if you do, the price of ignorance can be

23  very, very steep.

24            Just ask Barrett Swan, because he is

25  paying that price right now.  Barrett, who is a

1   convicted felon, is on trial for knowingly

2   possessing two firearms last summer that he did

3   not know about or intend to control.  Because he

4   wasn't aware and alert of his circumstances he

5   was in a situation where firearms were present

6   that he didn't know about.

7            And Barrett, more than anyone,

8   should always be on guard regarding the presence

9   of firearms, because 13 years ago at the age of

10   21 in this very court, federal court, in the

11   Southeastern Division of Cape Girardeau he

12   pleaded guilty to possessing a firearm after he'd

13   been a convicted felon.

14            So Barrett Swan knows that he knows

15   that he knows that he cannot be in possession of

16   a firearm.  So how is it that he finds himself on

17   trial today for possessing two of them?

18            We must return to last summer to

19   learn what the evidence will be in this case.

20   It's Friday, May 25th of 2018, and everyone is

21   planning for their Memorial Day weekend plans.  A

22   woman that Barrett is dating, Ebony Stigall, has

23   made plans for she and Barrett to go to Ebony's

24   sister's house in Indiana to enjoy the weekend.

25            The plan is to leave for Indiana

1   sometime after Ebony Stigall gets off work on

2   Friday.  Ms. Stigall gets off work early, drives

3   to Barrett's home and learns that he isn't there.

4   On this day Ebony is driving Barrett's black

5   Dodge Charger, and Barrett is driving the car

6   that he and Ebony plan to take to Indiana, a

7   rental car.

8          Barrett isn't home.  So Ebony

9   decides to make good use of her time and run some

10  last-minute errands before the trip to Indiana.

11  While doing so and driving the Charger to do her

12  errands, Ebony is in possession of her

13  nine-millimeter Smith & Wesson firearm.  It's a

14  handgun that she bought at the sale barn in

15  Poplar Bluff a few months prior to May 25th of

16  2018.  Ebony grew up in Poplar Bluff, and she

17  still has family there.

18          When out in public, Ebony Stigall

19  typically carries her firearm with her in her

20  car.  She is not a convicted felon.  And she

21  knows that she can legally possess a firearm for

22  protection.  Ebony is aware of that though Cape

23  Girardeau on one hand is a very quiet, rural

24  Missouri town, a very nice place to live, it also

25  has its fair share of very violent crime.

1        Ebony knows that a woman must always

2   be alert and aware that she can be grabbed in a

3   parking lot, she can be car jacked, or she could

4   be pushed inside her own home and assaulted when

5   coming home from work and unlocking the door.

6   Ebony is not willing to pay the price of

7   ignorance regarding her personal safety.

8        After she finishes her errands,

9   Ebony begins to grow increasingly frustrated and

10  upset because Barrett still has not returned

11  home.  As the night wears on, Ebony suspects that

12  Barrett is probably out with another woman.

13  Ebony has suspected for a long time that Barrett

14  is still seeing his ex-girlfriend, a woman by the

15  name of Shavion Reed, and sure enough he is.

16       Ebony receives a text message from

17  someone who has spotted Barrett with Shavion on

18  the parking lot of a nightclub across the river

19  in Illinois where people have gathered to

20  socialize.  This parking lot is the parking lot

21  of a club called The Pony.  And after a night

22  spot closes in Cape Girardeau, people move over

23  across the bridge to socialize in that parking

24  lot as that establishment stays open for a long

25  time.

1          The nightclub is only about a

2    15-minute drive from Ebony's location.  She jumps

3    into the driver's seat of Barrett's Dodge Charger

4    and very quickly makes her way to the nightclub.

5    Because she is distracted by anger and her need

6    to catch Barrett red-handed, Ebony forgets to

7    take her firearm out of the door pocket of the

8    Charger where she placed it earlier in the day.

9          On any other day Ebony Stigall knows

10   that she knows that she knows that she cannot go

11   into Illinois with her firearm.  Illinois' gun

12   laws are very different from Missouri's and

13   incredibly strict, but on this day, distracted by

14   anger and the need to confront Barrett if he is

15   with another woman, she isn't aware and alert

16   that she's going to Illinois with an unintended

17   passenger, her firearm.

18          Ebony arrives at the nightclub

19   parking lot, and she sees Barrett and Shavion

20   together.  Ebony throws the Charger into park,

21   quickly gets out of the car, confronts Barrett

22   and lets him know that she will no longer be

23   played a fool.  She is livid.  She is hurt, and

24   she is humiliated.  She doesn't want anything

25   more to do with Barrett.

1              The keys are in the car that Barrett

2    drove to the nightclub, the rental car that had

3    intended to go to Indiana, and Ebony drives off

4    in that car.  As she speeds away, her unintended

5    passenger is in Illinois, her firearm remains

6    behind in the door pocket of the Charger where

7    she left it earlier in the day.

8              Later that night Barrett drives his

9    own car back from Illinois.  He drives the

10   Charger back across the bridge to Missouri to go

11   home.  It has been a bad night.  Ebony won't take

12   Barrett's calls, and Shavion Reed, upon seeing

13   Ebony show up, is incredibly angry and now

14   realizes that Barrett was seeing Ebony behind

15   Shavion Reed's back, and Shavion has exploded on

16   Barrett.

17             So he's drinking from a straight

18   bottle of Remy Martin Cognac in the car with him

19   because of all the mess he's gotten himself into

20   as he's driving across the bridge.

21             Another car pulls up next to him to

22   race.  Well, the race is on because Barrett is in

23   a bad mood, and that Charger is built for speed.

24   It has a Hemi engine in it.  All the while

25   Barrett doesn't know he isn't riding alone.  The

1    unintended passenger is still in the door pocket.

2              As the two cars race into Missouri,

3    Barrett sees police cars facing the bridge on the

4    side street on the Missouri side of the

5    Mississippi River.  It's too late.  He can't slow

6    down fast enough, and he blows by the officers'

7    location at about 100 miles an hour.

8              Barrett knows that there is no way

9    those police officers just didn't see that

10   Charger blaze by at fast speed.

11             Barrett has been drinking, and,

12   though not intoxicated, he knows that he'll

13   likely blow over the legal limit when those

14   police officers catch up with him.  He doesn't

15   want another DWI, because he's had a few,

16   including a felony.

17             So he quickly cuts into a

18   neighborhood to take side streets hoping that he

19   can disappear before the red and blue lights of

20   the police cars are in the rearview mirror.

21             Barrett doesn't get very far.  That

22   Dodge Charger with his Hemi engine may be very

23   fast, but so are the City of Cape Girardeau's

24   police cars.  Barrett is able to travel about

25   three blocks without being tailed at all before

1    the police cars follow behind him.

2              He doesn't stop, and the police cars

3    chase him at a high rate of speed for about half

4    a mile.  He loses control of the Dodge Charger

5    while making a turn and crashes into an empty

6    parked car at a curb.

7              He gets out of the car.  He tries to

8    run away, but he doesn't get far.  The police

9    officers approach Barrett.  He doesn't resist.

10   And he goes to jail without incident.

11             When the police search the Charger,

12   they find the unintended passenger, Ebony

13   Stigall's firearm.  Had Barrett realized that the

14   gun was in the car, truth be told, he would have

15   thrown it out the window prior to the police cars

16   looping in behind him.  He knew they were going

17   to come for him.

18             Barrett knew that he had plenty of

19   time to get rid of the gun if he knew he had the

20   gun.  And he knows he can't be in possession of

21   it.  He didn't throw the gun out of the window,

22   because he didn't know it was there.

23             And that is how the summer of 2018

24   began for Barrett Swan.  How it ended concerns

25   Count 2.  After Barrett is arrested for being a

1   felon in possession of a firearm on May 26th of
2   2018, he spends the summer knowing that it's only
3   a matter of time before the federal government
4   chooses to indict him for the matter.

5          Barrett is confident that a federal
6   indictment is coming just like it did 13 years
7   prior for the same offense.  Barrett knows that
8   any day and every day is a day when he could be
9   arrested for the federal arrest warrant.  And
10   that day turns out to be August 1st of 2018.

11          During the early morning hours of
12   August 1st, Barrett is with his friend Tiara
13   Thorpe in St. Louis.  Barrett has been in
14   St. Louis for about two weeks.  His father is ill
15   in the hospital up there, so Barrett is staying
16   in a hotel visiting his father.

17          On this night Barrett is out with
18   Tiara.  It's her birthday.  She's wanting to go
19   out to get his mind off of everything that he's
20   worrying about.  Tiara is driving her car.  She's
21   the driver.  Barrett is in the passenger seat.
22   And she is driving him back to his hotel room in
23   Florissant, Missouri.

24          They get pulled over for a traffic
25   violation.  Officer Jonathan Kemp, a Florissant

1    police officer, approaches Tiara's window,

2    informs her of the reason for the traffic stop.

3    He asks for her identification, insurance and

4    registration, and she gives all of that to him.

5                    When Officer Kemp asks Barrett for

6    his identification, Barrett said that he did not

7    have anything physical on him, no driver's

8    license, but he gives the officer a false name

9    and false identifying information.

10                   When he does this, Tiara Thorpe

11   looks at Barrett with a very strange look on her

12   face and asks him why did he just do that?  It's

13   at this moment that Barrett lets Tiara know that

14   there's probably a federal arrest warrant for

15   him.

16                   He tells her that Officer Kemp will

17   likely come back to the car and ask for his real

18   name any minute.  If asked for his real name, he

19   will give it, because he has to face the federal

20   arrest warrant at some point.

21                   Tiara and Barrett sit in the car and

22   wait for Officer Kemp to return.  Officer

23   Jonathan Kemp returns five minutes later and, as

24   predicted, asks Barrett for his real name,

25   because the fake information didn't pan out.

1            Barrett gives Officer Kemp his real

2    identification.  Officer Kemp leaves Barrett and

3    Tiara in the car again unattended for another

4    period of time while Officer Kemp returns to his

5    squad car to check on Barrett's real name.

6            Barrett, knowing that he's going to

7    be arrested, makes a phone call to Shavion Reed

8    to tell her that he's been pulled over and that

9    this is probably the moment he'll be going into

10   custody, and he patiently waits.

11           As predicted by Barrett, Officer

12   Kemp returns to the car, tells Barrett there is a

13   federal warrant for his arrest and asks him to

14   get out of the car.  Barrett gets out of the car

15   and allows Officer Kemp to make the arrest

16   without any resistance or hesitation.

17           And at this point a second police

18   officer pulled up.  As Barrett is being placed in

19   Officer Kemp's police car, the second officer

20   asks Tiara Thorpe if she has anything illegal in

21   her car.  She said that she has nothing illegal

22   in her car, but she informs the officers what she

23   does have, she's in legal possession of her Smith

24   & Wesson firearm.  It's in her console.

25           Tiara has been a victim of violent

1    crime several times in St. Louis, including an

2    armed carjacking where she was a prosecution

3    witness.  The police officers ask her where her

4    firearm is located, and she tells them it's in

5    the console of her vehicle.

6            Tiara hadn't told Barrett that she

7    was keeping her firearm in the console of her

8    vehicle, and he didn't know about the presence of

9    the firearm in the console.  Barrett found out

10   about the firearm's presence when the police

11   officers found it.

12           When the second officer goes to

13   Tiara's car to find the firearm in the console,

14   he can't find it.  The console has multiple

15   compartments.  After Tiara explained how to

16   remove a tray to access the bottom compartment of

17   the console, the first officer, Officer Kemp,

18   locates Tiara's firearm.  He puts on evidence

19   gloves and gets the firearm and puts it in an

20   evidence bag.

21           Tiara protests and asks Officer Kemp

22   why is he taking her firearm from her?  She

23   purchased it legally at a gun dealer in St. Louis

24   in 2017.  She's told she can't have the firearm

25   in the car if Barrett is in the car, and she's

1    told to take it up with the authorities at the

2    police department.

3                    According to Officer Kemp, the gun

4    was found on the passenger seat where Barrett

5    Swan got out of the car to surrender peacefully

6    on his federal arrest warrant.  According to

7    Tiara and Barrett, the gun was not on the

8    passenger seat.

9                    Barrett would not sit unattended in

10   a car for 10 to 15 minutes possessing a firearm

11   while waiting patiently to be arrested on a

12   federal warrant.  Someone isn't telling the

13   truth.  Officer Kemp, Tiara Thorpe and Barrett

14   Swan can't all be telling the truth about where

15   the gun was found.

16                   Hard questions will be asked during

17   the trial of all three, and their answers will be

18   carefully measured by you.  Be alert and remain

19   aware.  Don't miss the truth as it comes to

20   light.

21                   You've now heard what the defense

22   intends the evidence will be during this trial.

23   After all the evidence is heard, I will ask you

24   to return not guilty counts for Barrett Swan.

25   Thank you.

1            THE COURT:   Ladies and gentlemen,

2    we'll take our lunch break at this time.   You'll

3    be on your own for lunch.   Feel free to visit one

4    of the downtown restaurants.

5            But if you would be back here at 1

6    o'clock, and we'll commence hearing the evidence

7    in the case shortly after that.

8            So remember the admonition I've

9    given you repeatedly.   Do not discuss the case

10   among yourselves or with others or permit anyone

11   to discuss it in your presence and do not form or

12   express any opinion about the case until it's

13   given to you to decide.

14            So should they come back to the jury

15   assembly room or up here?

16            THE COURT CLERK:   To the jury

17   assembly room.

18            THE COURT:   So you're excused at

19   this time and report back to the jury assembly

20   room by 1 o'clock.

21            Thank you.   Court is in recess until

22   1 o'clock.

23            (A lunch recess was taken at this

24   time.)

25            (Proceedings resumed in open court

1    outside the presence of the jury.)

2              THE COURT:  Counsel, do you have any

3    preliminary matters?

4              MR. TILSEN:  Just me.  I don't think

5    anybody thinks it's a good idea, but I'm going to

6    do it anyway, Judge.  The next three witnesses

7    are all law enforcement officers that aren't in

8    the room.  They all have tool belts on.  They

9    have holsters, radios, tasers.  I don't know what

10   else they have.  And it's bad enough that they

11   wear uniforms which gives an air of authority.  I

12   don't think they should be allowed to wear -- I

13   know they're not allowed to have guns, but they

14   shouldn't be allowed to wear any of the other

15   tools that they use.  They're just witnesses in

16   the courtroom.

17             THE COURT:  Well, what are they

18   supposed to wear?

19             MR. TILSEN:  Their uniforms if they

20   want, but not, you know, a billy club or whatever

21   it is, a radio or a taser.

22             THE COURT:  I don't see any problem

23   with that at all.

24             MR. TILSEN:  Okay.  The other

25   suggestion I have is that I'd be curious to know

1     how many jurors were able to actually get lunch

2     in an hour.

3                    THE COURT:  It is very convenient

4     for anybody to get lunch in an hour downtown.

5                    MR. TILSEN:  You could ask them.

6                    THE COURT:  No.  I'm not going to

7     ask them.

8                    The other thing too is there was --

9     the clerks mentioned there was some contact by

10    one of the people in the audience from the

11    Defendant's side with one of the jurors outside.

12    And if that happens again, I will take some

13    extreme, immediate action.

14                   MS. BOOTH:  Sir, could you tell me

15    who that was, so I can make certain that never

16    happens.

17                   THE COURT CLERK:  I'm not sure which

18    person it was.

19                   THE COURT:  See if you can get

20    Michelle.

21                   THE COURT CLERK:  It was me.

22                   THE COURT:  Oh, you mentioned it?

23                   (A discussion was held off the

24    record.)

25                   THE COURT CLERK:  It was just one of

1    the jurors when they were walking.

2              THE COURT:  Let's make a record of

3    it.  Go ahead and tell them.

4              THE COURT CLERK:  As the jurors were

5    walking out, there was a group of either family

6    or friends standing out there, and one of the

7    jurors kind of stopped and acted like he was

8    going to talk to someone.  No words were

9    exchanged.

10             MS. BOOTH:  All right.

11             THE COURT CLERK:  But I just said,

12   We need to keep moving.  We can't have people

13   interacting with the jurors.  So that was all.

14             THE COURT:  Okay.

15             MS. BOOTH:  Yes, sir.

16             MR. SORRELL:  Which juror?

17             THE COURT:  Do you know which juror?

18             THE COURT CLERK:  It was the

19   gentleman I believe that was number -- I don't

20   know which juror it was anymore.  I believe it

21   was the last one on the top row over here.  I

22   believe the second to last one on the top.

23             MR. SORRELL:  In a white jersey?

24             THE COURT CLERK:  Yes.

25             MR. TILSEN:  Just so it's clear, the

1      interaction you saw was the juror talking to one

2      of the family members?

3                      THE COURT CLERK:  There was no

4      talking.

5                      MR. TILSEN:  Just attempting to?

6                      THE COURT CLERK:  Right.  Right.  He

7      just stopped and started to say something, and

8      then I shushed him on along.

9                      THE COURT:  Okay.  Who started to

10     say something?

11                     THE COURT CLERK:  The juror.

12                     THE COURT:  The juror?

13                     THE COURT CLERK:  Yes, the juror.

14     Right.

15                     MR. SORRELL:  Well, Judge, I just

16     ask that you make him the alternate to ensure

17     there's no possibility of there being a problem.

18                     THE COURT:  Well, there wasn't any

19     exchange, so I'm going to admonish the jurors

20     again.

21                     MR. SORRELL:  Okay.  Thank you.

22                     THE COURT:  But, you know, I hate to

23     do this, but I'm going to clear the corridors to

24     let them out.  You know, I don't want any kind of

25     exchange whatsoever.

1           MR. SORRELL:  Yes.  Thank you.

2           THE COURT:  So, okay.  You can bring

3    the jurors in.

4           (Proceedings resumed in open court.)

5           THE COURT:  The Court has been

6    advised that there was some interaction between

7    people in the hall and a member or two of the

8    jury, and I want to admonish you again, don't

9    talk to anybody.  I mean, don't approach anybody.

10   Don't make contact of any kind with anybody until

11   after this case is over; okay?

12           Call your first witness.

13           MS. WOODRUFF:  Thank you.  The

14   Government calls Kyle Evans.

15           MR. SORRELL:  Your Honor, while

16   that's going on, may we read a stipulation into

17   the record?

18           THE COURT:  Yes.

19           MR. SORRELL:  The parties have

20   stipulated and have filed a stipulation on file

21   with the court.

22           It has been agreed to and stipulated

23   by the parties -- that is, both the Government

24   and the defense -- that the Defendant, Barrett

25   Swan, has been convicted of a felony that is a

1    crime punishable by imprisonment for a term

2    exceeding one year; and, therefore, was a

3    previously convicted felon under the laws of the

4    State of Missouri during May 2018 and

5    August 2018.

6          Second, the Defendant, Barrett Swan,

7    knew that he had been convicted of a felony that

8    is a crime punishable by imprisonment exceeding

9    one year during May 2018 and August 2018.

10         That the firearms listed in the

11   indictment and described as follows are firearms

12   as defined by federal statutes that were

13   manufactured in the State of Connecticut and that

14   both firearms affected interstate commerce prior

15   to their discovery in Missouri.  Count 1, a Smith

16   & Wesson model SD9VE nine-millimeter handgun

17   bearing Serial Number HEM9114.  And Count 2, a

18   Smith & Wesson Model M&P Shield nine-millimeter

19   semi-automatic handgun bearing Serial Number

20   LDE1400.

21         The stipulation is signed by myself,

22   Mr. Swan and Ms. Booth.

23         And with that, Your Honor, the

24   parties have also agreed that all the exhibits

25   listed on the Government's exhibit sheet and the

1    Defendant's exhibit sheet are admitted by

2    stipulation.

3                    THE COURT:   They'll be admitted

4    then.

5                    MR. SORRELL:   Thank you.

6                        KYLE EVANS,

7    being produced and sworn, testified as follows:

8                    THE COURT:   You may proceed.

9                    MR. SORRELL:   Thank you.

10                   DIRECT EXAMINATION

11   BY MS. WOODRUFF:

12        Q.   Would you please state your name.

13        A.   Kyle Evans.

14        Q.   And how are you employed?

15        A.   Through the Cape Girardeau Police

16   Department.

17        Q.   And how long have you generally worked

18   there?

19        A.   For Cape almost four years.

20        Q.   And were you in law enforcement prior to

21   that?

22        A.   I was.

23        Q.   Where was that?

24        A.   In Blytheville, Arkansas.

25        Q.   And how long were you in law enforcement

1    then?

2         A.   Eighteen months.

3         Q.   So you've worked here for the Cape

4    Girardeau Police Department for a number of

5    years?

6         A.   Yes.

7         Q.   And were you working in an employed

8    capacity as a police officer on May 26th of this

9    year -- or, I'm sorry, 2018?

10        A.   Yes.

11        Q.   And also still this year too?

12        A.   Both years.

13        Q.   And on that date, May 26th, 2018, were

14   you working on regular patrol?

15        A.   Yes.

16        Q.   And were you working, what, the

17   overnight shift?

18        A.   Yes.  I was on midnights.

19        Q.   Would you move that a little bit closer

20   to you so the jury can be sure to hear you.

21        A.   (Witness complies.)

22        Q.   Thank you.  And you were on midnights?

23        A.   Yes.

24        Q.   How many people are on your platoon?

25        A.   We usually allow 10 if we're running a

1  full shift, but sometimes it will run anywhere

2  from six to ten depending on whether we have

3  extra detail on the weekends due it being busy.

4  It can vary from six officers all the way up to

5  we've had 20.

6     Q.   Sure.   And on this particular night you

7  were working a regular patrol with others that

8  were in your platoon?

9     A.   Yes.

10    Q.   And approximately at 3:40 a.m. do you

11 recall where you were?

12    A.   Yes.

13    Q.   And where was that?

14    A.   I was in the 500-block of South

15 Frederick and College.   The intersection where

16 College is, Frederick and Middle.   In between

17 Frederick and Middle, but on College if that

18 makes sense.

19    Q.   Well, it makes sense to me but not all

20 of our jurors are from Cape Girardeau.

21    A.   Okay.

22    Q.   So can you give them an idea of where

23 that is in relation to the Mississippi River

24 bridge?

25    A.   So it will be -- the bridge will be

1   Route 146 going to Illinois or Route 74.  College

2   is the immediate north street up there.  Even

3   though it's separated by a grass median you can

4   still be on College and see the whole bridge.

5          Q.   So you were down in an area around the

6   bridge?

7          A.   Yes.

8          Q.   Obviously on the Missouri side?

9          A.   Yes.

10         Q.   And were other officers there at the

11  time?

12         A.   Were other officers with me?

13         Q.   With you.

14         A.   Yes.

15         Q.   Who else was there?

16         A.   There was an Officer Yoder and an

17  Officer Brotz.

18         Q.   And were all of you dressed as you are

19  today in full police uniforms?

20         A.   Yes.

21         Q.   And were you in a fully marked patrol

22  car?

23         A.   Yes.

24         Q.   And what were you doing down there?

25         A.   We were -- there was a previous call

1    we'd had, and we'd cleared that call, and we were

2    talking about that call.  It was shots fired call

3    down there.  It didn't have -- it wasn't in

4    reference to this or anything, but that's where

5    we were.  We just happened to be there, and we

6    talked about it.

7         Q.   So you cleared one call, and then you

8    were just congregating there as you were talking

9    about that previous call?

10        A.   Correct.

11        Q.   And did something catch your attention?

12        A.   Yes.

13        Q.   That was that?

14        A.   That a dark colored vehicle in the

15   driving lane coming over the Illinois bridge at a

16   high rate of speed.

17        Q.   So what was it that first caught your

18   attention?  Was it the sound, or did you see it?

19        A.   I could hear it.  I could hear the

20   vehicle.  And then I saw it almost

21   simultaneously.

22        Q.   And when you say you could hear it, what

23   was it that drew your attention?

24        A.   The sound of a car accelerating.

25        Q.   Going pretty fast?

1          A.    Yes.

2          Q.    And then what happened then?

3          A.    I got on the radio.   I estimated its

4    speed was close to 100 when I radioed.   And I

5    immediately went to where it was at and went on

6    Frederick, which is I was in between Frederick --

7    and so when I went on Frederick going northbound,

8    I don't know the other street -- sorry.

9          Q.    I do have a map.   It's marked as

10   Government's Exhibit 10.   It's already been

11   admitted.   You should be able to see it there on

12   your screen.   Do you see that?

13         A.    I can, but I don't know if I can read

14   it.

15              (Government's Exhibit No. 10, Aerial

16   Map, was identified.)

17   BY MS. WOODRUFF:

18         Q.    Well, they have it on their screen as

19   well right in front of them, and then there is a

20   large television screen there.   Can you point out

21   where the area is, basically the Mississippi

22   River bridge.

23         A.    So 74 -- is this a touch screen?

24         Q.    Is this the bridge right here?   I can

25   point to it.

1          A.   Okay.  Yes.

2          Q.   And you were in the area close to the

3    bridge?

4          A.   Correct.  I was right here.

5          Q.   If you make a mark on your screen, it

6    will show up on the other screens.

7          A.   Okay.  I believe I was right there.

8          Q.   You were that close to 74?

9          A.   Well, College runs right there.

10          Q.   And that's where you guys were initially

11   congregated?

12          A.   Correct.

13          Q.   So then you see this dark colored car

14   coming off the bridge, and I think you were

15   describing the direction of travel that you took.

16          A.   Yes.  So I went immediately a short

17   distance west, and then I went north on

18   Frederick, which is right here.

19          Q.   And that's the direction that you

20   traveled in?

21          A.   Yes.

22          Q.   And then --

23          A.   Down Morgan Oak west.  It's hard for me

24   to see the screen.  I believe that's Morgan Oak

25   right -- the first one.

1      Q.    So are you basically traveling parallel

2   to the direction of the speeding car?

3      A.    Well, yes.   When I went west and we're

4   both going on 74 and then we're both parallel to

5   each other northbound.

6      Q.    Okay.   So at some point were you able to

7   catch up with the motor vehicle?

8      A.    Yes.

9      Q.    And when I say "catch up," were you

10  right behind them?

11     A.    On distance wise I would say 10 to 15

12  car lengths.

13     Q.    Were there any cars between you and the

14  car that you were pursuing?

15     A.    No.

16     Q.    And is it fair to say you got a better

17  look at what that motor vehicle looked like now?

18     A.    I'm sorry?

19     Q.    Could you get a better look at what the

20  motor vehicle looked like?

21     A.    Yes.

22     Q.    And what was its approximate make?

23     A.    It was a Dodge Charger.

24     Q.    And it was the same car you saw coming

25  off the bridge?

1      A.   It was a dark colored vehicle.  I mean,

2   at that distance I couldn't for certain say that

3   it was a Dodge Charger on top of the Illinois

4   bridge.

5      Q.   Did you believe that it was the same

6   car?

7      A.   Yes.

8      Q.   Otherwise why are you following it;

9   right?

10     A.   At 3:40 in the morning there's no

11  traffic.

12     Q.   So at some point were you able to get

13  close enough to see the license plate?

14     A.   Yes.

15     Q.   And did you realize at some point that

16  you were familiar with that car?

17     A.   I did.

18     Q.   Where was that?

19     A.   We were about Morgan Oak and Pacific,

20  which is maybe a block and a half from where I

21  began to read out the plate.

22     Q.   So can you point on the screen there for

23  the jury where you were when you realized you

24  recognized the car.

25     A.   The -- so the words on here are really

1    blurred.  I'm not really clear on what is on the

2    screen.

3          Q.   Can you read them?

4          A.   I cannot.

5          Q.   Okay.

6          A.   I want to circle Good Hope, and I don't

7    want to get the wrong street.  We were at Morgan

8    Oak, and it was not Pacific, but I can't tell if

9    that's Good Hope or not.

10         Q.   Okay.  So at some point you --

11         A.   I believe that it would be right here

12   where I'm circling, because that looks like Good

13   Hope that's above it northbound, because it has a

14   quick J, so I believe this would be it what's

15   circled.

16         Q.   How did you recognize the car?

17         A.   So I have seen the car multiple times.

18   It's in the same neighborhood that I've lived in

19   for an extended period of time.  It might have

20   been a year.

21         Q.   And did you associate that car with a

22   specific person?

23         A.   I did.

24         Q.   And who was that person?

25         A.   It was Barrett Swan.

1    Q.   Do you see Mr. Barrett Swan in the

2    courtroom today?

3    A.   Yes.

4    Q.   Could you point to him and describe what

5    he's wearing for the record?

6    A.   He's at the defense table with the

7    blue-collared shirt.

8         MS. WOODRUFF:   Your Honor, I'd ask

9    the record reflect the witness has identified the

10   Defendant.

11        THE COURT:   The record will so

12   reflect.

13   BY MS. WOODRUFF:

14   Q.   And so is it fair to say at this point

15   you recognize the car, but you can't tell who's

16   in it?

17   A.   No.

18   Q.   And are you still traveling at a high

19   rate of speed?

20   A.   Over the posted speed limit, yes.

21   Q.   And is the Dodge Charger still traveling

22   at a high rate of speed?

23   A.   Correct.

24   Q.   At what point do you turn on your

25   overhead lights to conduct a speeding stop?

1    A.    I think it was real close to the area of

2    where I've got circled here, and it might have

3    been just before that area, or within one or two

4    seconds of that intersection.

5    Q.    And when you turned on your lights, did

6    you turn on your sirens as well?

7    A.    That probably took another two seconds,

8    but --

9    Q.    When you turned on your lights, did the

10   car immediately pull over?

11   A.    It did not.

12   Q.    What happened?

13   A.    So the car failed to yield going

14   northbound up to -- it went past Good Hope going

15   northbound.  This is Good Hope right here.  Good

16   Hope jumps onto a couple of hills right here, and

17   it's also right here.  So he took Good Hope, and

18   then I went westbound.  And I believe this will

19   be Henderson.

20             And then that may be the next one.  I

21   can't read the -- I don't know if that's either

22   Henderson or Park.  I believe the next one is

23   Park.  So that's Henderson.  And that's where the

24   vehicle tried to turn southbound, and it hit

25   another vehicle.

1          Q.    So you are pursuing the vehicle at this

2     point?

3          A.    Yes.

4          Q.    And at some point you turn on your

5     sirens?

6          A.    Yes.

7          Q.    You have on your overhead police lights,

8     those red and blue lights?

9          A.    Yes.

10         Q.    And the vehicle is not stopping?

11         A.    Correct.

12         Q.    And how fast were you going?  Is that a

13    residential neighborhood?

14         A.    It is.

15         Q.    Do you know about how fast you were

16    going?

17         A.    I estimated to be around 70.

18         Q.    What's the speed limit there?

19         A.    I believe all our residential is 30.

20         Q.    And so you already mentioned this corner

21    of Henderson and Good Hope.  And what happened at

22    that corner?

23         A.    The vehicle attempted to turn

24    southbound, and I've got it marked here.  It's a

25    little slope.  It hit a parked vehicle.

1          Q.   So that Charger struck a parked vehicle?

2          A.   Yes.

3          Q.   And did it cause it to come to a stop?

4          A.   I don't know if that did or if there was

5     braking involved, but it stopped.

6          Q.   Okay.  And did you see the collision?

7          A.   I did.

8          Q.   So once you see the collision, what are

9     you doing?

10         A.   Radioing.  I don't know if somebody is

11    on the radio, but I don't know.  I didn't listen

12    to the radio.  I usually call in a 1015.  Then

13    I've got -- I'm in full pursuit.  Sometimes we

14    don't have that authority to do that.

15         Q.   So for those of us who are not police

16    officers, what does 1015 mean?

17         A.   I'm sorry.  It means a motor vehicle

18    accident.

19         Q.   And so you see this accident, and then

20    so you're right there on the scene when it

21    happens?

22         A.   Yes.

23         Q.   What happens then?

24         A.   I see a black male drive -- jump out of

25    the car and get out of the driver's seat, and he

1   leaves the vehicle with the door wide open.  It

2   took me approximately -- I didn't know who was

3   driving at the time.  Yet it took me -- I'm

4   sorry?

5        Q.   So you see somebody get out of the

6   driver's seat?

7        A.   Yes.

8        Q.   Describe that person.

9        A.   It took me one second approximately to

10   know it was Barrett Swan.

11        Q.   And so it took you a second to process

12   that's who that was?

13        A.   Uh-huh, yes.

14        Q.   Is that a yes?

15        A.   Yes.  Sorry.

16        Q.   Are you out of your car by now?

17        A.   Yes.

18        Q.   And so you can see how far away he is

19   from you?

20        A.   20 -- maybe 20, 30 feet.

21        Q.   And when you see him get out of the

22   driver's side car door, does he leave the

23   driver's car door open?  Then what happens?

24        A.   Yes.  I yell out his first name.

25        Q.   Barrett?

1          A.   Correct.  And he looks back at me.  I

2     give demands to stop, and he continues to run.

3          Q.   I assume away from you?

4          A.   Correct.

5          Q.   He's not running towards you; right?

6          A.   He did not.

7          Q.   So when he runs away from you, what did

8     do you do?

9          A.   I radio over running southbound.  I knew

10    that he was running into an alleyway that was

11    just west from where we were.  We went through a

12    gate.  I don't know if we jumped it or not.  It

13    might have been open.  We continued to run past

14    Bloomfield.

15         We got to where there's like smaller

16    houses there, almost shotgun houses.  So that I

17    saw him in the backyard, and I believed he was

18    turning around to maybe run -- you know, the

19    common thing is to elude police, to run circles,

20    not to continue to just run south since they may

21    be getting tired.  So he made a loop, and I

22    radioed that he was coming back from northbound

23    on Bloomfield, and that's when one of the other

24    officers intervened on Bloomfield.

25         Q.   Because as you were doing this, were you

1    radioing to other officers to let them know

2    what's going on?

3         A.   Yes.

4         Q.   And were you radioing your location?

5         A.   Yes.  They knew the -- I believe they

6    knew the location.

7         Q.   So after he got out of the driver's side

8    door, did he leave the driver's side door open?

9         A.   Yes.

10        Q.   When you chased him on foot, were you

11   able to see inside that front passenger

12   compartment of the car?

13        A.   I can see the passenger compartment and

14   where the driver was.

15        Q.   Was there anybody else in there?

16        A.   Not in the front, no.

17        Q.   And so this is all happening very fast?

18   Is that a yes?

19        A.   Yes.

20        Q.   Is it fair to say you can't see the

21   backseat?

22        A.   Yes.  I cannot see anything within the

23   rear of the car.

24        Q.   So then you chase him, and he starts to

25   double back and other officers are arriving on

1    scene to assist?

2         A.   Yes.

3         Q.   Now, where was he eventually taken into

4    custody?

5         A.   I believe custody was on the opposite

6    side of Bloomfield.  I believe it was at the

7    intersection -- I don't want to -- I believe it

8    was one house off of Bloomfield, I believe, in

9    the backyard on the opposite side of where -- so

10   he circled out on the south side of Bloomfield,

11   but he was taken into custody at the house on the

12   north side of Bloomfield, but it was just like

13   immediate on the other side.  Was that clear

14   enough to give that account?

15        Q.   How far away from the crash?

16        A.   It couldn't have been more than

17   50 yards.  It was less than that.

18        Q.   So it was all very fast; is that

19   correct?

20        A.   Yes.

21        Q.   So if you see this car coming across the

22   bridge at 3:40 a.m., which you already testified

23   to, do you recall what time he was taken into

24   custody?

25        A.   I would estimate about three minutes.

1       Q.   So it was all very, very fast, the

2   seeing him, the pursuit, and the running, all of

3   it within about three minutes?

4       A.   Yes.

5       Q.   And there was another officer who found

6   this hiding spot and took him into custody?

7       A.   Yes.

8       Q.   Is that Sergeant Edwards?

9       A.   Yes.  I believe it was Corporal Edwards

10  at the time.  So it may have listed corporal in

11  the report, but yes.

12      Q.   He's a sergeant now?

13      A.   Yes.

14      Q.   And you then returned to where you left

15  your car there at the scene of the crash?

16      A.   Yes.

17      Q.   And I want to show you what's recently

18  been admitted as Government's Exhibit 1.  I know

19  that's very dark.  But can you point out for the

20  jurors what they're seeing here.

21      A.   So we've got back here Good Hope.  Back

22  here is where the street is at.  This is

23  Henderson right here.  This will be the lane on

24  Henderson.  The vehicle goes off the roadway and

25  we're this way, which is facing south.

1            So the vehicle attempts to turn south,

2      and he misses his lane, obviously, and flies

3      off -- the vehicle flies off in this lane, and he

4      hits this parked vehicle that's back here, which

5      I can see back there.

6            So I did notice the -- there's the door

7      that's open.  I can't see anything other than

8      that.  I probably -- not probably.  I ran right

9      through here.  I was going to -- I never hit

10     grass, so I didn't get -- I was only on pavement

11     when I ran.  I went to cross.  I didn't see

12     anything obvious, no persons anywhere concerned

13     about somebody pursuing us and trying to hurt us.

14     That was my immediate concern.  And then I

15     refocused back on the driver.

16                (Government's Exhibit No. 1, Photo,

17     was identified.)

18     BY MS. WOODRUFF:

19         Q.   Okay.  So the dark-colored vehicle we

20     see in the foreground, is that Mr. Swan's car?

21         A.   Yes.

22         Q.   And then the one that's barely visible

23     there, a little bit in the distance in front of

24     Mr. Swan's car, that's the car that he struck?

25         A.   Yes.

1          Q.   I'm going to show you a little better

2     picture which has already been admitted as

3     Government's Exhibit 2.   A little clearer; right?

4          A.   Yes.

5               (Government's Exhibit No. 2, Photo,

6     was identified.)

7     BY MS. WOODRUFF:

8          Q.   So we can see that open driver's side

9     door of Mr. Swan's car?

10         A.   Yes.

11         Q.   Is that how you left it when you got

12    out?

13         A.   Yes.

14         Q.   And then that tan-colored car in front,

15    is that the parked car that he struck?

16         A.   Yes.

17         Q.   Now, I understand you didn't have

18    anything to do with the evidence collection in

19    this case --

20         A.   I did not.

21         Q.   -- other than you ran a trace on a

22    firearm that was located in Mr. Swan's car?

23         A.   I did.

24         Q.   And that's called an ATF trace?

25         A.   Yes.

1      Q.   And is that something that you normally

2   do when guns are recovered?

3      A.   Yes.

4      Q.   And did you receive a response back?

5      A.   I did.

6      Q.   I'm going to show you what's previously

7   been marked and admitted as Government's

8   Exhibit 13.  I'm going to move it down here a

9   little bit for you.

10          Is that your name there at the top --

11     A.   Yes.

12     Q.   -- as requesting officer?

13     A.   Yes.

14          (Government's Exhibit No. 13, Trace

15   Report, was identified.)

16   BY MS. WOODRUFF:

17     Q.   And can you explain to the jury what

18   this trace report tells you.

19     A.   I don't know a whole lot honestly about

20   when we get firearms back where -- you know, this

21   is more of a follow-up process.  I know it will

22   tell you like where it was purchased last, where

23   it was -- I don't know if that's just -- you can

24   ask, you know, where it was legally purchased at.

25   I don't even know if that's what it amounts to.

1    I know that it was bought at Instapawn in Poplar

2    Bluff, and they traced it back to there.

3         Q.   Okay.  So we can see here on the screen

4    where it was purchased at Instapawn in Poplar

5    Bluff?

6         A.   Yes.

7         Q.   And then it shows the person who

8    purchased that was Steven Fowler?

9         A.   Correct.

10        Q.   Obviously not Barrett Swan --

11        A.   Correct.

12        Q.   -- or anybody else?  It was Steven

13   Fowler listed as the owner --

14        A.   At this date in time, yes, he was.

15        Q.   -- when you recovered the gun and it was

16   run through ATF; correct?

17        A.   Yes.

18        Q.   Did all of this occur within Cape

19   Girardeau?

20        A.   Yes.

21        Q.   That's within the Eastern District of

22   Missouri?

23        A.   Yes.

24             MS. WOODRUFF:   No further questions.

25

```
1                    CROSS-EXAMINATION
2    BY MS. BOOTH:
3         Q.   Officer Evans, good afternoon.
4         A.   Hi.
5         Q.   Just a few moments ago we were working
6    with Government's Exhibit No. 1, a map.  I have a
7    similar map, so I'm going to put it down on the
8    machine to see if we're able to see the street
9    names better over the machine.  If not, I'll ask
10   the Judge if I can physically approach you and
11   then you can look at this piece of paper.
12        A.   Okay.
13             (Defendant's Exhibit No. A, Map, was
14   identified.)
15   BY MS. BOOTH:
16        Q.   This is Defendant's Exhibit A.  Are you
17   able to see street names on this, Officer Evans?
18        A.   Yes, I can see them better.
19        Q.   All right.  And this map is similar to
20   the one that we just viewed of the Government's;
21   correct?
22        A.   Yes.
23        Q.   All right.  But it's, I guess, a higher
24   up view.  We see here where I'm pointing this is
25   the Mississippi River; correct?
```

1          A.   Yes.

2          Q.   All right.  And this is Highway 74.

3    It's crossing over the Mississippi River and

4    proceeding into Cape Girardeau; correct?

5          A.   Yes.

6          Q.   Okay.  Now, are you familiar with a

7    nightclub that's located immediately across the

8    river in Illinois called The Pony?

9          A.   I am.

10          Q.   Okay.  Is it fair to say that The Pony

11    is just immediately across the bridge over more

12    in this area, but it's pretty much right across

13    the bridge; correct?

14          A.   It's in Illinois across the bridge.  I

15    don't know the exact distance.

16          Q.   Would you say about five minutes across

17    the bridge once you get into Illinois?

18          A.   It's not five minutes, no.

19          Q.   Maybe two minutes?

20          A.   It may not even be two minutes.

21          Q.   Okay.  So The Pony is right there right

22    as you get off the bridge in Illinois; is that

23    fair to say?

24          A.   Yes.

25          Q.   Officer Evans, you were located on

1  College Street where I'm pointing on the map;

2  correct?

3       A.   Yes.

4       Q.   And you were parked there in your patrol

5  car with some other officers?

6       A.   Yes.

7       Q.   And the other officers that were there,

8  who else was parked right there on College

9  Street?

10       A.   So it was me, Officer Yoder, and now --

11  they're all there now with me, Officer Yoder and

12  Officer Brotz.

13       Q.   And your car is positioned on College

14  Street that you are actually facing east so you

15  can see the traffic coming across this bridge;

16  correct?

17       A.   I was out of my vehicle.

18       Q.   Okay.

19       A.   I'm not positive which way my vehicle

20  was facing.

21       Q.   That's all right.  Just so long as you

22  were facing east.

23       A.   Yes.  I was out of my vehicle.

24       Q.   Okay.  And briefly this car is parked

25  there on College Street?

1          A.   Yes.

2          Q.   Was your light bar activated or

3     headlights and taillights on?

4          A.   I believe my headlights and taillights

5     were working, yes, ma'am.

6          Q.   How about the other police cars, what

7     were the lights on those cars like?

8          A.   I don't know.  They were not in an

9     emergency vehicle at the time.

10         Q.   But headlights and taillights on?

11         A.   Yes.

12         Q.   And you saw this black car proceeding

13    from Illinois on the bridge; correct?

14         A.   Yes.

15         Q.   And where would you say you first

16    noticed it?  Would it be more with where my

17    finger is or a little bit more back on the

18    bridge?

19         A.   More east.

20         Q.   More east?

21         A.   From there I can almost see the Missouri

22    line.

23         Q.   Oh, all right.

24         A.   Or I can't really see the Missouri line.

25         Q.   So would you say my finger is right here

1    is where you noticed that black car speeding into

2    Missouri?

3         A.   It would have been probably further east

4    than that.  Maybe it would have been through

5    there.

6         Q.   All right.  If I put a mark here where

7    my finger is, is that fair?

8         A.   Yeah, I believe so.

9         Q.   All right.  So this black car is

10   speeding into Missouri as you said at a very high

11   rate of speed; correct?

12        A.   Yes.

13        Q.   And when you noticed this, you decide

14   that you are going to proceed north and try to

15   intercept this car; correct?

16        A.   Yes.

17        Q.   And so our jury can understand, if

18   you're located on College Street, there's a fence

19   in the median here, you just can't pull your

20   police car out on Highway 74?

21        A.   Correct.

22        Q.   Okay.  And from your location you saw

23   this car proceed and make a right up Sprigg

24   Street?

25        A.   Yes.

1      Q.   Okay.   So when you notice this black car

2   make a right and go up Sprigg Street, you tried

3   to intercept it, and you know the best way for

4   you to proceed is to proceed north; correct?

5      A.   Correct.

6      Q.   And then you went up to this street

7   here, which is Morgan Oak; correct?

8      A.   Yes.

9      Q.   Do you know if you went up Frederick or

10   if you went up South Middle?

11      A.   I went up Frederick.

12      Q.   So this is you going up to Morgan Oak.

13   And you immediately proceed west on Morgan Oak

14   and attempt to catch up with that black car;

15   correct?

16      A.   Correct.

17      Q.   I'll show you going west.   And the black

18   car had proceeded up north on Sprigg and then had

19   gone left, which is west on Morgan Oak?

20      A.   Correct.

21      Q.   And you caught up with the black car

22   would you say at Morgan Oak and South Pacific?

23      A.   Correct.   I don't know what -- I'm close

24   enough to read the plate which was almost at

25   Morgan Oak and Pacific if that's considered

1    catching up.

2         Q.   So I'll go ahead and draw the path of

3    the black car.  Then, of course, you're right

4    behind it.  So then the black car went north on

5    South Pacific, correct, onto Good Hope?

6         A.   Correct.

7         Q.   And then Good Hope swings to the east --

8    I'm sorry, the west; correct?

9         A.   Yes.  To the west.

10        Q.   And then the black car basically tries

11   to make the turn on Hanover and crashes; correct?

12        A.   Correct.  And you said Hanover?  It's

13   Henderson.

14        Q.   I'm sorry.  Henderson.  I'm sorry.

15   You're right, sir.  I'm sorry.  Henderson.

16        A.   Okay.

17        Q.   And then, of course, you're in hot

18   pursuit the whole way.

19             So, Officer Evans, from College through

20   here where the police officers were located to up

21   to the area where you caught up with the black

22   Charger no police officer was behind the Charger

23   for these blocks; correct?

24        A.   Until -- correct.  Until those are close

25   to intersecting.

1     Q.   Okay.   So can you point on the map where

2     the police cars got behind the black Charger?

3     A.   The black Charger might have been right

4     here while I was maybe here.

5     Q.   Let me see here.   So right about here is

6     where you would have caught up with the black

7     Charger; correct?

8     A.   Correct.

9     Q.   All right.   Sir, I'm going to mark that

10    on our map.   So, again, this space here that the

11    Charger travels it's all on its own not

12    accompanied by any police car behind it; correct?

13    A.   Correct.

14    Q.   All right.   Officer Evans, again, how

15    many years have you been a police officer?

16    A.   It's around five now.

17    Q.   So certainly you're not a novice.   You

18    have lots of experience pursuing people in cars

19    as they're trying to flee from the police;

20    correct?

21    A.   I have a lot for sure.

22    Q.   Yes, sir.   It's not uncommon for people

23    to start throwing contraband out the window as

24    you're pursuing them; correct?

25    A.   It does happen.

1          Q.   So you've been trained you always have a

2     keen eye to see if anything is going to fly out

3     the window; correct?

4          A.   Yes.   That's a secondary.   Safety is our

5     first, but the secondary is items getting thrown

6     out.

7          Q.   Yes, sir.   And I believe you testified

8     on Direct that you were familiar with this black

9     Dodge Charger; correct?

10         A.   Yes.

11         Q.   And you live in the same neighborhood

12    that Mr. Swan lives in or is it that his

13    girlfriend lives in?

14         A.   I don't know who the owner of the home

15    is or if it was a rental, but that vehicle was

16    there consistently, and Barrett was driving it

17    consistently.

18         Q.   All right.   So you live in a

19    neighborhood in Cape Girardeau; correct?

20         A.   Correct.

21         Q.   And there's a home in the neighborhood

22    where you would see Barrett and his car

23    frequently parked?

24         A.   Correct.

25         Q.   Is this home right across the street

1  from you?

2       A.  Yes.

3       Q.  So you'd see it all the time, and that

4  car was typically there?

5       A.  Yes.

6       Q.  And, again, you don't know whose home

7  that may be?

8       A.  I don't know if it's a rental.  I'm

9  assuming it's a rental because there's other

10  people that live there, but that's just an

11  assumption.

12       Q.  Officer Evans, I'm going to show you

13  Defendant's Exhibit B.  This is, of course, an

14  identical copy of one of the Government's

15  exhibits you just looked at.

16           So Mr. Swan jumps out of the car, he

17  doesn't miss a beat, and he takes off running; is

18  that accurate?

19       A.  Correct.

20              (Defendant's Exhibit No. B, Photo,

21  was identified.)

22  BY MS. BOOTH:

23       Q.  And you never saw Mr. Swan reach for the

24  door pocket of the car door; correct?

25       A.  I did not.

1          Q.   You never saw him hesitate in any way

2     around the door?

3          A.   There was no hesitation.

4          Q.   He just took off running?

5          A.   Correct.

6          Q.   Officer Evans, was it your call to call

7     an evidence technician to take photographs of the

8     scene, or was that some other officer's

9     responsibility?

10         A.   I believe I made the call.

11         Q.   And was it your decision to direct the

12    evidence technician as to where to focus his

13    photographs, or would that have just been left

14    with him, and I speak to him when he testifies?

15         A.   They go to separate specialized training

16    to make sure they get what they need, so I

17    couldn't speak on his behalf.  He knew a general

18    idea of what I needed photographed.

19         Q.   And you wrote a police narrative in this

20    case; correct?

21         A.   Yes.

22         Q.   And then you were also the police

23    officer that wrote the probable cause statement

24    for Mr. Swan's arrest; correct?

25         A.   Yes.

1      Q.   And a probable cause statement is what's

2  handed to the judge to get a warrant for

3  someone's arrest; correct?

4      A.   Correct.

5      Q.   Would you say then that you're the lead

6  investigating officer on this matter?

7      A.   It was my traffic stop, yes.

8      Q.   And you brought your police narrative

9  with you here today?

10     A.   I did.

11     Q.   And when you got back to the station on

12  May the 26th, it's fair to say too that your

13  first order of business was to write down

14  everything you could remember from this event;

15  correct?

16     A.   From the time allotted.  I don't know

17  what other calls were coming in, but, yes, it

18  needed to be done before the shift ended.

19     Q.   Yes.  And you completed your report on

20  May 26th; correct?

21     A.   Yes.

22     Q.   The same day that this happened?

23     A.   Correct.

24     Q.   And I see that you signed your name to

25  the bottom of your report?

1      A.    Yes.

2      Q.    And signed your name?

3      A.    Yes.   On the -- it may not show it on

4  these print-offs, but on my original that's in

5  our records they are signed.

6      Q.    And that's to say that you have verified

7  it and everything is accurate?

8      A.    Yes.

9      Q.    Thank you, Officer Evans.

10      A.    Thank you.

11            THE COURT:   Any redirect?

12            MS. WOODRUFF:   No, no redirect.

13            THE COURT:   You may step down.

14            THE WITNESS:   Do I need to clear the

15  screen?

16            THE COURT:   She can do it.

17            (Witness Excused.)

18            THE COURT:   Call your next witness.

19            MS. WOODRUFF:   The Government calls

20  Sergeant Rodney Edwards.

21                 RODNEY EDWARDS,

22  being produced and sworn, testified as follows:

23            THE COURT:   You may proceed.

24            MS. WOODRUFF:   Thank you.

25            DIRECT EXAMINATION

BY MS. WOODRUFF:

Q.   Would you please state your name.

A.   My name is Rodney Edwards.  Sorry.

Q.   Okay.  How are you employed?

A.   The City of Cape Girardeau Police Department.

Q.   How long have you been a police officer?

A.   23 years.

Q.   And were you so employed working in your capacity as a police officer for Cape PD on August 26th, 2018?

A.   Yes, I was.

Q.   And were you just on regular patrol that night?

A.   I was, yes.

Q.   And around 3:40 a.m. was there a call that came out that caught your attention?

A.   There was, yes.  I responded to the area of Morgan Oak and Lorimer for a shots fired call. We were trying to determine the origin of where that incident took place.

And while I was in that area, I overheard Patrolman Evans on the radio state he was observing a Dodge Charger at a high rate of speed on the roadway.

1    Q.   Did you have a direction of travel for

2    that vehicle?

3    A.   I don't know if initially he gave the

4    direction of travel out, but ultimately I saw the

5    vehicle.

6    Q.   Okay.  Go ahead and just describe for

7    the jury what happened next.

8    A.   Well, as I was going west on Morgan Oak

9    and as I was proceeding towards Sprigg Street, I

10   saw Patrolman Evans exit off Frederick Street and

11   also travel west on Morgan Oak.  About the same

12   time I then saw the Dodge Charger turn west on

13   Morgan Oak from Sprigg.

14   Q.   I know that's a lot of directions.  Is

15   it fair to say that you saw Officer Evans in

16   pursuit of a Dodge Charger?

17   A.   Ultimately, yes.

18   Q.   Okay.  Did you participate in that

19   pursuit?

20   A.   I did.

21   Q.   And where were you in relation to the

22   order of cars?

23   A.   Behind the Dodge Charger was Patrolman

24   Evans, and then I was about one or two blocks

25   behind him in a secondary unit.

1      Q.   And are you trying to catch up, or are

2  you just keeping a safe distance, or what's going

3  on?

4      A.   At that time we're on certain streets

5  through the City, so I'm basically just trying to

6  keep up eyesight of Patrolman Evans.

7      Q.   Did you have lights and siren on?

8      A.   Yes.

9      Q.   And that kind of signals everybody else

10  to stay away or stop and things of that nature

11  for public safety?

12      A.   Correct.

13      Q.   And what happens then?

14      A.   As we continue to follow the vehicle,

15  it's gone north on Pacific and then west on Good

16  Hope Street.  And when I approached the

17  intersection of Good Hope and Henderson, I saw

18  that the Charger apparently had been involved in

19  an accident.

20      Q.   Okay.  So you were far enough back that

21  you couldn't actually see the collision; is that

22  fair?

23      A.   That's correct.

24      Q.   So when you arrived on scene, the

25  collision had already occurred?

1      A.   Correct.

2      Q.   What did you see when you got right

3  there?

4      A.   What I saw was a black male wearing his

5  hair in multiple dreads, long dreads running from

6  the driver's side vehicle.

7      Q.   The Dodge Charger vehicle?

8      A.   Correct.

9      Q.   Where was Patrolman Evans?

10      A.   He was chasing after the suspect.

11      Q.   Was he already out of his car?

12      A.   Yes.

13      Q.   So you were still in your patrol car?

14      A.   At this time, yes.

15      Q.   Okay.  So you don't see the collision,

16  but you actually see the driver bale out and run

17  off?

18      A.   Correct.

19      Q.   All right.  And what happens then?

20      A.   I basically just stay in my patrol car

21  and follow both the male and the driver and

22  Patrolman Evans.  And at some point the male runs

23  east into an alley off of Henderson with

24  Patrolman Evans was still chasing him on foot.

25          So I drive through the same alley.  And

1   as we're -- as I'm going through the alley, the

2   male and Patrolman Evans then goes south through

3   the yards of the houses.

4       Q.   How far away are you from the scene of

5   the crash?

6       A.   At this point?

7       Q.   Yes.

8       A.   Probably 50 yards.

9       Q.   So you're still pretty close?

10      A.   Yes.

11      Q.   And then what happens?

12      A.   So I continue -- I stay in my car.  I

13  continue through the alley and then come out on

14  Hanover Street.  I make a right onto Hanover and

15  go to the corner of Bloomfield and Hanover, which

16  is the start of the 1100 block.  And as I go west

17  on the street, I then see the same individual

18  from the car, the Charger, now heading north

19  across Bloomfield.

20      Q.   And you're still in your car?

21      A.   Yes.

22      Q.   And what then?

23      A.   Then I stopped my car.  And about the

24  same time I see the same individual run to the

25  east side of the corner house, which was 1118

1    Bloomfield.  And I temporarily sighted him.  I

2    exited my car.  I go to the same location where I

3    last saw him.

4              And at the side of this house not

5    exactly up against the house, but about 5 feet

6    off the house is kind of a brush line of vines

7    and some heavy growth, and I found the male

8    hiding in that growth.

9         Q.   So in some tall shrubs or tall grass or

10   something?

11        A.   Not necessarily grass, but it was kind

12   of a vining up against a chain link fence.  Just

13   weeds.

14        Q.   When you say hiding, was he crouching

15   down or what?

16        A.   I believe he was crouched down, yes.

17        Q.   And what do you do then?

18        A.   I then ordered him to the ground, and I

19   take him into custody and handcuff him.

20        Q.   And do you have your service revolver in

21   your hand at that time?

22        A.   Yes, I do.

23        Q.   So you're approaching him at gunpoint?

24        A.   Yes.

25        Q.   And you give him some orders, and he

1    follows?

2         A.   I'm sorry?

3         Q.   You give him some orders, and he obeys

4    those orders?

5         A.   Yes, he does.

6         Q.   And do you see that man in the courtroom

7    today?

8         A.   I do.

9         Q.   Can you please point to him and describe

10   what he's wearing for the record?

11        A.   He's wearing a blue dress shirt, and

12   he's at the defense table.

13        Q.   Thank you.

14             MS. WOODRUFF:   Your Honor.  I would

15   ask the record reflect the witness has identified

16   the Defendant.

17             THE COURT:   The record will so

18   reflect.

19   BY MS. WOODRUFF:

20        Q.   And that's Mr. Barrett Swan?

21        A.   Correct.

22        Q.   And that's the man that you saw running

23   from the driver side door of that Dodge Charger?

24        A.   Yes, it is.

25        Q.   And that's the man you found hiding in

1    the tall brush there beside the house on

2    Bloomfield?

3         A.   Yes.

4         Q.   And that's the man that you took into

5    custody and placed under arrest?

6         A.   Yes, it is.

7         Q.   Did you have a gun drawn at that time?

8         A.   Yes.

9         Q.   And you didn't find anything illegal on

10   his person?

11        A.   No.

12        Q.   And we'll try this again and show you

13   Government's Exhibit 10 which has been admitted.

14   The print is very small.  It's hard to read, but

15   it's a map of the area.  And I think I can zoom

16   in, but I don't know if that will help the print

17   here or not.  Maybe not.

18             Can you find on this map the area at

19   Henderson and Good Hope where the crash occurred?

20        A.   (Witness complies.)

21        Q.   Is that about right?

22        A.   Yes.

23        Q.   Is that Henderson and Good Hope?

24        A.   I believe it is, yes.

25        Q.   So it was right at that corner there?

1      A.   Where the accident took place?

2      Q.   Yes.

3      A.   Yes, ma'am.

4      Q.   And from that point can you point for

5  the jurors where you took Mr. Swan into custody?

6      A.   Okay.  It would have been the corner

7  house right here.

8      Q.   If you can circle it on the screen, it

9  will show up.  So it wasn't very far from this

10  site of the crash?

11      A.   No.

12      Q.   It all happened very fast?

13      A.   Correct.

14      Q.   Other than that did you have any other

15  involvement in this case?

16      A.   No.

17      Q.   Thank you.

18           MS. WOODRUFF:  No further questions.

19                CROSS-EXAMINATION

20  BY MS. BOOTH:

21      Q.   Sergeant Edwards, you saw Mr. Swan get

22  out of the black Dodge Charger after the crash;

23  correct?

24      A.   No.

25      Q.   You did not see him get out?

1        A.    No.

2        Q.    Well, it makes sense then that it's fair

3   to say you never saw him reach towards the door

4   pocket of the black Dodge Charger, or anything

5   like that, of course, because you didn't see him

6   get out of the car; correct?

7        A.    That would be correct.

8        Q.    And you searched Mr. Swan very

9   thoroughly before you took him into custody;

10  correct?

11       A.    I believe so, yes.

12       Q.    You searched his pockets?

13       A.    Yes.

14       Q.    Anything else that you searched?  You

15  didn't have -- it was just pockets basically to

16  search on his person; correct?

17       A.    Correct.

18       Q.    Meaning he didn't have a backpack or

19  anything like that with him?

20       A.    No.

21       Q.    Okay.  And you didn't find anything on

22  his person connected to a firearm, correct?

23       A.    That's correct.

24       Q.    You didn't find any ammunition?

25       A.    No.

1          Q.   You didn't find an extra magazine for a

2     firearm, or anything like that?

3          A.   No.

4          Q.   And Mr. Swan, when you encountered him,

5     he complied with your commands; correct?

6          A.   That's correct.

7          Q.   Okay.   He never resisted you physically

8     in any way?  He didn't fight with you to go into

9     custody?

10         A.   Correct.

11         Q.   I understand he ran away from the police

12    officers, but when you were going to physically

13    put handcuffs on him and take him into custody,

14    he didn't physically aggress against you in any

15    way?

16         A.   That's correct.

17         Q.   Okay.   And Mr. Swan is a pretty large

18    man; correct?

19         A.   Yeah.   As far as height I believe so,

20    yes.

21         Q.   Yes.   Yes.   He's a big man, but he

22    didn't use his physical force to push against

23    you, or anything like that?

24         A.   No.

25         Q.   All right.   And he wasn't rude or

1    combative or disrespectful in how he spoke with

2    you when you were taking him into custody;

3    correct?

4         A.   No not with me, no.

5         Q.   Sergeant Edwards, when you got back to

6    the police station after this incident, it was

7    still, of course, the early morning hours of

8    May 26th, 2018; correct?

9         A.   Yes.

10        Q.   And your first order of business, was it

11   to make your police narrative?

12        A.   I'm sorry, to make my what?

13        Q.   Your police narrative.  You authored

14   your police narrative; correct?

15        A.   At that point in time I would, yes.

16        Q.   Yes, on May the 26th.  If you had your

17   report in front of you, you could look at the

18   bottom of that if that would refresh your memory.

19        A.   It looks like I opened the document

20   at 4:29.

21        Q.   I'm sorry, sir, I did not hear you.  If

22   you could say that again, please.

23        A.   I believe I opened the document up at

24   4:29 a.m.

25        Q.   On May the 26th of 2018 to begin writing

1    your report; correct?

2         A.   Correct.

3         Q.   And you completed your report on that

4    day; correct?

5         A.   Correct.

6         Q.   And then on your report it also has your

7    signature.  Did you sign the report, hand sign

8    it?

9         A.   I would have, yes.

10        Q.   And is that after you review it for

11   accuracy to make sure everything in it is correct

12   as to how you remember it?

13        A.   I try my best to review everything, but,

14   yes.

15        Q.   And certainly you reviewed your report

16   for accuracy before you turned it over to the

17   prosecutor and everyone to use; correct?

18        A.   I typically sign it after I'm finished

19   and I've reviewed it, yes.

20        Q.   Yes, sir.  Thank you.  Thank you, sir.

21             THE COURT:  Redirect.

22                  REDIRECT EXAMINATION

23   BY MS. WOODRUFF:

24        Q.   Officer, when you write your report, you

25   do your best to put all the important information

1   in your report, don't you?

2        A.   Yes, I do.

3        Q.   Sometimes you forget to put things in

4   there, don't you?

5        A.   It can happen, yes.

6        Q.   Or sometimes things that are important

7   later you don't realize it at the time?

8        A.   Correct.

9             MS. WOODRUFF:  No further questions.

10            THE COURT:   Any recross?

11            MS. BOOTH:  No, sir.  Nothing

12   further.

13            THE COURT:  You may step down.

14            THE WITNESS:  Okay.

15            (Witness Excused.)

16            THE COURT:  Call your next witness.

17            MS. WOODRUFF:  I call Gabriel Yoder.

18            If you'll come up, the clerk will

19   swear you in.

20                 GABRIEL YODER,

21   being produced and sworn, testified as follows:

22            THE COURT:  You may proceed.

23            MS. WOODRUFF:  Thank you.

24               DIRECT EXAMINATION

25   BY MS. WOODRUFF:

1        Q.    Please state your name.

2        A.    Gabriel Yoder.

3        Q.    And how are you employed?

4        A.    A patrolman with the Cape Girardeau

5   Police Department.

6        Q.    How long have you been a police officer?

7        A.    Four years since August.

8        Q.    And were you employed as a police

9   officer with the Cape Girardeau Police Department

10  on May 26th of 2018?

11       A.    Yes.

12       Q.    And at approximately 3:40 a.m. do you

13  recall where you were at that time?

14       A.    College and Middle Street talking with

15  some other officers.

16       Q.    Just right off the road from the

17  Mississippi River bridge?

18       A.    Yes.

19       Q.    And what were you doing there?

20       A.    Talking to the other officers.

21       Q.    Who were the other officers?

22       A.    Officer Evans and Officer Brotz.

23       Q.    And while you guys are congregated down

24  in that location, is there something that happens

25  that catches your attention?

1          A.   Yes.   We heard a vehicle that sounded

2     like it was a traveling at a high rate of speed

3     coming across the bridge westbound in Missouri

4     from Illinois.

5          Q.   And so you've got a speeding car?

6          A.   Yeah.

7          Q.   What happens then?

8          A.   Officer Evans goes to intercept it, and

9     Officer Brotz was there.   I turned around.

10          Q.   So Officer Evans went to intercept it?

11          A.   Yes.

12          Q.   And you weren't in any big hurry.   I

13     mean, it's a speeding car; right?

14          A.   Yes.

15          Q.   It doesn't usually take a bunch of you

16     to stop a speeding car?

17          A.   No.

18          Q.   Okay.   So at some point it turns into

19     something more than a just a speeding car?

20          A.   Yes.   Officer Evans advised that the

21     vehicle was failing to yield, at which time I

22     began to speed up and try to get to his location.

23          Q.   And when you say he advised, you could

24     hear the radio traffic in your car?

25          A.   Yes.

1      Q.    And that's how you're aware of what's

2   going on with the other police officers?

3      A.    Yes.

4      Q.    And so you indicated that you were

5   trying to get -- to hurry to catch up?

6      A.    Yes.

7      Q.    And what happens then?

8      A.    As I'm responding to his -- to try to

9   catch up with the pursuit he advised that the

10   vehicle crashed at Henderson and Good Hope, and

11   he advised that the subject was on foot.

12      Q.    So were you aware that he was being

13   chased on foot?

14      A.    Yes.

15      Q.    And were you then on the scene pretty

16   quickly right after that?

17      A.    I would say less than a minute.

18      Q.    So when you get on the scene, what do

19   you see?

20      A.    I observe Officer Evans' vehicle with

21   its lights still on parked behind the black Dodge

22   Charger, and the driver side door of the Charger

23   is open.

24      Q.    Okay.  And I'm going to show you what's

25   previously been admitted as Government's

1    Exhibit 1.  Is that the scene as you saw it when

2    you first arrived?  I know it's very dark.  I

3    have a better picture next.

4          A.   I believe so.  I can't tell from that.

5          Q.   Let me show you what's marked as

6    Government's Exhibit No. 2.

7          A.   Yes.

8          Q.   This shows that you've got police car

9    lights on the scene:  Is that fair to say?

10         A.   Yes.

11         Q.   Now, when you arrived on the scene, did

12   you see anyone else around?

13         A.   I did not.

14         Q.   So Officer Evans -- was his car still

15   there?

16         A.   Yes.

17         Q.   And this is exactly how you saw that --

18   the driver's side door of the Dodge Charger?

19         A.   Yes.  It was completely open.

20         Q.   And what did you do then?

21         A.   As I approached the vehicle, I observed

22   in the pocket of the driver's side door that

23   there was a handgun sitting there.

24         Q.   So I'm just going to circle the driver's

25   side pocket on my screen; is that correct?

1    A.   Yes.

2    Q.   And is that where you saw a handgun?

3    A.   Yes.

4    Q.   So can you tell the jury how that gun

5    was positioned within that pocket?

6    A.   It was positioned with its grip facing

7    down with the barrel facing forward forming like

8    a T where you could easily grab it.

9    Q.   So it's in the driver's side pocket.  Is

10   that an open pocket?

11   A.   Yes.

12   Q.   So you could see it right away?

13   A.   Yes.

14   Q.   You didn't have to like lift anything or

15   open the door wide, or anything like that?

16   A.   No.

17   Q.   And would you say that it was positioned

18   so that you could just reach out and grab it if

19   this is the handle of the gun right here, this is

20   the barrel?  Is it like this?

21   A.   Yes.

22   Q.   So it's to the left of the driver?

23   A.   Yes.

24   Q.   So if you're left handed, you can easily

25   reach in and grab it and pull it right up?

1        A.   Yes.   That's how I store my firearm --
2    I'm left handed -- on my days off.
3        Q.   That's how you store your firearm in the
4    pocket of your driver's side door?
5        A.   Yes.
6        Q.   It makes it easily accessible:  Is that
7    fair to say?
8        A.   Yes.
9        Q.   So when you saw the gun, what do you do
10   immediately?
11       A.   I make sure I grab it.  I put gloves on,
12   and I make sure, one, it's real and, two, now
13   that I know it is real I make it safe.  I remove
14   the magazine and lock the slide back.  And after
15   I lock the slide back, a live round comes out of
16   the chamber of the gun showing that it was
17   readily useable.
18       Q.   So when you say you make sure it's real,
19   you make sure it's a real gun?
20       A.   Yes.
21       Q.   And when you say that you make it safe,
22   do you mean that you unloaded it?
23       A.   Yes.
24       Q.   And what kind of gun was it?
25       A.   Smith & Wesson nine-millimeter.

1     Q.   A handgun?

2     A.   Yes.

3     Q.   And a semi-automatic handgun?

4     A.   Yes.

5     Q.   And that means that all the ammunition

6  fits into the handle of the gun, the grip?

7     A.   It fits into the magazine.

8     Q.   Right.

9     A.   And the magazine is inserted into the

10 gun.

11    Q.   And then it just automatically --

12    A.   You get one bang per trigger pull.

13    Q.   Okay.  And when you say that there was

14 one in the chamber, what does that mean?

15    A.   It means that all you have to do is pull

16 the trigger.  You don't have to rack the slide

17 and put a round in there.  You can just pick it

18 up and shoot it.

19    Q.   So you have a Smith & Wesson

20 nine-millimeter semi-automatic handgun --

21    A.   Yes.

22    Q.   -- in the open door pocket of the car;

23 correct?

24    A.   Correct.

25    Q.   And semi-automatic, you refer to it, but

1      for those who aren't familiar with guns, in order

2      to make it ready to fire you have to pull back

3      the top slide?

4            A.    Yes.

5            Q.    And that chambers a round?

6            A.    Yes.

7            Q.    So all you have to do is pull the

8      trigger and the bullet comes out the pointing

9      end; right?

10           A.    That's correct.

11           Q.    Once you seized the firearm and you

12     unloaded it, what did you do then?

13           A.    While I was doing that, I looked in the

14     vehicle, and in plain view there was a cell phone

15     sitting in the center console that's underneath

16     the -- like the radio, and there was apparent

17     marijuana on it.  And as I continued to search

18     the vehicle, I observed a marijuana cigarette in

19     the same area.

20                 And as I searched in the glove box or in

21     the center console compartment that sits right

22     next to the driver's seat, I found two bank cards

23     with the name Barrett Swan on them.

24           Q.    And do you collect all of those items?

25           A.    Yes.

1          Q.    You weren't an evidence tech at the
2    time?
3          A.    No.
4          Q.    And did you -- were you aware that an
5    evidence tech was responding?
6          A.    I believe later.
7          Q.    And so you just collect the items and
8    then the evidence technician actually --
9          A.    Processes everything and puts it in
10   evidence.
11         Q.    And takes photographs and everything?
12         A.    Yes.
13         Q.    That gun the way that you described that
14   it was in that car door pocket, why didn't you
15   leave it in place so it could be photographed in
16   place?
17         A.    I mean, it's a firearm.  I just want to
18   make sure that it's properly secured and that no
19   one comes up and grabs it and tries to shoot us
20   or comes up and tries to steal it and for
21   evidence.
22         Q.    So for safety reasons?
23         A.    Yes.
24         Q.    And do you then turn the scene over to
25   the evidence technician when he arrives?

1          A.   Yes.

2          Q.   I'm going to show you what's previously

3     been admitted as Government's Exhibit 4.  Are

4     these some of the items that you talked about

5     that you found?

6          A.   Yes.

7               (Government's Exhibit No. 4, Photo,

8     was identified.)

9     BY MS. WOODRUFF:

10         Q.   And so as I point to them, can you tell

11    the jury what we're looking at here?

12         A.   That's the firearm, the magazine that's

13    in the firearm and the round that ejected from

14    the chamber.

15         Q.   So that's a live round of ammunition

16    here?

17         A.   Yes.

18         Q.   How many rounds of ammunition were in

19    the magazine?

20         A.   I don't know.  I did not remove the

21    rounds from the magazine.

22         Q.   Is that something the evidence tech

23    should take care of?

24         A.   Yes.

25         Q.   And then what do we have here?

1        A.   I believe that's the marijuana

2   cigarette.

3        Q.   Just a small amount of marijuana?

4        A.   Yeah.

5        Q.   And cell phone?

6        A.   Yes.

7        Q.   And I think you can see this, the strip

8   of the back of the bank card; is that right?

9        A.   Uh-huh.

10        Q.   Is that a yes?

11        A.   Yes.  Sorry.

12        Q.   Now, I'm going to show you what's

13   previously been admitted as Government's Exhibit

14   No. 5.  Can you point on your screen -- actually,

15   I think I put it on my screen.  Is this the slide

16   that you talked about you have to pull back in

17   order to chamber a round?

18        A.   Yes.

19             (Government's Exhibit No. 5, Photo,

20   was identified.)

21   BY MS. WOODRUFF:

22        Q.   And it's just at the top of the gun?

23        A.   Uh-huh, yes.

24        Q.   And then other than locating this gun

25   and making it safe, unloading it and searching

1   the car, did you have any other involvement in

2   this case?

3         A.   No.

4         Q.   You didn't have any contact with

5   Mr. Barrett Swan?

6         A.   I did not.

7         Q.   Thank you.

8              MS. WOODRUFF:   No further questions.

9              THE COURT:   Cross-examination.

10                  CROSS-EXAMINATION

11  BY MS. BOOTH:

12        Q.   Officer, good afternoon.

13        A.   Good afternoon.

14        Q.   Sir, if you look for me at Defendant's

15  Exhibit A, this is a Google map of the streets of

16  the area where the black Dodge Charger was

17  initially seen and the police chase ensued.   So

18  if you've had a moment to look at this now and

19  see the streets indicated, so you oriented

20  yourself that this is the map that is described?

21        A.   Yes.

22        Q.   Okay.   So, again, you were located on

23  College Street, correct, when you noticed a car

24  speeding across the Mississippi river bridge

25  proceeding into Cape Girardeau; correct?

1        A.   Yes.

2        Q.   And the car, would you say you noticed

3   it as it was over the water, or was it more into

4   Cape as you saw -- as you noticed it?

5        A.   I couldn't tell you.  Just it was on the

6   bridge.

7        Q.   Okay.  But it was definitely on the

8   bridge coming in from Illinois; correct?

9        A.   Yes.

10        Q.   Going very fast?

11        A.   I believe so.

12        Q.   No mistake about that; right?

13             Sir, when you noticed that black Dodge

14   Charger speeding west coming off the bridge, you

15   also noticed another vehicle that was also

16   speeding and heading west in the same direction

17   as the Charger; correct?

18        A.   Yes.

19        Q.   So there were two vehicles speeding

20   heading into Cape Girardeau; is that fair to say?

21        A.   Yes.

22        Q.   Did they look as though they were

23   keeping up neck and neck, the two vehicles?

24        A.   I really don't remember seeing the

25   second vehicle.  I don't know where they were at.

1    I couldn't tell you anything about the second

2    one.

3         Q.   Can you remember if they were next to

4    each other or one behind the other, if you can

5    remember that?

6         A.   I don't.

7         Q.   You don't?  That's all right.

8              Officer Yoder, when you began touching

9    items of evidence inside the Dodge Charger, did

10   you have gloves on?

11        A.   Yes.

12        Q.   So you had gloves on before you picked

13   up the firearm; correct?

14        A.   Yes.

15        Q.   You made certain to do that?

16        A.   Yes.

17        Q.   And why do you put gloves on?  Why not

18   just pick the firearm up with your bare hands?

19        A.   I don't want to put my fingerprints or

20   my DNA on the gun.

21        Q.   So you don't want to contaminate any

22   evidence that may be on the gun; correct?

23        A.   Correct.

24        Q.   And that's a procedure you use all the

25   time; correct?

1      A.   For firearms?

2      Q.   Yes, sir.

3      A.   It depends on the circumstances.

4      Q.   So if you have gloves available,

5    certainly you're going to put them on for

6    handling the firearm; correct?

7      A.   Yes.

8      Q.   Officer Yoder, let's look at Defendant's

9    Exhibit D, and you found the firearm in the

10   storage pocket of the Charger; correct?

11     A.   Yes.

12          (Defendant's Exhibit No. D, Photo,

13   was identified.)

14   BY MS. BOOTH:

15     Q.   And I think that the way you described

16   it sitting was if you were sitting in a car, you

17   could just reach down and grab it, and it would

18   fit conveniently in your hand.  That was the

19   position of it; correct?

20     A.   Yes.

21     Q.   And, in fact, you said that when you're

22   off duty, that's how you carry your firearm in

23   your car; is that correct?

24     A.   Yes.

25     Q.   And in May of 2018, Officer Yoder, for

1    our jurors who may not know, was it Missouri's

2    law that if a person could legally carry a

3    firearm, meaning they're not a convicted felon,

4    they don't have a restraining order against them,

5    they don't have any domestic assault

6    misdemeanors, nothing that would preclude them

7    from having a firearm in the car, a Missouri

8    citizen didn't need a concealed carry permit or

9    anything to carry a firearm in a car; correct?

10        A.   Correct.

11        Q.   Okay.  So, in fact, as a police officer

12   I'm sure you've pulled over people in Missouri

13   for just simple traffic offenses and have learned

14   that they have a firearm in their car with them;

15   correct?

16        A.   Yes.

17        Q.   And so long as they're not a convicted

18   felon or prohibited from having that firearm in

19   any way they're allowed to drive off with their

20   firearm; correct?

21        A.   Yes.

22        Q.   Let's go back to Government's Exhibit 4.

23   Officer Yoder, now you're not the person who took

24   this photograph, Officer Hellmann took this

25   photograph; correct?

1          A.   Yes.

2          Q.   All right.  Now, who was responsible for

3     putting the firearm and these other items in this

4     car seat?

5          A.   I was.

6          Q.   Okay.  So we need to be clear that when

7     you came up to the Charger to start

8     investigating, these items were not in this car

9     seat; correct?

10         A.   They were not.

11         Q.   Okay.  None of these items you found in

12    this car seat.  Again, we talked about the

13    firearm had its magazine in it, and they were in

14    the door pocket; correct?

15         A.   Yes.

16         Q.   Okay.  And then the cell phone was

17    sitting on top of the center console?

18         A.   In the center -- where that white dot is

19    on the left corner that -- underneath like the

20    radio.  Right there, yes.

21         Q.   Oh, right there?  Okay.

22         A.   That's where it was at.  Where one of

23    the cell phones was at.

24         Q.   And then I think we have some like

25    credit cards or bank cards; correct?

1          A.   Yes.

2          Q.   These were not located -- these were

3     located somewhere over in the console?

4          A.   Those were located in like the actual

5     compartment that you flip up --

6          Q.   Okay.

7          A.   -- in between the two seats.

8          Q.   So, yes, sir.  The over arching theme

9     I'm trying to make is that these items were not

10    found in the car seat, specifically the firearm?

11         A.   Yes.

12         Q.   Okay.  And in the door pocket you didn't

13    find anything but the firearm; correct?

14         A.   Correct.

15         Q.   You didn't find Mr. Swan's cell phone;

16    correct?

17         A.   Correct.

18         Q.   You didn't find a pack of cigarettes, or

19    anything else like that, any personal items of

20    Mr. Swan's in the door pocket; correct?

21         A.   I do not believe so.

22         Q.   Officer Yoder, please look at the

23    Defendant's Exhibit C for me.  Do you recognize

24    what this is a picture of?

25         A.   It's looks like a bottle of liquor and

1    cigarettes.

2                   (Defendant's Exhibit No. C, Photo,

3    was identified.)

4    BY MS. BOOTH:

5         Q.   Yes.   This is a photograph of the

6    passenger seat of the Dodge Charger after the

7    police were processing it for evidence.   Do you

8    recall seeing that bottle of alcohol and that

9    pack of cigarettes in that passenger seat?

10        A.   I don't.

11        Q.   That's okay if you don't.   But you don't

12   remember seeing that?

13        A.   No.

14        Q.   And, again, you didn't take this photo?

15        A.   No.

16        Q.   Now, we talked about how you put some

17   evidence items in the driver's seat just for a

18   photographic purpose; correct?

19        A.   Yes.   All the things that I located.

20        Q.   Okay.   Yes, sir.   The important things

21   that you located.

22             But now you didn't place this alcohol

23   bottle or this pack of cigarettes in the

24   passenger seat; correct?

25        A.   No.

1    Q.   So it's fair to say that that's how it

2    was found when the police encountered the car?

3    A.   I don't know if it was by another

4    officer.

5    Q.   That's a good point, but you know you

6    didn't?

7    A.   I don't believe so.

8    Q.   Thank you, Officer.

9         THE COURT:   Redirect?

10        MS. WOODRUFF:   No, sir.

11        THE COURT:   You may step down.

12        (Witness Excused.)

13        THE COURT:   Call your next witness.

14        MS. WOODRUFF:   Yes, sir.   The

15   Government calls Corporal Brett Hellmann.

16             BRETT HELLMANN,

17   being produced and sworn, testified as follows:

18        THE COURT:   You may proceed.

19        MS. WOODRUFF:   Thank you.

20        DIRECT EXAMINATION

21   BY MS. WOODRUFF:

22   Q.   Would you please state your name.

23   A.   Brett Hellmann.

24   Q.   Where are you employed?

25   A.   I'm a police officer for Cape City.

1          Q.    How long have you been a police officer?

2          A.    A little over five years.

3          Q.    And were you employed working in your

4    capacity as a police with the Cape Girardeau

5    Police Department on May 26th of 2018?

6          A.    I was.

7          Q.    What was -- did you have any special

8    duties at that time?

9          A.    I did.  I was a evidence technician.

10         Q.    Can you explain to the jury what an

11   evidence technician is.

12         A.    Any time there's any kind of evidence on

13   a crime scene that needs to be processed they

14   call me out to the scene, and that's what I do.

15         Q.    So do you have specialized training for

16   that?

17         A.    I do.

18         Q.    Do you have to go to certain schools?

19         A.    I've been to three or four different

20   schools, probably altogether a couple of months'

21   worth.

22         Q.    And that's in order to qualify you to be

23   an evidence technician?

24         A.    Yeah.  Certified evidence tech.

25         Q.    And that's the capacity that you served

1    then on May 26th, 2018?

2         A.   It was.

3         Q.   On that date were you called to the

4    scene of a motor vehicle crash at Henderson and

5    Good Hope?

6         A.   I did.

7         Q.   And can you just describe for the jury

8    what you saw when you got there?

9         A.   When I got there, there was a black

10   Dodge Charger facing south on Henderson right

11   past Good Hope, I believe.  It appeared that it

12   had struck a parked car on the side of the road.

13   There was a police car parked behind it.  And on

14   the Dodge Charger the driver door was wide open.

15        Q.   And let me show you what's previously

16   been admitted as Government's Exhibit 2.  Is that

17   the scene you saw as you arrived on the scene?

18        A.   Yes, it is.

19        Q.   Did you take this photo?

20        A.   I did.

21        Q.   Did you take all of the photos involved

22   in this matter?

23        A.   I believe so.  I'm pretty sure I took

24   every photograph in this case.

25        Q.   Because you're an evidence technician?

1          A.    That is correct.   That is what I do.

2          Q.    And it is your job to take photos and

3     collect the evidence?

4          A.    That is correct.

5          Q.    And is that what you did here?

6          A.    Uh-huh.

7          Q.    Is that a yes?

8          A.    Yes.

9          Q.    And so is -- the door being open like

10    that, is that how you saw the scene when you

11    arrived?

12         A.    That is exactly how I saw the scene when

13    I arrived.   Nothing has been moved there.

14         Q.    All right.   And next I'm going to show

15    you what's marked and previously been admitted as

16    Government's Exhibit Number 3.   Can you explain

17    to the jury what they are seeing --

18         A.    Move that down just a little bit.

19         Q.    -- here?

20         A.    Yes.   That is the front end of the Dodge

21    Charger facing south.   And there -- it's hard to

22    see, but there's actually some damage right

23    around here.

24              (Government's Exhibit No.  3, Photo,

25    was identified.)

1  BY MS. WOODRUFF:

2      Q.   If you can circle it on the screen, it

3  will show up for the jurors.

4      A.   I can do that.  Okay.  Right in there.

5      Q.   And that's where you noted the damage?

6      A.   Uh-huh.

7      Q.   Is that a yes?

8      A.   Yes.

9      Q.   That's a dark-colored car, so it's

10 difficult to see, but in person you could see it

11 just fine?

12     A.   You can see it easily.

13     Q.   Was there any damage to that tan car?

14     A.   There's some damage to the back end and

15 in that area.

16     Q.   All right.  And next I'm going to show

17 you what's been marked and admitted as

18 Government's Exhibit 4.  Can you explain to the

19 jury what they are seeing here?

20     A.   This is the driver's seat of the black

21 Dodge Charger that had the door open in the

22 picture.  What you're looking at is a handgun,

23 which is right there.  It's got a little dot on

24 it.  You have the magazine, which goes to the

25 bottom of the handgun and holds all the bullets,

1    that is right there.  It's hard to see on here.

2              I believe this right here is the -- yes.

3    That right there is a spent -- not a spent bullet

4    but just a loose bullet.  There's a marijuana

5    cigarette.  A couple of cell phones are in there.

6    There's a wallet somewhere in here, I believe,

7    and a couple of credit cards here and there.  And

8    there's the cell phone I was talking about

9    earlier.

10        Q.   And those were all evidentiary items

11   that you seized?

12        A.   Yes.  Those were all items that I seized

13   except for the wallet that's over here and the --

14   there's the top of the center console that's

15   there as well.  I did not seize those two items.

16        Q.   When you got on scene, were those items

17   already in the seat?

18        A.   Yes, they were already in the seat.

19        Q.   So you didn't search the car and find

20   those items yourself, somebody had already

21   selected them?

22        A.   That's correct.

23        Q.   And was that Patrolman Yoder?

24        A.   That was Yoder.

25        Q.   Next, I'm going to show you what's been

1    admitted as Government's Exhibit 5, and this is

2    just a closer photo, but can you tell the jurors

3    what each of these items are?  And feel free to

4    use the screen.

5         A.   Okay.  So, once again, like I said, this

6    is the handgun that had been located in the car.

7    And then there is a magazine containing the

8    bullets which is right there.  This right here is

9    the better picture of the loose round, which I

10   believe came from the chamber of the gun itself.

11   A marijuana cigarette.  And then you've got a

12   couple of business cards.  And then there's the

13   back of one of the debit cards.

14        Q.   And you collected all of those items?

15        A.   Yes.

16        Q.   And was there a name on those bank

17   cards?

18        A.   Yes.  The bank cards have Barrett Swan's

19   name on them.

20        Q.   And I know that typically as an evidence

21   technician you prefer to photograph items in

22   place; is that fair to say?

23        A.   That's correct.  I prefer to do that.

24        Q.   And that didn't happen here?

25        A.   It did not.

1          Q.   Can you explain to the jury, if you

2     know, why that did not happen here?

3          A.   Ultimately, we would like to preserve

4     evidence in the way that we see it.  That way in

5     situations like this you can see exactly what we

6     saw, but officer safety and the safety of the

7     public comes first.  If there's a gun in play

8     when we show up and it's sitting there, and we

9     can't -- we don't have the officer available to

10    make sure that that gun is not dangerous, we have

11    to seize that gun.  We have to make sure it's

12    safe.  We don't want to get shot in the back.  We

13    don't want anybody else to get shot.  So that's

14    why we have to move it sometimes.

15         Q.   And sometimes the situations you're in

16    are pretty fluid; is that fair to say?

17         A.   That's very fair to say.

18         Q.   So there are times when it is best to

19    seize the gun and immediately unload it rather

20    than leave it in play, I think is the words you

21    used; right?

22         A.   Yes, that's correct.

23         Q.   Now, this particular gun, it was a Smith

24    & Wesson?

25         A.   Yes.

1      Q.    A nine-millimeter?

2      A.    Yes.

3      Q.    Semi-automatic handgun?

4      A.    Semi-automatic handgun.

5      Q.    And for the jurors who are not familiar

6    with the difference between semi-automatic

7    handguns and revolvers, can you just give them a

8    little bit of an explanation of what the

9    difference is?

10     A.    Yes.  So like I was saying earlier, this

11   is the magazine on the gun.  That magazine goes

12   into the bottom of the gun, and the main

13   difference between a semi-automatic and a

14   revolver is every time you pull the trigger on a

15   semi-automatic gun the gun will fire, but a shell

16   casing gets ejected from the gun.

17          A revolver doesn't.  You pull the

18   trigger on the revolver -- you can still pull the

19   trigger until, you know, there's no more bullets,

20   but the shells stay in the gun.

21     Q.    So the revolver is going to be a little

22   harder?

23     A.    A little tougher.

24     Q.    And in a semi-automatic the magazine

25   fits into the grip of the gun?

1          A.   That's correct.

2          Q.   Now, so you seized all of these items,

3    you took them back to the Cape Girardeau Police

4    Department?

5          A.   Yes, I did.

6          Q.   Now, in addition to these photos you

7    took some other photos I believe?

8          A.   Yes, I took several other photos.

9          Q.   So can you explain to the jury what

10   they're seeing here?

11         A.   That's the front passenger seat.

12   There's a bottle of liquor here.  It looks like a

13   pack of cigarettes there.

14         Q.   Now, those items are photographed in

15   place as you found them; is that correct?

16         A.   That's correct.

17         Q.   That's how you saw them?  You

18   photographed them just as they were?

19         A.   Yes.

20         Q.   To your knowledge, they hadn't been

21   moved by anyone else?

22         A.   No.  Not to my knowledge, no.

23         Q.   Do you know if there's any liquor in

24   that bottle?

25         A.   I don't recall.

1    Q.   But you didn't take the bottle with you?

2    A.   No, I did not.  I did not seize the

3    bottle.

4    Q.   And then did you also take photographs

5    of the backseat of the car?

6    A.   Yes.

7    Q.   And once you seized all the items, did

8    you return them to the Cape Girardeau Police

9    Department?

10   A.   I did.

11   Q.   And then did you take what we call

12   controlled photos?

13   A.   Yes.  I take photographs on the scene,

14   and any evidence that I collect from the scene I

15   take back to the station, or I take better

16   photographs closer up to it that's why you can

17   actually tell -- you know, if it wasn't clear

18   before, you can see what it is there.

19   Q.   And, of course, the police department,

20   that's a safe environment, you can take your time

21   and take as many photographs as you want?

22   A.   Yes.

23   Q.   So I'm going to show you what's

24   previously been admitted as Government's

25   Exhibit 7.  Can you just please explain to the

1  jury what you're seeing here.

2          A.   Yes.   This right here is the same

3  firearm that you saw in the front seat of the

4  black Charger.   This is the magazine that I also

5  pointed out.   All of these bullets here all came

6  from the magazine itself.   And this round -- this

7  bullet there was the bullet that came from the

8  chamber of the firearm.

9                  (Government's Exhibit No. 7, Photo,

10  was identified.)

11  BY MS. WOODRUFF:

12          Q.   So how many rounds were in the magazine?

13          A.   There were 15 in the magazine.

14          Q.   And how many rounds does the magazine

15  hold?

16          A.   A magazine holds 15 rounds.

17          Q.   So we have 16 bullets here?

18          A.   That's correct.

19          Q.   Where was the 16th bullet?

20          A.   The 16th bullet was what most people

21  would describe as in the barrel.   It would be the

22  first one when you pull the trigger it would

23  fire.

24          Q.   So how do you get that 16th bullet into

25  the gun while still keeping a full magazine?

1      A.   The easiest to way to do it is just to

2   take a magazine that has 15 bullets in it, put it

3   in the bottom section right there.  You then pull

4   the slide back, which takes one of those bullets

5   from the magazine and puts it in the chamber or

6   in the barrel, and then you can take the magazine

7   out and put another bullet in.

8      Q.   So then you're not just fully loaded,

9   but you are fully loaded?

10      A.   Yes.  15 plus one.

11      Q.   Okay.  And next I'm going to show you

12   what's marked as Exhibit 8.  Can you please

13   describe for the jury what we're seeing here?

14      A.   Once again, these are the two cell

15   phones that I pointed out earlier.  This is the

16   marijuana cigarette.  This right here is just a

17   couple of pieces of loose marijuana, a small

18   amount.  These are the two debit cards that had

19   Barrett Swan's name on it.  And these are the

20   business cards.  I think it was Lavish Boutique.

21                (Government's Exhibit No. 8, Photo,

22   was identified.)

23   BY MS. WOODRUFF:

24      Q.   And you collected those because Officer

25   Yoder put them in the driver's seat?

1          A.    That's correct.

2          Q.    You didn't have a -- do you remember if

3     they had anybody's name on them, or anything like

4     that?

5          A.    The two Alliance Bank cards had Barrett

6     Swan's name on them.

7          Q.    Did the business cards have anybody's

8     name on them?

9          A.    I don't think so.

10          Q.    Now, that small amount of marijuana -- I

11     call it a small amount.  Is that, in fact, an

12     actual very small amount of marijuana?

13          A.    Yeah.  It's a small amount.  It was less

14     than 10 grams.  It was very small.

15          Q.    And less than 10 grams that means --

16          A.    It's just a fine.

17          Q.    Just a fine?

18          A.    Just a fine in the State of Missouri.

19          Q.    So that firearm that you seized --

20               MS. WOODRUFF:   Your Honor, may I

21     approach the witness?

22               THE COURT:   Yes.

23     BY MS. WOODRUFF:

24          Q.    Now, I've handed you what is marked as

25     Government's Exhibit No. 9.  Are there any

1  identifying marks on the outside of that box?

2       A.   Yes.   You have the information that I

3  put on the box, report number, my name, DSN,

4  date.

5       Q.   And can you go ahead and open the box

6  and take a look inside?

7       A.   Uh-huh.

8            (Government's Exhibit No. 9, Box,

9  was identified.)

10 BY MS. WOODRUFF:

11      Q.   And I know that some of the items may be

12 loose.  I believe that -- well, actually why

13 don't you tell the jury what's inside the box.

14      A.   The bullets.  The count I believe is

15 probably 15.  15.

16      Q.   Those are the 15 bullets in the

17 magazine?

18      A.   Those are the 15 from the magazine.  Can

19 I hold this up?

20      Q.   As soon as you're done with the bullets.

21      A.   Okay.

22      Q.   And those bullets, are those all

23 nine-millimeter?

24      A.   These are all nine-millimeter.

25      Q.   But they're not all the same brand, are

1    they?

2         A.   No.   There's several different brands in

3    here.   Different colors.   Different types of

4    bullets.

5         Q.   But it's still nine-millimeter?

6         A.   Yeah.   They're all nine-millimeters.

7         Q.   And then if you can set that down.   And

8    then, if you can, hold up for the jury and point

9    to or show them that's what inside this box so

10   they understand.   And what is that?

11        A.   That's the firearm that was seen earlier

12   in the photographs with the magazine.   And then

13   the round from the bullet or from the barrel is

14   in that box.

15        Q.   So that's a firearm that you seized as

16   evidence from the black Charger?

17        A.   Yes, it is.

18        Q.   Obviously, that's a real gun?

19        A.   Yes.

20        Q.   Fires a real bullet?

21        A.   Yes.

22        Q.   You can go ahead and have a seat.   As an

23   evidence technician you have some specialized

24   training, of course, in processing evidence;

25   right?

1    A.   That's correct.

2    Q.   You already talked about taking photos

3  and how it's preferable if it's safe to do so to

4  photograph things in place; right?

5    A.   Yes, it is.

6    Q.   And this particular instance with the

7  fluid situation with the firearm it was not

8  photographed in place?

9    A.   It was not, no.

10    Q.   But that's not unusual, is it?

11    A.   No, it's not unusual.  I mean, like I

12  said, we'd like to have it in its original place,

13  but it happens quite frequently that can't do

14  that because, like I said, safety is the number

15  one thing.

16    Q.   The next thing I want to talk about is,

17  based on your training and experience as an

18  evidence technician and when you send things to

19  the lab for testing, to the crime lab, now, in

20  this particular instance was that gun sent to the

21  crime lab?

22    A.   No.   This gun was not sent to the crime

23  lab.

24    Q.   Now, sometimes you can send guns to the

25  crime lab, can't you?

1          A.    You can.

2          Q.    And sometimes you can have them test it

3    for all those things we see on TV like DNA and

4    fingerprints and all that kind of stuff; right?

5          A.    Yes, you can.  You can do that.

6          Q.    But that doesn't happen in every case,

7    does it?

8          A.    No, it does not.

9          Q.    And you did not do that in this case,

10   did you?

11         A.    I did not.

12         Q.    And as far as fingerprints, why didn't

13   you send the gun for fingerprints testing?

14         A.    There are several reasons why I didn't

15   do fingerprints.  Number one, if I have a gun

16   that -- or anything that comes from a vehicle or

17   a house where I believe I already know who it

18   belongs to -- fingerprints and DNA are expensive.

19   This should be something -- that's something that

20   you reserve for homicide investigations, major

21   assaults, possibly some robberies if you don't

22   have a suspect identified.  It's to identify an

23   actual suspect for a particular crime.

24              Also, for fingerprinting, do you just

25   want me to handle the fingerprints?

1      Q.   I'm sorry?

2      A.   Do you just want me to handle just the

3  fingerprint aspect, why I didn't send this for

4  fingerprints?

5      Q.   If you could.

6      A.   Okay.

7      Q.   You could break it down to DNA in just a

8  second.

9      A.   Fingerprints is all based off of

10 texture.   Can I stand up and show them?

11          MS. WOODRUFF:   May he stand?

12          THE COURT:   Okay.

13     A.   Okay.   It's all based off of texture.

14 You want something that's very smooth that will

15 absorb the oil that's on your fingers.   That's

16 what gives away the fingerprint.   If it has -- if

17 it's a textured surface, you're not going to be

18 able to see that actual latent print.   They call

19 it a latent print, but we'll just call it

20 fingerprints for now.

21          This has all of the -- pretty much

22 everything negative to try to get a fingerprint

23 off of it.   All of these grips.   All of this

24 stuff on the slide where even if there was a

25 fingerprint on the slide, you wouldn't be able to

1    see it anyway.

2         Q.   Because it's too textured?

3         A.   It's too textured, yeah.

4         Q.   And so the surface matters when you're

5    talking about fingerprints?

6         A.   Surface is the number one thing when it

7    comes to fingerprints.

8         Q.   So it's not like on TV where everything

9    you touch has a useable fingerprint; right?

10        A.   That's correct.

11        Q.   And, in fact, have you ever tested a gun

12   for fingerprints and successfully got a print

13   back?

14        A.   Not that I can ever remember getting a

15   fingerprint back on a gun.  They pretty much

16   always come off glass.

17        Q.   I know that fingerprints are a bit

18   different than DNA?

19        A.   Yes.

20        Q.   And we see a lot of stuff in true crime

21   shows about DNA.

22        A.   Uh-huh.

23        Q.   But you didn't send this gun for DNA

24   either, did you?

25        A.   I did not, no.

1      Q.   Please explain to the jury why you did

2  not do that.

3      A.   Several reasons.  Once again, like I

4  mentioned earlier, DNA is extremely expensive.

5  It takes a lot of time.  It could take upwards of

6  a year on two years to get a DNA sample back if

7  you were to send something in.  It's not like

8  people think where you can send a DNA sample off

9  and get it to come back in two days.  It just

10  doesn't work that way.

11          Also, from my understanding this gun --

12  I mean, this came from a vehicle owned and

13  registered by Barrett Swan.  If this gun was

14  located in his car, his DNA is going to be on it.

15  It would be like having an item in your house,

16  your DNA is going to be on the -- you may never

17  have touched that item, but your DNA is probably

18  going to be on it.  It doesn't have to be of

19  evidentiary value on it.

20      Q.   So if you find an item in my pocket, you

21  would expect to find my DNA on it; right?

22      A.   Yes.

23      Q.   If you find an item in my car that I am

24  in all the time, I routinely use, you would

25  expect to find my DNA on it?

1          A.    Yes.

2          Q.    So is there evidentiary value in sending

3    those items to just confirm what we already

4    expect to be there?

5          A.    I don't believe so.

6          Q.    And, in fact, if you send that gun and

7    it has, say, Mr. Swan's DNA on it, does that give

8    you a time frame for it?

9          A.    No, there's no time frame for DNA.

10         Q.    And so even if DNA had been found on it,

11   you wouldn't know if he intentionally put it

12   there or if it's just his skin cells falling off

13   in the car?

14         A.    That's correct.

15         Q.    Is it fair to say you have to make

16   judgment calls on the evidentiary value of why

17   you send things to the crime lab?

18         A.    Yeah.  I have to make judgment calls as

19   to what I send and what I don't send.  Obviously,

20   if I'm ordered to send something, I will.

21         Q.    And in this particular instance you made

22   a judgment call not to send either of those

23   items?

24         A.    I did.

25         Q.    Because you didn't think there was going

1    to be any true evidentiary value in any of the

2    results?

3            A.   That's correct.  And to touch back on

4    the DNA, if you don't mind, there are two

5    different types -- we'll just make it easy -- two

6    different types of DNA.  There's the body fluid

7    DNA and then there's touch DNA.

8                Touch DNA is what people like to think

9    of, you know, you just -- I put my hand here, and

10   then you swab it, and you can get my DNA from me

11   touching this table.  It doesn't work that way.

12   You would have to put -- you would have to really

13   hold something for quite an extended period of

14   time, and it would have to -- I don't want to say

15   recent, but it's just that it's not the best way.

16   You would need body fluid for DNA for the most

17   part.

18           Q.   So the best results of the DNA are from

19   bodily fluids?

20           A.   Yes.

21           Q.   Blood?

22           A.   Yes.

23           Q.   Saliva?

24           A.   Yes.

25           Q.   Semen?

1      A.   Yes.

2      Q.   And then touch DNA, it's a little bit

3  like junk science, isn't it?

4      A.   It's just it's the science of you

5  touching something, and then some of your skin

6  cells get left behind, and then they're able to

7  on occasion get DNA from that.

8      Q.   But in order for skin cells to be left

9  behind you have to have friction; right?

10     A.   That's correct.

11     Q.   Like a skin cell may have fell here on

12  this piece of paper, but at the same time while

13  I've been standing here for a couple of hours, my

14  DNA may not be anywhere on here; right?

15     A.   It may not be.

16     Q.   And that's what touch DNA is?

17     A.   That's what touch DNA is.

18     Q.   And given the lack of evidentiary value

19  for fingerprints or touch DNA in this particular

20  case, lack of bodily fluids, you didn't send any

21  of these items for testing?

22     A.   I did not, no.

23          MS. WOODRUFF:   Thank you.   No

24  further questions.

25          THE COURT:   Ms. Booth.

CROSS-EXAMINATION

BY MS. BOOTH:

Q.   Officer Hellmann, good afternoon.

A.   Good afternoon.

Q.   Sir, let's begin with something that's been previously marked as Defendant's Exhibit B.

A.   Okay.

Q.   Now, you recognize that you took this photograph; correct?

A.   That's correct.

Q.   All right.   And I believe you've already discussed on Direct Examination why there isn't a photograph of the firearm actually inside the door pocket; correct?

A.   That is correct.

Q.   Okay.   But it's important to note you actually took a picture of the car with the door open so that you'd be able to demonstrate where the firearm was found; correct?

A.   That was -- that was not the purpose of that photograph, no.   That photograph was simply an overall -- call it overall photograph of the scene, so that this was just simply kind of showing this is what I see from my perspective at this point, so just so anyone else that looks

1    months down the road could see it.

2         Q.   Certainly.  But also to be able to

3    explain to a jury or a prosecutor where the

4    firearm was found.  This picture you took is

5    helpful because it shows the door that's open and

6    the door pocket; correct?

7         A.   Yeah.  It shows the door pocket right

8    there.

9         Q.   And you took lots of pictures in this

10   case as far as the Charger, the contents --

11        A.   Yes.

12        Q.   -- at the scene; correct?

13        A.   That's correct.

14        Q.   And pictures are important so they can

15   show parties at a later date where evidence was

16   found; correct?

17        A.   Yes.

18        Q.   I believe you spoke of this bottle of

19   alcohol on Direct with Ms. Woodruff.  But, again,

20   this is a picture of a bottle of alcohol found in

21   the passenger seat of the Dodge Charger; correct?

22        A.   That's correct.

23        Q.   And you took this picture of the bottle

24   as found, no police officer had placed this

25   bottle in that seat, or anything like that?

1    A.   I didn't witness any police officer

2    place the bottle there.  I never moved it.

3    Q.   All right.  Officer Hellmann, did you

4    also take the picture that's Defendant's Exhibit

5    F?

6    A.   Yes, I did.

7         (Defendant's Exhibit No. F, Photo,

8    was identified.)

9    BY MS. BOOTH:

10   Q.   Can you explain to the jury what this is

11   a picture of?

12   A.   It is the backseat of the Dodge Charger.

13   Q.   And did you have occasion to actually

14   look in this bag right here --

15   A.   I don't --

16   Q.   -- to see what the contents were?

17   A.   I don't recall if I did or not.  Is

18   there a picture of it?

19   Q.   No, sir, there is not.

20   A.   Okay.  Then I don't recall.

21   Q.   Officer Hellmann, did you pick up the

22   firearm at the scene and put it in an evidence

23   bag?

24   A.   Can you repeat the question?  Like did I

25   remove it from the vehicle and take it back to

1    the station?

2         Q.   Yes, sir.

3         A.   Yes, ma'am.

4         Q.   When you handled the firearm, did you

5    have gloves on?

6         A.   Yes, ma'am.  Always use gloves.

7         Q.   Always use gloves --

8         A.   Always use gloves.

9         Q.   -- when you handle a firearm; correct?

10        A.   Yes, ma'am.

11        Q.   And why is that?

12        A.   It is for evidence purposes.  If you --

13   like I said, with being around the scene we're

14   there for 5 or 10 minutes, and I don't know what

15   I'm going to do with this yet.  If I do decide to

16   send it in for DNA or fingerprints, I do not want

17   my DNA or fingerprints on it.

18        Q.   Exactly.

19        A.   Yes.

20        Q.   Do you have any forensic evidence report

21   that Mr. Swan's fingerprints are on that firearm?

22        A.   No.

23        Q.   And when you do have fingerprint

24   evidence in a case, it's very powerful evidence,

25   wouldn't you agree?

1          A.   It could be.  It depends on the

2    situation.

3          Q.   And you indicate the reason why you

4    didn't send this firearm off for fingerprint

5    analysis is because there aren't any smooth

6    surfaces on the firearm?

7          A.   I don't want any smooth surfaces.  I

8    would say it doesn't have a lot of smooth

9    surfaces.

10              MS. BOOTH:   Sir, may I approach

11   Officer Hellmann?

12   BY MS. BOOTH:

13         Q.   Officer Hellmann, would you hold up the

14   evidence box for the jury so that they can see

15   the firearm contained therein.

16         A.   Uh-huh.

17         Q.   Is it fair to say that on the slide of

18   the firearm -- I'm sorry, sir, the magazine, and

19   if you could point to what the magazine is.

20         A.   This is the magazine.

21         Q.   That there's some smooth surfaces on

22   there?

23         A.   There are.

24         Q.   And the bullets as well, there are

25   smooth surfaces on the bullets?

1    A.   Yeah, they're smooth.

2    Q.   And to load the firearm obviously

3  someone has to use their hands to do that?

4    A.   Yes.

5    Q.   You have no evidence that Mr. Swan ever

6  touched this firearm; correct?

7    A.   I guess not.

8    Q.   And no evidence he ever touched that

9  magazine?

10   A.   There's no fingerprints.

11   Q.   Yes, sir.  And no evidence that he ever

12  touched the bullets?

13   A.   No fingerprints.

14   Q.   Yes, sir.  No fingerprints.

15        MS. BOOTH:  Nothing further for

16  Officer Hellmann.

17        THE COURT:  Any redirect?

18        MS. WOODRUFF:  Just briefly, Judge.

19            REDIRECT EXAMINATION

20  BY MS. WOODRUFF:

21   Q.   Corporal, Ms. Booth specifically asked

22  about the bullets.

23   A.   Uh-huh.

24   Q.   And I know sometimes it's interesting to

25  hypothesize when you're watching television shows

1    where fingerprints are found on bullets, but that

2    is a tiny curve in it, isn't it?

3            A.   It is.

4            Q.   And, in fact, a print is the entire pad

5    of your finger; right?

6            A.   That would be a full print, yes.

7            Q.   Now, if I intentionally rolled my print

8    along that bullet, maybe you could recover it,

9    but that is highly unlikely, isn't it?

10           A.   Yes.  We'll put it this way:  I've

11   recovered I don't know how many shell casings in

12   my career, bullets in my career, and never once

13   have we ever located a fingerprint on a shell

14   casing.  And I will say I know -- I know there

15   have been some cases where we have tried if they

16   have been homicides, and nothing has come up.

17           Q.   And when Ms. Booth asked you if there --

18   I believe her question was there's no evidence

19   tying this gun to Mr. Swan.  You mean there's no

20   forensic evidence?

21           A.   There's no forensic evidence.

22           Q.   I mean, obviously, the gun right next to

23   him in his car is evidence?

24           A.   That's right.

25           Q.   And that's illustrated through your

1    testimony?

2        A.   Yes.

3        Q.   So when you answered that's correct to

4    her, you meant no --

5        A.   No forensic evidence.  That's what I

6    meant.

7        Q.   Okay.  I just wanted to clarify that.

8        A.   Yes.

9            THE COURT:  Anything further?

10           MS. BOOTH:  No, sir.

11           THE COURT:  You may step down.

12           (Witness Excused.)

13           THE COURT:  Ladies and gentlemen,

14   we'll take about a 10-minute break, and you can

15   go back to the jury room.

16           Remember the admonition I told you

17   not to discuss the case among yourselves or with

18   others or permit anyone to discuss it in your

19   presence.  Do not form or express any opinion

20   about the case until it's given to you to decide.

21           So you can go back with the Court

22   Security Officer or the clerk, and we'll call you

23   back in 10 minutes or a little more.  Thank you.

24   Court is in recess.

25           (Proceedings stood in temporary

1    recess.)

2              (Proceedings resumed in open court

3    outside the presence of the jury.)

4              THE COURT:  Do you want to make a

5    record about what we discussed in Chambers,

6    counsel?

7              MS. BOOTH:  Yes, sir.

8              Sir, it has come to the attention of

9    the attorneys that one and, perhaps, more of the

10   jurors are having difficulties staying awake.  I

11   have discussed this matter with Mr. Swan.  He

12   knows that he could ask for a mistrial at this

13   point, and he is not going to do so.

14             It's his understanding that we're

15   going to finish the Government's case in chief

16   today and return tomorrow for the defense case in

17   chief, and he is not asking for a mistrial.

18             THE COURT:  Do you agree with that,

19   Mr. Swan?

20             THE DEFENDANT:  Yes, sir.

21             THE COURT:  Okay.  Do you have any

22   questions about it?

23             THE DEFENDANT:  No, sir.

24             THE COURT:  Okay.  I will state that

25   I did notice some people nodding off, but I

1   didn't think anybody was asleep, or anything like

2   that.  It's not much different than a lot of

3   trials.  I didn't really think that it was of

4   that significance, but, anyway, you made your

5   record, so you can bring the jury in.

6              And I will admonish the jury to pay

7   better attention.

8              (Proceedings resumed in open court.)

9              THE COURT:  Be seated, please.

10  Sorry for the delay.  We had an equipment issue

11  that we had to deal with.  We'll go until about

12  5:30 or 6:00 today, probably maybe not even that

13  late.

14             One other issue I want to raise.

15  The lawyers for both sides are very concerned

16  that several of you appear to be nodding off a

17  little bit.  Please pay strict attention to

18  everything that's going on during the trial.

19             With that, call your next witness.

20             MS. WOODRUFF:  Thank you, Your

21  Honor.

22             The Government calls Steven Fowler.

23             If you'll walk around, the clerk

24  will swear you in.

25                  STEVEN FOWLER,

1    being produced and sworn, testified as follows:

2                    THE COURT:   You may proceed.

3                    MS. WOODRUFF:   Thank you.

4                    DIRECT EXAMINATION

5    BY MS. WOODRUFF:

6        Q.   Would you please state your name.

7        A.   Steven Fowler.

8        Q.   And, Mr. Fowler, where do you currently

9    live?

10       A.   In Poplar Bluff.

11       Q.   Have you lived there your entire life?

12       A.   Yes.

13       Q.   Are you a gun owner?

14       A.   Yes.

15       Q.   And I'm going to show you what's

16   previously been admitted as Government's

17   Exhibit 13.  You'll see it pop up on your screen.

18   Can you see that?

19       A.   Yes.

20       Q.   And this is an ATF report regarding a

21   Smith & Wesson nine-millimeter semi-automatic

22   handgun.  Do you, in fact, own a Smith & Wesson

23   nine-millimeter automatic handgun?

24       A.   Yes, I do.

25       Q.   Semi-automatic handgun, excuse me.

1          A.    Yes.

2          Q.    And, as indicated on this ATF trace, do

3    you recall when you first got that firearm?

4          A.    I purchased it new, yes.

5          Q.    You purchased it from Instapawn in

6    Poplar Bluff?

7          A.    Yes, I did.

8          Q.    And the purchaser information you see it

9    there, is that your name?

10         A.    Yes, it is.

11         Q.    And the date of your purchase was

12   March 15th of 2013?

13         A.    Yes.

14         Q.    And did you -- obviously, you bought

15   that from a licensed dealer?

16         A.    Uh-huh.

17         Q.    Is that a yes?

18         A.    Yes.

19         Q.    And that gun belonged solely to you?

20         A.    Yes.

21         Q.    Now, when did you become aware that your

22   gun was missing?

23         A.    Honestly when ATF called me.

24         Q.    So ATF called you after it was

25   recovered?

1          A.   Yes.

2          Q.   And until that time did you think that

3     it was still in your safe at home?

4          A.   Yes.

5          Q.   You didn't even know that it was gone?

6          A.   Once I put them up I don't -- I don't go

7     and play with them, you know, so I always just

8     thought it was there.

9          Q.   So once you put it up, you didn't take

10    it out to mess with it, you just thought it was

11    still there?

12         A.   Yes.

13         Q.   And you did not become aware that it had

14    been stolen until ATF contacted you?

15         A.   Correct.

16         Q.   And but can you confirm for the jury

17    that you did, in fact, purchase the firearm that

18    we see noted here on this ATF trace?

19         A.   Yes, I did.

20              MS. WOODRUFF:   And, Your Honor, may

21    I approach the witness with the exhibit?

22              THE COURT:   Yes.

23    BY MS. WOODRUFF:

24         Q.   Mr. Fowler, can you take a look at that

25    gun and confirm for the jury that that, in fact,

1   is a gun that belongs to you?

2         A.   It is definitely my gun.

3         Q.   And that's the gun that you thought was

4   in your safe, but it turns out that it had been

5   stolen?

6         A.   Correct.

7         Q.   And do you know Barrett Swan?

8         A.   No, I do not.

9         Q.   Have you ever seen him before in your

10  life?

11        A.   Yes.

12        Q.   And did he have permission to possess

13  your gun?

14        A.   No.

15        Q.   Do you know Ebony Stigall?

16        A.   No.

17        Q.   And did anyone have permission to

18  possess your gun other than yourself?

19        A.   No.

20        Q.   Thank you.

21             MS. WOODRUFF:   No further questions.

22                   CROSS-EXAMINATION

23  BY MS. BOOTH:

24        Q.   Mr. Fowler, good afternoon.

25        A.   Okay.

1          Q.    Sir, you live in Poplar Bluff right now?

2          A.    Yes.

3          Q.    And that is where this firearm was

4     purchased back in 2013?

5          A.    Yes.

6          Q.    And so you're very familiar with Poplar

7     Bluff?

8          A.    Oh, yes.

9          Q.    Sir, on Fridays in Poplar Bluff is there

10    an event at the sale barn?

11         A.    Yes, there is every Friday.

12         Q.    Okay.  Can you tell our jurors what

13    happens at the sale barn in Poplar Bluff every

14    Friday?

15         A.    People sell anything and everything.

16         Q.    It's just like a giant swap meet or

17    garage sale?

18         A.    Pretty much.

19         Q.    And you're familiar with that?

20         A.    Yes.

21         Q.    Okay.  Are firearms also sold at the

22    sale barn?

23         A.    Yes.  Mostly rifles.

24         Q.    But it's not limited to just rifles?

25         A.    No.

1         Q.    Have you ever purchased a firearm at the

2    sale barn?

3         A.    No.

4              MS. BOOTH:   Judge, I have nothing

5    further for Mr. Fowler.

6                    REDIRECT EXAMINATION

7    BY MS. WOODRUFF:

8         Q.    Do you go to the sale barn regularly?

9         A.    No.

10             MS. WOODRUFF:   No further questions.

11             THE COURT:   You may step down.

12             (Witness Excused.)

13             THE COURT:   Call your next witness.

14             MR. SORRELL:   I call Kristy

15   Pennington.

16                   KRISTY PENNINGTON,

17   being produced and sworn, testified as follows:

18             THE COURT:   You may proceed.

19             MR. SORRELL:   Thank you.

20                   DIRECT EXAMINATION

21   BY MR. SORRELL:

22        Q.    Would you state your name, please.

23        A.    Kristy Lee Pennington.

24        Q.    And how are you employed?

25        A.    I am employed by the Florissant Police

1    Department.

2         Q.   And what is your occupation at the

3    Florissant Police Department?

4         A.   I am the IT manager.

5         Q.   What duties do you perform as an IT

6    manager?

7         A.   I maintain the computer systems, the

8    software systems, the camera and surveillance

9    systems for the police department.

10        Q.   Is it fair to say you're a custodian of

11   all the electronic data that's stored on behalf

12   of the Florissant Police Department?

13        A.   That is correct.

14        Q.   Can you tell the jury how that, for

15   example, radio calls are stored, how they're made

16   by officers?

17        A.   When an officer keys their mic, the

18   traffic will automatically go to a database in

19   St. Louis County where it's housed at an

20   environmentally safe location free from basically

21   disasters.  And what will happen is we can pull

22   it when we need it for another time.

23        Q.   Okay.  And are all the police

24   departments in the County of St. Louis connected

25   to this one service?

1          A.   Yes, that is correct.

2          Q.   And you have access to that service; is

3     that right?

4          A.   Yes.

5          Q.   And are you able to pull off radio calls

6     for a particular date and time?

7          A.   Yes.

8          Q.   Those calls are all made and stored in

9     the regular course of business I assume?

10         A.   Yes.

11         Q.   And do those recordings -- they're just

12    for the contact the officer has with the

13    dispatcher back and forth:  Is that fair?

14         A.   Yes.

15         Q.   Okay.  And were you requested to make a

16    DVD recording of certain radio calls that were

17    made on the night of August 1st, 2018, between

18    3:21 a.m. and 3:49 a.m.?

19         A.   Yes, I was.

20         Q.   And did you do that?

21         A.   Yes.

22              MR. SORRELL:  May I approach the

23    witness from time to time?

24    BY MR. SORRELL:

25         Q.   If I may, I'd like to hand you what I've

1    marked as Government's Exhibit 16 and ask you if

2    you recognize this jacket?

3          A.   Yes.

4                (Government's Exhibit No. 16, DVD,

5    was identified.)

6    BY MR. SORRELL:

7          Q.   In fact, is that the jacket for the DVD

8    that you made for the radio calls that were made

9    by the Florissant -- or by, actually, all the

10   officers in St. Louis County on August 1st

11   between 3:21 and 3:49 a.m.?

12         A.   Yes, that is correct.

13         Q.   So on that disk there are actually other

14   officers' calls just at the correct times; is

15   that right?

16         A.   Yes.

17         Q.   And are the times that are recorded

18   accurate?

19         A.   Yes, they are.

20         Q.   So the DVD that you made listing all

21   those calls lists both the time and the date of

22   the event and where it was -- or who it was who

23   has spoken back and forth between the dispatcher

24   and the officer?

25         A.   Yes, that is correct.

1     Q.   Okay.  And did you also print out for us

2  what we call a CAD report?

3     A.   Yes.

4     Q.   And what is a CAD report?

5     A.   It's the computer-aided dispatch system

6  that we use for calls for the police officers,

7  and that is the whole event for that call for

8  service that the officer was on.

9     Q.   Okay.  And so it's basically a -- who

10  keeps -- who actually enters the data for a CAD

11  report?

12     A.   The dispatcher will do it if the police

13  officer indicates on the radio that he is doing a

14  call for service, or the dispatcher will put it

15  out on the radio.

16     Q.   So the dispatcher will actually initiate

17  a CAD report for an event and then keep track of

18  what's going on for that particular event?

19     A.   Yes, that is correct.

20     Q.   Ma'am, I handed you what I've marked as

21  Government's Exhibit 14.  Can you tell the Court

22  what that -- or jury what that exhibit is?

23     A.   This is the CAD event report from our

24  database.

25              (Government's Exhibit No. 14, CAD

1  Report, was identified.)

2  BY MR. SORRELL:

3  　　　Q.   And that's the report you printed off

4  for us; is that right?

5  　　　A.   Yes.

6  　　　Q.   Now, as far as the radio calls sometimes

7  they're somewhat difficult to understand; is that

8  fair?

9  　　　A.   Yes.

10  　　　Q.   Officers speak in shorthand and in very

11  brief conversations; is that also right?

12  　　　A.   Yes, that is correct.

13  　　　Q.   In this particular event, if I can play

14  one of those calls, can you tell who's speaking

15  and what's going on in this particular event?

16  I'm sorry.

17  　　　　　　　(A portion of Government's Number

18  Exhibit 16 was played for the jury.)

19  　　　A.   In laymen's terms what happened is the

20  officer initiated a traffic stop on dealer plate

21  D11 -- I don't recall the rest of it -- on a red

22  vehicle at the corner of Dunn Road.

23  　　　Q.   Okay.  And basically that's just a

24  normal start for a traffic stop; is that right?

25  　　　A.   Correct.

1      Q.   And so the officer would keep on

2   referring back to the dispatcher for different

3   events:   Is that also fair?

4      A.   Yes.

5      Q.   And do officers also call in when

6   they're en route to assist?

7      A.   Yes.

8      Q.   So they would notify a dispatcher that

9   they're going to another officer's location?

10     A.   Correct.

11     Q.   I'll play another one of these if I can.

12          (A portion of Government's Exhibit

13   Number 16 was played for the jury.)

14     A.   That call says 560.   So unit 205 went 60

15   with 208, so he was assisting car 208 at the

16   time.

17     Q.   All right.   And that's Officer Fodde; is

18   that right?

19     A.   Correct.

20     Q.   And that occurred at -- based on what's

21   on the screen -- at 3:21 and 31 seconds; is that

22   right?

23     A.   Yes, that's correct.

24     Q.   Okay.   That should be 21 seconds after

25   the officer first initiated the call; is that

1   right?

2         A.   Correct.

3         Q.   And that first officer was Officer Kemp;

4   is that fair?

5         A.   Yes, that's correct.

6         Q.   I'm just trying to get the sequence of

7   events.  Now, so that sort of thing would

8   continue all the way down through these call

9   logs; is that fair?

10        A.   Yes, that is correct.

11        Q.   Okay.  And all the way through to the

12  end of the stop?

13        A.   Yes.

14        Q.   And the officers involved in this are

15  known by their officer numbers; is that right?  I

16  mean, they refer to an officer number when

17  they're reporting in to the dispatcher?

18        A.   They report in as a unit ID.

19        Q.   I'm sorry, yes, that's better?

20        A.   Yes.

21        Q.   So that's how that the County keeps

22  track of each person and each unit?

23        A.   Yes, that is correct.

24        Q.   All right.  And so the regular dispatch

25  would basically give a time, date and what's

1    going on at the scene based on the officer's

2    description to the dispatcher?

3         A.   Yes, that is correct.

4         Q.   All right.

5              MR. SORRELL:  Nothing further at

6    this time.  Thank you.

7              MS. BOOTH:  I have no questions.

8              THE COURT:  You may step down.

9              (Witness excused.)

10             THE COURT:  Call your next witness

11   then.

12                  JONATHAN KEMP,

13   being produced and sworn, testified as follows:

14             THE COURT:  You may proceed.

15             MR. SORRELL:  Thank you.

16               DIRECT EXAMINATION

17   BY MR. SORRELL:

18        Q.   Would you state your name, please.

19        A.   Jonathan Kemp.

20        Q.   And how are you employed?

21        A.   By the City of Florissant.

22        Q.   And in what department?

23        A.   Florissant Police Department.

24        Q.   How long have you worked for that

25   department?

1          A.   Approximately five years.

2          Q.   What is your current rank with that

3     department?

4          A.   Detective.

5          Q.   And on August 1st of 2018 were you a

6     detective?

7          A.   No, sir.

8          Q.   What was your rank at that point?

9          A.   I was a patrol officer.

10          Q.   Just a regular duty patrol officer?

11          A.   Yes, sir.

12          Q.   And around on August 1st, 2018, at

13     around 3:20 in the morning did you have occasion

14     to see a red Ford Edge?

15          A.   Yes, sir.

16          Q.   And what caused you to notice the red

17     Ford Edge?

18          A.   I observed the vehicle failed to stop at

19     a stop sign.

20          Q.   And what was the street address of that

21     stop sign?

22          A.   It was on Dunn Road just west of St.

23     Michael Court in the City of Florissant.

24          Q.   Dunn Road, is that a street that just

25     runs parallel to 270?

1          A.   Yes, sir.

2          Q.   Has lots of exits onto 270 and stop

3     signs just after those exits; is that fair?

4          A.   Correct.

5          Q.   Now, what do you do after seeing the

6     Ford Edge fail to stop at a stop sign?

7          A.   I positioned my vehicle behind that

8     vehicle, activated my emergency lights and siren

9     and conducted a traffic stop of that vehicle.

10         Q.   Now, when you saw the Ford Edge, when

11    you first saw it, what direction is your car in

12    relationship to the Ford Edge?

13         A.   I would have been traveling in the

14    opposite direction, so traveling eastbound.

15         Q.   So you were meeting the Ford Edge?

16         A.   Correct.

17         Q.   Just in the other lane of travel?

18         A.   Correct.

19         Q.   And so how did you make the maneuver to

20    get behind the Ford Edge?

21         A.   When it was clear to safely conduct a

22    U-turn on Dunn Road to position behind that

23    vehicle.

24         Q.   Okay.  And had you seen that Ford Edge

25    any time prior to that night?

1          A.   No, sir.

2          Q.   Did the Ford Edge stop soon after you

3    activated your emergency lights?

4          A.   Yes, sir.

5          Q.   And what did you do then?

6          A.   I exited my vehicle, approached the

7    vehicle and made contact with the driver of that

8    vehicle and advised them for the reason that I

9    stopped.

10         Q.   And the driver was who?

11         A.   The driver was a Tiara Thorpe.

12         Q.   Did you get any personal information

13   from Ms. Thorpe?

14         A.   Yes, sir.

15         Q.   How did you get that information, or did

16   you get it by question and answer, or did she

17   give you her license?

18         A.   She provided me with a Missouri driver's

19   license.

20         Q.   Now, was there a passenger in the car?

21         A.   Yes, sir.

22         Q.   And where was that passenger seated?

23         A.   He was seated in the front right

24   passenger seat.

25         Q.   Male or female?

1          A.   It was a male.

2          Q.   Did you ask that man for his

3    identification?

4          A.   I did.

5          Q.   What did the man respond to?

6          A.   He advised me that he didn't have any

7    identification or any documentation of his

8    identity, and he provided me with his name and

9    Social Security Number or --

10         Q.   Okay.   And did you run that information

11   to see -- to check the identity of these two

12   people?

13         A.   Yes.

14         Q.   Now, how did you do that at first?

15         A.   I respond -- I have in-car computer

16   where I do can do an inquiry of the subject on

17   that computer.

18         Q.   Basically just type the information into

19   your computer and see what information is

20   reported back on those people?

21         A.   Correct.

22         Q.   And what does your computer tell you

23   back?

24         A.   As far as Ms. Thorpe was that she had a

25   valid driver's license and no warrants for her

1    arrest.  And inquiry of the information provided

2    by the passenger was inconsistent with his

3    appearance to include, I believe, that the Social

4    Security Number he provided was affiliated with a

5    female subject.

6        Q.   Okay.  Do you remember the name that the

7    male passenger provided to you?

8        A.   I do not, sir.

9        Q.   And the identifying information, it

10   didn't come back as someone who was the same as

11   the passenger that you saw?

12       A.   Correct.

13       Q.   Now, did you -- did you learn or did you

14   also check Ms. Thorpe's information with your

15   dispatcher?

16       A.   Not through dispatch.  Just on the car

17   computer.

18       Q.   You didn't need to do anything else

19   there, did you?

20       A.   Correct.

21       Q.   Now, when you discovered this

22   information about the male passenger that the

23   numbers didn't match or that the identity didn't

24   seem to match, what did you do?

25       A.   I re-approached and made contact again

1    with that male passenger.

2          Q.   Which side of the vehicle are you on at

3    this time?

4          A.   I believe that I had responded to the

5    passenger side at that time.

6          Q.   Okay.  Because you wanted to talk

7    directly to him?

8          A.   Correct.

9          Q.   And now continue.

10         A.   So I re-approached to that passenger

11   side, made contact with him.  I advised him that

12   I observed inconsistencies with the information

13   that he provided.  I requested his actual

14   identification and advised him that it would be a

15   lot easier to just give it to me roadside versus

16   transporting him back to the police department to

17   have to identify him or fingerprint him to obtain

18   his identification.

19         Q.   Okay.  And did you also mention that it

20   might make it easier on himself?

21         A.   Yes, sir.

22         Q.   And how did the passenger respond to

23   that information?

24         A.   He provided me with a new name and

25   Social Security and name of Barrett Swan at that

1    time.

2         Q.   And so what did you do with that

3    information?

4         A.   I responded back to my patrol vehicle

5    again and did a computer inquiry of the new

6    information he provided.

7         Q.   What did you find out about the identity

8    of Mr. Barrett Swan?

9         A.   That there was an active federal arrest

10   warrant for that subject.

11        Q.   Okay.  Did you take some steps to verify

12   the existence of that warrant?

13        A.   I did.

14        Q.   What did you do?

15        A.   Then I called it through the radio to

16   dispatch for them to do a second inquiry just to

17   verify the information and that it was an active

18   warrant.

19        Q.   Okay.  And did the dispatcher do exactly

20   that?

21        A.   Yes, sir.

22        Q.   And are you familiar with the radio

23   logs -- I mean, the radio call system used by

24   your department?

25        A.   Yes.

1          Q.   And, in fact, you've listened to the

2     radio calls that were set out or broken up on the

3     Exhibit 16 by Kristy Pennington; is that right?

4          A.   Yes, sir.

5          Q.   Did you prepare a log of the events that

6     occurred on that night?

7          A.   Yes, sir.

8               MR. SORRELL:   May I approach the

9     witness, Your Honor?

10               THE COURT:   Yes.

11     BY MR. SORRELL:

12          Q.   Sir, I've shown you what's been marked

13     as Exhibit 15.   Can you tell the Court what that

14     exhibit is, please.

15          A.   It's a summary log of the times and an

16     explanation of the radio transmissions that

17     occurred that night relevant to my traffic stop.

18               (Government's Exhibit No. 15,

19     Summary Log, was identified.)

20     BY MR. SORRELL:

21          Q.   Okay.   That's just prepared by you; is

22     that fair?

23          A.   Correct.

24          Q.   Let me retrieve that.

25          A.   Sure.

1      Q.   Now, do you call your dispatcher when

2    you make a stop?

3      A.   Yes.

4      Q.   All right.  Let me play one of the first

5    one of these messages and see if you can

6    recognize that.

7              (A portion of Government's Exhibit

8    Number 16 was played for the jury.)

9  BY MR. SORRELL:

10     Q.   Do you recognize that call, sir?

11     A.   Yes, sir.

12     Q.   What is that?

13     A.   That's me initially calling with the

14   traffic stop and advising the plate, make and

15   model of the vehicle in that location.

16     Q.   And do you see the exhibit on the screen

17   in front of you where that one is highlighted at

18   the very top?

19     A.   Yes.

20     Q.   And does that -- is that the one that

21   was made at 3:21:10 on the night of August 1st?

22     A.   Correct.

23     Q.   So that's the first time you call in to

24   the dispatcher; is that fair?

25     A.   Yes, sir.

1      Q.   And is the car stopped at that point, or

2  are you still in the process of getting the car

3  pulled over?

4      A.   Typically once I activate my emergency

5  lights and sirens is when I will call out a

6  traffic stop, but sometimes it may be right after

7  it's stopped.

8      Q.   But it's just right around that time

9  either shortly before the stop or right at the

10  stop?

11      A.   Correct.

12      Q.   Okay.  And do other officers arrive to

13  assist in that -- in that event?

14      A.   Yes.  Eventually, yes, sir.

15      Q.   And did an officer arrive to assist on

16  this stop?

17      A.   Yes.

18      Q.   Let me let you listen to another one of

19  these.

20           (A portion of Government's Exhibit

21  Number 16 was played for the jury.)

22  BY MR. SORRELL:

23      Q.   Do you recognize that one even though

24  it's very short?

25      A.   Yes, sir.

1      Q.   And what is that?

2      A.   That is another patrol officer called

3   205 on advising that he is en route to my

4   location to assist.

5      Q.   Who is 205?

6      A.   His name is Officer Kevin Fodde.

7      Q.   Okay.  And did Officer Fodde then show

8   up during this traffic stop?

9      A.   Yes.

10      Q.   Now, you've already gotten -- taken us

11   through point where you're going up and talking

12   to Mr. Swan, and you got his information and come

13   back.  Has Mr. Fodde arrived at the scene by this

14   point?

15      A.   It was right around the time shortly

16   after that that I did the radio into dispatch for

17   the inquiry of the subject.

18      Q.   Okay.  And what would Officer Fodde's

19   role have been on this stop?

20      A.   Just as an assist officer on this stop.

21   He -- more or less officer safety just stood by

22   to provide safety for myself as well as the

23   occupants inside the vehicle.

24      Q.   Okay.  So do you know where he was

25   stationed when he pulls up?  Do you know where he

1  stands?

2      A.    Once he exits his vehicle, he's parked

3  behind mine.  He walked up and would place

4  himself near the rear passenger side of the

5  vehicle that I had stopped.

6      Q.    Okay.  And so did you contact dispatch

7  to start trying to find out more about Mr. Swan?

8      A.    Yes, sir.

9      Q.    This thing is touchy.  Pardon me.  If

10  you'd listen to this one, please.

11              (A portion of Government's Exhibit

12  Number 16 was played for the jury.)

13  BY MR. SORRELL:

14      Q.    And do you recognize that voice?

15      A.    Yes, sir.

16      Q.    What is that?

17      A.    That's me requesting dispatch to advise

18  when they're clear for me to run a subject over

19  the radio.

20      Q.    Okay.  And did you then provide the

21  subject pedigree?

22      A.    I did.

23      Q.    All right.  Now, I'm going to refer to

24  the next one at 3:30:29.

25              (A portion of Government's Exhibit

234

1    Number 16 was played for the jury.)

2        Q.   So is that the first time you called the

3    dispatcher about Mr. Swan's identity?

4        A.   Yes, sir.

5        Q.   Is Mr. Swan still in the car at this

6    time?

7        A.   Yes, sir.

8        Q.   And what about the driver?

9        A.   Yes, sir.

10       Q.   Okay.  So you still haven't really

11   verified everything you want to know at this

12   point; is that fair?

13       A.   Correct.

14       Q.   At 3:30:29, which would have been almost

15   10 minutes after he'd been at the stop, 9 minutes

16   or so?

17       A.   Correct.

18       Q.   Okay.  So then did the dispatch

19   basically provide the information on Mr. Swan?

20       A.   Yes, sir.

21       Q.   That happened, I believe, at 3:32:35.

22            (A portion of Government's Exhibit

23   Number 16 was played for the jury.)

24   BY MR. SORRELL:

25       Q.   Did you hear that, sir?  Let me stop

1    that.

2                   THE COURT:  Mr. Anderson, are you

3    having trouble staying awake?

4                   JUROR NUMBER 7 ANDERSON:  Yeah.

5                   THE COURT:  Is there a problem or --

6                   JUROR NUMBER 7 ANDERSON:  I didn't

7    take my medicine.

8                   THE COURT:  Do you have medicine

9    with you?

10                  JUROR NUMBER 7 ANDERSON:  Yeah.

11                  THE COURT:  Do you need to take some

12   then?

13                  JUROR NUMBER 7 ANDERSON:  Yeah.

14                  THE COURT:  Okay.  Why don't we take

15   a short recess for that purpose, and we'll call

16   you back in.  Go to the jury room and remember

17   the admonition I gave you earlier not to discuss

18   the case.  We'll call you back in in just a very

19   short time.

20                  So will that take care of the

21   problem?

22                  JUROR NUMBER 7 ANDERSON:  It should.

23                  THE COURT:  Okay.

24                  (Proceedings resumed in open court

25   outside the presence of the jury.)

1           THE COURT:  Let's go back on the
2    record while we're waiting for them to come back.
3    The juror in question who was falling asleep has
4    said that he was having trouble staying awake.
5    He's also one of the jurors who was the subject
6    of our questions beforehand, so this is twice
7    now.
8           If we continue to have a problem
9    with him, it's my intention to excuse him and
10   substitute the alternate for him.  So hopefully
11   we won't come to that.
12           MR. SORRELL:  Yes, sir.
13           THE COURT:  Are they ready?
14           THE CLERK:  They're ready.
15           (Proceedings resumed in open court.)
16           THE COURT:  Be seated, please.
17           Mr. Anderson, are you okay now?
18           JUROR NUMBER 7 ANDERSON:  Yes, sir.
19           THE COURT:  Okay.  You may proceed.
20           MR. SORRELL:  Thank you.
21         DIRECT EXAMINATION CONTINUED
22   BY MR. SORRELL:
23       Q.   Officer, I believe we ended up with a
24   radio call where your -- the radio dispatcher had
25   acknowledged Mr. Swan's arrest warrant.  Do you

1    remember that?

2           A.   Yes.

3           Q.   And did you acknowledge that call?

4           A.   Yes, sir.

5                (A portion of Government's Exhibit

6    Number 16 was played for the jury.)

7    BY MR. SORRELL:

8           Q.   Is that your acknowledgment of the radio

9    dispatcher call?  Let me show you on the screen

10   where it is.  The one marked 3:32:55 right above

11   is the one that I just played for the -- where

12   the radio dispatcher gave you the information

13   back?

14          A.   Yes.  And that would be it.

15          Q.   Okay.  And so what did you do as soon as

16   you heard the information about the arrest

17   warrant on Mr. Swan?

18          A.   That was whenever I had my -- well, I

19   had requested for dispatch to verify the arrest

20   warrant.  And then I proceeded to exit my

21   vehicle.  At that time my assist officer had

22   arrived on the scene.  So I contacted him

23   before I made contact with Mr. Swan and just

24   advised him of the arrest warrant, you know, for

25   officer safety reasons.

1          I then proceeded up to the passenger

2     side of the vehicle where I requested Mr. Swan to

3     step out of the car, which he did.  I advised him

4     of the warrant and placed him into handcuffs.

5          Q.   Okay.  And Mr. Swan, is it fair to say

6     he got out of the car willingly and didn't cause

7     any -- didn't resist in any way, shape or form,

8     did he?

9          A.   Correct, sir.

10          Q.   Was the car door closed when you walked

11     up to Mr. Swan's side of the car?

12          A.   Yes, sir.

13          Q.   And how long did it stay closed?  Did

14     you explain anything to him through the window,

15     or did you just get him out first?

16          A.   We requested him to exit the vehicle

17     through the window.  At that time he -- the door

18     began to open.

19          Q.   Okay.  All right.  So at least the door

20     was closed when you first walked up?

21          A.   Correct.

22          Q.   And can you tell the jury what happened

23     as soon as Mr. Swan stepped outside of the car?

24     Go over that sequence, if you would, please.

25          A.   So after requesting him to exit the

1   vehicle, as I'm placing him in handcuffs, I

2   observed a firearm or handgun sitting on the

3   passenger seat where Mr. Swan's previously

4   sitting.  I then directed --

5        Q.   Let me stop you just a second --

6        A.   Yes.

7        Q.   -- and slow you down.

8             Did you -- when you look over at the

9   seat, did you immediately recognize that item as

10  being a firearm?

11       A.   No.

12       Q.   What did you first think it was?

13       A.   My first impression with the position of

14  the firearm I believed it was a portion of the

15  seat belt where the seat belt buckles into.

16       Q.   And can you describe to the jury how the

17  firearm was in the seat where Mr. Swan had

18  exited.

19       A.   The way that it was positioned in the

20  seat would have been with the barrel was facing

21  toward the passenger door with the magazine and

22  grip portion facing towards the glove box

23  compartment where essentially the butt of the gun

24  would have been where that seat belt holder would

25  be, and the slide of the firearm was resting

1    against the back of the seat.

2         Q.   And how far or where was it positioned

3    in terms of being to the right or left of

4    Mr. Swan?

5         A.   It would have been on his left.

6         Q.   Okay.   But all the way over?

7         A.   Correct.   But against that seat belt

8    holder.

9         Q.   And was the handle up or pointed up or

10   was pointed horizontally?

11        A.   It was pointed down basically laying

12   flat on the seat pointing towards the glove

13   compartment.

14        Q.   Okay.   Now, at what point did you see

15   the handgun in terms of handcuffing Mr. Swan?

16   I'm just trying to make sure I know what had then

17   happened when.

18        A.   Sure.   So as he's exiting, you know,

19   it's initially kind of difficult to be on the

20   same side of the vehicle.   So as I escort him up

21   just a little bit towards -- a little bit more

22   towards the passenger door and I'm able to kind

23   of get in between the passenger doorframe and the

24   vehicle itself on that side of the vehicle as

25   well as my put flashlight on him, so it would

1    have been at that time after Mr. Swan's

2    handcuffed and I was more positioned between the

3    passenger door and the actual vehicle itself.

4        Q.   All right.  Where was Ms. Thorpe when

5    you first saw the handgun?

6        A.   She was still seated in the driver's

7    seat.

8        Q.   All right.  And how did this progress

9    from that point to what did you do after you saw

10   the firearm?

11       A.   So after observing the firearm, I

12   directed Mr. Swan to my assist officer that was

13   at the rear of the vehicle that he was seated in.

14   And after I directed him to the assist officer, I

15   requested Ms. Thorpe to exit the vehicle, which

16   she did.  At that time I retrieved the firearm

17   from the side of the vehicle.

18       Q.   Okay.  Did you make that firearm safe?

19       A.   Yes, sir.

20       Q.   And what did you do to make it safe?

21       A.   I released the magazine or detached the

22   magazine from the handgun and cleared the

23   chamber.

24       Q.   Okay.  At that time were you wearing

25   plastic gloves or anything?

1          A.   No, sir.

2          Q.   And what was your reason for picking it

3     up that quickly?

4          A.   Just officer safety.  It was immediately

5     in the open, the firearm needed to be secured.

6          Q.   Sir, I've handed you a box which has

7     been marked as Exhibit No. 11.  Would you take a

8     look in that box and tell me what's in there,

9     please.

10         A.   This is the firearm that I seized that

11    night from the subject.

12              (Government's Exhibit No. 11, Box,

13    was identified.)

14    BY MR. SORRELL:

15         Q.   Is there ammunition in that box?

16         A.   Yes, sir.

17         Q.   And would you display that to the jury,

18    please.  Just hold the box up.  Oh, okay.  You

19    can take the pistol out.  It might be secured in

20    there, but would you hold the pistol up?

21              And what kind of pistol is that, what

22    brand?

23         A.   It's a Smith & Wesson M&P9 Shield.

24         Q.   Nine is a nine-millimeter caliber?

25         A.   Yes, sir.

1          Q.    And is that -- is that the firearm you
2     seized that night?
3          A.    Yes, sir.
4          Q.    And how can you tell that?
5          A.    Through the serial number.
6          Q.    Okay.  So -- and also is the box -- does
7     the exhibit box have your initials or name on it?
8          A.    Yes, sir, it does.
9          Q.    And you can put that back in the box, if
10    you would, please.
11               And the ammunition for that that was
12    seized with that is just in the box, I believe,
13    in a Ziploc bag; is that fair?
14         A.    Yes, sir.
15         Q.    Okay.  Then after you seized that
16    firearm, did you do anything else with the
17    firearm?
18         A.    Yes.  It was forwarded to the St. Louis
19    County Lab for ballistic testing.
20         Q.    Let me ask you about that.  Did you make
21    any requests of the dispatcher concerning the
22    firearm at the scene?
23         A.    Yes, sir.  I conducted an inquiry
24    through dispatch of the serial number on the
25    firearm.

1      Q.   Okay.  All right.  So the last time you

2   talked with the dispatcher when you learned about

3   the warrant was at 3 o'clock or 32 minutes after

4   3:00 at the 58 second mark; is that right?

5      A.   Yes, sir.

6      Q.   Let's look at the next one that's your

7   call, which is 3:36:31.  Would you listen to

8   this, please.

9           (A portion of Government's Exhibit

10   Number 16 was played for the jury.

11   BY MR. SORRELL:

12      Q.   Can you tell the jury what that request

13   is?

14      A.   That's me radioing into dispatch

15   requesting for them to do a computer inquiry of

16   the serial number on the firearm.

17      Q.   So at that time you had already gone up

18   to the car and informed Mr. Swan of the warrant,

19   got him out, handcuffed him, asked Ms. Thorpe to

20   get out, seized the gun, unloaded it and then got

21   on back to your car to check the serial number to

22   check to see if it's stolen?

23      A.   Correct.

24      Q.   Okay.  And so from the time you learned

25   of the existence of the warrant until you checked

245

1   the serial number for the gun is, what, about

2   three and a half minutes?

3         A.   Yes, sir.

4         Q.   Based on your -- on the calls that were

5   made on the radio --

6         A.   Correct.

7         Q.   -- to the dispatcher?

8              Okay.  And then the calls go normally

9   until it stops; is that right?

10        A.   Yes.

11        Q.   I believe it would have ended around

12  3:49?

13        A.   Yes, sir.

14        Q.   Now, did you give Ms. Thorpe any traffic

15  tickets?

16        A.   She was issued some, yes, sir.

17        Q.   Okay.  And did Mr. Swan make any request

18  of you to speak to Ms. Thorpe while still at the

19  scene of the traffic stop?

20        A.   Yes, sir.

21        Q.   What happened regarding that request?

22        A.   He requested -- he requested to say

23  goodbye to Ms. Thorpe, which I allowed and

24  escorted Ms. Thorpe to the rear passenger side of

25  the vehicle.  Mr. Swan was seated in the back of

1    my patrol vehicle.  I opened the door and let her

2    speak to him at that time, and he made a

3    statement to her during that time of "I'm

4    finished, I'm done," something to that effect.

5         Q.   All right.  And did they speak briefly

6    in the back of your car?

7         A.   Yes, sir.

8         Q.   And then Ms. Thorpe went back to her

9    car?

10        A.   Correct.

11        Q.   And then the tickets were issued and the

12   scene was clear; is that fair?

13        A.   Yes, sir.

14        Q.   Okay.  And do you -- do you issue the

15   tickets at the end of the stop?

16        A.   Typically, yes.  Towards the end of the

17   stop.

18        Q.   Are those -- the ticket times always

19   printed on the tickets when they're issued?

20        A.   At the time they're generated, yes, sir.

21        Q.   And how are tickets generated if you

22   want to issue a traffic ticket to a person?

23        A.   So we have what's called mobile

24   ticketing.  It's a program inside of our computer

25   in our cars where it prints the tickets out.  So

1  we enter in either a license number, a driver's

2  license number, a Social Security Number, and it

3  inquires all that subject's pedigree.

4          And then I do the same with the vehicle

5  with an identification number or a license plate,

6  and it calculates almost all the fields inside of

7  the traffic summons.  So then I just put whatever

8  violation was done and then print the ticket.

9          Q.   And does the machine also print the time

10  the ticket is issued?

11          A.   Yes, sir.

12          Q.   Do you have any way of changing that

13  time?

14          A.   No, sir.

15          Q.   And do you know what time this ticket

16  was issued?

17          A.   I believe it was at 3:44 a.m.

18          Q.   And if I -- that would have been about

19  five minutes before the stop ended at 3:49; is

20  that right?

21          A.   Correct.

22          Q.   And you cleared the scene and took

23  Mr. Swan back to the Florissant police station?

24          A.   Yes, sir.

25          Q.   Ms. Thorpe was just simply released to

1   go on her way; is that right?

2        A.   Yes, sir.

3        Q.   She told you at the scene that the gun

4   belonged to her; is that fair?

5        A.   Correct.

6        Q.   And it did turn out to be her -- the gun

7   that she had purchased?

8        A.   Correct.

9        Q.   And when you seized this, how many

10  magazines did you seize with the gun?

11       A.   Just one magazine that was inside the

12  firearm.

13       Q.   Did you search the car?

14       A.   Not to my recollection, no.

15       Q.   Okay.  You didn't seize anything else

16  from the car, did you?

17       A.   No, sir.

18       Q.   And what was done to Mr. Swan when you

19  got back to the police station?

20       A.   He was escorted into our holdover

21  facility, which is more or less a temporary jail.

22  Inside there he is booked into the computer

23  system as being arrested, his property is

24  inventoried, and he's dressed out into a jumpsuit

25  waiting to be transported out to the county jail

1    and in this case being -- waiting to be

2    transported on the arrest warrant.

3         Q.   And did you speak to Mr. Swan briefly

4    about the firearm?

5         A.   Yes, sir.

6         Q.   And what did you tell Mr. Swan?

7         A.   Prior to getting him dressed into a

8    jumpsuit, I advised him that upon completion of

9    the booking process, which is everything I just

10   described, that I would escort him up to an

11   interview room so that we could discuss what

12   was -- the firearm that was located inside the

13   vehicle.

14        Q.   And did Mr. Swan make a statement that

15   starts with, "We both know"?

16        A.   Yes, sir.

17        Q.   And would you tell the jury what that

18   statement was?

19        A.   Yes, sir.  He stated, "We both know what

20   you found in the vehicle, and I'd rather be in a

21   position that I'm in now than one that I was in

22   in the past when I was shot and didn't have

23   anything on me."

24        Q.   At that time did Mr. Swan make any

25   statements to you about whether he had been shot

1   before?

2         A.   No, sir.

3         Q.   Did you have any idea that Mr. Swan had

4   been shot before?

5         A.   No, sir.

6         Q.   Now, is it fair to say that that -- your

7   report of his statement is basically the

8   substance of Mr. Swan's statement, not the exact

9   words?

10        A.   Correct.

11        Q.   So there could be a word or two altered;

12  is that fair?

13        A.   Yes, sir.

14        Q.   Is the meaning changed in any way, shape

15  or form?

16        A.   No, sir.

17        Q.   And did you later on speak with Officer

18  Brian Eggers?

19        A.   Yes, sir.

20        Q.   Did you report that statement to him?

21        A.   Yes, sir.

22        Q.   Now, did you write a report on this

23  event?

24        A.   Yes, sir.

25        Q.   And it's fair to say that your report

1    doesn't include that statement, does it?

2          A.   No, it does not.

3          Q.   But you told Officer Eggers about the

4    statement; is that right?

5          A.   Yes, sir.

6          Q.   And did you tell him about it at what

7    point in time?

8          A.   During a phone conversation.  I

9    initially contacted him in reference to Mr. Swan

10   being arrested, and, during our conversation, he

11   relayed to me that Mr. Swan had been shot, and at

12   that time I recalled the statement and stated to

13   the effect how it made sense because he had made

14   that statement to me and relayed the statement

15   that Mr. Swan made to me to Officer Eggers at

16   that time.

17         Q.   Okay.  And then Officer Eggers put it in

18   his statement --

19         A.   Correct.

20         Q.   -- or report?

21         A.   Yes, sir.

22         Q.   And what day was this report made to

23   Officer Eggers?

24         A.   On August the 1st, 2018.

25         Q.   About what time or around what time?

1          A.   I believe it was prior to me getting off

2      shift maybe around like 5:00 a.m., 5:00 or

3      6:00 a.m.

4          Q.   So at the same time?

5          A.   Yes, sir.

6          Q.   And you've listened to all the radio

7      traffic on Government's Exhibit 16 and all that

8      that you made is accurate as far as the times

9      made and the substance of the calls that were

10     made?

11         A.   Yes, sir.

12         Q.   Okay.

13              MR. SORRELL:  I believe that's all I

14     have, Your Honor.  Thank you.

15              THE COURT:  Cross-examination.

16                   CROSS-EXAMINATION

17     BY MS. BOOTH:

18         Q.   Detective Kemp, when you first made

19     contact with Ms. Thorpe and Mr. Swan after you

20     stopped the vehicle, neither of them were

21     combative, rude or disrespectful in any way to

22     you?

23         A.   No, ma'am.

24         Q.   They were cooperating with you?

25         A.   Outside of the initial pedigree

1   incident.

2        Q.   Yes, sir.

3             And, again, Ms. Thorpe was seated in the

4   driver's seat?

5        A.   Correct.

6        Q.   And Mr. Swan is seated in the front

7   passenger seat?

8        A.   Correct.

9        Q.   And when you first contacted Mr. Swan,

10  he was alert and acknowledged your presence by

11  talking to you?

12       A.   Correct.

13       Q.   He didn't try to get to you or harm you

14  in any way?

15       A.   No, ma'am.

16       Q.   And it was very clear that you were a

17  police officer when you were speaking with

18  Mr. Swan?

19       A.   Yes, ma'am.

20       Q.   In addition to asking for Ms. Thorpe's

21  identification you asked for Mr. Swan's as well?

22       A.   Yes, ma'am.

23       Q.   And he didn't ignore you when you asked

24  him for his identification?

25       A.   No, ma'am.

1        Q.   And he gave you some identification

2   verbally?

3        A.   Correct.

4        Q.   And when you walked back to your police

5   car to check that information as well as

6   Ms. Thorpe's information, it was clear to the

7   occupants of the car that you were returning

8   later; correct?

9        A.   I can't speak on their behalf, but as I

10  was -- as I'm approaching the vehicle again?

11       Q.   I'm sorry, Detective Kemp, I didn't

12  phrase that very well.  Let me ask again.

13            After you got the identifying

14  information from Ms. Thorpe and Mr. Swan the

15  first time, you told them to stay here, I have to

16  go check this information in your police car,

17  which was parked behind them; correct?

18       A.   Correct.

19       Q.   Okay.  So it was -- you made it clear to

20  them they weren't free to drive away, you were

21  coming back?

22       A.   Correct.

23       Q.   And when you walked back to your police

24  car to check this information on your computer,

25  no other police car was stationed there, no other

1    police officer was there at the car to watch Ms.

2    Thorpe and Mr. Swan; correct?

3         A.   Correct.

4         Q.   So they were essentially left

5    unattended?

6         A.   Yes, ma'am.

7         Q.   Free to move about and do whatever they

8    wanted in the car?

9         A.   Yes, ma'am.

10        Q.   After learning that information Mr. Swan

11   gave you wasn't accurate, you returned to the car

12   to confront him about that fact; correct?

13        A.   Correct.

14        Q.   And at this point he remains respectful

15   and doesn't switch his attitude to combative or

16   angry; correct?

17        A.   Correct.

18        Q.   And you essentially tell him that the

19   information he gave you didn't add up, and he

20   might as well tell you who he is or else you're

21   going to have to go to the police department for

22   some fingerprinting; correct?

23        A.   Correct.

24        Q.   And he responded immediately by telling

25   you his name was Barrett Swan?

1          A.   Correct.

2          Q.   And he gave you his Social Security

3     Number?

4          A.   Yes, ma'am.

5          Q.   So then at that point you have to return

6     back to your police car to check that information

7     about Barrett Swan; correct?

8          A.   Correct.

9          Q.   And, again, Ms. Thorpe and Ms. Swan or

10    Mr. Swan are left unattended in Ms. Thorpe's car;

11    correct?

12         A.   Correct.

13         Q.   Free to move about and do whatever they

14    wanted, no one was watching them; correct?

15         A.   Yes, ma'am.

16         Q.   And while you're back at your police car

17    checking the information on Barrett Swan, it

18    takes a few minutes to do that?

19         A.   Yes, ma'am.

20         Q.   And you learn that Mr. Swan has an

21    active federal warrant for his arrest?

22         A.   Correct.

23         Q.   You respond back to the car and ask

24    Mr. Swan to step out, advising him that he was

25    under arrest for the active federal warrant?

1         A.   Correct.

2         Q.   And he immediately steps out of the

3    vehicle without any delay?

4         A.   Yes, ma'am.

5         Q.   He doesn't try to stall or distract you

6    in any way from him being removed from the car?

7         A.   No, ma'am.

8         Q.   And, again, he's still respectful and

9    hasn't switched his attitude to combative or

10   rude, or anything like that?

11        A.   Correct.

12        Q.   And Ms. Thorpe remains respectful and

13   cooperative with you as well?

14        A.   Yes, ma'am.

15        Q.   So at this moment when Mr. Swan gets out

16   of the car, it's been about 10 to 15 minutes

17   since the time you initially stopped the vehicle?

18        A.   I believe it is approximately, yes.

19        Q.   And it's your testimony that it is at

20   this moment when Mr. Swan steps from the car you

21   see that firearm on the passenger seat?

22        A.   Correct.

23        Q.   Now, Detective Kemp, back in August of

24   2018 you've been a police officer for almost

25   about four years?

1        A.   Yes.  I believe so, yes.

2        Q.   Or four and a half might be more

3   accurate?

4        A.   A little over four years, yes, ma'am.

5        Q.   Yes, sir.  So it's fair to say that you

6   were not a novice police officer or inexperienced

7   at that point?

8        A.   I had had four and a half years.  Yes,

9   roughly four -- a little over four years in.

10  Some might consider that still a novice, but I

11  had some experience, yes.

12       Q.   So you knew at that point that you could

13  call out an evidence technician from the police

14  department and take evidentiary photos if need

15  be?

16       A.   Yes, you could.

17       Q.   Yes.  But you had done that before?

18       A.   Correct.

19       Q.   Again, this wasn't your first week on

20  the job and you didn't know that you could call

21  someone to take photos of where the firearm was

22  found; correct?

23       A.   Correct.

24       Q.   But that wasn't done in this case?

25       A.   No, ma'am.

1    Q.   And by the time you located the gun and

2    had Mr. Swan out of the car another officer was

3    there, Officer Kevin Fodde; correct?

4    A.   Correct.

5    Q.   And you could have had Officer Fodde

6    take Mr. Swan in to the station for processing;

7    correct?

8    A.   Correct.

9    Q.   And you could have remained behind and

10   called an evidence technician to photograph where

11   you found the firearm in the car?

12   A.   Yes, ma'am.

13   Q.   But that didn't happen in this case?

14   A.   No, ma'am.

15   Q.   Do you have any photographs that we can

16   show the jury here today of any photos that were

17   taken at the scene?

18   A.   I do not, no, ma'am.

19   Q.   And by the time you sat down to write

20   your police narrative on this matter you had

21   written many police narratives before; correct?

22   A.   Correct.

23   Q.   Once again, not your first week on the

24   job; correct?

25   A.   Correct.

1      Q.    And so you knew that your police

2  narrative must include all important facts; is

3  that fair to say?

4      A.    Yes, ma'am.

5      Q.    It must be thorough?

6      A.    Yes.

7      Q.    Now, you testified here today that, in

8  fact, Tiara Thorpe told you at the scene that the

9  gun was hers; correct?

10      A.    Correct.

11      Q.    And that's not reflected in your police

12  report; correct?

13      A.    Correct.

14      Q.    And you never told Agent Eggers that

15  information when you spoke to him on the phone;

16  correct?

17      A.    Correct.

18      Q.    And the first time that information was

19  disclosed was when you testified in a previous

20  hearing on this matter, correct, in this

21  courthouse?

22      A.    Prior to speaking with you, yes.  It

23  was, yes.

24      Q.    It's fair to say that any fact related

25  to the ownership of the gun you found is an

1  important fact?

2      A.  One more time?

3      Q.  It's fair to say that any fact related

4  to the ownership of the gun you found is an

5  important fact?

6      A.  Yes.  I mean, at that time of the stop I

7  couldn't prove it to be her firearm, and due to

8  the constructive possession that was why I had

9  requested that she had the documentation to bring

10  it up to the police department, and I would

11  attach it.

12      Q.  And you never included the fact that

13  Ms. Thorpe told you it was her gun in your police

14  report, though?

15      A.  No, ma'am.

16      Q.  And you told her, though, that if she

17  had proof that that was her firearm, you would

18  attach it to the report?

19      A.  Correct.

20      Q.  And thereafter -- soon thereafter

21  Detective Cork in your police department did an

22  ATF trace on the firearm; correct?

23      A.  Yes.  I believe that's their procedure,

24  yes, ma'am.

25      Q.  And an ATF trace is where the ATF is

1   asked to find out who is the initial purchaser of
2   this firearm; correct?
3        A.   Correct.
4        Q.   I'm going to show you -- I'm going to
5   show you Defendant's Exhibit R.  This is the
6   firearms trace request done by the detective
7   in -- I'm sorry, the evidence technician in your
8   department, Scott Cork; right?
9        A.   Correct.
10             (Defendant's Exhibit No. R, ATF
11   Trace Report, was identified.)
12   BY MS. BOOTH:
13        Q.   And it indicates that the request date
14   was August the 1st of 2018; correct?
15        A.   Yes, ma'am.
16        Q.   And that's the day that you arrested
17   Mr. Swan?
18        A.   Yes.
19        Q.   And you said that if any information
20   Ms. Thorpe could give you to prove that this was
21   her firearm, you'd attach it to the report and
22   include it in the report; correct?
23        A.   Correct.
24        Q.   The completion date when the Florissant
25   Police Department -- your police department --

1  received this report is August 14th of 2018;

2  correct?

3       A.   Yes.   That's what it states, correct.

4       Q.   Thirteen days after the request was

5  made?

6       A.   Correct.

7       Q.   Who was the purchaser of the firearm

8  according to the ATF trace report?

9       A.   Tiara Davon Thorpe.

10      Q.   And that's the Ms. Thorpe that was in

11 the car with Mr. Swan; correct?

12      A.   Correct.

13      Q.   And this indicates they she purchased

14 the firearm on March 3rd of 2017 where my finger

15 is pointing, sir, if you can see.

16      A.   I can see that it's 2017.   I can't see

17 the other portion on the monitor, though.

18           MS. BOOTH:   Your Honor, may I

19 approach Detective Kemp?   I think he could see it

20 better if I approached him.

21           THE COURT:   I know.   This is not in

22 dispute, though, is it?   Counsel, do you want to

23 stipulate?

24           MR. SORRELL:   I would.   We already

25 have.

1          THE COURT:  Yeah.

2          MS. BOOTH:  All right.

3          THE COURT:  Okay.

4    BY MS. BOOTH:

5          Q.   It says she purchased the firearm in

6    2017 and from Gander Mountain; correct?

7          A.   Correct.

8          Q.   In Chesterfield, Missouri.

9          A.   Correct.

10         Q.   So this information was in your office

11   on August the 14th, your police department, but

12   yet we still don't see any information about

13   Ms. Thorpe being the firearm owner in your police

14   report; correct?

15         A.   Correct.

16         Q.   Is it fair to say that any statement

17   that a defendant makes to you in reference to a

18   gun in an illegal possession gun case is an

19   important fact as well?

20         A.   Yes, ma'am.

21         Q.   And it's been your habit in the past

22   regarding your narratives about defendants in

23   illegal gun possession matters to specifically

24   note in your report what a defendant said about a

25   gun if they said anything about a gun at all?

1          A.    Typically, yes, ma'am.

2          Q.    But we don't see in your report any

3    incriminating statement by Mr. Swan noted, do we?

4          A.    Correct.

5          Q.    After you spoke with Agent Eggers,

6    Detective Kemp, did he request that you file a

7    supplemental report giving the details of this

8    statement that you say Mr. Swan made to you?

9          A.    Not that I specifically recall.  It was

10   my belief that he was going to include that

11   statement inside of the report if -- in his

12   report if it was needed.

13         Q.    But Mr. Swan didn't make that alleged

14   statement to Agent Eggers; correct?

15         A.    Correct.

16         Q.    You say he made it to you?

17         A.    Correct.

18         Q.    And, again, you don't really remember

19   the statement verbatim; is that fair to say?

20         A.    At this time, correct, yes, I do not

21   recall specifically right now.

22         Q.    And that statement he made to you isn't

23   recorded in any way; correct?

24         A.    Correct.

25         Q.    There's no body cam video of him making

1    that statement?

2           A.    No.

3           Q.    And as far as booking videos from the

4    police department, there's no audio to hear what

5    anyone has to say when being booked in; correct?

6           A.    Correct.

7           Q.    Your police report doesn't reflect there

8    was a window of time between Mr. Swan giving you

9    a false name, him being left in the car

10   unattended, and you returning later with federal

11   warrant information; correct?

12          A.    Correct.

13          Q.    Your police report indicates that

14   Mr. Swan gave you his correct identifying

15   information straight away?

16          A.    I mean, the report -- I don't say

17   immediately provided me with that information,

18   but it does not notate the false information.

19          Q.    So your report doesn't reflect that

20   there was a window of time between Mr. Swan

21   giving you false information and his correct

22   information; correct?

23          A.    That is correct.

24          Q.    Why wouldn't you note that in your

25   police report?

1          A.   It's fairly common that somebody

2     provides you with a false identity sometimes if

3     they have an arrest warrant, and sometimes they

4     just don't want to provide you with the proper

5     pedigree information.  And in this case -- and

6     typically I don't notate any sort -- anything of

7     that sort unless I'm additionally charging them

8     with that as far as providing false information.

9          Q.   So it wasn't relevant in a case where

10    you're arresting a man on a federal gun warrant

11    and you say that there was a gun on the seat when

12    he got out?  You found that him not telling you

13    who he was at first wasn't important to note?

14         A.   I did not notate that in this case.

15         Q.   And you wrote your police narrative

16    about this incident on August 1st, 2018?

17         A.   Correct.

18         Q.   And you wrote the narrative immediately

19    after returning to the police station and getting

20    Mr. Swan booked in and situated in a cell?

21         A.   I believe it was around that time.  It

22    was prior to my shift ending at 6:00 a.m.

23         Q.   And you wrote the narrative when all the

24    details of the case were fresh in your mind?

25         A.   Correct.

1        Q.    And the actual date of your encounter

2    with Mr. Swan, of course, is August 1st of 2018;

3    correct?

4        A.    Correct.

5        Q.    But your police narrative indicates that

6    the event happened on Wednesday, August the 8th

7    of 2018; correct?

8        A.    That's correct.

9        Q.    Why is that date wrong?

10       A.    It's just a clerical error on my part.

11   I typed in 8, and it should have been the 1st.

12       Q.    So it's your testimony when you sat down

13   to write your report on August the 1st of 2018,

14   you accidentally thought it was Wednesday,

15   August the 8th instead?

16       A.    Correct.

17       Q.    You got the date of August 1 correct on

18   all the booking sheets; is that right?

19       A.    Correct.

20       Q.    You got the date of August 1st correct

21   when you hand signed the St. Louis County Police

22   Department evidence sheet?

23       A.    Correct.

24       Q.    And all those sheets were signed on

25   August the 1st?

1        A.   Correct.

2        Q.   So when it came time to write the

3   narrative, you got the date of the correct

4   Wednesday of Mr. Swan's arrest wrong?

5        A.   Yes, ma'am.

6        Q.   And you read your police narrative after

7   you completed it?

8        A.   Yes.

9        Q.   And you didn't catch this error when you

10  proofread your narrative?

11       A.   I did not.

12       Q.   And the incident report that you

13  generated for this case was reviewed by several

14  people in the Florissant Police Department for

15  accuracy after you wrote it; correct?

16       A.   Correct.

17       Q.   I'd like you to look at Defendant's

18  Exhibit O.  This is the first page of the

19  Florissant Police Department incident report that

20  you wrote in this case; correct?

21       A.   Correct.

22            (Defendant's Exhibit No. O,

23  Florissant Police Department Incident Report, was

24  identified.)

25  BY MS. BOOTH:

1          Q.    And you see that the first page is a

2     general information page; correct?

3          A.    Correct.

4          Q.    Then as we proceed through the report we

5     see there's a page for offenses to list what

6     offense was committed; correct?

7          A.    Correct.

8          Q.    We also have a page for persons

9     involved; is that correct?

10         A.    Yes, ma'am.

11         Q.    We have a page for vehicles involved?

12         A.    Yes, ma'am.

13         Q.    And then, of course, then we have your

14    narrative; correct?

15         A.    Correct.

16         Q.    And that's where we see on Wednesday,

17    August the 8th is when you stopped Ms. Thorpe's

18    car; correct?

19         A.    Correct.

20         Q.    And we see here below all the people

21    that reviewed your report once you wrote it;

22    correct?  We have, of course, you.  At the time

23    you were with Patrolman Jonathan Kemp.  And we

24    see the date August 1st, 2018; is that correct?

25         A.    Yes, ma'am.

1      Q.    Then it's reviewed by a Ms. Peggy Fowler

2  who's a secretary, and she reviewed that on

3  August the 17th; correct?

4      A.    Correct.

5      Q.    We see Sergeant Andre Reece of B platoon

6  reviewed the matter on August the 19th; correct?

7      A.    Correct.

8      Q.    And Sergeant Reece, was he a supervisor

9  of yours at the time?

10      A.    Yes.   He was my road sergeant.

11      Q.    Then we see on August the 19th the

12  narrative is approved by Lieutenant Rick Pfaff;

13  correct?

14      A.    Yes.

15      Q.    Then we see on August 23rd approved by

16  Lieutenant Rick Pfaff; correct?

17      A.    Correct.

18      Q.    And none of these people caught that

19  August 8th date discrepancy:  Is that what you're

20  telling me?

21      A.    Yes, ma'am.

22      Q.    Officer Kemp -- I apologize, Detective

23  Kemp, is there an original version of your

24  narrative somewhere where you note that indicates

25  the gun was found in the console of the car and

1  that Tiara Thorpe told you that gun was hers?

2        A.  No, ma'am.

3           MS. BOOTH:  I have nothing further

4  at this time, Judge.

5           MR. SORRELL:  Would you turn the

6  Elmo back on.  Thank you.

7              REDIRECT EXAMINATION

8  BY MR. SORRELL:

9        Q.  Sir, I believe you've already spoken

10  about Exhibit O.  Do you see the one I'm

11  referring to from the Defendant?

12        A.  Yes, sir.

13        Q.  Does that include a copy of the

14  narrative of your arrest of Mr. Swan that night?

15        A.  Yes, sir.

16        Q.  And in particular does it talk about

17  your arresting Mr. Swan while he was sitting on a

18  firearm?

19        A.  Correct.

20        Q.  I believe it says, "It should be noted

21  that while Swan was exiting the vehicle, I

22  observed a black-colored handgun on the passenger

23  seat where he was previously sitting, and after

24  securing Mr. Swan in the handcuffs, I retrieved

25  the firearm and properly secured it."  And then

1   you describe the firearm; is that right?

2        A.   Correct.

3        Q.   And then you said you also secured the

4   firearm in your report that had a bullet in the

5   chamber and seven rounds of ammunition in the

6   magazine; is that right?

7        A.   Yes, sir.

8        Q.   And that was written that night?

9        A.   Yes, sir.

10       Q.   Is that the report that's been written

11  on this case?

12       A.   Yes, sir.

13       Q.   Is there any other report or any other

14  narrative?

15       A.   No, sir.

16       Q.   And you were asked, I believe, if you

17  could have called an evidence technician to the

18  scene to take photographs; is that right?

19       A.   Yes, I remember that.

20       Q.   Now, if you would have called an

21  evidence technician to the scene after you had

22  already picked up -- after you already unloaded

23  it and after you already put it back in your car

24  is it fair to say that any photographs would have

25  to have just been staged?

1      A.   Yes, sir.

2      Q.   So you would have had to have just

3  simply put it back like you found it in order for

4  someone to take a picture of it?

5      A.   That's correct.

6      Q.   And you're not going to leave that

7  firearm in the car until an evidence technician

8  would be called out to the scene at 3:30 in the

9  morning?

10     A.   Correct.

11     Q.   Okay.  Now, you've been asked questions

12  about the gun part of this case.  Now, after

13  Mr. Swan was arrested, were you requested to do

14  any other investigation regarding the seizure of

15  this firearm?

16     A.   No, sir.

17     Q.   You haven't talked to any other

18  witnesses?

19     A.   Correct.

20     Q.   Certainly we didn't contact you to

21  decide whether to indict the case?

22     A.   Correct.

23     Q.   And basically your investigation ended

24  when Mr. Swan left your custody in the Florissant

25  jail; is that right?

1     A.   Yes, sir.

2     Q.   Is it fair to say that the case, however

3  it turned out to be, was going to be the

4  responsibility of some other officer, whether it

5  be the ATF or some other person?

6     A.   Yes, sir.

7     Q.   Is it fair to say you're not -- you

8  don't have any more involvement in that part of

9  the case even though a lot of other things

10 happened later?

11    A.   Correct.

12    Q.   Okay.  Now, you were talking about or

13 were asked about the first disclosure of

14 Mr. Swan's statement.  The first disclosure of

15 that statement was actually made the night that

16 it occurred; is that fair?

17    A.   Yes, sir.

18    Q.   To Mr. Eggers?

19    A.   Yes, sir.

20    Q.   Okay.  That included a statement that

21 Mr. Swan said that he had been shot or basically

22 affirmed that he had been shot?

23    A.   Yes, sir.

24    Q.   And you just reported that statement as

25 accurately as you could to Mr. Eggers; is that

1  fair?

2      A.  Correct.

3          MR. SORRELL:  Nothing further.

4  Thank you.

5          THE COURT:  Anything further?

6          MS. BOOTH:  No, sir.

7          THE COURT:  You may step down.

8          THE WITNESS:  Do you want the

9  firearm?  Do you want to take the firearm?

10          MR. SORRELL:  Yes.

11          I don't have any other questions.

12          (Witness Excused.)

13          MR. SORRELL:  I have one witness.  I

14  don't know if you want to --

15          THE COURT:  Yeah.  We'll keep going.

16  Is everybody okay to keep going a little bit?

17          Call your next witness then.

18          MR. SORRELL:  We call Brian Eggers,

19  please.

20              BRIAN EGGERS,

21  being produced and sworn, testified as follows:

22          THE COURT:  You may proceed.

23          MR. SORRELL:  Thank you.

24          DIRECT EXAMINATION

25  BY MR. SORRELL:

1      Q.   Would you state your name, please.

2      A.   Brian Eggers.

3      Q.   And what agency do you work for?

4      A.   I'm a police officer with the -- for the

5    City of Cape Girardeau and a task force officer

6    with the ATF.

7      Q.   Okay.  Is it fair to say you're a case

8    agent for this case?

9      A.   Yes, sir.

10      Q.   And as part of your duties you requested

11   an ATF trace report for a firearm discovered by

12   Officer Kemp, or did you receive one?

13      A.   I received one, yes, sir.

14      Q.   You didn't actually request it, did you?

15      A.   Correct.

16      Q.   All right.  Now, let me show you what

17   I've marked as Exhibit 17.  It's already been

18   admitted.  And that's talking about the ATF trace

19   report; is that fair?

20      A.   Yes, sir.

21      Q.   Okay.  And it lists Ms. Thorpe as the

22   purchaser of that firearm from a gun shop in

23   Missouri, I believe; is that right?

24      A.   Yes, sir.  Yes, sir.

25      Q.   All right.  And you had an opportunity

1　to write a report on this case; is that right?

2　　　　A.　Yes, I did.

3　　　　Q.　And you spoke to Mr. Kemp on the night

4　of the arrest?

5　　　　A.　Yes, sir.

6　　　　Q.　That was on August 1st?

7　　　　A.　Yes, it was.

8　　　　Q.　About what time in the morning did you

9　speak to Officer Kemp?

10　　　　A.　It was early.　I would say probably

11　around 4:00 or 5:00 in the morning.

12　　　　Q.　How were you notified that Mr. Swan had

13　been arrested?

14　　　　A.　So once someone who is indicted their

15　warrant is put into a database called NCIC.　And

16　when that person is arrested, we get a phone call

17　from Washington, D.C. from the case agent saying,

18　hey, this individual has been arrested and what

19　agency arrested them.　And then at that point

20　we're able to reach out to that agency to get the

21　details of the arrest.

22　　　　Q.　And that seemed pretty early in the

23　morning to contact Mr. Kemp.　Did you do that?

24　　　　A.　Yes, sir.

25　　　　Q.　And Mr. Kemp was still on duty?

1          A.   Yes, he was.

2          Q.   And did Mr. Kemp report a statement that

3     Mr. Swan made to him?

4          A.   Yes, sir, he did.

5          Q.   You put that in your report?

6          A.   I did.

7          Q.   And that report, of course, is turned

8     over to the defense like everything else in this

9     case?

10         A.   Yes, sir.

11         Q.   And did you have a conversation with

12    Mr. Swan around the end of 2016 or the beginning

13    of 2017?

14         A.   Yes, sir, I did.

15         Q.   And how did you make contact with

16    Mr. Swan?

17         A.   I was on patrol with the City of Cape

18    Girardeau.  It was nighttime.  I don't remember

19    exactly what time, but I pulled over a vehicle

20    and Mr. Swan was driving.

21         Q.   Okay.  And did you have a conversation

22    with Mr. Swan about a gunshot injury?

23         A.   I did.

24         Q.   And can you relate to the jury what that

25    conversation was about?

1          A.   I didn't know who was driving the

2     vehicle.  When I approached, I recognized

3     Mr. Swan and told him that it was good to see

4     him.  I was glad he was okay.

5          Q.   And why did you have a conversation

6     about him being okay?

7          A.   Because I heard that Mr. Swan was shot,

8     and it was very severe life threatening injuries.

9          Q.   Okay.  But Mr. Swan had survived that?

10         A.   Yes, sir.

11         Q.   And did you talk about his gunshot wound

12    on the scene?

13         A.   Not in details, but I told him I had

14    heard he had been shot.  I was happy to see him.

15    I was glad he was okay.

16         Q.   But that was before any of the events

17    had occurred in this case?

18         A.   Absolutely.

19              MR. SORRELL:  May I have just a

20    moment, Your Honor?

21              Your Honor, at this time I'm going

22    to ask about 404(b) evidence, and we have an

23    instruction that we would propose that you read

24    for the jury.  If I may tender it to the Court.

25              THE COURT:  Yes.

1          Ladies and gentlemen, I'm going to

2    read to you a special instruction I'll mark as

3    Instruction A.  You're about to hear evidence

4    that the Defendant was previously convicted of

5    the crime of felon in possession of a firearm.

6    You may consider this evidence only if you

7    unanimously find it is more likely true than not

8    true.

9          You decide that by considering all

10   of the evidence and deciding what evidence is

11   more believable.  This is a lower standard than

12   proof beyond a reasonable doubt.

13         If you find this evidence has been

14   proved, then you may consider it to help you

15   decide the issues of motive, opportunity, intent,

16   preparation, plan, knowledge, absence of mistake

17   or lack of accident.  You should give it the

18   weight and value you believe it's entitled to

19   receive.

20         If you find that this evidence has

21   not been proved, you must disregard it.

22   Remember, even if you find that the Defendant may

23   have committed a similar act in the past, this is

24   not evidence that he committed such an act in

25   this case.

282

1          You may not convict a person simply

2     because you believe he may have committed similar

3     acts in the past.  The Defendant is on trial only

4     for the crimes charged, and you may consider the

5     evidence of prior acts only on the issues stated

6     above.

7                    MR. SORRELL:  Thank you.

8     BY MR. SORRELL:

9          Q.  Officer, would you take a look at what

10    I've marked as Exhibit 12.  Can you see that?

11         A.  Yes, sir.

12         Q.  And can you tell the jury what that is?

13         A.  That is a federal indictment for

14    Mr. Barrett Swan.

15                   (Government's Exhibit No. 12,

16    Indictment, was identified.)

17    BY MR. SORRELL:

18         Q.  Okay.  And do you know if this Barrett

19    Swan listed on Exhibit 12 has any relationship to

20    the Defendant in this case?

21         A.  Yes, sir.  It's the same person.

22         Q.  Okay.  And would you then take a look at

23    the back of this exhibit, second page, is that

24    the judgment for the same case?

25         A.  Yes, sir, it is.

1      Q.    Just basically shows the conviction of

2   Mr. Swan; is that right?

3      A.    That's correct.

4      Q.    Now, you wrote a report in this case; is

5   that fair?

6      A.    Yes, sir.

7      Q.    Did you -- when you wrote that report,

8   what date did you put the event occurred on?

9      A.    I put that it occurred on August 8th.

10     Q.    And you actually talked to Mr. Kemp on

11   August 1st?

12     A.    Yes, sir, that's correct.

13     Q.    So is that just an error by reading from

14   Mr. Kemp's report?

15     A.    That's exactly right.

16     Q.    And you just carried it forward on your

17   report?

18     A.    I'm sorry?

19     Q.    And it just carried forward on your

20   report?

21     A.    Yes, sir.

22     Q.    And do you know the two firearms the

23   testimony so far has been they were both found on

24   the left side of Mr. Swan; is that right?

25     A.    That's correct.

1          Q.   And do you know if Mr. Swan is left
2    handed?
3          A.   Mr. Swan is left handed.
4          Q.   And do you see that person in court or
5    do you know Mr. Swan?
6          A.   Yes, sir.
7          Q.   Would you point him out for the Court,
8    please.
9          A.   The gentleman at the defense table in
10   the blue shirt.
11              MR. SORRELL:  Would the record
12   reflect the witness has identified Mr. Swan?
13              THE COURT:  The record will so
14   reflect.
15   BY MR. SORRELL:
16         Q.   And that's the Mr. Swan that the arrest
17   warrant was pending for on the night of
18   August 1st; is that correct?
19         A.   Yes, sir.
20              MR. SORRELL:  Nothing further.
21   Thank you.
22              THE COURT:  Ms. Booth.
23              MS. BOOTH:  I'm sorry.  I didn't
24   know Mr. Sorrell was finished.
25                   CROSS-EXAMINATION

1    BY MS. BOOTH:

2        Q.    Agent Eggers, you had an opportunity to

3    speak with Jonathan Kemp -- Detective Jonathan

4    Kemp on August 1st of 2018; correct?

5        A.    Yes, ma'am.

6        Q.    He called you when he learned there was

7    a federal arrest warrant for Mr. Swan; correct?

8        A.    I don't remember if I called him or if

9    he called me, but when I was notified by the

10   agency in Washington, D.C. I don't remember if I

11   called the Florissant Police Department or if he

12   called me right away.

13       Q.    Okay.  So just so our jurors understand

14   that when that federal arrest warrant is made,

15   you're alerted; correct?

16       A.    Absolutely.

17       Q.    Because your name would have been on

18   that arrest warrant information to contact you --

19       A.    Yes, ma'am.

20       Q.    -- correct?

21             And you had several conversations with

22   Detective Kemp about the facts of the case;

23   correct?

24       A.    Yes, sir.

25       Q.    And when you spoke with him, it was

1 clear that he would just provide you all

2 important information he learned about the case;

3 correct?

4   A. That's what I understood, yes, ma'am.

5   Q. He never told you that Tiara Thorpe told

6 him that that firearm was hers at the scene;

7 correct?

8   A. No, ma'am.

9   Q. And that statement that Detective Kemp

10 says that Mr. Swan made to him that's included in

11 your report, did you ever tell Detective Kemp

12 don't worry about writing a supplemental, no need

13 to put that in your report?

14   A. No.

15   Q. And at some point did you ask Officer

16 Kemp to write a supplemental report to give the

17 details of how that statement came to be?

18   A. I did.

19   Q. And did he write that supplemental

20 report?

21   A. No, ma'am.

22     MS. BOOTH:  I have nothing further,

23 Your Honor.

24     MR. SORRELL:  No, Your Honor.

25 Nothing further.

1           THE COURT:  You may step down.

2                (Witness excused.)

3           MR.  SORRELL:  Your Honor, the

4    Government rests.

5                (Government Rests.)

6           THE COURT:  All right.  Ladies and

7    gentlemen, we'll recess for the day and finish

8    the trial tomorrow.

9                And you're going to go home, and

10   your spouses, your family, your friends are all

11   going to want to know what's going on.  Just tell

12   them you're under threat of contempt of court to

13   talk about the case in any respect, and you know

14   the reasons why as I've explained to you at

15   length.

16                So please honor that oath that

17   you've taken.  Don't discuss the case among

18   yourselves or with others or permit anyone to

19   discuss it in your presence.  Do not form or

20   express an opinion about the case until it's

21   given to you decide.

22                We'll reconvene at 9 o'clock

23   tomorrow.  Should they go to the jury assembly

24   room?

25           THE CLERK:  Yes.

1              THE COURT:  And then you'll be
2  brought up here.  But, again, report at 9:00 a.m.
3  to the jury assembly room.
4              Thank you for your patience, and
5  we'll be in recess for the day.
6              Mr. Anderson, if you'd stay in the
7  courtroom for a few minutes.
8              So you're excused at this time.
9              (Proceedings resumed in open court
10  outside the presence of the jury except Juror
11  Number 7.)
12              THE COURT:  Mr. Anderson, I'm going
13  to ask you a few questions.  I'm concerned about
14  the matter of when you had to go out to the car.
15  The court security officers had observed you
16  leaving and going out to the car with two people,
17  a woman and a child, who were sitting with the
18  members of the friends and family of the
19  Defendant.
20              Do you know any of these people?
21              JUROR NUMBER 7 ANDERSON:  No.  I
22  know them.  That's my family.
23              THE COURT:  Okay.  They were in the
24  courtroom then during the trial?
25              JUROR NUMBER 7 ANDERSON:  Yeah.

1           THE COURT:  And who is that, your --

2           JUROR NUMBER 7 ANDERSON:  My

3    daughter and my fiancee.

4           THE COURT:  Your daughter and your

5    fiancee.  Okay.  And they went out to the car

6    with you then to get medication?

7           JUROR NUMBER 7 ANDERSON:  Yeah.

8    They brought me.  She drove me here.

9           THE COURT:  Okay.  All right.  That

10   kind of alleviates my concern about the matter.

11          Again, it's just absolutely critical

12   that you don't have any interaction with any of

13   the people involved in the trial, including the

14   friends and family.

15          JUROR NUMBER 7 ANDERSON:  All right.

16   Yeah.  They don't know me.

17          THE COURT:  Okay.  That's fine.  All

18   right.  We'll see you tomorrow at 9 o'clock then.

19          (Juror Number 7 left.)

20          (Proceedings resumed in open court

21   outside the presence of the jury.)

22          THE COURT:  Any matters you want to

23   take up before recessing for the day?

24          MS. WOODRUFF:  No.

25          MR. SORRELL:  No, sir.

1          MR. TILSEN:  No.

2          MS. BOOTH:  No, sir.

3          THE COURT:  All right.  We'll go off

4     the record.

5          (A discussion was held off the

6     record.)

7          (Proceedings resumed in open court

8     outside the presence of the jury.)

9          THE COURT:  Let me go back on the

10    record with everybody.  When the CSO interrogated

11    or asked the two people who left with

12    Mr. Anderson, he asked are you here with the

13    Defendant's family?  And they said, Yes.

14          And so I'm going to inquire further.

15    Maybe it was a miscommunication, but in the

16    morning I'll inquire one more time about that.

17          MR. SORRELL:  Okay.

18          THE COURT:  But it's apparently not

19    because --

20          MR. TILSEN:  I think you should

21    leave him alone, Your Honor, for the record.

22    Well, you've asked him, and he's answered the

23    Court.  Why don't you -- who's the CSO who spoke

24    to these people?

25          THE COURT:  That doesn't matter.

1  Anyway, I may or may not bring it up again in the

2  morning, but it was conflicting.

3              MR. TILSEN:  I mean, we've already

4  singled out one of the several jurors that was

5  sleeping, you know, and I have -- there was a

6  reason for it, but still that's extra pressure on

7  him when I don't think it's fair.

8              THE COURT:  Well, do you want to

9  move for a mistrial?

10             MR. TILSEN:  No.

11             THE COURT:  Or what do you want to

12 do?

13             MR. TILSEN:  I think you've

14 adequately asked this juror whether he had any

15 connection with the Defendant or the Defendant's

16 family.

17             THE COURT:  Well, at the time that I

18 asked I didn't have all of the information.

19 So -- okay?

20             We'll be recessed for the evening

21 then.

22             (The hour of adjournment having

23 arrived, the jury, being duly admonished by the

24 Court, by agreement, is allowed to separate for

25 the evening, under the usual instructions of the

1    Court, until Tuesday, July 9, 2019, at 9:00 a.m.)

2                (PROCEEDINGS CONCLUDED AT 5:20 P.M.)

```
1              C E R T I F I C A T E

2

3              I, Alison M. Garagnani, Registered

4    Merit Reporter and Certified Realtime Reporter,

5    hereby certify that I am a duly appointed

6    Official Court Reporter of the United States

7    District Court for the Eastern District of

8    Missouri.

9              I further certify that the foregoing

10   is a true and accurate transcript of the

11   proceedings held in the above-entitled case and

12   that said transcript is a true and correct

13   transcription of my stenographic notes.

14             I further certify that this

15   transcript contains pages 1 through 294 inclusive

16   and that this reporter takes no responsibility

17   for missing or damaged pages of this transcript

18   when same transcript is copied by any party other

19   than this reporter.

20             Dated Cape Girardeau, Missouri, this

21   13th day of January, 2020.

22

23
     _____
24   /s/Alison M. Garagnani
     Alison M. Garagnani, CCR, CSR, RMR, CRR
25   Official Court Reporter
```