<pre>
 1            UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF MISSOURI
 2                 SOUTHEASTERN DIVISION

 3   UNITED STATES OF AMERICA,

 4           Plaintiff,

 5           vs.              Cause No. 1:18CR98 SNLJ

 6   BARRETT C. SWAN,

 7           Defendant.
     ===============================================
 8                TRIAL DAY 2 OF 2
                  Pages 295 - 506
 9
       BEFORE THE HONORABLE STEPHEN N. LIMBAUGH, JR.
10              UNITED STATES DISTRICT JUDGE

11                  JULY 9, 2019
     ===============================================
12
                    APPEARANCES
13
     For Plaintiff:
14
     Mr. Keith D. Sorrell
15   Ms. Angel Woodruff
     Assistant United States Attorneys
16   555 Independence, Room 3000
     Cape Girardeau MO 63703
17
     For Defendant:
18
     Ms. Jennifer L. Booth
19   Mr. Scott Tilsen
     Assistant Federal Public Defenders
20   325 Broadway
     2nd Floor
21   Cape Girardeau MO 63701

22                  Reported by:

23     Alison M. Garagnani, CCR #475, CSR, RMR, CRR
                Official Court Reporter
24            United States District Court
             555 Independence, Room 3100
25             Cape Girardeau, MO 63703
                  (573) 331-8832
</pre>

1            I N D E X

                                    Page
2           July 9, 2019

3   Trial Continued:

4              DEFENDANT'S EVIDENCE:

5   EBONY STIGALL:
        DIRECT EXAMINATION BY MS. BOOTH         306
6       CROSS-EXAMINATION BY MS. WOODRUFF       323
        REDIRECT EXAMINATION BY MS. BOOTH       331
7
    SHAVION REED:
8       DIRECT EXAMINATION BY MS. BOOTH         332
        CROSS-EXAMINATION BY MS. WOODRUFF       341
9
    TIARA THORPE:
10      DIRECT EXAMINATION BY MS. BOOTH         345
        CROSS-EXAMINATION BY MR. SORRELL        364
11      REDIRECT EXAMINATION BY MS. BOOTH       390

12  BARRETT SWAN:
        DIRECT EXAMINATION BY MS. BOOTH         392
13      CROSS-EXAMINATION BY MR. SORRELL        420

14  KEVIN FODDE:
        DIRECT EXAMINATION BY MR. SORRELL       449
15      CROSS-EXAMINATION BY MS. BOOTH          453

16  Instruction conference                     457

17  Government's Closing Argument by           477
    Ms. Woodruff
18  Defendant's Closing Argument by Ms. Booth  486
    Government's Closing Argument Continued by 492
19  Mr. Sorrell

20  Bailiff Sworn by Clerk                     498

21  Question by the jury                       500

22  Verdict received at 4:20 p.m. and Jury Not 504
    Polled
23

24

25

1

<u>EXHIBIT INDEX</u>

2

Government's
<u>Exhibit</u>          <u>Description</u>                    <u>Id</u>      <u>Rec'd</u>

3

18        Traffic Tickets                  375      375

4

5

Deft's
<u>Exhibit</u>          <u>Description</u>                    <u>Id</u>      <u>Rec'd</u>

6

B         Photo                            315
7         C         Photo                            399
D         Photo                            319
8         F         Photo                            320
H         Photo                            358
9         I         Photo                            359
J         Photo                            360
10        K         Photo                            360
L         Photo                            361
11        M         Photo                            362

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (THE FOLLOWING PROCEEDINGS WERE HELD

2   IN OPEN COURT AND WITH THE DEFENDANT PRESENT:)

3        (THE PROCEEDINGS BEGAN AT 9:14 A.M.)

4

5                  **T R I A L**

6

7        The trial began on Monday the 8th day of

8   July, 2019, and concluded on Tuesday the 9th day

9   of July, 2019, before the Honorable Stephen N.

10  Limbaugh, United States District Judge, of the

11  Eastern District of Missouri, Southeastern

12  Division, before a jury and one alternate juror,

13  who were impaneled, selected and sworn.

14              (Proceedings resumed in open court

15  outside the presence of the jury.)

16              THE COURT:  As you probably know, by

17  now Juror Anderson is it --

18              THE CLERK:  Yes, sir.

19              THE COURT:  -- has been arrested for

20  an outstanding warrant.  He also had apparently

21  multiple arrests for felonies.  And so at this

22  point he's no longer available to serve, and the

23  Court will substitute the alternate in his place.

24              Do you want to elaborate on that?

25  Do you know anything more than I do?

1          MR. SORRELL:  That's exactly what I

2     know, Judge, but, no, I don't have anything more

3     to elaborate on that.  I would have stricken him

4     if he would have told us about his felony

5     arrests, but he did not.  We did strike Juror

6     Number 22 for exactly that reason.

7          THE COURT:  Do you want to introduce

8     any kind of records in support of that?

9          MR. SORRELL:  Judge, if I may.  Do

10     you want me to -- I've got a record of his --

11          THE COURT:  Well, let me just ask,

12     any objection by Defendants?

13          MS. BOOTH:  No, sir.

14          THE COURT:  All right.  Never mind.

15          MR. SORRELL:  Okay.  Thank you.

16          THE COURT:  I think that takes care

17     of it.

18          MR. SORRELL:  Yes, sir.

19          THE COURT:  So the second thing --

20     the next thing we need to do is for you to come

21     up, if you would, Mr. Swan, with your lawyer.  I

22     have to question you.  I want you first to be

23     sworn in by the Court Clerk.

24                    BARRETT SWAN,

25     being produced and sworn, testified as follows:

1        THE COURT:  Okay.  Now, at this

2   point of the trial the Government has rested, and

3   now it's time for you to introduce any evidence

4   that you want to introduce, including testifying

5   yourself, and, of course, you'll be allowed to

6   testify.  That goes without saying.  And you can

7   tell your side of the story.  And then, of

8   course, you'll also be entitled to call witnesses

9   on your own behalf.

10        But if you decide to testify, then

11  the Government's lawyer will be allowed to

12  cross-examine you.  You understand that, don't

13  you?

14        THE DEFENDANT:  Yes, sir.

15        THE COURT:  And as part of that

16  cross-examination they may or may not try to

17  introduce evidence of prior convictions to

18  attempt to impeach your credibility.  Do you

19  understand that too?

20        THE DEFENDANT:  Yes, sir.

21        THE COURT:  You've talked about this

22  with your lawyer at length, haven't you?

23        THE DEFENDANT:  Yes, sir.

24        THE COURT:  Now, on the other hand,

25  if you decide not to testify, that can't be used

1    against you.  You have a right against

2    self-incrimination under the Constitution.  You

3    know that too, don't you?

4              THE DEFENDANT:  Yes, sir.

5              THE COURT:  And not only that, if

6    you decide not to testify, the jury will not be

7    allowed to hold it against you that you decided

8    not to testify.  Do you understand that?

9              THE DEFENDANT:  Yes, sir.

10             THE COURT:  And I want to reinforce

11   that by telling you that I will also -- if you

12   decide not to testify, I will give a written

13   instruction to the jury that they cannot hold it

14   against you that they -- that you decided not to

15   testify.  Do you understand all that?

16             THE DEFENDANT:  Yes, sir.

17             THE COURT:  Now, and, again, you've

18   had plenty of time to talk with your lawyer about

19   this; right?

20             THE DEFENDANT:  Yes, sir.

21             THE COURT:  Have you come to a

22   decision on whether or not to testify in the case

23   then?

24             THE DEFENDANT:  Yes, sir.

25             THE COURT:  And what is that?

1    THE DEFENDANT:  That I will.

2    THE COURT:  Okay.  That's fine.

3    With that do you want to add anything further

4    then, counsel?

5    MS. BOOTH:  No, sir.  Other than I

6    guess Mr. -- the chain will be removed from his

7    leg so that he can walk up to the witness stand?

8    THE COURT:  Yep.  That's fine.

9    MS. BOOTH:  Sir, yes, one -- we're

10   finished with that now.

11   THE COURT:  You can have a seat

12   then.

13   MS. BOOTH:  One final --

14   THE COURT:  What's that?

15   MS. BOOTH:  Your Honor, prior to the

16   defense calling our witnesses there is a

17   stipulation between the Government and the

18   defense.  There was a police officer who could

19   not be here today --

20   THE COURT:  Okay.

21   MS. BOOTH:  -- so we have some

22   stipulated testimony that everyone has signed.

23   THE COURT:  Do you want to start

24   with that first when we call the jury in?

25   MS. BOOTH:  Yes, sir.  I'd like to

```
1    start with it --
2                   THE COURT:  Yeah, that's fine.
3                   MS. BOOTH:  -- when I do the defense
4    case in chief.  And is this something you would
5    like me to read into the record?
6                   THE COURT:  Sure.  Just like Mr.
7    Sorrell did.
8                   MS. BOOTH:  Yes, sir.  Okay.
9                   THE COURT:  That would fine.
10                  MS. BOOTH:  Okay.  That's what we'll
11   do then.
12                  THE COURT:  And then what other
13   witnesses do you have so I can calibrate the
14   time?
15                  MS. BOOTH:  Sir, we have -- we'll
16   have Ms. Ebony Stigall.  We will have Ms. Shavion
17   Reed.  We have Ms. Tiara Thorpe.
18                  THE COURT:  Okay.
19                  MR. COHEN:  And then Mr. Swan will
20   be last.
21                  THE COURT:  Okay.
22                  MS. BOOTH:  We are -- Ms. Thorpe may
23   be running late, so if she's not here by the time
24   we call her, we'll have to switch up the order
25   with Mr. Swan and Ms. Thorpe, but so that's how
```

1    we'll proceed.

2              THE COURT:   All right.   Any

3    preliminary matters?

4              MR. SORRELL:   No, Your Honor.

5    Thank you.

6              THE COURT:   Okay.   You can bring the

7    jury in.

8              (Proceedings resumed in open court.)

9              THE COURT:   You may be seated.

10             Good morning, ladies and gentlemen.

11   Juror Number 7 is no longer available.   And for

12   that reason the alternate Ms. Carroll is now a

13   regular juror.

14             And why don't you in the back row

15   just everyone scoot up one seat, and that will be

16   easier for you to see and hear the witness.

17             And with that the Government rested

18   at the end of the day yesterday.

19             So, Ms. Booth.

20             MS. BOOTH:   Yes, sir.   Your Honor,

21   I'll begin with the Defendant's case in chief by

22   reading the stipulated testimony of Cape

23   Girardeau canine officer Jonathan Brotz.   He

24   could not be here today, but he has signed this

25   stipulated testimony as have the parties.

304

1              On May 26th, 2018, at approximately

2    3:40 hours I, canine Officer Brotz, was sitting

3    in my patrol car facing east towards the

4    Mississippi River bridge on College Street near

5    the intersection of South Middle Street.  I was

6    talking to Officer Evans who was present with his

7    patrol car parked next to me.  The headlights and

8    taillights in my patrol vehicle were illuminated.

9              I observed a newer model black Dodge

10   Charger and another vehicle coming from the

11   Mississippi River bridge traveling west on

12   Route 74 passing Fountain Street at a high rate

13   of speed.  The Dodge Charger was in the westbound

14   driving lane.  The other car, a gray car, was in

15   the passing lane.  It appeared as though the cars

16   were racing each other.

17             I looked at the radar unit in my

18   patrol car, and it showed the Dodge Charger

19   traveling at 90 miles per hour in a 45 mile per

20   hour zone.  Officer Evans notified dispatch via

21   radio that he had a black car traveling at a high

22   rate of speed traveling west on Route 74.

23             Officer Evans left our location to

24   intercept the vehicle.  Via the radio I learned

25   that during the pursuit the black car wrecked.

1    I responded to the area of the wreck.  Shortly

2    after seeing a black male with dreadlocks running

3    I was advised over the radio by Sergeant Edwards

4    that he had a person in custody.  It was the male

5    I observed running.

6                   Sergeant Edwards and I

7    simultaneously searched the male's person, and he

8    didn't have anything illegal on his person.  I

9    escorted the man to a patrol car, and he was

10   placed in the backseat of the patrol car without

11   incident.

12                  Your Honor, I call Ebony Stigall to

13   the stand.

14                      EBONY STIGALL,

15   being produced and sworn, testified as follows:

16                  THE COURT:  You may proceed.

17                    DIRECT EXAMINATION

18   BY MS. BOOTH:

19        Q.   Please state your name for the record.

20        A.   Ebony Stigall.

21        Q.   Ms. Stigall, how old are you?

22        A.   35.

23        Q.   And how are you employed?

24                  THE COURT:  Can you pull the

25   microphone up to you so that everybody can hear

1   you.

2               THE WITNESS:  Yes.

3        A.   I work for St. Francis Medical Center.

4        Q.   Do you have any criminal convictions?

5        A.   No, ma'am.

6        Q.   Do you know Barrett Swan?

7        A.   Yes.

8        Q.   How long have you known him and in what

9   capacity?

10       A.   Since 2013 dating off and on.

11       Q.   What is your relationship status with

12  him right now?

13       A.   We don't have a relationship right now.

14       Q.   Were you in a dating relationship with

15  Mr. Swan at the beginning of last summer in May

16  of 2018?

17       A.   Yes.

18       Q.   Would he spend the night at your home

19  sometimes?

20       A.   Yes.

21       Q.   And your home, was that located here in

22  Cape Girardeau?

23       A.   Yes.

24       Q.   Did you live across the street from a

25  Cape Girardeau city police officer at that time?

1          A.   Yes.

2          Q.   Do you know which officer it was?

3          A.   No.

4          Q.   When Mr. Swan would spend the night at

5     your home, would he park his car in your

6     driveway?

7          A.   Yes.

8          Q.   And what type of car did Mr. Swan own at

9     that time?

10         A.   A 2015 black Charger.

11         Q.   Do you remember the events of the day of

12    Friday, May 25th of 2018?

13         A.   Yes.

14         Q.   Did Mr. Swan spend the night at your

15    home on the previous night, the night of

16    Thursday, May 24th, 2018?

17         A.   Yes.

18         Q.   Did he park his Dodge Charger in your

19    driveway when he came to spend the night?

20         A.   Yes.

21         Q.   And did you go to work on Friday, May

22    the 25th?

23         A.   Yes.

24         Q.   When you left home to drive to work, did

25    you take your car?

1          A.    No.

2          Q.    What car did you drive to work?

3          A.    His Charger.

4          Q.    And why is that?

5          A.    It was parked behind me.

6          Q.    And your car at the time that you were

7    driving, what car was that?

8          A.    I had a rental.

9          Q.    So you left that car behind in the

10   driveway?

11         A.    Yes.

12         Q.    Do you recall what color that rental car

13   was?

14         A.    Silver.

15         Q.    Was it out of the ordinary for you and

16   Mr. Swan to drive each other's cars from time to

17   time?

18         A.    No.

19         Q.    Did you own a firearm at the time you

20   dated Mr. Swan?

21         A.    Yes.

22         Q.    And how long have you been a firearm

23   owner?

24         A.    Since I was probably 18.

25         Q.    Did you have any firearm training or

1    military training, anything like that?

2         A.   Yes.  I was in ROTC since I was a

3    freshman, and we had marksman training.

4         Q.   And ROTC stands for?

5         A.   Junior -- I can't remember.

6         Q.   Junior reserve officer training course?

7         A.   Yes.

8         Q.   In high school?

9         A.   Yes.

10        Q.   Was that all four years of high school?

11        A.   Yes.

12             MS. BOOTH:   Your Honor, may I

13   approach?

14             THE COURT:   Yes.

15   BY MS. BOOTH:

16        Q.   Ms. Stigall, did you own a Smith &

17   Wesson nine-millimeter firearm when you dated

18   Mr. Swan back in May of 2018?

19        A.   Yes.

20        Q.   And, ma'am, do you recognize this

21   exhibit, this Government's Exhibit No. 9?

22        A.   Yes.

23        Q.   And can you tell me what this is?

24        A.   It's my nine-millimeter.

25        Q.   When was the last time you saw this

1    firearm?

2         A.   Friday, May 25th.

3         Q.   Ms. Stigall, when you dated Mr. Swan,

4    you were aware that he was a convicted felon?

5         A.   Yes, ma'am.

6         Q.   As such you were aware that he couldn't

7    possess any firearms?

8         A.   Yes, ma'am.

9         Q.   Did you take that matter seriously and

10   always take care to keep your firearm from

11   Barrett?

12        A.   Yes, ma'am.

13        Q.   What would you do with your firearm when

14   Barrett would stay at your home?

15        A.   Put it in my garage in my car that was

16   locked.

17        Q.   And Barrett knew you had your firearm?

18        A.   Yes.

19        Q.   Did he take care to stay away from your

20   firearm?

21        A.   Yes.

22        Q.   Was it your practice to carry the

23   firearm with you at times when you were not with

24   Mr. Swan?

25        A.   All the time.

311

1      Q.    And why did you do that, ma'am?

2      A.    I had been robbed several times.  I'm

3    single.

4      Q.    Were you in possession of your firearm

5    while operating Mr. Swan's Charger on Friday, May

6    the 25th?

7      A.    Yes.

8      Q.    When did you get that Smith & Wesson

9    firearm?

10     A.    Sometime in the previous year.

11     Q.    The year prior to May 25th of 2018?

12     A.    Yes.

13     Q.    And where did you purchase that firearm?

14     A.    In Poplar Bluff.

15     Q.    Was there a specific place in Poplar

16   Bluff, a store?

17     A.    No.  It's like a swap meet thing that

18   they do down on the south side of town.

19     Q.    A swap meet like a sale barn?

20     A.    Yes.

21     Q.    Are you familiar with Poplar Bluff?

22     A.    I grew up there.

23     Q.    And that's where you purchased this

24   firearm?

25     A.    Right.

1    Q.    Did you and Mr. Swan have plans to spend
2    Memorial Day weekend of 2018 together?
3    A.    Yes.
4    Q.    What were those plans?
5    A.    We were supposed to be going to Indiana.
6    Q.    Was that to spend some time with some
7    family?
8    A.    Yes.  We was supposed to have a family
9    cookout.  All my sisters always get together, and
10   we had made plans to do that again.
11   Q.    When did you plan to leave for Indiana?
12   A.    Friday after work.
13   Q.    What car were you-all going to take?
14   A.    We were going to take the rental.
15   Q.    When you got off work, Ms. Stigall, on
16   Friday, was Mr. Swan ready to leave for Indiana?
17   A.    No.
18   Q.    At some point did you travel to his home
19   to leave with him in the rental car for Indiana?
20   A.    Yes.
21   Q.    And at that time where was he living?
22   A.    With his mom.
23   Q.    So he wasn't home when you went to his
24   mother's home?
25   A.    No.

1       Q.   Did that frustrate you?

2       A.   Yes.

3       Q.   Why is that?

4       A.   Because I was already leaving late.  I

5  had already missed some of the things we were

6  supposed to do that day.

7       Q.   Things that you planned to do in

8  Indiana?

9       A.   Yes.

10       Q.   Did you decide to wait for Mr. Swan

11  before leaving for Indiana?

12       A.   Yes.

13       Q.   What did you do with your time while you

14  waited for him?

15       A.   His daughter had forgotten some stuff,

16  so we went to the store to pick some things up.

17  We went and packed her bag and then watched a

18  movie downstairs.

19       Q.   And so you did run some errands?

20       A.   Uh-huh.

21       Q.   And at that time you were still driving

22  the Dodge Charger?

23       A.   Correct.

24       Q.   Did you have your firearm with you at

25  that time?

314

1          A.    Yes.

2          Q.    And where was the firearm located?

3          A.    In the car.

4          Q.    Was it located anywhere specific in the

5     car?

6          A.    In the door.

7          Q.    Ms. Stigall, I'm showing you Defendant's

8     Exhibit B.  Do you recognize this as the black

9     Charger that you were driving on Friday, May the

10    25th of 2018?

11         A.    Yes, ma'am.

12               (Defendant's Exhibit No. B, Photo,

13    was identified.)

14    BY MS. BOOTH:

15         Q.    And, ma'am, before you do, I'll explain.

16    You are able to touch the screen in front of you.

17    And where you touch it will indicate on the

18    screen where your finger is in red.  Can you show

19    me where you carried the gun in the Dodge Charger

20    IF this picture is clear enough for you?

21         A.    Here.

22         Q.    I'm not seeing anything come up on my

23    screen.  Oh, there we go.

24               MS. BOOTH:  Your Honor, may I

25    approach Ms. Stigall?

1          THE COURT:  Yeah, I mean, that's

2     fine.

3     BY MS. BOOTH:

4          Q.  Just to make it clear, Ms. Stigall, on

5     Defendant's Exhibit B if you could take this pen

6     and mark where you carried that firearm.  I'll

7     display this.

8               So, ma'am, you've indicated right here;

9     correct?

10          A.  Correct.

11          Q.  When you returned to Barrett's mother's

12     home after you ran your errands, was he home at

13     that time?

14          A.  No.

15          Q.  Did the night wear on without Mr. Swan

16     coming home to leave for Indiana?

17          A.  Yes.

18          Q.  Did that frustrate you?

19          A.  Yes.

20          Q.  Were you attempting to call him to find

21     out where he was and why he wasn't home?

22          A.  Yes.

23          Q.  Was he taking your calls?

24          A.  Some of them.

25          Q.  Some of them?  Ms. Stigall, were you

1    beginning to suspect that Mr. Swan could be out

2    with another woman at that time?

3         A.   Yes.

4         Q.   And why would you suspect that?

5         A.   Because that's what he does.

6         Q.   Did you suspect that he was with any

7    specific woman?

8         A.   Yes.

9         Q.   And who would that be?

10        A.   Shavion Reed.

11        Q.   And who was Shavion Reed?

12        A.   At the time it was an ex.

13        Q.   So you had suspected that Mr. Swan was

14   still seeing Shavion while he was dating you?

15        A.   Uh-huh.

16        Q.   Is that a yes, ma'am?

17        A.   Yes.

18        Q.   Had you previously confronted Mr. Swan

19   about your suspicions about Shavion?

20        A.   Uh-huh, yes.

21        Q.   Had you received a straight answer from

22   him?

23        A.   No.

24        Q.   As you were waiting for Mr. Swan to come

25   home, did you receive a call or a text from

1   someone regarding Mr. Swan's whereabouts?

2          A.   Yes.

3          Q.   And what information did you receive?

4          A.   That he was sitting in the parking lot

5   with that girl.

6          Q.   And what parking lot would that be?

7          A.   At The Pony.

8          Q.   And can you tell the jury what The Pony

9   is?

10         A.   It's a strip club.

11         Q.   And is it located across the bridge from

12  Cape Girardeau in Illinois?

13         A.   Yes.

14         Q.   Located immediately across the bridge.

15  Do people gather in the parking lot of that

16  nightclub to socialize?

17         A.   Yes.

18         Q.   How did you feel when you got that

19  information about Mr. Swan being across the river

20  with a woman?

21         A.   I was pissed.

22         Q.   And what action did you take upon

23  receiving that information?

24         A.   I got in the car and went over there.

25         Q.   Were you in a hurry to get to Illinois?

1          A.    Yes.

2          Q.    Why the hurry?

3          A.    Because I wanted to give him a chance to

4     tell me why.

5          Q.    When you left in the Charger to drive to

6     Illinois, did you remember that your firearm was

7     in the door pocket?

8          A.    I wasn't thinking about that then.

9          Q.    Were you aware at that time as well as

10    right now that Illinois' gun laws are very

11    different from Missouri's?

12         A.    Yes.

13         Q.    And the reason why you did not remove

14    your firearm before going to Illinois please tell

15    us again.

16         A.    Because I was angry, and I wasn't

17    thinking.

18         Q.    Ms. Stigall, I'm going to show you

19    Defendant's Exhibit D.  These are items that the

20    police found inside the Dodge Charger when it was

21    searched.  There's some business cards here for a

22    boutique named Lavish Boutique.  Can you see that

23    on the screen?

24         A.    Yes.

25              (Defendant's Exhibit No. D, Photo,

1   was identified.)

2   BY MS. BOOTH:

3          Q.   Can you tell me are those business

4   cards -- do they belong to you?  Were they in

5   your possession?

6          A.   Yes.

7          Q.   What is the Lavish Boutique?

8          A.   It's a store.

9          Q.   It's a store that you frequent?

10         A.   Yes.

11         Q.   And the cell phones in Defendant's

12  Exhibit D, do you recognize any of these cell

13  phones?

14         A.   The black one on the bottom.

15         Q.   The black one on the bottom?

16         A.   Yes.

17         Q.   Whose cell phone is this?

18         A.   It's my son's.

19         Q.   I'm also going to show you Defendant's

20  Exhibit F.  This has previously been identified

21  as the backseat of the black Dodge Charger.  Do

22  you recognize it as that?

23         A.   Yes.

24              (Defendant's Exhibit No. F, Photo,

25  was identified.)

```
1   BY MS. BOOTH:
2        Q.   And, Ms. Stigall, this grocery bag --
3   this bag here in the back of the Charger -- do
4   you recognize that bag?
5        A.   Yes.
6        Q.   How is it that you recognize that bag?
7        A.   It's mine.
8        Q.   What was inside that bag?
9        A.   Underwear.
10       Q.   That you were taking on your trip?
11       A.   Yes.  Some of it, yes.
12       Q.   How long did it take for you to drive
13  the Charger to get to The Pony in Illinois?
14       A.   Probably 15 minutes.
15       Q.   Is it fair to say that you were probably
16  speeding?
17       A.   Probably.
18       Q.   When you got the to the parking lot of
19  The Pony, what did you see?
20       A.   I saw him sitting on the car talking to
21  Shavion.
22       Q.   Were you angry at that point?
23       A.   Yes.
24       Q.   Were you embarrassed?
25       A.   Humiliated.
```

1     Q.   Were you crying?

2     A.   Yes.

3     Q.   Did you get out of the Charger and

4  confront Mr. Swan?

5     A.   I got out of the car and screamed some

6  things, and I got back in the car.

7     Q.   And what is the other car that you're

8  speaking of?

9     A.   The rental car.

10    Q.   And you drove away from The Pony?

11    A.   Yes.

12    Q.   And the car you were in was the rental

13 car?

14    A.   Correct.

15    Q.   Did you stop to take your firearm out of

16 the Charger and put it in the rental car?

17    A.   No.

18    Q.   Why not?

19    A.   I wasn't thinking about it.

20    Q.   When did you remember that you forgot

21 your gun behind in the Charger?

22    A.   When I got the call the next day that he

23 had been arrested.

24         MS. BOOTH:   I have nothing further

25 right now, Your Honor.

322

1                    CROSS-EXAMINATION

2      BY MS. WOODRUFF:

3           Q.   Ms. Stigall, had you ever shot that gun

4      before?  Had you ever shot the gun before that

5      you say belonged to you?

6           A.   Yes.

7           Q.   Where would you go shooting?

8           A.   I would shoot in Poplar Bluff at a

9      friend's house or, you know, just out in the

10     country.

11          Q.   How frequently would you go shooting?

12          A.   Not very often.  I work a lot.

13          Q.   Where did you buy your ammo?

14          A.   Walmart mostly.

15          Q.   Do you have a favorite brand?

16          A.   And I like Federal because they're cheap

17     at Cabela's.

18          Q.   Is that what you usually loaded your gun

19     with?

20          A.   It just depends on what I have of

21     anything.

22          Q.   And do you always load it in the same

23     way?

24          A.   What do you mean?

25          Q.   Do you always load your gun in the same

1  way?

2       A.  Like take the clip out and put the

3  bullets in?

4       Q.  How many bullets does your magazine

5  hold?

6       A.  16.

7       Q.  16 in the magazine?

8       A.  Yes.

9       Q.  Now, you indicated that you and Mr. Swan

10  had dated on and off for years?

11       A.  Yes.

12       Q.  I'm sorry, when did you start dating?

13       A.  2013.

14       Q.  And when did that relationship end?

15       A.  Like March or April of 2014.

16       Q.  But you were still in a relationship

17  with him in 2018?

18       A.  He went to prison.

19       Q.  When did your most recent relationship

20  with him end?

21       A.  Recently.

22       Q.  What's recently?

23       A.  I'm going to say around March.

24       Q.  And why did it end in March?

25       A.  Because Shavion made a post.

1      Q.   She posted something on social media you

2  didn't like?

3      A.   Yes.

4      Q.   And so are you saying that you ended

5  your relationship with Mr. Swan because of that?

6      A.   It wasn't like we were in a relationship

7  like a boyfriend, but, yes, pretty much.

8      Q.   Do you have children with Mr. Swan?

9      A.   I don't.

10     Q.   Do you have any children?

11     A.   I do.

12     Q.   How many?

13     A.   Three.

14     Q.   How old are they?

15     A.   16, 15 and 11.

16     Q.   And had Mr. Swan been involved in their

17  upbringing?

18     A.   Yes.

19     Q.   Was he kind of a father figure to them?

20     A.   He can be.

21     Q.   And before March you were maintaining

22  very regular contact with Mr. Swan, weren't you?

23     A.   Yes.

24     Q.   You were paying to do video visits,

25  many; right?

1          A.    Correct.

2          Q.    You were also paying for many, many,

3    many phone calls; is that correct?

4          A.    Yes.

5          Q.    You were putting money on his books?

6          A.    Yes.

7          Q.    And but it's your testimony today is

8    that all ended in March?

9          A.    No.   I'm not saying that I don't talk to

10   him or that I wouldn't help him out.   I'm just

11   saying it just kind of fell out in March.

12         Q.    So you would help him out still?

13         A.    If he needed to talk to his mom, yes, or

14   if he calls my phone, sometimes I answer, and

15   sometimes I don't.

16         Q.    And is it fair to say -- obviously, I

17   mean, you loved the man, you were involved with

18   him for years; right?

19         A.    Correct.

20         Q.    And you want to help him out; is that

21   fair to say?  You just said you'd help him out;

22   right?

23         A.    We were talking about money on his books

24   or phone calls.

25         Q.    And that's helping him out?

1       A.   Yes.

2       Q.   Right?

3            Now, this story about this gun belonging

4  to you, did you know that it was a stolen gun?

5       A.   No.

6       Q.   And you understand that it's a felony to

7  possess a stolen gun?

8       A.   I do understand that.

9       Q.   And when Mr. Swan was arrested for -- in

10  August -- I mean, he had been arrested in May for

11  what you're saying was your gun; right?

12      A.   Right.

13      Q.   And when did you go to the police and

14  tell them that was your gun?

15      A.   I was advised not to.

16      Q.   Who advised you of that?

17      A.   His lawyer.

18      Q.   Ms. Booth?

19      A.   No.

20      Q.   Who was that?

21      A.   When the State -- when he was arrested,

22  we hired a lawyer here on Independence,

23  Stephen --

24      Q.   And that lawyer told you not to go to

25  the police?

1      A.   He said if it comes to that, then we'll

2  do that.

3      Q.   So you did not go to the police and say,

4  Hey, that gun he's locked up for belongs to me?

5      A.   He told me not to.

6      Q.   And you did not contact ATF to say that

7  that gun belonged to you?

8      A.   That's -- the feds weren't involved at

9  that time.

10     Q.   And you didn't contact the State

11  prosecutor's office to say that gun belonged to

12  you?

13     A.   After his lawyer advised me not to, I

14  did not, no.

15     Q.   Now, that -- he didn't -- whoever that

16  person was he didn't stay his lawyer for long,

17  though, did he?

18     A.   He did not.

19     Q.   And, in fact, Mr. Swan was then arrested

20  again for a different gun in August, wasn't he?

21     A.   I'm not sure what he was arrested for.

22     Q.   And you still didn't go to the police

23  and say that gun belonged to me?

24     A.   Well, when he got arrested the second

25  time and he got a new lawyer, I did advise him

1    too.

2         Q.    Did you call the police?

3         A.    No. I asked his lawyer.

4         Q.    Did you call the ATF?

5         A.    I'm not a criminal lawyer.  I don't know

6    the specifics behind should I go and do that, so

7    I did what the lawyers said.

8         Q.    The first lawyer?

9         A.    The first lawyer.

10        Q.    So this entire time Mr. Swan is locked

11   up for what you're saying is a gun that belonged

12   to you?

13        A.    My point exactly.  I didn't agree with

14   what his lawyer said, but I did it anyway because

15   that's what he went to school for, so I figured

16   that was right.

17        Q.    So this lawyer who no longer represented

18   him?

19        A.    Correct.

20        Q.    And you never told your story about that

21   gun belonging to you to anyone other than,

22   perhaps, Ms. Booth or his other lawyer until

23   today; right?

24        A.    Everybody knew it was my gun.  I don't

25   know what you mean.  Did I tell the police?  No.

1      Q.    So everybody didn't know, did they,

2   because the police didn't know, did they?

3      A.    I don't know what the police knew.

4      Q.    You didn't tell them, did you?

5      A.    No.

6      Q.    And the U.S. Attorney's Office didn't

7   know because you didn't tell us, did you?

8      A.    I figured telling his lawyer was enough.

9      Q.    So you didn't advise anyone in law

10  enforcement that that gun that he had been locked

11  up for for over a year actually belonged to you?

12     A.    No. Not besides his lawyers.

13     Q.    I understand that you were very upset

14  when you caught Mr. Swan cheating on you and that

15  you jumped in your car or his car actually and

16  you drove to Illinois. Did you take your purse

17  with you?

18     A.    I didn't take my purse with me.

19     Q.    But you took your gun?

20     A.    I left the gun in the car.  His mom

21  doesn't like guns, so I never take the gun in the

22  house.

23     Q.    So you just keep it locked up in the

24  car?

25     A.    Correct.

1      Q.   Where did you get the keys to the

2   rental?

3      A.   They were in the car.

4      Q.   So the keys for the rental were just

5   left in the ignition?

6      A.   I don't know if you've ever -- you know,

7   when they go hang out -- probably not.  But

8   everybody leaves their car on listening to music,

9   so, yes, the keys were in the car.

10            MS. WOODRUFF:  No further questions.

11                 REDIRECT EXAMINATION

12   BY MS. BOOTH:

13      Q.   Ms. Stigall, are you lying today to help

14   Barrett?

15      A.   No.

16      Q.   Truth be told is you still do care about

17   him?  That's true?

18      A.   That's true.

19      Q.   But are you going to lie today and

20   jeopardize your freedom over it?

21      A.   No.

22      Q.   And you did come tell me the truth very

23   early on, did you not?

24      A.   Yes, ma'am.

25      Q.   And I asked you if you'd be willing to

1   come to court and tell the truth?

2        A.   Yes, ma'am.

3        Q.   And I even told you it could expose you

4   to criminal liability for prosecution in

5   Illinois?

6        A.   Yes, ma'am.

7        Q.   And I gave you a subpoena to come and

8   tell the truth?

9        A.   Yes, ma'am.

10       Q.   And that is why you're here?

11       A.   Yes, ma'am.

12            THE COURT:   Any other questions?

13            MS. WOODRUFF:   No, sir.  Thank you.

14            THE COURT:   You may step down.

15            (Witness Excused.)

16            THE COURT:   Call your next witness.

17            MS. BOOTH:   Your Honor, I call

18   Shavion Reed to the stand.

19            THE COURT:   You may proceed.

20                 SHAVION REED,

21   being produced and sworn, testified as follows:

22                DIRECT EXAMINATION

23   BY MS. BOOTH:

24       Q.   Would you state your name for the jury.

25       A.   Shavion Reed.

1      Q.   And, Ms. Reed, how old are you?

2      A.   26.

3      Q.   What is your job title and how are you

4   employed?

5      A.   I work for the State of Missouri as an

6   eligibility specialist.

7              THE COURT:  Please pull up the

8   microphone so everybody can hear you.

9   BY MS. BOOTH:

10     Q.   Ms. Reed, do you have any criminal

11  convictions?

12     A.   No, ma'am.

13     Q.   And do you know Barrett Swan?

14     A.   Yes, ma'am.

15     Q.   What is your relationship with Mr. Swan

16  at this moment?

17     A.   He's my boyfriend.

18     Q.   When did your relationship with Mr. Swan

19  begin?

20     A.   It began in November of 2016.

21     Q.   And has it been a steady relationship

22  from then all the way up until now?

23     A.   No, ma'am.

24     Q.   And why hasn't it been steady?

25     A.   It's typical relationship problems.

1        Q.   Was there some rockiness in the

2    relationship because of other women?

3        A.   Yes, ma'am.

4        Q.   Do you recall seeing Barrett on Friday,

5    May the 25th of 2018?

6        A.   Yes, ma'am.

7        Q.   Did you know at that time, Ms. Reed,

8    that Barrett was seeing Ms. Ebony Stigall, dating

9    her?

10        A.   No, ma'am.

11        Q.   Had you noticed a few things that made

12    you suspicious that as to whether he was seeing

13    another woman?

14        A.   I wouldn't say it really made me

15    suspicious, but I knew that I noticed that he

16    wasn't driving his car lately.

17        Q.   And that raised a red flag to you?

18        A.   Yes, ma'am.

19        Q.   Did he come to your house on Friday, May

20    25th, 2018?

21        A.   Yes, ma'am.

22        Q.   Was he driving his car at that time?

23        A.   No, ma'am.

24        Q.   What car was Mr. Swan's car at that

25    time?

1          A.   What was his car at the time, or what
2     was his car when he came to my home?
3          Q.   What was the car that he was driving at
4     that time?  We'll get to the second question in
5     just a moment.
6          A.   I don't remember what kind of car it
7     was, but I know it wasn't his.
8          Q.   You're speaking of the car that he drove
9     to your home on May the 25th?
10         A.   Correct.
11         Q.   Do you remember what color that car was?
12         A.   I want to say silver, but I'm not quite
13    sure.
14         Q.   And back in May of 2018 the car that
15    Mr. Swan owned, his personal car, what was it?
16         A.   It was a 2016 Dodge Charger.
17         Q.   And did he remain at your house on
18    Friday, May the 25th, or did he leave?
19         A.   He left.
20         Q.   And thereafter did you go out on your
21    own for the evening?
22         A.   Yes, ma'am.
23         Q.   And where did you end up?  Was it a
24    nightclub or a dance club?
25         A.   I went to The Pony across the bridge.

1      Q.   And now what happens at The Pony that

2   people go there to socialize?

3      A.   Just after hours after the bars close

4   everybody goes down there to socialize.

5      Q.   Did you go there with Mr. Swan?

6      A.   No, ma'am.

7      Q.   But at some point he came to The Pony;

8   correct?

9      A.   Yes, ma'am.  I called him to come.

10      Q.   You called him on the phone and asked

11   him to come over and spend time with you?

12      A.   Yes, ma'am.

13      Q.   Did he want to come over at first?

14      A.   No.

15      Q.   Did he tell you why he didn't want to

16   come over?

17      A.   He said that he had been drinking.

18      Q.   Were you able to prevail upon him to

19   come over?

20      A.   Yes, ma'am.

21      Q.   And do you remember what time this was

22   that he came over to The Pony?

23      A.   No, ma'am.

24      Q.   When he arrived to The Pony, do you

25   remember what car he was driving?

1          A.   He was in the same rental car that he

2     was in earlier that day.

3          Q.   Did that cause you any concern?  Did

4     that send up any red flags in your mind at that

5     point?

6          A.   Yes.

7          Q.   And why is that?

8          A.   Because I was in question as to why he

9     wasn't driving his car.

10          Q.   So did you and Mr. Swan socialize and

11     talk to everyone for a while?

12          A.   For a little bit, not very long.

13          Q.   Now, truth be told you were drinking as

14     well that night?

15          A.   Yes, ma'am.

16          Q.   But was your level of alcohol intake

17     such that you can't remember important facts from

18     that night?

19          A.   I was drinking quite a bit, but I can

20     remember certain things, but not accurately

21     everything.

22          Q.   And you remember for certain, though,

23     when Mr. Swan arrived he wasn't in his black

24     Dodge Charger?

25          A.   Absolutely, because I was mad.

337

1      Q.   At some point do you see the black Dodge

2   Charger pull up on the parking lot of The Pony?

3      A.   Yes, ma'am.

4      Q.   And why does this stick in your mind?

5      A.   Because I had noticed I hadn't seen him

6   driving his car.  And then when the car pulled

7   around, I'm like I think that's his car, but I

8   wasn't quite sure.

9      Q.   At some point were you sure that it was

10   Mr. Swan's black Dodge Charger?

11      A.   Yes, ma'am.

12      Q.   And you know for a fact that he wasn't

13   driving it because he was already there with you?

14      A.   Absolutely.

15      Q.   Did you see who got out of the driver's

16   seat of the black Dodge Charger when it pulled

17   up?

18      A.   At first I wasn't really paying

19   attention.  I just kind of blocked it out, and

20   then eventually, yes.

21      Q.   Who drove the black Dodge Charger to The

22   Pony?

23      A.   Ebony Stigall.

24      Q.   And now are you friends with

25   Ms. Stigall?

1          A.   No, ma'am.

2          Q.   Did you notice Mr. Swan and Ms. Stigall

3     talk to each other?

4          A.   Eventually, yes.

5          Q.   How would you characterize their

6     interaction with each other?

7          A.   You could tell they were arguing.

8          Q.   Could you hear what they were saying?

9          A.   No.

10         Q.   Did Ms. Stigall appear to be very upset?

11         A.   Yes, ma'am.

12         Q.   When you saw this interaction between

13    Ms. Stigall and Mr. Swan, was it obvious to you

14    that they were probably romantically involved and

15    now you knew for sure?

16         A.   At that point, yes, because I didn't

17    understand why she would be driving his car if

18    there wasn't anything going on.

19         Q.   Did other people see this as well?

20         A.   I don't know if they really was focused

21    on what was going on like I was, but they could

22    have.  I'm not sure.

23         Q.   Were you angry --

24         A.   Yeah.

25         Q.   -- when you first see this?

339

1      A.   Yes.

2      Q.   Were you embarrassed?

3      A.   Very.

4      Q.   At some point Ms. Stigall leaves?

5      A.   I'm sorry?

6      Q.   At some point Ms. Stigall leaves?

7      A.   Yes, ma'am.

8      Q.   Were you able to see her leave?

9      A.   Yes, ma'am.

10     Q.   Did she drive off in the black Dodge

11  Charger?

12     A.   No, ma'am.

13     Q.   Did you see what car she drove off in?

14     A.   She left in the rental.

15     Q.   At this point did Mr. Swan try to

16  approach and you try to smooth things out with

17  you?

18     A.   Yes.  He had told me to go home, and he

19  would be there.

20     Q.   And how did you respond?

21     A.   I was mad at him, I told him no.

22     Q.   Did you just return back to speaking

23  with your friends?

24     A.   Yes, ma'am.  And then I eventually left.

25     Q.   Last summer on August 1st of 2018 were

1    you aware that Barrett was up in St. Louis?

2         A.   Yes, ma'am.

3         Q.   And did you receive a call from him in

4    the evening hours -- I'm sorry, the late early

5    morning hours of August the 1st?

6         A.   Yes, ma'am.

7         Q.   And what did he say to you at that time?

8         A.   He had told me the police had pulled him

9    over, and he was about to go to jail.

10        Q.   Were you able to talk to him any more?

11        A.   Not much.

12        Q.   Did the phone just hang up, or did he

13   say I'll call you back?

14        A.   The phone hung up.

15             MS. BOOTH:   Nothing further at this

16   time, Your Honor.

17                   CROSS-EXAMINATION

18   BY MS. WOODRUFF:

19        Q.   Ms. Reed, is it fair to say you don't

20   know if he had a gun in his car or not on

21   May 26th?

22        A.   I know he didn't have a gun.

23        Q.   How do you know that?

24        A.   How do I know that he didn't have a gun?

25   Because he was in a rental car.

1       Q.   The Charger was his regular car?

2       A.   Yes, ma'am.

3       Q.   So you don't know if he had a gun in

4    there already, do you?

5       A.   I was in a relationship with him, and

6    I've never seen him with a gun, so I don't

7    believe that.

8       Q.   You're saying you've never seen him with

9    a gun?

10       A.   Not around me or my child, correct.

11            MS. WOODRUFF:  No further questions.

12            THE COURT:  Any other questions?

13            MS. BOOTH:  No, Your Honor.

14            THE COURT:  You may step down.

15            (Witness excused.)

16            THE COURT:  Call your next witness.

17            MS. BOOTH:  Your Honor, my witness

18    is entering the building at this time.  May we

19    take a brief recess, perhaps, a restroom break?

20            THE COURT:  Okay.  We'll take a

21    short recess.

22            Remember the admonitions I've told

23    you not to discuss the case.  Go to the jury

24    room, and we'll call you back shortly.  Thank

25    you.

1            We'll be in recess.

2            (Proceedings stood in temporary

3    recess.)

4            (Proceedings resumed in open court

5    outside the presence of the jury.)

6            MS. BOOTH:  Judge Limbaugh, also I'd

7    like to speak with you just a brief moment.

8            THE COURT:  Okay.

9            (A discussion was held off the

10   record.)

11           THE COURT:  Is that all you wanted?

12           MS. BOOTH:  That's all I wanted to

13   ask you about, yes.

14           (Proceedings stood in temporary

15   recess.)

16           (Proceedings resumed in open court

17   outside the presence of the jury.)

18           THE COURT:  What is going on?  Bring

19   the jury in.  What's the problem?

20           MS. BOOTH:  Oh, I'm sorry.  My

21   witness, I thought she was in the elevator.

22   She's coming through security right now.

23           THE COURT:  Well, we're going to go

24   ahead now.  It was a five-minute break now --

25           MS. BOOTH:  I think in two minutes

1   she'll be here, but, sir, I defer to you.

2              THE COURT:  Is she downstairs?

3   What's this -- where is she?

4              MS. BOOTH:  She got lost.

5              THE COURT:  How do you get lost?

6              MS. BOOTH:  I don't know.  I thought

7   I made it very clear not to go to like the

8   municipal court, or anything like that, but --

9              THE COURT:  Well, is she in the

10  building is what I'm saying?

11             MS. BOOTH:  I believe that she is in

12  the building coming through security.

13             (A discussion was held off the

14  record.)

15             (Proceedings resumed in open court.)

16             THE COURT:  Be seated, please.

17             MS. BOOTH:  Your Honor, security has

18  confirmed that our next witness is coming up on

19  the elevator right now.

20             Your Honor, we call Tiara Thorpe to

21  the stand.

22                  TIARA THORPE,

23  being produced and sworn, testified as follows:

24             THE CLERK:  Please have a seat in

25  the witness stand.  If you just go around here

344

```
1    and then go along the wall with the court
2    security, he'll get you to the right seat.
3               THE COURT:  You may proceed.
4                    DIRECT EXAMINATION
5    BY MS. BOOTH:
6         Q.   Ma'am, would you please state your name
7    for the Court.
8         A.   Tiara Thorpe.
9         Q.   And, Ms. Thorpe, how old are you?
10        A.   I'm 32.
11        Q.   And, ma'am, how are you employed?
12        A.   I am a home health worker agent, and I'm
13   a musical engineer.
14        Q.   And have you ever pleaded guilty to a
15   criminal felony?
16        A.   No, sir.
17        Q.   Ms. Thorpe, do you know Barrett Swan?
18        A.   Yes.
19        Q.   And how long have you known Mr. Swan?
20        A.   Three years now.
21        Q.   I'm sorry, ma'am?
22        A.   Three years now.
23        Q.   And the nature of your relationship with
24   Mr. Swan, are you friends, is it something
25   romantic?  How would you characterize it?
```

1          A.   We're romantic.

2          Q.   I'm sorry, ma'am?

3          A.   We're romantic.

4          Q.   And were you with Mr. Swan during the

5     early morning hours of August 1st of 2018?

6          A.   Yes.

7          Q.   And how was it that you and Mr. Swan

8     were together at that time?

9          A.   We were leaving my birthday party.  I

10    was dropping him off. We were going to go indulge

11    in adult activities.

12         Q.   So you were out that night with Mr. Swan

13    celebrating your birthday?

14         A.   Yes, I was.

15         Q.   And you were driving him back to where

16    he was --

17         A.   Yes, I was.

18         Q.   Ms. Thorpe, I appreciate that you're

19    testifying today, but let me ask the questions

20    first, and then you answer.  The court reporter

21    is taking down everything that we're saying, so

22    it has to be clear.  I don't want to talk over

23    you.  Does that work?

24         A.   I understand.

25         Q.   Okay.  So on August 1st were you driving

1    Mr. Swan back to where he was staying in

2    St. Louis after your birthday?

3         A.   Yes, I was.

4         Q.   And at that time Mr. Swan didn't live in

5    St. Louis; correct?

6         A.   Correct.

7         Q.   He lived in Cape Girardeau?

8         A.   Yes.

9         Q.   Do you know why he was in St. Louis at

10   that time?

11        A.   Visiting me.

12        Q.   Was his father also in the hospital up

13   in St. Louis?

14        A.   Yes.

15        Q.   Now, were only you and Mr. Swan in your

16   vehicle?

17        A.   Yes.

18        Q.   And that vehicle was a red Ford Edge?

19        A.   Yes.

20        Q.   And, Ms. Thorpe, as you're driving, were

21   you pulled over for a traffic violation?

22        A.   I was.

23        Q.   And was that in Florissant, Missouri?

24        A.   It was.

25        Q.   And did you pull over right away when

1    you saw the police officer behind you?

2         A.   Yes, I did.

3         Q.   Ms. Thorpe, did you have a firearm in

4    the car with you at that time?

5         A.   Yes, I did.

6         Q.   And whose firearm was that?

7         A.   It was mine.

8         Q.   And where was the gun in the car when

9    you were driving Mr. Swan on August the 1st?

10        A.   It was in my armrest up under the

11   compartment that's up under the compartment.

12        Q.   And what type of firearm was it?

13        A.   It was a Smith & Wesson MP model

14   nine-millimeter.

15        Q.   And, Ms. Thorpe, when had you purchased

16   that firearm?  When had you obtained it?

17        A.   A couple years before.

18        Q.   How did you obtain it?

19        A.   I bought it.

20        Q.   Where did you buy it?

21        A.   Gander.

22        Q.   And for our jurors who aren't from

23   St. Louis, what is Gander?

24        A.   That's -- it's like Pro Bass.

25        Q.   Oh, like a Bass Pro Shop?

1          A.   Or whatever, yeah.

2          Q.   So Gander Mountain is like a

3    sports shop?

4          A.   It's where a sport -- and, yes, you go

5    and purchase things like fishing rods, guns,

6    ammunition, things like that.

7          Q.   And you purchased your firearm at Gander

8    Mountain?

9          A.   Yes, I did.

10         Q.   Did you have to fill out any paperwork,

11   formal paperwork?

12         A.   Yes, I did.

13         Q.   Ms. Thorpe, why do you have a firearm?

14         A.   Why wouldn't I?

15         Q.   Had you been the victim of any crimes in

16   St. Louis?

17         A.   Yes, I had, several.

18         Q.   Did you feel that you needed a firearm

19   to protect yourself?

20         A.   Of course.  I live in St. Louis,

21   Missouri.

22         Q.   What are some of the crimes that you've

23   been a victim of?

24         A.   Burglary.  I've been robbed.  I've had

25   everything you can think of to make happen one

1    person can do to another even with my children.

2           Q.    Have you been car jacked?

3           A.    Yes, I have, with a gun to my head with

4    my three children in the car.  I've had people

5    climb through my window while I'm laying on the

6    couch with my children in the house.

7           Q.    So at the time of August 1st of 2018 did

8    you always carry a firearm with you?

9           A.    Yes, I have.

10          Q.    Ms. Thorpe, did Mr. Swan know that you

11   had a firearm in the car?

12          A.    I can't say that he did, but the

13   majority of everyone that's around me knows that

14   I don't go anywhere without my gun.  It's not

15   like it's always out.  I don't -- I'm not like a

16   cowboy or anything, but, yes, I have my gun with

17   me everywhere I go.

18          Q.    So everyone who knows you you should

19   know that?

20          A.    The majority.  Not everyone.  I don't

21   brag about it.

22          Q.    So it's fair to say that you hadn't

23   shown your firearm to Mr. Swan that night;

24   correct?

25          A.    Correct.

1      Q.    And you hadn't said, Barrett, it's in

2  the console; correct?

3      A.    Correct.

4      Q.    But Barrett knows you, and everyone that

5  knows you knows you always have your firearm; is

6  that fair to say?

7      A.    That's fair to say.

8      Q.    Ms. Thorpe, have you ever allowed

9  Mr. Swan to have your gun or handle your gun?

10     A.    No.

11     Q.    When the officer came to your car window

12 to advise you of the reason for the stop, he

13 didn't ask you if you had a firearm in the car,

14 correct?

15     A.    Correct.

16     Q.    And when the officer asked you for your

17 identification, you immediately gave it to him?

18     A.    Yes, I did.

19     Q.    So you immediately cooperated?

20     A.    Yes, I did.

21     Q.    And the officer also asked for

22 Mr. Swan's identifying information; correct?

23     A.    Correct.

24     Q.    And Mr. Swan didn't give the officer the

25 correct name, did he?

1          A.    No, he didn't.

2          Q.    At that point did that surprise you?

3          A.    No.

4          Q.    Did you say to Mr. -- did you look at

5    Mr. Swan odd to wonder why --

6          A.    I asked him like, What's going on?

7          Q.    At that time did he tell you he thought

8    there probably was a federal warrant out for his

9    arrest?

10         A.    He looked at me, he said, He's going to

11   coming back asking for the correct information.

12   And when the officer came back, he gave the

13   officer the correct name.

14         Q.    So let's -- if we may slow down for a

15   moment.  When Mr. Swan gave the false information

16   to the police officer, Mr. Swan said to you, The

17   officer is going to end up coming back asking for

18   my real name?

19         A.    He didn't say that.  Not verbatim, no.

20   We kind of laughed it off.  I looked at him like,

21   Are you serious?  He laughed it off.  He rolled

22   his eyes, and that was that.  And then when the

23   officer came back, he gave the officer the

24   correct name.

25              He ran it.  And then the officer

1  returned to the car and stated that he had an

2  arrest -- well, he had a pending arrest or

3  whatever because he was a fugitive.

4        Q.   All right.  When the police officer left

5  the car for the first time to go back and check

6  Mr. Swan's false name, you and Mr. Swan were left

7  in the car unattended; correct?

8        A.   Yes.

9        Q.   And there was no police officer

10  stationed outside the car to watch you?

11       A.   Correct.

12       Q.   And you were left to do whatever you

13  wanted; correct?

14       A.   Correct.

15       Q.   Then when the officer came back to the

16  car to ask for Mr. Swan's real information, he

17  then left again and gave you additional time to

18  be in the car alone with Mr. Swan; correct?

19       A.   Yes.

20       Q.   And there was no police officer

21  stationed there to watch what you-all were doing

22  in the car?

23       A.   Correct.

24       Q.   And this entire time, Ms. Thorpe, your

25  firearm, was it ever out in the car?

1          A.    No.   It was like two seconds.

2          Q.    I'm sorry, what was two seconds?

3          A.    The time between the officer leaving and

4    coming back.  It was not a very long time, but,

5    no.

6          Q.    Your gun was always in the console of

7    your car?

8          A.    My gun was always put away.

9          Q.    When the police officer came back and

10   asked Mr. Swan to get out of the car, Mr. Swan

11   didn't hesitate?

12         A.    No.

13         Q.    He got out of the car and cooperated

14   with the police officer?

15         A.    Immediately.

16         Q.    And your firearm was never in Mr. Swan's

17   possession?

18         A.    No.

19         Q.    And your firearm was not on the

20   passenger seat when Mr. Swan got out of the car?

21         A.    Absolutely not.

22         Q.    And, Ms. Thorpe, at some point another

23   police officer came and joined the traffic stop;

24   correct?

25         A.    Absolutely.

1       Q.   And after Mr. Swan was arrested, you

2  were allowed to go back to speak with Mr. Swan at

3  the police car; correct?

4       A.   Yes.

5       Q.   And then at some point around this time

6  did either of the police officers ask if you had

7  anything illegal in the car?

8       A.   The second officer who arrived at the

9  scene was the one who actually asked, because

10 Barrett had asked for me.  I was sitting in the

11 car after they had already placed him under

12 arrest.  Barrett was sitting in the backseat of

13 the car.  He asked for me, and the first officer

14 arrived, came to the door and told me that he

15 wanted me.

16          I got out of the car.  I went and talked

17 to Barrett for a couple of seconds.  We kissed,

18 we hugged, and I walked away.  The second officer

19 asked me to sit on the front of the car where I

20 stood, and I talked to him.

21          We conversed over like a little bit of

22 nothing.  Actually, he asked me what we were

23 doing, why was we out so late, did I know that

24 Barrett was on the run, several things about

25 Barrett.

1           And then he asked me was there anything

2      illegal in my car, and I told him at that time,

3      yes, I have my gun, but it's not illegal.  It was

4      actually purchased by me.  I told him where I

5      purchased it from, and he asked me where he could

6      find the gun, and I told him where to find it.

7           Q.   Okay.

8           A.   He went to search for it, and he could

9      not find it.

10          Q.   All right.  Ms. Thorpe, thank you.

11     We'll go back over all of this.  Thank you.  But

12     we'll take it in little pieces.

13          So at some point the second officer

14     asked you is there anything illegal in the car

15     that we should know about; correct?

16          A.   Correct.

17          Q.   And you said there's nothing illegal,

18     but I do have my firearm in the car?

19          A.   Absolutely.

20          Q.   And you told the second officer where

21     your firearm was located?

22          A.   Yes, I did.

23          Q.   And you said that was in the console of

24     your car?

25          A.   Yes.

1          Q.    Now, did the second officer go to your

2    car and try to find the firearm?

3          A.    Yes, he did.

4          Q.    Now, was he successful?

5          A.    No, he was not.

6          Q.    Was he able to find it?

7                So when he came back and said, I

8    couldn't find it, does he ask you to explain more

9    where it's located?

10         A.    Yes, he did, and I did in detail.  I

11   explained to him exactly where he could find my

12   gun and how he could get to it, and he still was

13   unable to find my gun.

14         Q.    All right.

15         A.    So the initial officer on the scene, he

16   went to look for it, and he was also unsuccessful

17   with finding my gun but eventually found it.

18         Q.    Well, let's stop for a moment.  I would

19   like to show the jury a video that we have made

20   of showing how your console works --

21         A.    Okay.

22         Q.    -- so then we can speak to the jury more

23   about that.

24               Ms. Thorpe, if you'll watch your video

25   screen.

1          A.   Where am I looking?

2          Q.   Right in front of you.  It's going to

3     come up any moment now.

4               (A video was played for the jury at

5     this time.)

6     BY MS. BOOTH:

7          Q.   So, Ms. Thorpe, you've just had a moment

8     to review this video; correct?

9          A.   Okay.

10         Q.   And this is a video that my investigator

11    made when he came out to speak with you so you

12    could show us where the firearm was located in

13    your console; correct?

14         A.   Correct.

15         Q.   And just so we can be clear, Ms. Thorpe,

16    if you will look at Defendant's Exhibit H.  This

17    is a picture of you sitting in your automobile;

18    correct?

19         A.   Yes, it is.

20              (Defendant's Exhibit No. H, Photo,

21    was identified.)

22    BY MS. BOOTH:

23         Q.   The automobile you were driving that

24    night that you and Mr. Swan were stopped in

25    Florissant, Missouri?

1      A.   Yes.

2      Q.   And these photos were also taken when my

3 investigator came out to make the video; correct?

4      A.   Yes, it was.

5      Q.   Okay.  So and the passenger seat that

6 Mr. Swan was sitting in is where I'm placing my

7 finger; correct?  He was sitting in this

8 passenger seat?

9      A.   Uh-huh.

10      Q.   All right.  And then Defendant's Exhibit

11 I, is this you sitting in the driver's seat?

12      A.   Yes.

13           (Defendant's Exhibit No. I, Photo,

14 was identified.)

15 BY MS. BOOTH:

16      Q.   And we see here in this picture your

17 console; correct?

18      A.   Yes.

19      Q.   Okay.  And the night of the Florissant

20 traffic stop the firearm was contained in this

21 console?

22      A.   Yes.  In that console up under another

23 piece that's inside of there.

24      Q.   Okay.  Let's see, ma'am.  We'll look at

25 Defendant's Exhibit J if that helps you better

1    explain.  So this is a picture of your console
2    open; correct?
3         A.   Yes.
4              (Defendant's Exhibit No. J, Photo,
5    was identified.)
6    BY MS. BOOTH:
7         Q.   And this is your hand reaching in?
8         A.   Uh-huh.
9         Q.   And are you reaching in to grab a tray
10   that lifts out?
11        A.   Yes.  There's an additional tray.  You
12   open my console, and there's a tray that lifts,
13   and then there's about four and a half to five
14   feet -- I mean five inches up under the tray.
15        Q.   All right.  This is Defendant's Exhibit
16   K.  Is this your console with that tray lifted
17   out?
18        A.   Yes.
19              (Defendant's Exhibit No. K, Photo,
20   was identified.)
21   BY MS. BOOTH:
22        Q.   So this picture is displaying just the
23   bottom compartment of your console?
24        A.   Uh-huh.
25        Q.   And is this where the firearm is

1   located?

2          A.   Yes, it is.

3          Q.   And were these items -- were other items

4   in your console as well?

5          A.   Probably in addition to a whole bunch of

6   other trash, but, yes.

7          Q.   Okay.  So the firearm was located in

8   your console underneath a tray, and then it was

9   in this compartment?

10         A.   Yes.

11         Q.   And the police officers had difficulty

12  figuring out that tray or --

13         A.   Yes.  The second officer to arrive on

14  the scene, he lifted the tray, and he could not

15  find the gun.  And then the initial officer, he

16  went in there, and I don't know if he lifted the

17  tray or whatever it was, but he couldn't find the

18  gun as well, so he had to search several times.

19  I had to explain to him in great detail as to

20  where the gun was located.

21         Q.   Yes, ma'am.  And Defendant's Exhibit L,

22  Ms. Thorpe, do you recognize this picture?

23         A.   Yes.  That is the gun that I own that I

24  received when I purchase my gun.

25              (Defendant's Exhibit No. L, Photo,

1   was identified.)

2   BY MS. BOOTH:

3       Q.   This is the box that your firearm came

4   in?

5       A.   Yes, it is.

6       Q.   Now, this wasn't in the car for the

7   Florissant traffic stop; correct?

8       A.   No, it wasn't.

9       Q.   You brought this box to show my

10  investigator so he could take a picture?

11      A.   When I met with him, I think his name

12  was Detective Keys, or something like that.

13      Q.   Yes, ma'am.

14      A.   Yes, it is.

15      Q.   And then we have Defendant's Exhibit M.

16  And can you tell the jury what this is, what this

17  is a picture of?

18      A.   That's the label that was placed on my

19  gun when I purchased it.

20           (Defendant's Exhibit No. M, Photo,

21  was identified.)

22  BY MS. BOOTH:

23      Q.   So this is the label on the box which

24  indicates --

25      A.   The serial number.

1          Q.    -- the serial number, the serial number

2     of your firearm; correct?

3          A.    Yes.

4          Q.    And then Defendant's Exhibit N, can you

5     tell the jury what this is?

6          A.    That is the use pamphlet, and then that

7     is also the pamphlet that lets me know more about

8     the gun that I purchased.

9          Q.    So you kept all the contents of the box?

10         A.    Yes, I did.

11         Q.    I think we even have like a safety lock

12    here that came with the firearm?

13         A.    Yes.

14         Q.    And you still have this box?

15         A.    Yes, I do.

16         Q.    Ms. Thorpe, when the police officer took

17    the firearm out of your console, you made it

18    clear that that was your firearm?

19         A.    Oh, yes.  I was extremely upset, and I

20    was asking him and probably screaming at him at

21    the same time.  I couldn't understand why he was

22    trying to retain my gun.  Like why would you be

23    taking my gun?  That's mine.  I purchased it.

24    It's legal.  And I abide by every rule possible.

25    I even purchased a book stating the Missouri law

1    of having a handgun.  I had no reason to have my

2    gun taken from me.  I was told by an officer of

3    the law to go and purchase the gun because of

4    I've had so many incidents during one of those

5    times.

6         Q.   Yes, ma'am.  And did you try to call the

7    police station after your gun was taken from you?

8         A.   Yes, I did immediately, August 1st.  I

9    think Barrett was locked up July 31st going into

10   August 1st.  I'm not sure of the exact time;

11   sometime between like 3:00 or 4:00 a.m.  So

12   immediately a couple hours later when I woke up I

13   called everywhere trying to figure out what was

14   exactly going on with him and where my gun was

15   located.

16        Q.   And was anyone able to help you?

17        A.   No.  They acted as if they had

18   absolutely no idea what was going on with my gun.

19   They hadn't heard of my gun.  And they weren't

20   really speaking on Barrett Swan's case.

21             MS. BOOTH:  Your Honor, my direct of

22   Ms. Thorpe is complete.

23             THE COURT:  Cross-examination.

24             MR. SORRELL:  Thank you.

25                  CROSS-EXAMINATION

1    BY MR. SORRELL:

2        Q.   Ms. Thorpe, I believe you said that on

3    August 1st that you were celebrating a birthday

4    party that night; is that right?

5        A.   Yes.  August the 1st.

6        Q.   Okay.  I believe you described it as you

7    were engaged in adult activities.  Is that what

8    you said?

9        A.   Yes.  I said, I was getting ready to

10   drop Barrett off to a hotel room, and we were

11   going to engage in adult activities.

12       Q.   Oh, okay.  And so where had you been the

13   night before that you got stopped?

14       A.   Prior to the hours?

15       Q.   I'm sorry?

16       A.   You're saying where were we coming from?

17       Q.   Yes, ma'am.

18       A.   We were out celebrating.

19       Q.   Yeah, but what club had you been to?

20       A.   We had went to a friend of mine's bar.

21   I can't think of the name of it.

22       Q.   You don't know the name of the place

23   that you were?

24       A.   No, I can't think of the name of it.

25       Q.   Illinois or Missouri?

1          A.    It's right off of Newstead and in

2    between like Natural Bridge and St. Louis Avenue.

3          Q.    Okay.

4          A.    It's closed down as of now, but that's

5    where we were leaving.

6          Q.    All right.  Did you take your gun

7    inside?

8          A.    No, I didn't.

9          Q.    You left it in the car?

10         A.    Yes, I did.

11         Q.    And you showed a photograph of the --

12   your gun in your car where you keep it at the

13   bottom of the console; is that right?

14         A.    Correct.

15         Q.    And was all that stuff in the console at

16   the time that you had the gun in the console that

17   night on August 1st?

18         A.    Yes.  It was a little bit more too.

19         Q.    And so you kept the gun basically

20   because you're afraid of being accosted?

21         A.    Yes.

22         Q.    So how is that readily available to you

23   if you've got to dig through all of that?

24         A.    I really don't have to.  I know where

25   it's at.  I'm the only person who knows where it

1    is, so when I pull it out, I know exactly how to

2    get to it.

3         Q.   But it seems to me like if you want it

4    readily available, you've got to go through a lot

5    of stuff to get to it.

6         A.   Yes.  It's not what it seems like.  I

7    know how to get to it.

8         Q.   But you've got to pull a tray up to get

9    to it?

10         A.   Yes, I do.

11         Q.   All right.  And you would have time to

12    do all that --

13         A.   Yes, I do.

14         Q.   -- if somebody had a gun to your hand --

15         A.   Yes.

16         Q.   -- to your head?

17         A.   Yes.

18         Q.   All right.  Now, you were talking about

19    this stop, and I think the way you described it

20    is that --

21         A.   It was bogus.

22         Q.   I'm sorry?

23         A.   It was bogus.

24         Q.   Oh, right?

25         A.   It was totally illegal, everything about

1    it, and they lie about it.

2         Q.   Well, I'd like you to explain that.

3         A.   Okay.  So this is the thing.  They said

4    that I stopped -- or I didn't stop at a stop

5    sign, and then I received several tickets, but

6    when I went to court, I had proof of everything

7    that the officers said that I didn't have.  I had

8    everything, and they threw that completely out

9    because I had everything.  He said I didn't have

10   registration.  I had that.  He said I didn't have

11   insurance.  I had that.  He said that there was a

12   stop sign, and there was not a stop sign.

13        So everything that -- every ticket that

14   I received the officer and the judge or the

15   lawyer that was in front of the judge at the time

16   when I went to court he threw that out.

17        Q.   And so your car had dealer plates on it,

18   didn't it?

19        A.   Yes, it did.

20        Q.   And --

21        A.   My car had dealer plates on it, because

22   when I purchased my car, I purchased a used

23   vehicle, and the used vehicle had been purchased

24   from another wholesaler.  And in the State of

25   Missouri you can't purchase a vehicle from a

1    wholesaler without a certain -- like it has to go

2    from one thing to another, and they did not do

3    that process.

4              So when I went down to the city hall to

5    get my car registered, they didn't do that

6    properly.  So the Schicker Ford, whomever I

7    purchased my car from, they allowed me their

8    plates until they figured out their mishap.

9         Q.   All right.

10        A.   That is the reason for my -- me having

11   the dealer plates.

12        Q.   And you bought the car in, what,

13   February?

14        A.   Yes, I did.

15        Q.   And you were stopped in August?

16        A.   Yes.

17        Q.   And you still hadn't got plates yet?

18        A.   Correct.  They hadn't figured that out

19   by then.

20        Q.   You still hadn't paid the sales tax on

21   the car, or anything like that?

22        A.   No.  I had paid the sales tax.  I hadn't

23   figured out the getting the stuff together. As of

24   now, yes, I have plates on my car.

25        Q.   All right.

1          A.    If that's what you're asking.

2          Q.    Since then you've acquired plates?

3          A.    Oh, yes.

4          Q.    Okay.

5          A.    The plates were on there immediately

6     once they gave me my title to my vehicle.

7          Q.    Okay.  And how long do you think this

8     whole traffic stop took from the time it started?

9          A.    It took approximately no more than 15,

10    20 minutes.

11         Q.    All right.  Now, let me show you a copy

12    of a radio log that's already been introduced

13    into evidence showing that the first dispatch

14    call went out for the stop at 3:21 and that the

15    officer left at 3:49.  Does that sound about

16    right to you?

17         A.    28 minutes?  I said 20 to 28?

18         Q.    Yes.  Is about that right?

19         A.    That's about right.

20         Q.    Okay.  Because the times are important,

21    aren't they?

22         A.    Yes.

23         Q.    The sequence of events?

24         A.    Well, yeah, like what they report in

25    between is more important.

1     Q.   All right.  We'll get to that.

2     A.   Okay.

3     Q.   So if I understand it right, you had

4  this stop, and then the officer came up, and he

5  only asked you for your ID first?

6     A.   Correct.

7     Q.   That's what you say.  Now, when did the

8  officer give you the traffic tickets?

9     A.   He gave me the traffic tickets

10 approximately I would say like 13 minutes after.

11    Q.   I'm sorry?

12    A.   He asked me for my information.  I gave

13 him everything.  He went back to the car.  He ran

14 everything.

15         He came back, and he asked Barrett for

16 his information.  He went back to the car.  And

17 then he came up and probably gave me the tickets

18 then.

19    Q.   And then did you tell him -- I thought

20 that you had made a statement that you got your

21 ticket before the officer asked for Mr. Swan's

22 ID?

23    A.   I'm not sure exactly, but I believe that

24 he had -- he gave me the tickets before.  I'm not

25 sure exactly.

1      Q.   Did you make a statement to Officer

2    Eggers when you talked to him that you had gotten

3    your --

4      A.   I just stated I'm not sure exactly.

5      Q.   Well, let me ask the questions first.

6    You can't answer it until you know.  Did you

7    ask -- make a statement to Mr. Eggers that you

8    had -- that you had gotten your tickets before

9    the officer asked Mr. Swan for his name?

10     A.   Again, I'm not sure exactly if it was

11   before or after they had already handcuffed

12   Barrett and put him in the backseat.

13     Q.   Well, let me just put your words to you

14   and see if you can remember it better.

15               (Audio was played for the jury at

16   this time.)

17   BY MR. SORRELL:

18     Q.   So is it fair to say that that's the

19   sequence of events?

20     A.   That's to say that I done told the story

21   about five times.  Between there and now that's

22   been a year ago.

23     Q.   Well, which is the more accurate

24   version?

25     A.   Exactly what I'm telling you now and

372

1    what I told the officer then.

2         Q.   That you got the tickets first?

3         A.   I gave it to him either five seconds

4    before or five seconds after.

5         Q.   I'm sorry.  You gave --

6         A.   I gave the officer my information, and I

7    received the tickets five seconds before or five

8    seconds after.  It took five seconds.

9         Q.   Okay.  Right about the time that

10   Mr. Swan -- that the officer asked Mr. Swan for

11   his identification?

12        A.   I'm pretty sure I had already -- I'm

13   pretty sure I had already received the tickets by

14   the time they asked Mr. Swan for his information.

15        Q.   Because usually the stop is over at that

16   point?

17        A.   Correct.

18        Q.   Okay.  All right.  Now, then I believe

19   you also described that it couldn't have been a

20   long time between the asking for Mr. Swan's real

21   name and his arrest.  I think you described it as

22   two seconds?

23        A.   Something of that sort.

24        Q.   Would you switch back over to the

25   monitor, please.

1          Now, the County's records at least show

2     that the officer started asking Mr. Swan about

3     his identity at 3:30?

4          A.   Uh-huh.

5          Q.   And then discovered the warrants and

6     then found out about the existence of the warrant

7     at 3:32?

8          A.   That's two minutes.

9          Q.   I don't -- does that -- well, you said

10    two seconds, or maybe you were just using that

11    term inaccurately?

12         A.   So maybe it's two seconds.

13         Q.   It doesn't make any difference?

14         A.   It was still they were unlawful with

15    everything because I provided everything that he

16    needed, and everything was accurate.

17         Q.   So we can agree then at least you got

18    the tickets either right before or right at the

19    same time that Mr. Swan --

20         A.   We can also agree that the officer had

21    everything that he asked for, and he was still

22    inaccurate on his -- everything that he did

23    afterwards.

24         Q.   Let me show you what I believe are your

25    traffic tickets that were issued that night.  Do

1    you recognize those?

2         A.   Uh-huh.  I have them in my console as

3    well.

4         Q.   All right.  And does that look like the

5    same kind of paper that you received that night?

6         A.   It does.

7         Q.   I'm going to mark this as No. 18.

8              MR. SORRELL:  And I'll offer that,

9    Your Honor.

10             (Government's Exhibit No. 18,

11   Traffic Tickets, was identified.)

12             MS. BOOTH:  No objection.

13             THE COURT:  It's admitted.

14             (Government's Exhibit No. 18,

15   Traffic Tickets, was received.)

16   BY MR. SORRELL:

17        Q.   Now, do you see the line here -- or the

18   form sets out all of your information; is that

19   right?

20        A.   Correct.

21        Q.   It also sets out the day the ticket was

22   issued, August 1st, 2018?

23        A.   Yes.

24        Q.   It also sets out the time the ticket was

25   issued, doesn't it?

1      A.    That says 6 o'clock.  Is that 6 o'clock

2  in the morning?

3      Q.    That's 3:44 in the morning.

4      A.    Oh, okay.  Yeah.  That's that time.

5  That time they may be correct.

6      Q.    And the radio log shows the stop ended

7  at 3:49.  So you got the tickets right at the

8  very end of the stop; is that fair?

9      A.    Absolutely incorrect.

10     Q.    And what's incorrect about it?

11     A.    Because Barrett was in the car with me

12  when I received the tickets.

13     Q.    All right.  And so the radio logs are

14  wrong?

15     A.    Yes.

16     Q.    And the officers that called back and

17  forth that we've already heard testify --

18     A.    Absolutely incorrect.

19     Q.    -- they just made up the log?

20     A.    Yes, they did.

21     Q.    And they made up the calls?

22     A.    Yep.

23     Q.    They were able to simultaneously --

24          MR. TILSEN:  Objection, this is

25  argumentative.  They can be mistaken as well

1    as --

2                    THE COURT:  Overruled.

3                    MR. TILSEN:  This is improper

4    cross-examination.

5                    THE COURT:  Overruled.

6    BY MR. SORRELL:

7        Q.   So is it your suspicion then the

8    officers made up the radio log?

9        A.   Yes.

10       Q.   Okay.  All right.  Well, I mean, I just

11   want to be clear what you're saying.

12       A.   I'm telling you that I was sitting in

13   front of the car when the officers completed -- I

14   sat outside the car for at least about 5 minutes

15   after everything had taken place.  I don't

16   believe the officers called it in until after

17   Barrett was placed inside of the car.

18       Q.   Okay.  All right.  Now, then, so at some

19   point in time the officer asked Mr. Swan for his

20   name, and Mr. Swan gives a fake ID?

21       A.   Absolutely correct.

22       Q.   And so did you say, Hey, officer, that's

23   not his name?

24       A.   I didn't say anything.

25       Q.   You just let that go?

1              A.    Yes, I did.

2              Q.    And then so you would have been okay

3         then if Mr. Swan would have --

4              A.    No.   I talked that over with him.

5              Q.    So after that then the officer came

6         back --

7              A.    Yes.

8              Q.    -- and asked for Mr. Swan's real name?

9              A.    Yes, he did.

10             Q.    And after that the officer had to go

11        back and check that name; is that fair?

12             A.    Yes.   And that didn't take any time.

13             Q.    Did it take several minutes?

14             A.    I would say a minute or so, yes.

15             Q.    From say around 3:30 until 3:33?

16             A.    Approximately.   I wasn't looking at my

17        watch.

18             Q.    All right.   Now, the officer also shows

19        that he's calling in a number for a gun that was

20        found three and a half minutes later.   Do you see

21        that?

22             A.    Uh-huh.

23             Q.    Is that when all that happened?

24             A.    That's exactly what I just told you.

25             Q.    That's -- that all happened that you

1    just told about that -- that the officer put

2    Mr. Swan in the car, that he was doing all of his

3    work, the second officer is talking to you, you

4    tell him about the gun being in the car, the

5    first officer searches, the second officer

6    searches.  They can't find the gun.  You have to

7    tell them again.  And then is when the gun is

8    discovered?

9         A.   Exactly.

10        Q.   Okay.

11        A.   So are you trying to say what?

12        Q.   It doesn't seem to be enough time.

13        A.   Well, that's exactly what happened.

14   Barrett was already in the backseat of the car

15   when I told the officers where the gun was

16   located.  I told one officer.  He went in looking

17   for it.  He couldn't find it.  I told him again.

18   He went and searched for it.  He did not find it.

19             The initial officer on the scene went

20   and searched for it.  He couldn't find it.  He

21   went and looked again.  Then he found it, placed

22   his gloves on -- grabbed a bag, put his gloves on

23   and then placed my gun in a bag, because I

24   explained to him in great detail where he could

25   find my gun.

1          Q.   Okay.   But the officer goes on then to

2     say -- to talk about all the other things he's

3     doing and calls back at 3:36:41.

4          A.   So he stated that he was standing on the

5     side talking to Barrett while I was talking to

6     the second officer to arrive on the scene, and we

7     were talking about me licking on a lemon because

8     it was my birthday and me being sick.   That's

9     what me and the initial officer that asked me

10    about my gun, which was the second officer to

11    arrive on the scene, that's what we were talking

12    about.

13         Q.   But the officer is calling back every

14    minute or so?

15         A.   The initial officer to arrive on the

16    scene hadn't asked me for my gun.   The second

17    officer was the one to ask me if there was

18    anything illegal in the car.

19         Q.   You said the first officer is the one

20    that found the gun, didn't you?

21         A.   Yes.   That's because I explained it to

22    officer who was the one that I was talking to,

23    which was the second one to arrived on the scene.

24    He asked me if there was anything illegal in the

25    car, and I said, no, there's nothing illegal, but

1    my gun is in the car.

2           He asked me where was my gun.  I

3    explained to him where my gun was.  He went and

4    looked.  He said, I cannot find it.  He went and

5    looked again.  He could not find it.  I had

6    explained it to him.

7           So the officer that was standing on the

8    side of the car talking to Barrett left Barrett

9    and went and searched my car.

10          Q.  I understand your story.

11          A.  And he couldn't find it.  And then I

12   explained it to him.  And then he went and looked

13   again.  And when he found it, he went and put his

14   gloves on, and then he grabbed the bag and then

15   put my gun in there.

16          Q.  So but if you look on the radio log,

17   you'll see that the first officer --

18          A.  That's incorrect.

19          Q.  So, again, the radio log is entirely

20   wrong?

21          A.  Yes.  You guys are false all the time.

22          Q.  Okay.

23          A.  That's nothing new.

24          Q.  Okay.

25          A.  You fix things to make it look good for

1    you.

2           Q.    Okay.   And you wouldn't do that?

3           A.    No, I wouldn't.

4           Q.    Okay.

5           A.    I'm going to tell you the truth.

6           Q.    And you were --

7           A.    I have nothing to lose or nothing to

8    gain from this.

9           Q.    And when Mr. Swan gave the false name,

10   you didn't -- you didn't step up and say --

11          A.    Me and Mr. Swan talked about that.

12          Q.    Well, but you didn't tell the officer?

13          A.    And he gave the real name once me and

14   Mr. Swan talked about that.

15          Q.    All right.   And so if I understand it

16   correctly, your position is that the time on the

17   ticket is wrong, the radio logs are wrong, and

18   the calls are incorrect?

19          A.    I'm saying the stop was totally bogus.

20   The officers were incorrect, and we gave them

21   everything that they asked for every time they

22   asked for it.   There was no problem between me

23   and the officers, none between Barrett and the

24   officers.   It was a -- it was actually an okay

25   stop considering the circumstances.

1          Q.   Now, I believe you told Mr. Eggers that

2     you had two magazines for that gun?

3          A.   Yes, I do.

4          Q.   The officers only seized the one in the

5     pistol?

6          A.   Yes, they did.

7          Q.   Where is the second one?

8          A.   In my car where they left it loaded.

9          Q.   It was -- it was in the console?

10         A.   It was in the car loaded, and they left

11    it.

12         Q.   In the place where you just described?

13         A.   Yes.

14         Q.   Okay.  So you're just saying the

15    officers looked through that --

16         A.   Exactly.

17         Q.   -- and left a loaded magazine in your

18    car?

19         A.   Yes.  That's exactly what I'm telling

20    you.

21         Q.   All right.  You still got that magazine?

22         A.   Yes, I do.

23         Q.   Okay.  Now, when did you first meet

24    Mr. Swan?

25         A.   I met him probably November, October a

1    couple years prior to.

2         Q.   Okay.  Is that sometime in the middle of

3    2017, do you think?

4         A.   '17, '16, yeah.

5         Q.   And when did you purchase the gun that

6    was found in the car?

7         A.   I purchased the gun prior to me knowing

8    him.

9         Q.   All right.  About when did you purchase

10   the gun?

11        A.   I purchased it in February or March.

12        Q.   Of what year?

13        A.   I'm not sure exactly.

14        Q.   All right.

15        A.   It was way before I knew Mr. Swan.

16        Q.   Well, the gun trace says you bought it

17   on March the 3rd --

18        A.   Okay.

19        Q.   -- of 2017?

20        A.   That would be exact then.  That was

21   prior to me knowing Mr. Swan.

22        Q.   That's about the time that you met

23   Mr. Swan?

24        A.   No.  I said that would be before I met

25   Mr. Swan.

1              Q.   How much before?

2              A.   I didn't know him until November or

3    October of that year, so give or take, what, nine

4    months.

5              Q.   Did you tell Officer Eggers you met

6    Mr. Swan about in the middle of 2017?  You said

7    about a year before this incident took place?

8              A.   I told Mr. Eggers what exactly?

9              Q.   That you met Mr. Swan about a year

10   before this incident took place.

11             A.   I purchased my gun in March.  I met him

12   in October or November.  What are you saying?

13   What are you not understanding?

14             Q.   I'm just wanting to know exactly when

15   you met Mr. Swan?

16             A.   I just told you.

17             Q.   All right.  And so you're -- so it was

18   within a few months of you meeting Mr. Swan?

19             A.   No.  That was clearly about nine months

20   if I purchased it in March and I met him in

21   October or November.

22             Q.   All right.  Let's go at it this way.

23   Did you tell Officer Eggers that you met Barrett

24   Swan in the middle of 2017?

25             A.   I could never put an exact date on the

1    time that I met him.

2         Q.   Well, we can play it back to you if you

3    need it.

4         A.   You can.  I recall that it was being

5    recorded.

6         Q.   So but did you tell him that?

7         A.   I'm telling you what I'm telling you

8    now.  I'm telling you the exact same thing that I

9    told Mr. Eggers.

10        Q.   All right.  We'll do it this way.

11              (An audio recording was played for

12   the jurors.)

13   BY MR. SORRELL:

14        Q.   Does that remind you a little bit about

15   what you said?

16        A.   That was an incident.  So play the

17   entire recording because we were talking about me

18   purchasing my gun and what required me to

19   purchase my gun, not when I purchased my gun.  We

20   were talking about an incident that occurred,

21   what made me purchase my gun.  Play the entire

22   recording.  Don't play a little bit.

23        Q.   How long have you known Barrett?  I had

24   known Barrett for --

25        A.   Play the entire recording.  You're

1   playing a little bit.

2        Q.   Well, just answer the question.

3             MR. TILSEN:  Objection.  Let her

4   answer the question, Your Honor.

5             THE COURT:  Overruled.

6             MR. SORRELL:  Ms. Booth is the

7   person for this witness, not Mr. Tilsen.

8             THE WITNESS:  You played a little

9   bit.  Play the entire recording.  Play exactly

10  the question that was asked prior to me answering

11  that question.

12            MR. SORRELL:  You don't get to do

13  that.  So --

14            THE WITNESS:  Oh.

15            MR. SORRELL:  So --

16            THE WITNESS:  So you get to halfway

17  play the truth?  Because he asked me why I

18  purchased the gun, and I explained to him what

19  made me purchase the gun.

20            THE COURT:  Ma'am, stop.  He asks

21  the questions.

22            THE WITNESS:  Even though he's being

23  wrong?

24            MS. BOOTH:  Just answer the

25  questions.

1    BY MR. SORRELL:

2         Q.   So did you know Mr. Swan a year before

3    August 1st?

4         A.   Yes.

5         Q.   And that's a few months of the time that

6    you bought the gun?

7         A.   Incorrect.

8         Q.   All right.  And why is it incorrect?

9         A.   Because I purchased the gun two years

10   prior to then.

11        Q.   All right.  If you knew Mr. Swan a year

12   before August 1st, that would have been

13   August 1st of 2017?

14        A.   Correct.

15        Q.   And you bought this gun on August the --

16   or March the 3rd of 2017?

17        A.   Incorrect.

18        Q.   You didn't buy it on March 3rd?

19        A.   I bought the gun August -- you said I

20   purchased the gun when?  Right.  Yeah.

21        Q.   Hang on just a second.  Do you see this?

22   Can you see where my ink pen is pointing, ma'am?

23        A.   Three?

24        Q.   March 3rd, 2017?

25        A.   No.  I need you to correct that.  Where

1    is your ink pen pointed at?

2        Q.   Well, what I pointed to is the purchase

3    where it says purchase date.  Do you see that?

4        A.   3/03/2017.

5        Q.   All right.  Is that the date you

6    purchased the gun?

7        A.   Correct.

8        Q.   All right.  So it's within a few months

9    of the time that you met Mr. Swan?

10            MR. TILSEN:  I object to the form of

11   the question.

12            MR. SORRELL:  Mr. Tilsen can't make

13   an objection.

14            THE COURT:  Overruled.

15   BY MR. SORRELL:

16       A.   And you're asking me again when did I

17   meet Mr. Swan?

18       Q.   Yes.

19       A.   I met him in October of that year.

20       Q.   All right.  Have you ever bought any

21   other firearms?

22       A.   No.

23       Q.   Either before or since?

24       A.   No.

25            MR. SORRELL:   That's all I have.

1    Thank you.

2                    THE WITNESS:  So what are you

3    saying?

4                    REDIRECT EXAMINATION

5    BY MS. BOOTH:

6         Q.   Ms. Thorpe, the traffic stop in

7    Florissant took how long from start to finish?

8         A.   20 minutes that I would say.

9         Q.   And that's easy to remember; correct?

10        A.   Yeah.

11        Q.   But the time when a ticket was given or

12   the exact time the police officer got Barrett's

13   false information, do you know all those exact

14   times?

15        A.   No.  I can't remember the time when

16   everything happened.  No.  I wasn't looking at my

17   watch.

18        Q.   That firearm, was it out in the car in

19   Barrett's possession?

20        A.   No.

21        Q.   And, Ms. Thorpe, I know you care for

22   Mr. Swan; is that fair to say?

23        A.   Yes.

24        Q.   Would you lie for him today?

25        A.   No.

1    Q.   And on June the 14th did an ATF agent
2    come out and speak to you?
3    A.   June 14th?
4    Q.   Yes, ma'am.
5    A.   That's the Friday before I went on my
6    vacation.  Yes.  He was extremely disrespectful.
7    Q.   And that would be Agent Eggers?
8    A.   Yes, that's correct.
9    Q.   But you told him what you testified here
10   to today; correct?
11   A.   Correct.
12   Q.   You didn't tell him, I don't want to
13   talk to you?
14   A.   No. I invited him to my space exactly
15   where I was.
16   Q.   And you spoke to him willingly?
17   A.   Yes, I did.
18   Q.   Did you have to?
19   A.   No, I didn't.
20        MS. BOOTH:  Judge, I have nothing
21   further.
22        MR. SORRELL:  No, sir.
23        THE COURT:  You may step down.
24        (Witness Excused.)
25        THE COURT:  Call your next witness.

1           MS. BOOTH:  Your Honor, I call

2     Mr. Swan to the stand.

3                     BARRETT SWAN,

4     being produced and sworn, testified as follows:

5           THE COURT:  You may proceed.

6                   DIRECT EXAMINATION

7     BY MS. BOOTH:

8           Q.   Can you please state your name for the

9     record.

10          A.   Barrett Swan.

11          Q.   And, Mr. Swan, we finally get to hear

12    from you; correct?

13          A.   Yes, ma'am.

14          Q.   Mr. Swan, how old are you?

15          A.   35.

16          Q.   And you are a convicted felon?

17          A.   Yes, ma'am.

18          Q.   And you know that?

19          A.   Yes, ma'am.

20          Q.   And can you tell the jury do you have

21    any -- you have a prior conviction for felon in

22    possession of a firearm?

23          A.   Yes, ma'am.

24          Q.   And --

25                     THE COURT:  Why don't you pull the

1    microphone up.

2    BY MS. BOOTH:

3         Q.    And you pled guilty to that offense

4    when?

5         A.    I pled guilty for it in 2006.

6         Q.    And that was here in federal court?

7         A.    Yes, ma'am.

8         Q.    And that was Count 1; correct?

9         A.    Yes, ma'am.

10        Q.    But there were two other counts there,

11   weren't there?

12        A.    Yes, ma'am.

13        Q.    And tell the jury what those were.

14        A.    Distribution of a controlled substance.

15        Q.    And your other felony convictions, what

16   are those for the jury?

17        A.    I have a previous possession of a

18   controlled substance, and I have a DWI also.

19        Q.    And, Mr. Swan, the previous possession

20   of a controlled substance that was in the 2003?

21        A.    Yes, ma'am.

22        Q.    And your DWI was in 2011?

23        A.    Yes, ma'am.

24        Q.    And that was a felony DWI?

25        A.    Yes, ma'am.

1          Q.   And then you also have a felony

2     receiving stolen property in 2006:   Do you

3     recall?

4          A.   Yes.   That was also the gun -- the same

5     gun that I was charged with that was stolen, so

6     they charged me with receiving stolen property

7     also.

8          Q.   All right.   So those offenses happened

9     around age 19 to 22?

10         A.   19 to 21, yes, ma'am.

11         Q.   And, of course, you're 35 now?

12         A.   Yes, ma'am.

13         Q.   So time has passed?

14         A.   Yes, ma'am, a lot.

15         Q.   But the felony DWI was in 2011?

16         A.   Yes, ma'am.

17         Q.   So, Mr. Swan, you know you can't be in

18    possession of firearms?

19         A.   Definitely.

20         Q.   That is clear?

21         A.   Yes, ma'am.

22         Q.   On May 25th of 2018 were you in

23    possession of Ebony's firearm knowingly?

24         A.   No.

25         Q.   Let's go back to that day.   You had

1    plans with Ebony to go to Indiana?

2         A.   Yes, ma'am.

3         Q.   And on that day, May 25th, what car were

4    you driving?

5         A.   A rental car.

6         Q.   And Ebony had your Dodge Charger?

7         A.   Yes, ma'am.

8         Q.   And was that unique for her to drive

9    your Charger?

10        A.   Unique?  No.  If I parked it in front of

11   her car, she just takes mine.  I would wake up,

12   and it would be gone.

13        Q.   Now, at that time did you know that

14   Ebony was a firearm possessor?

15        A.   Yes, ma'am.

16        Q.   And you had seen her firearm at some

17   point?

18        A.   I have seen it previously.  Like, you

19   know, I don't -- I made it very clear to Ebony

20   like I don't want to be around guns.  Usually she

21   don't have them out, but there's been times when

22   I have walked in the house, and she might have

23   been fiddling with it or something, and I would

24   say, Hey, and she would put it up, so I move on.

25        Q.   So you were always careful not to be

1    around her firearm?

2         A.   Yes, ma'am.

3         Q.   Because you've had some serious

4    consequences for firearm possession, haven't you?

5         A.   Definitely.

6         Q.   Were you over at The Pony with Shavion

7    Reed in the early morning hours of May the 26th?

8         A.   Yes, ma'am.

9         Q.   And the car that you drove over, what

10   car was that?

11        A.   The rental car.

12        Q.   It's hard to talk about, Mr. Swan, but

13   were you being honest with these women about who

14   you were seeing and who you weren't seeing?

15        A.   No, ma'am.

16        Q.   Did Ebony appear at The Pony that

17   evening?

18        A.   Yes, ma'am.

19        Q.   And that evening would be the early

20   morning hours of May the 26th?

21        A.   Yes, ma'am.

22        Q.   Had she been calling you trying to get

23   ahold of you?

24        A.   Yes, ma'am.

25        Q.   Had you been taking all of her calls?

1    A.   Not all of them.  You know, we were

2    supposed to go to Indiana, so I was kind of like

3    not answering or something, or I might answer and

4    be like, oh, I'm going somewhere.  I'm going to

5    call you right back or something.

6         Q.   And did she show up at The Pony at some

7    point?

8         A.   Yes, ma'am.

9         Q.   And was she driving your black Dodge

10   Charger?

11        A.   Yes, ma'am.

12        Q.   And I know we've heard from her, and

13   we've heard from Ms. Reed.  But what did Ebony

14   say to you when she confronted you?

15        A.   I don't remember her exact words.  It

16   wasn't nice.  It was, you know, a lot of cussing

17   and screaming.

18        Q.   She was very, very upset?

19        A.   Yes, ma'am.

20        Q.   Can you blame her?

21        A.   No, ma'am.

22        Q.   And then Ms. Reed, was she also upset?

23        A.   Yes, ma'am.

24        Q.   What car did Ms. Stigall leave in?

25        A.   She ended up taking the rental car.

1          Q.   And were the keys in it?

2          A.   Yes, ma'am.

3          Q.   And why is that?

4          A.   Have you ever been to The Pony?  Like,

5     first of all, I didn't plan on staying that long,

6     but everybody is not going in the club.  It's

7     like more of an outside in the parking lot thing.

8     And when Shavion asked me to come over, I really

9     didn't -- you know -- it was I was supposed to be

10    going to Indiana with Ebony, so, you know, I

11    wasn't -- I probably shouldn't have went, and I

12    ended up going anyways, but I didn't plan to stay

13    that long, so the car was still running with the

14    keys in it.

15         Q.   At some point you did leave The Pony?

16         A.   Yes, ma'am.

17         Q.   Of course, your black Charger was there?

18         A.   Yes, ma'am.

19         Q.   So you leave in the black Charger?

20         A.   Yes, ma'am.

21         Q.   Did you realize that Ms. Stigall's

22    firearm was in the door pocket?

23         A.   No, ma'am.

24         Q.   Did you have any reason to look for it?

25         A.   No, ma'am.

1      Q.   Had Ebony always been careful  about
2   keeping her firearms away from you?
3      A.   Yes, ma'am.   She knows I don't like
4   guns because they have cost me a lot in my life.
5   I did time for guns.  I've been shot by guns.  So
6   I don't deal with guns at all.  Like they
7   don't -- everybody knows I don't like to be
8   around guns period.  And it's not just because I
9   can't, but because I don't like to be around guns
10   at all.
11      Q.   Had you been drinking at The Pony?
12      A.   Yes, ma'am.
13      Q.   Would you say you were intoxicated, or
14   how would you rate it?
15      A.   I wouldn't say I was intoxicated, but,
16   you know, those machines or something might have
17   said it, but I wouldn't say I was.  I was still
18   pretty okay I would say.
19      Q.   Mr. Swan, I'm showing you Defendant's
20   Exhibit C. Do you recognize what this picture is?
21      A.   Yes, ma'am.
22           (Defendant's Exhibit No.  C, Photo,
23   was identified.)
24   BY MS. BOOTH:
25      Q.   Can you tell the jury what it is?

1          A.    That's a bottle of Remy, a fifth of Remy

2     Martin.

3          Q.    And is that your bottle of alcohol?

4          A.    Yes, ma'am.

5          Q.    And is that what you were drinking over

6     at The Pony?

7          A.    Yes, ma'am.

8          Q.    Are those cigarettes also yours?

9          A.    Yes, ma'am.

10         Q.    When you left The Pony, were you upset?

11         A.    Yeah.  I was more of in a situation.  I

12    probably had been not honest with both women, and

13    it just came out all at once.  And my daughter

14    was still at Ebony's house because I was taking

15    my daughter with us to Indiana also.  So my

16    daughter was over there.  She was mad.  She then

17    took the rental car.

18              So Shavion, I'm trying to explain her

19    why she had seen Ebony driving the car.  So there

20    was just a lot going on at the time.  So, yeah, I

21    was upset, but more felt dumb for causing the

22    situation.

23         Q.    When you were coming back into Missouri

24    across the Mississippi River bridge, did another

25    car pull up next to you, or was another car

1    leaving The Pony that wanted to race?

2         A.   Yes, ma'am.  He didn't so just pull up.

3    He was just like kind of just racing by me, which

4    is like, you know, we both was just racing into

5    the Missouri side.

6         Q.   So another man is in a car, and you-all

7    thought you just -- you would -- he was just

8    racing past you, and you thought you'd see what

9    that Charger could do?

10        A.   I get that a lot.  I have got a hemi,

11   and he was in an Audi, which is a pretty fast car

12   too. I get that a lot of people pulling up

13   wanting to race, so, yes.

14        Q.   So you actually did exceed the speed

15   limit coming into Missouri; correct?

16        A.   Yes, ma'am.

17        Q.   Now, coming into Missouri as soon as you

18   got off the bridge did you see any police

19   officers or --

20        A.   Yeah, I seen them.  They was to the --

21   they was to my right where they said like on

22   College by the bridge.

23        Q.   So the police officers' location was

24   clear to see from the road that you were on?

25        A.   Yeah.   There was nothing separating us

1    but a fence.

2          Q.   And did you try to slow down at all?

3          A.   I did try to slow down, but once I seen

4    them it was pretty much too late, because they

5    were parked there.  And by the time I seen them

6    and tried to slow down I was still well over the

7    speed limit.  I don't recall actually what I was

8    going.  They said they clocked me, but I didn't

9    recall at the time looking at it.  We was just

10   racing.  And just once I seen them I knew they

11   seen I was going pretty fast.

12         Q.   So you knew that you had just blown by

13   the police officers going incredibly fast?

14         A.   Definitely.

15         Q.   And what did you decide to do?

16         A.   I tried to turn, which in order for the

17   police to come they wouldn't -- they wouldn't be

18   able to come straight toward me.  So they would

19   have to go around the block about two blocks away

20   to come up.  And so I tried to speed up and get

21   past where I thought they would be coming from

22   and zigzagged through the neighborhood.

23         Q.   So you were trying to disappear?

24         A.   Yes.

25         Q.   And why?  Why not just pull over for the

1   police officers?

2       A.   The last time I pulled over for the

3   police officer and didn't think I was drunk I

4   blew a .08, which is actually the Missouri legal

5   limit, and I still received a DWI, a felony DWI,

6   which I had to go to prison for.   So me drinking.

7            It was just -- you know, it was a lot.

8   My daughter is at Ebony's house.   I'm going

9   through this situation with two women.   I just --

10  you know, I didn't want to go to jail right then

11  and there, you know, for the DWI again when my

12  daughter was there and then explain to my child's

13  mother where my daughter is. It was just a lot to

14  go to jail right then.   I knew I'd go to jail,

15  though, because, of course, I'm in my car.

16      Q.   And the police officers know your car?

17      A.   Yeah, pretty much.

18      Q.   Ms. Stigall, where you spent time at her

19  house, is that directly across the house from a

20  -- I'm sorry, directly across the street from

21  where a Cape Girardeau Police Department officer

22  lives?

23      A.   Yes, ma'am.

24      Q.   And you would see him there all the

25  time?

1        A.   I've seen him.   I've probably been

2   pulled over by him.   Like Eggers said, he pulled

3   me over.   Like the police know my car because

4   it's got pulled over plenty of times.   He seen

5   me, so, yeah, I'm pretty sure they know that's

6   Barrett Swan's car.

7        Q.   And at the time you fled from the police

8   did you know the firearm was in the car?

9        A.   No, ma'am.

10        Q.   When did you learn that Ebony's firearm

11   was in the car?

12        A.   Once I was charged with it.

13        Q.   Had you known the firearm was in the car

14   what would you have done?

15        A.   Honestly, I would have got rid of it.   I

16   had plenty of time.   I'm saying I had seen the

17   police where they were parked.   I was blocks away

18   from them before he even hit his lights and

19   before he even caught contact with me.   So if I

20   knew I had a firearm, I definitely would have

21   gotten rid of it.

22        Q.   So you were arrested, Mr. Swan, when the

23   police caught up with you on foot?

24        A.   Yes, ma'am.

25        Q.   And did you fight with them in any way

1    or --

2         A.   No, ma'am.   There was no need to fight.

3    At the time I didn't know -- you know, I'm just

4    thinking, you know, speeding.  I ran from them,

5    so, of course, that's another charge.  You know,

6    I had to face it.  So there was no need to argue

7    or fight with them.  I'm going to jail.

8         Q.   And you were charged, correct, at the

9    state level?

10        A.   Yes, ma'am.

11        Q.   And that would be for felon in

12   possession of a firearm?

13        A.   Yes, ma'am.

14        Q.   And you were released from custody;

15   correct?

16        A.   Yes.  I posted bond.

17        Q.   And so at some point did you realize

18   that most likely you were going to be indicted by

19   the federal government for felon in possession of

20   a firearm?

21        A.   Yes.  I had -- when I bonded out, I

22   hired Steve Wilson as my lawyer.  I knew Steve.

23   We had known each other.  I had used him a few

24   times.  So he had told me it probably was a good

25   chance, you know, to defend to pick it up,

1     basically, you know, because whenever he took my

2     money he let me know like if it's federal, the

3     price will go up.  So he's like you know you got

4     a good chance of the feds picking it up.

5           Q.   And you'd been prosecuted by the federal

6     government before, years prior, for felon in

7     possession of a firearm?

8           A.   Yes, ma'am.

9           Q.   So you were pretty confident that

10    federal indictment was going to come?

11          A.   Yeah, I knew it was definitely going to

12    come.  Actually, there was a conversation between

13    him and Jennifer whenever I waived -- I mean,

14    with Angel.  I waived my preliminary hearing,

15    because the judge had took my license for going

16    so fast or whatever, so he took my license.

17               So Steve's thing was I wanted to still

18    have my preliminary hearing and bring up, you

19    know, the situation about the gun with Ebony and

20    everything.  He said if I wanted my license back

21    right then to go ahead and waive it and get in

22    front of a different judge so we can get your

23    license back, and so I can drive.

24               And actually, Angel had came to him and

25    whenever I waived it and was like, you know, what

1    is he trying to do, waive his rights and hurry up

2    and plead out?  So when she told Steve that,

3    Steve had came to me, and he was like, you know,

4    yeah, she pretty much let me know like it's

5    probably going to be picked up by the federal

6    government.  They think you're trying to -- they

7    thought I was trying to plead out, that's why I

8    waived my preliminary hearing.  Actually, I was

9    trying to get my license.

10        Q.   So you just said a lot, so let me

11   clarify that for the jury.  When you were charged

12   at the state level in Cape Girardeau for felon in

13   possession of a firearm, the state court

14   prosecutor had charged you with that?

15        A.   Yes, ma'am.

16        Q.   And when you say "Angel," you mean

17   Ms. Woodruff?

18        A.   Yes.

19        Q.   All right.  And she's also a Special

20   Assistant United States Attorney; correct?

21        A.   Yes, ma'am.  They told me she was in

22   some program where she was able to get it hung

23   over straight to -- and prosecuting it in

24   federal.

25        Q.   Yes.  She's a Special Assistant United

1   States Attorney.  So when she was prosecuting

2   your state matter, pretty clearly you knew this

3   will probably go federal?

4        A.   Yes.

5        Q.   Because she is a Special United States

6   Attorney?

7        A.   Steve told me that, yeah.

8        Q.   Okay.  So then that summer what did you

9   do?  Did you just wait for the warrant to come

10  out or --

11       A.   I was going through a lot at that time.

12  My stepfather, who's now passed away -- he passed

13  away in April, but at the time he had cancer.  He

14  was battling cancer staying in St. Louis.  And

15  actually when I went up to St. Louis to visit

16  Tiara, that's what I was doing, I was visiting my

17  stepfather.  He was in the hospital fighting,

18  battling cancer.

19       Q.   So you were out with Ms. Thorpe the

20  early morning hours of August 1st of 2018?

21       A.   Yes, ma'am.

22       Q.   And you had been up in St. Louis

23  visiting your father?

24       A.   Yes, ma'am.

25       Q.   But Ms. Thorpe had asked you to go out

1    for her birthday, and you thought, well, that's

2    all right, I'll do that too?

3          A.   She knew I was going through a lot, you

4    know, with the -- there was a lot going on.  But

5    I needed -- I knew probably the warrant -- I had

6    the warrant and what I was going through with my

7    mother.  I'm my mother's only child.  And she was

8    going through that with my father.  My mother was

9    still at home trying to work and pay bills, and

10   he's in the hospital.  So I guess, you know, she

11   just kind of just got me out to come on, have fun

12   and took me with her.

13         Q.   And when the car was stopped in

14   Florissant on August the 1st of 2018, did you

15   have a pretty good idea that that federal warrant

16   might be out?

17         A.   Yeah.  I knew.  Yeah.

18         Q.   How did you know?

19         A.   Because whenever the warrant came out,

20   they -- the police went to Ebony's house and my

21   mother's house at the same time.  They were going

22   there with search warrants to get me.  It just so

23   happened I was in St. Louis.

24         Q.   So on August 1st when Officer Kemp asked

25   you for your name the first time, is that why you

409

1    gave him a fake name?

2         A.   I gave him a fake name just -- I don't

3    know.  I really wasn't thinking.  You know, I was

4    just going through a lot.  I really wasn't just

5    really -- I knew what was going to come.  I

6    definitely was going to jail once he found out

7    that I was Barrett Swan.  You know, I didn't

8    think about the name and the Social Security.  I

9    just blurted out anything out of my head, so I

10   knew he'd be coming back.

11        You know, so I don't know, like Tiara

12   said, we had a conversation where it was like

13   basically you're going to have to face this.

14        Q.   So while Officer Kemp was back at the

15   car trying to run the fake identification, you

16   decided in your mind I just -- I need to tell him

17   who I am, and I just need to face this?

18        A.   Yeah.  After talking to Tiara, Tiara is

19   like, you know, there's no way out of it.  You

20   gave him a wrong name.  It's just any name, any

21   Social Security Number, so, of course, he was

22   coming back for the real name.

23        You know, she was just -- she was kind

24   of trying to ease me like this is going to be all

25   right.  You know, you've got to face it.  There

1    ain't going to be anything you can do about it.

2    You have got to give him your real name, so

3    that's what I did.

4         Q.   So when he came back, you did give him

5    your real name?

6         A.   Yes, ma'am.

7         Q.   And then he went back to his car to

8    check that real name?

9         A.   Yes, ma'am.

10         Q.   So you had a significant amount of time

11   to sit in the car with Ms. Thorpe; correct?

12         A.   Yeah.

13         Q.   Before the police officer came back to

14   get you out of the car?

15         A.   Yes, ma'am.

16         Q.   And you and Ms. Thorpe were unattended?

17   No other police officer was there watching every

18   move you made?

19         A.   No, ma'am.

20         Q.   You were free to move about the car and

21   do whatever you want?

22         A.   Yes, ma'am.

23         Q.   Did you have possession of Ms. Thorpe's

24   firearm?

25         A.   No, ma'am.

1      Q.   Mr. Swan, and you were sober this

2  evening when talking to the police officer?

3      A.   Yes.

4      Q.   And you knew he was a police officer,

5  and he's coming back for you?

6      A.   Yes, ma'am.

7      Q.   And you were cooperative with him and

8  never battled with him?

9      A.   Yes, ma'am.

10     Q.   If Ms. Thorpe had had her firearm out in

11  the vehicle, would you have told her anything

12  specific to do with it knowing that a police

13  officer is coming back probably to get you out of

14  the car?

15     A.   I would have told her -- you're saying

16  if it was out?  If it was out, yeah, I would have

17  told her.  If I had knew she had the gun in

18  there, I would have said, yeah, I would have told

19  her.  I probably never would have got in the car,

20  period, if I had knew the gun was in there.

21          Like I know -- I just don't like being

22  the around the guns.  I'm saying it's cost me too

23  much in my life at this point.

24     Q.   It cost you too much.  You had

25  incarceration over it?

1          A.   Incarceration.  I've been shot.  I've

2     been -- I had a friend right before I got locked

3     up that killed herself with a gun, so, yeah, I've

4     been through a lot with guns, and I just don't

5     like guns.

6          Q.   In 2016 you were shot?

7          A.   Yes, ma'am.

8          Q.   And that was -- was that Christmas Eve

9     or Christmas Day?

10         A.   It was Christmas morning.  It was about

11    3:00 or 4:00 in the morning in Sikeston.

12         Q.   Christmas morning in Sikeston, Missouri?

13         A.   Yes, ma'am.

14         Q.   You were at a big party with a lot of

15    people?

16         A.   Yes, ma'am.

17         Q.   And were you in an argument with

18    someone?

19         A.   No.  No.  I didn't have any problems at

20    all.  You know, I don't -- I really don't even

21    know what happened.  There was a lot of people

22    outside, and it was dark.  You know, it was the

23    club was closed, so we was all outside.

24              And, you know, I was shot in the back.

25    I never seen, you know, who did it or anything.

1    So I really don't know what happened, because

2    there was no arguments, or no -- I didn't have

3    any problems with anybody when I was shot.

4         Q.    And you were shot in the back?

5         A.    Yes, ma'am.

6         Q.    Was it a long recovery after that?

7         A.    Yes, ma'am.

8         Q.    Were you in the hospital or were you --

9         A.    I was in the hospital for quite some

10   time.  I was in a coma for, what, 11 days.  And

11   there was a lot of damage.  There was a lot of

12   damage.  And at the time I didn't have insurance,

13   so, you know, they got me out of the hospital,

14   you know -- once I was alive they got me out of

15   the hospital, but I was still having to go back

16   and forth.

17        I was having -- once my insurance got --

18   I did get insurance.  I had nurses coming to the

19   house twice a week.  I had a lot of problems.

20   There was a lot of complications after being

21   shot.

22        Q.    Mr. Swan, do you still have physical

23   issues from being shot?

24        A.    Yes, ma'am.

25        Q.    What are those issues?

414

1     A.   I have a colostomy bag.  I still have to

2  have surgery -- I have to have surgery to redo

3  that.  They have got to -- my stomach was split

4  wide open.

5     Q.   I'm sure being shot was very

6  frightening?

7     A.   Yes, ma'am.

8     Q.   Why not carry a firearm to protect

9  yourself in case someone tries to shoot you

10  again?

11     A.   Well, for one I didn't -- I'm saying I

12  really don't know who -- why I was shot.  So it

13  wasn't like, oh, I think somebody is trying to

14  kill me, so get a gun.  It was never anything

15  like that.

16          Like I believe it was just either a

17  mistaken identity or the bullet just didn't go

18  right where somebody was shooting.  I don't know

19  what the case may be, but it was nothing that

20  made me feel like I was unsafe.  I still go to

21  Sikeston.  You know, I have friends, and I still

22  go to Sikeston all the time.

23          I haven't had any problems since then.

24  There was no threats or anything.  You know,

25  everybody was pretty much hoping I got better, so

1    I didn't see no need to ever have a gun.  Plus I

2    know I can't have them at all.  So, you know,

3    that ain't going to make the situation no better

4    for me carrying a gun and going to jail for it.

5        Q.   Now, when you went back to the

6    Florissant Police Station with Officer Kemp to

7    get booked in, were you cooperative during the

8    booking process?

9        A.   Yes, ma'am.

10       Q.   And at some point does he ask you about

11   if you have any health issues because he's about

12   to book you into jail?

13       A.   Yes, ma'am.  I made sure to tell him

14   that, you know, I have a colostomy bag, so it's a

15   lot to deal with.  So, yeah, I have to tell them.

16   When they're booking you in, they ask you, you

17   know, if you have any health issues or anything

18   of those things, so I had to tell him that, yeah.

19       Q.   Did you tell Officer Kemp at that point

20   that you had been shot, and that's why you have

21   the colostomy bag?

22       A.   Yes, ma'am.

23       Q.   And you were telling him, like, the

24   supplies that you needed, because you didn't have

25   any of those --

1          A.   Yeah, I told him.  Yeah, because when

2     I'm in jail, I'm going to have to have extra

3     bags, glue, scissors.  I got to have a lot of

4     stuff with me at all times, because, you know, I

5     don't know when I have to change it or whatever,

6     so, yeah, I had to explain it to him that, you

7     know, I have to have access to those types of

8     thing, yes.

9          Q.   Because you deal with your colostomy bag

10    yourself?

11         A.   Yes, ma'am.

12         Q.   And then at some point did he ask you

13    that he wanted to talk about the firearm found in

14    the car?

15         A.   Yes, ma'am.

16         Q.   In Tiara's car?

17         A.   Yes, ma'am.

18         Q.   And you heard him testify here today.

19    Did you -- I'm sorry, sir, yesterday.  Did you

20    ever tell him anything to the effect of I know

21    what you found in the car, and I'd rather be in

22    the situation that I am now than the one when I

23    was shot and had nothing on me?  Did you say that

24    to him?

25         A.   Definitely not.  He definitely added

417

1    that part.  Yeah.  It was very similar.  Whenever

2    he asked me -- he told me, you know, after you

3    get dressed, I'm going to take you to the

4    interview room and talk about it.

5           And I was like, you know, I don't want

6    to talk.  You know, we both know that whatever

7    you found in that car was hers.  It's simple.

8    But I told him, you know, like I don't care about

9    the situation, because at the time it was better

10   than being shot.  You know what I'm saying?

11          I didn't go into detail about how I got

12   shot, or anything, but I just told him I'd rather

13   be in this situation than whenever I got shot.  I

14   didn't say when I didn't have a gun on me.  He

15   definitely added that statement in there.

16      Q.   And what did you mean by when you said,

17   Hey, I'd rather be in this situation than like

18   when I got shot?

19      A.   Basically I'm saying I'd rather be --

20   even though I didn't know Tiara had a gun in the

21   car, I'd rather be in a situation with somebody

22   with a gun in the car than back when I was there

23   and nobody had nothing.  Like just recently I'm

24   showing you I didn't have a gun, so I didn't have

25   no gun.  Nobody around me had no gun, and it was

1    I got shot.

2          Nobody to help me.  I drove myself to

3    the hospital.  You know, I had to drive, and

4    nobody was there to help me do anything.  So,

5    yeah, I'd rather be in a situation where you

6    found somebody's legal gun on them, and back when

7    I was shot and I didn't have anybody around me.

8    Yeah, I definitely would rather be in that

9    situation.

10         Q.   So your point was to him that you

11   weren't heartbroken to come to find out that

12   Tiara had a firearm?

13         A.   Yeah.  Exactly.  And then after that

14   they didn't -- I didn't really actually know I

15   was ever charged because I never went to court.

16   It was 17 days before they brought me back here.

17         When they was -- when he was asking

18   about the gun, he never said, oh, well, you know,

19   I'm charging you with this gun.  You know, I'm

20   thinking about the Missouri incident which I was

21   being arrested for was a gun.

22         And, no, I'm not -- that's -- that's

23   just what it was.  It was never no statement

24   about, oh, I had a gun -- whenever I got shot I

25   had -- I didn't have a gun.  No, it was nothing

1    like that.

2             But he said it clear.  He was -- I'm not

3    going to say honest, but he did say he didn't

4    know exactly what I said, so, yeah.

5             MS. BOOTH:  I have nothing further

6    for Barrett Swan at this moment.

7             THE COURT:  Mr. Sorrell.

8             MR. SORRELL:  Thank you.

9                  CROSS-EXAMINATION

10   BY MR. SORRELL:

11        Q.   Thank you.  Mr. Swan, let me go back to

12   May the 25th of 2018 at this first event.  Do you

13   remember that night?

14        A.   Yes, sir.

15        Q.   Okay.  We all can agree that there was a

16   series of bad decisions made by you that night;

17   is that fair?

18        A.   Yes, sir.

19        Q.   Now, being involved with two different

20   women at the same time was certainly a bad

21   decision?

22        A.   Definitely.

23        Q.   Certainly and also involved with

24   Ms. Thorpe at the same time in St. Louis?

25        A.   Yes, sir.

1      Q.   Okay.   That's bound to cause problems

2   even if you don't have guns thrown in the mix;

3   isn't that fair?

4      A.   Yes, sir.

5      Q.   Okay.   Now, that night I believe that

6   you -- at least at the evening you wound up at

7   The Pony across the river over in Illinois; is

8   that fair?

9      A.   Yes, sir.

10      Q.   And The Pony is a strip club, isn't it?

11      A.   Yes, sir.

12      Q.   Is that a club you go to very often?

13      A.   I wouldn't say -- I don't -- I never go

14   in.  I don't go in at all.  It's like people hang

15   out in the parking lot.  Sometimes I might ride

16   through.  I don't frequent it, no.

17      Q.   All right.  It's not uncommon for people

18   to have guns over there on The Pony parking lot,

19   is it?

20      A.   To have guns over there?

21      Q.   Yes.

22      A.   I don't know about that.  I never seen

23   nobody with guns over there.

24      Q.   You never heard about any shots fired on

25   The Pony parking lot?

421

1        A.   Have I heard about it?  Yeah.  I've
2   heard about it, but I don't -- that's what I'm
3   saying.  I'm not saying it's -- no, I don't know
4   people that hang around with guns when the shots
5   are fired.
6             Have I heard about shots being fired
7   over there?  I wasn't in the area, so I really
8   don't recall, but I don't -- I never seen nobody
9   just walking around with guns at The Pony, no.
10        Q.   All right.  Of course, I wouldn't assume
11   they would carry them out in the open, but you
12   decide to come back to Missouri that night about,
13   oh, 3:30 or so in the morning; is that fair?
14        A.   I'm not going to get into times at all.
15   It's been like a year.
16        Q.   Okay.
17        A.   Maybe it's been over a year, so, yeah,
18   I'm not going to get into times.  I don't know.
19   I wasn't looking at watches. I wasn't looking at
20   times at all.
21        Q.   It was dark?
22        A.   Yes.
23        Q.   And you decided -- and you engage with
24   this other car, and you thought they wanted to
25   race, so you decided to accept that challenge?

1      A.   Yes, sir.

2      Q.   You had a car that would do it?

3      A.   Yes, sir.

4      Q.   Okay.  So did both of you floor your

5  cars at that time?

6      A.   I'm not going to say floor.  I

7  definitely didn't floor it right there, but, you

8  know, he came -- I didn't see -- he come past

9  fast, so, you know, it was just like a stop kind

10  of -- not stop, but, you know, slow down by me to

11  let me know that's what he was trying to do was

12  racing, so we sped up.

13      Q.   And you come over the bridge at

14  100 miles an hour or about 90 to 100?

15      A.   I don't -- I don't recall.  I did never

16  look at my speedometer.

17      Q.   Well, let me ask you this:  Do you

18  disagree with the officer's testimony that you

19  were doing about 90 miles an hour?

20      A.   Do I disagree?  I'm not quite sure how

21  fast I was going.  He said it was 100.  I'm

22  not -- I can't dispute it, because I didn't have

23  a radar.  He said he had a radar.  I don't -- I

24  don't know.  Maybe he clocked the other car.  I

25  can't be specific on which car he clocked.

1          We was racing across the bridge.  He was

2     on the other side of a whole fence.  So maybe

3     when he -- I don't know how the radars even work.

4     I guess if you aim it at two cars, it's going to

5     clock one of them.  I don't know how fast I was

6     going.

7          Q.   So you want to dispute how fast you were

8     going?

9          A.   I'm not going to --

10         Q.   I'll have it either way.  I don't care.

11         A.   I'm not going to dispute how fast I was

12    going.

13         Q.   Okay.  But, well, we can both agree that

14    it's a bad decision to drive in to the city

15    limits of Cape Girardeau at 90 miles an hour?

16         A.   Definitely.  Definitely.

17         Q.   And if you're driving that fast, you

18    can't have any care for pedestrians or other cars

19    on the street?

20         A.   No, I wouldn't say that either.  We was

21    on the highway.  There's a highway coming off the

22    bridge, straight highway.  You can see all of the

23    cars.

24         Q.   And if someone pulled out in front of

25    you, would you have had time to stop?

1          A.    There's nowhere to pull out in front of

2     me until you get to the street, which is we were

3     on the highway.

4          Q.    Right.  But you didn't get stopped on

5     the highway.

6          A.    But there's no side streets because we

7     was on the highway.

8          Q.    All right.  So you're saying that it's

9     impossible for someone to have pulled out in

10    front of you?

11         A.    No, I'm not saying that, sir.  I'm not

12    saying that at all.  I'm saying that it's really

13    unlikely that at that time of night that on a

14    bridge that a car is just going to come out of

15    nowhere when there's no streets right here to

16    just come out in front of you at.  That's what

17    I'm saying.

18         Q.    All right.  It was a risk you were

19    willing to take?

20         A.    Huh?

21         Q.    It's a risk that you were willing to

22    take?

23         A.    If I was in my head, no, I wouldn't have

24    been willing to take -- right then and there I

25    wasn't thinking, and, yeah, I did it.  I wouldn't

1    do it over again.  No, I'm not proud of the

2    decision I made to do it.

3          Q.   Okay.  And I believe you said that you

4    had been in a rental car earlier that evening?

5          A.   Yes, sir.

6          Q.   And do you have that rental contract?

7          A.   Do I have it?

8          Q.   Yes.

9          A.   No.  No.

10         Q.   Who rented it?

11         A.   Ebony had.

12         Q.   And so it wasn't rented in your name?

13         A.   No, sir.

14         Q.   Did you pay for the rental?

15         A.   No, sir.  She did.

16         Q.   Okay.  So you were just driving the

17   rental car yourself?

18         A.   She had took my car.  I didn't have a

19   choice about what to drive.  I was staying at her

20   house.

21         Q.   Okay.  But today at least you don't have

22   the rental car contract?

23         A.   That's a year ago.  Why would I have a

24   rental car contract for a car that I didn't rent?

25         Q.   Well, I just thought that -- I just

1    thought you might have one to show that there was

2    a car rented.  Maybe I'm wrong.

3         A.   I didn't rent the car.

4         Q.   Okay.

5         A.   So I would never have one even if there

6    was one.

7         Q.   All right.

8         A.   Okay.

9         Q.   So when you came over the bridge at this

10   90 miles an hour, you saw the police officer?

11        A.   Yes, sir.

12        Q.   Even though he was across the fence and

13   across the field as you say?

14        A.   Yes.

15        Q.   You knew then that there was a high

16   likelihood that they were going to notice you?

17        A.   Yes, sir.

18        Q.   And so you decided to make a decision to

19   try to escape?

20        A.   Yes, sir.

21        Q.   And go on.

22        A.   Yes.

23        Q.   Okay.  Now, you had a choice, either you

24   could have pulled over or continued on; is that

25   right?

1          A.   Pull over on the bridge?  There was no

2     lights.  There was no pull -- I could have pulled

3     over, got and out of the car and walked and

4     never -- you know, but I don't -- pulled over

5     there was nobody stopping me.  The police was on

6     the other side of the fence.  I'm sure they had

7     saw me, but they hadn't activated their lights

8     or -- you know, they hadn't -- there was no

9     reason to just pull over.

10         Q.   Well, or maybe I've said it wrong.  You

11    could have slowed down?

12         A.   Yeah, I did slow down.

13         Q.   Okay.  So but you didn't do that, did

14    you?

15         A.   I tried to slow down, yes.

16         Q.   You tried?

17         A.   Yes, I did try to slow down.

18         Q.   All right.  Then where did you make your

19    first turn when you got off the highway?

20         A.   Sprigg Street.

21         Q.   Sprigg?

22         A.   Yes, sir.

23         Q.   And went down Sprigg Street how far?

24         A.   I don't know.

25         Q.   A block or two?

1      A.   Yes.

2      Q.   And then turned and went back again

3  east?

4      A.   No.

5      Q.   Or west I mean headed toward --

6      A.   Yes.

7      Q.   -- the I-55?

8           And is it fair to say you were running

9  as hard as you could --

10     A.   No, definitely not.

11     Q.   -- through those streets?

12          You could have run it faster?

13     A.   Running or with the car?

14     Q.   No, the car, with the car.

15     A.   The car?  Could I have been going

16  faster?

17     Q.   Yes.

18     A.   I have got 160 on my dashboard.  Yes, I

19  could have gone faster.

20     Q.   In the city streets --

21     A.   In the city streets --

22     Q.   -- I mean, making those turns?

23     A.   Making those turns?  I'm saying I could

24  have definitely been going faster than what I was

25  going, yes.

1       Q.   Now, this ended with you sliding into

2   another car, didn't it?

3       A.   It slid.  If you showed the picture,

4   it -- I bumped it, and then it wasn't no crash to

5   where our cars were messed up, or nothing like

6   that.  I was -- I had slowed down tremendously by

7   that time.

8       Q.   But basically it ended when you slid off

9   into this other car?

10       A.   Yes, sir.

11       Q.   That's what caused you to stop is the --

12   is this minor accident?

13       A.   Yes, sir.

14       Q.   Okay.  And at that point you could have

15   said, all right, game is up, and I could just

16   stay with the car?

17       A.   Yes, I could.

18       Q.   The officer pulled in right behind you?

19       A.   I'm pretty sure right there around

20   there.  I'm not quite sure, but, yeah, he was

21   behind me.

22       Q.   And that was an officer that you knew?

23       A.   I didn't know what officer was behind me

24   at the time.

25       Q.   So when you stopped there and you had

1    just struck this other car, and you're sitting

2    there, you decide to get out of the car, and you

3    open the driver's door; is that right?

4         A.   Yes, sir.

5         Q.   And you did what?

6         A.   I got out of the car.

7         Q.   And then what?

8         A.   I ran.

9         Q.   Did the officer call your name?

10        A.   I don't recall that.

11        Q.   Just running too fast?

12        A.   No.  It's been a year.  I don't recall

13   all of it because it's been over a year.  I don't

14   remember him calling me.

15        Q.   And, again, it's kind of another bad

16   decision, isn't it, to run away?

17        A.   Definitely.  Definitely it was a bad

18   decision.

19        Q.   So the -- when you left, we can all

20   agree that there was a bottle of Remy in your

21   car?

22        A.   A bottle of Remy?

23        Q.   Yeah.

24        A.   Yes, sir.

25        Q.   That was yours?

1    A.   Yes, sir.

2    Q.   Now, you'd had a DWI in the past?

3    A.   Yes.

4    Q.   A felony DWI?

5    A.   Yes, sir.

6    Q.   And so you knew that could be a problem

7  having alcohol in your car and maybe being

8  impaired to drive; right?

9    A.   Mainly the reason I ran, yes.  Yes, sir.

10  I mean, if I knew --

11    Q.   Well, you said that --

12    A.   -- when I got out, yes, it definitely

13  would have been a DWI probably.

14    Q.   So that bottle of liquor could have been

15  a problem in a stop; is that fair?

16    A.   Not the liquor, no.  The bottle -- it's

17  not against the law to have a bottle of liquor in

18  your car.

19    Q.   You don't think that would have given

20  the officers an idea of what you might have had

21  to drink that night?

22    A.   The smell on me probably would have.

23  Not the liquor, no.  I -- probably every time I

24  get pulled over somehow if there's a bottle in

25  there, they don't go, oh, you're drunk, no.

1      Q.   But you mentioned that you had time to

2   throw the gun out if you had known it was there.

3   Do you remember that?

4      A.   Definitely.

5      Q.   But you didn't throw the liquor out,

6   did you?

7      A.   Why would I?

8      Q.   Why?  To get rid of it because you'd

9   been convicted of a DWI before.

10      A.   Yeah, but the liquor is not illegal to

11   have liquor in your car.

12      Q.   And the marijuana in the car, was that

13   yours?

14      A.   Yes, sir.

15      Q.   You could have thrown it out too?

16      A.   It's a misdemeanor.

17      Q.   That's right.  It didn't really amount

18   to much.

19      A.   It didn't amount to much.

20      Q.   So but basically what I'm getting at is

21   this, is that you really didn't have time to

22   throw anything out.  You were trying to evade the

23   police.

24      A.   I had plenty of time to throw anything I

25   wanted to throw out of the car.

1    Q.   But you're trying to get away first?

2    A.   I'm driving.

3    Q.   But you're trying to get away?

4    A.   I'm driving.  I could definitely have

5  time to throw out anything I wanted to out of my

6  car.  The police wasn't even behind me whenever I

7  started turning on them streets.  The police were

8  nowhere around.

9    Q.   Were you trying to escape?

10    A.   I was trying to get away, yes.  I was

11  trying to maybe get away.

12    Q.   Okay.  And so if you could have gotten

13  away, you wouldn't have had to throw away

14  anything?

15    A.   If I'd have gotten away, would I have?

16  Yeah.  Still with a gun, yeah, because with a gun

17  if I know there's a gun in there, I'm definitely

18  going to get rid of a gun no matter what because

19  I'm still taking chances.  It's in -- it's my

20  car.  So I already knew that regardless of

21  whether I got away or not I still would be

22  arrested.

23    Q.   And so you're saying you didn't know

24  that gun was in the pocket of that -- of the

25  driver's door of that car?

434

1      A.   No, sir.

2      Q.   Even though it was right -- it must have

3  been rattling around in there with you driving

4  around all of those corners and going that fast?

5      A.   No, sir.  It definitely wasn't rattling.

6  I don't know -- I never seen how they had it or

7  where it was positioned at in the car, but, no,

8  it wasn't.  I didn't hear any rattling.

9      Q.   It was on -- found on the driver's

10  pocket door.  You recall that testimony, don't

11  you?

12      A.   Yeah.  They said it was in the pocket,

13  but in the pocket is -- there's a couple of

14  different pockets.

15      Q.   Sure.  On the left side of the driver.

16      A.   Yeah.

17      Q.   And you're left handed?

18      A.   Yes.  There's a lot of pockets on the

19  side of the car.

20      Q.   Are you left handed?

21      A.   Yes, sir.

22      Q.   And so then turning to the night of this

23  event up in Florissant.

24      A.   When?

25      Q.   That's another night of several bad

1    decisions; is that fair?  Is that fair?

2         A.  Is what fair?

3         Q.  Is it -- was that another night of bad

4    decisions?

5         A.  Yes, I made some bad decisions that

6    night.  I probably have made bad decisions not

7    probably this costly, but, yeah, I make bad

8    decisions.  I think we all make bad decisions

9    from time to time.

10        Q.  So the officer stopped and came up to

11   the door.  Can you walk us through the sequence

12   of events that happened at that time?

13        A.  He came up to the door and asked me my

14   name.

15        Q.  Well, first off, he didn't ask for your

16   name first.  What did he do first?

17        A.  What he did do first?  He pulled us over

18   first.

19        Q.  And then what happened?

20        A.  He went to Tiara's side and asked her

21   for her information.

22        Q.  All right.

23        A.  And he told her why he was stopping her.

24        Q.  Okay.  Then what happened after that?

25   What's the next thing the officer did?

1          A.   He told her he was stopping her for

2     whatever.  I don't recall.  I don't really recall

3     what he said right then and there or what

4     happened right then.  I don't know.  He was

5     talking to her.  I wasn't saying anything.

6          Q.   Do you know if he gave her tickets at

7     that time?

8          A.   I don't recall when he gave her the

9     tickets.

10         Q.   All right.  And so at what point did the

11    officer ask for your name the first time?

12         A.   I believe he said -- whatever she was

13    pulled over for, I think it was a stop sign,

14    running a stop sign, she kind of let him know

15    like, no, I didn't run a stop sign, so they was

16    going through that.  They was having their own

17    conversation.  And I -- after that -- after that

18    conversation, I guess, or whatever happened was

19    when he asked me for my information.

20         Q.   Was the officer still on Tiara Thorpe's

21    side of the car?

22         A.   To be honest, I'm not going to lie to

23    you, I can't answer that.  I don't recall which

24    side he was on when he first asked me for my

25    information.

1     Q.   Is that because you might have been

2     intoxicated that night and just can't remember?

3     A.   No, I wasn't intoxicated.  I just --

4     it's been a year.  I've been going through a lot

5     in this last year being locked up.  I've been

6     going through a lot.

7     Q.   All right.  So but you don't know

8     exactly when the officer asked you for your name?

9     A.   No, sir.

10    Q.   Okay.  So the -- but eventually you gave

11    him a name that wasn't the right name?

12    A.   Yes, sir.

13    Q.   And do you know what name you gave?

14    A.   No, sir.

15    Q.   Did you give him a Social Security

16    Number also?

17    A.   Yes, sir.

18    Q.   And then you knew that wasn't going to

19    work very well, didn't you?

20    A.   I definitely knew that.

21    Q.   Because you knew there was an arrest

22    warrant pending for you, and that's why you gave

23    a fake name, isn't it?

24    A.   Yes, sir.

25    Q.   Okay.  So it's fair to say you were

1    willing to lie to avoid detection?

2         A.   Sir?

3         Q.   You were willing to lie that night to

4    evade detection?

5         A.   Yes, sir.  Yes, sir.

6         Q.   Just as the same you've been willing to

7    lie to the other women you've been involved with

8    about the other women?

9         A.   I wouldn't say -- I would say you put it

10   that way.  I would say it was more of a -- I

11   don't -- I wouldn't say lying to the women, you

12   know, I was more likely just not answering a lot

13   of questions.  It wasn't being truthful.  It

14   wasn't telling the truth, but it wasn't all lies

15   like I don't know.  It wasn't questions of this,

16   that and the other.  I wasn't lying.  I just

17   wasn't truthful.

18        Q.   So if one of the ladies asked you if you

19   were seeing someone else, did you just not

20   answer, or did you lie?

21        A.   I most likely did not answer like come

22   on now, we don't do that.  We're not going

23   getting into that.  You know, I put it off on not

24   arguing.

25        Q.   All right.  Now, after the arrest or

1    after your arrest, I believe Officer Kemp allowed

2    you to say goodbye to Ms. Thorpe that night; is

3    that right?

4         A.   Yes, sir.

5         Q.   And can you describe what happened?

6         A.   I told her goodbye.  I don't even

7    recall.  It was nothing.

8         Q.   You don't recall saying goodbye to Ms.

9    Thorpe?

10        A.   Yeah, I recall him letting me tell her

11   goodbye, but I don't recall the exact words that

12   was said or anything special happening at that

13   time.

14        Q.   And going through the sequences just to

15   make sure I understand it, you don't remember

16   exactly what thing happened at what time:  That

17   is, when the gun was found or when the -- or when

18   you were asked for an ID or when the officers did

19   one thing or another?

20        A.   Yeah.  On the times I'm definitely

21   not -- I wouldn't -- I couldn't tell you times on

22   that.

23        Q.   You can't tell me which thing happened

24   first or next or last, or anything like that?  I

25   mean, it's fine.  I just want to know if you have

1  a memory of it?

2      A.   I have a memory of some things, but some

3  things aren't as clear as others.

4      Q.   Now, did you know that Ms. Thorpe had

5  that pistol in her car that night?

6      A.   No, sir.

7      Q.   Do you know that Ms. Thorpe had a

8  pistol?

9      A.   Yes, sir.

10     Q.   She'd actually had it in Cape Girardeau

11 at your home in Cape Girardeau at times; is that

12 fair?

13     A.   She hasn't been in Cape Girardeau to my

14 home that many times but, yes, she probably --

15 yeah, she probably didn't -- she ain't just been

16 like, listen, I have a gun on me, no, she's never

17 said that, but she probably -- you know, she lets

18 me know what she's been through in her life.

19     Q.   So the -- so you're denying the words to

20 Officer Kemp, if I understand it correctly, at

21 the beginning of Mr. Kemp's statement that we

22 both know what you found in the car?  That's the

23 part you're denying?

24     A.   That's not the beginning of it.  The

25 first thing I said was that I don't want to talk.

1    I don't know why that's not being said.  Oh,

2    well, you're not saying that for some reason.

3    But the beginning of the statement was, I don't

4    want to talk.

5        Q.   Well, mainly because you have a right

6    not to say -- for that not to come in.

7        A.   That's why --

8        Q.   We don't mention that, but you have.

9             But then -- but then after that is the

10   statement made that Mr. Kemp reports of, We both

11   know what you found in the car?  That's the

12   statement you dispute, isn't it?

13       A.   Mr. Kemp didn't report it.  Mr. Eggers

14   reported it.  Mr. Kemp never reported it.

15       Q.   Well, Mr. Kemp testified.  And so Mr.

16   Kemp testified about what you said on the witness

17   stand.  Are you denying what -- that portion of

18   Mr. Kemp's statement?

19       A.   Which portion?

20       Q.   The portion where he said the words --

21   he repeated your words, We both know what you

22   found in the car, did you make that statement?

23       A.   Is that how -- no, that isn't how it

24   went.  No.

25       Q.   I'm sorry?

442

1      A.   That's not exactly how that went, no.

2      Q.   Did you say those words?

3      A.   That we both know what you found in her

4  car was hers, yes.

5      Q.   Okay.  That's what you --

6      A.   I let him know that.  It was

7  specifically the conversation went like this.

8  After I book you, after I get you dressed, I'm

9  going to take you upstairs, and I specifically

10  told him, No, I don't want to talk.  We both know

11  whatever you found in the car is hers, and I

12  would rather be in the situation I'm in now than

13  when I was shot.

14      Q.   Okay.

15      A.   There was a period in there.  The extra

16  stuff that he had, no.

17      Q.   Okay.  And it turned out that you had

18  actually been shot?

19      A.   Yes.

20      Q.   How many times had you been shot?

21      A.   Three times.  Three times at once.  Not

22  separate occasions. I don't know if that makes

23  sense.

24      Q.   Yeah, it does.  And I believe that you

25  testified you had a felony DWI?

1          A.   Yes, sir.

2          Q.   Did you run at that stop?

3          A.   Did I run at that stop?

4          Q.   Yeah.  Did you try to evade the police

5     officers?

6          A.   On the prior DWI?  No. Because I was --

7     I wasn't.  I hadn't been drinking that much.

8     Actually, the police officer tricked me into

9     blowing.  Well, if you don't blow that much,

10    don't worry, you're not going to jail.  And I was

11    telling her I'm not blowing.  I don't need to

12    blow.  I haven't been drinking that much.  Which

13    I did end up blowing a .08, which is the legal

14    limit.

15         Q.   Okay.  That was down at the police

16    station where you blew in the DataMaster or one

17    of the machines?

18         A.   That's been so many years ago I can't

19    recall where I blew, sir.

20         Q.   You don't really remember?

21         A.   That was 2011.

22         Q.   But the main impact of that was at least

23    you didn't run, didn't try to flee from the

24    officer in your car on that occasion?

25         A.   No, I didn't flee from that occasion

1    because it hadn't been a felony yet.  I didn't

2    think it was going to be a felony, no.

3         Q.   But it turned out to be?

4         A.   Yes.

5         Q.   And do you have any dispute about the

6    accuracy of the radio call logs made by the

7    Florissant Police Department?

8         A.   I can't dispute it, because I don't know

9    times.  I don't know -- I didn't know times at

10   all.  I know -- I know Kemp wasn't honest about a

11   lot of things, so I dispute anything he says that

12   he had anything to do with it.

13        Q.   All right.  What was Mr. Kemp not honest

14   about?

15        A.   He wasn't honest about my statement.  He

16   wasn't honest about telling the other officers

17   that Tiara told him it was her gun.  He said it

18   up here, but he didn't say it -- I probably might

19   not have even been indicted had he been honest

20   and told them that Tiara said that this was her

21   gun.  I might not have to be facing this jury now

22   if he would have been honest about that part

23   about that part about that.  He wasn't honest

24   about that.  He wasn't honest about it.

25             He wasn't honest about the time.  He

1    said it was the 8th, on the 8th.  It was the 1st.

2    There was a lot of things that he said that he

3    didn't really recall what he said verbatim of my

4    statement when he attempted to interview me, then

5    turned around and said that -- tried to put words

6    together that I said after saying that he didn't

7    know.

8              I believe in my suppression hearing him

9    and Mr. Eggers' both stories didn't match up.

10   Eggers said that, yes, Kemp told him that he was

11   trying to interview me.  Kemp testified that he

12   didn't.  So one of those stories had to be off.

13   I'm guessing that Eggers was telling the truth.

14   So, yes, Kemp's stories and lies just continue.

15             So anything that he has to do with, yes,

16   would be a question to me, because I'm fighting

17   for my life, so, yes, I'm going to question

18   anything.  If I see you've lied on certain

19   things, yes, I'm -- it's definitely a question.

20        Q.   Okay.  But you don't have any dispute

21   about what Officer Kemp testified about the

22   sequence of events --

23        A.   The sequence of events?

24        Q.   -- that took place at the stop?

25        A.   Do I have -- I didn't -- the sequence of

1    it I feel like it really didn't mean much.  It

2    really didn't matter, so I didn't pay too much

3    attention to what sequence in what things

4    happened.

5           I know he didn't find a gun on me, so I

6    knew that was a lie.  He lied about where he

7    found the gun.  All this was like it was just

8    lies.  Lies after lies after lies.  I don't

9    understand why he lied about it.  I never

10   understood.

11          And whenever I was taken to jail, I

12   wasn't -- I was never brought in front of a

13   judge, so I never took much care to it, because I

14   didn't feel like they was charging me with it.  I

15   was locked up 17 days and never was arraigned on

16   any charge.  I wasn't brought down here for a

17   long while.

18          So Kemp I figured like, you know, it

19   wasn't until way afterwards that he said where he

20   had found the gun and all those lies were told

21   where he found the gun.  There has been a lot of

22   lies that were told by Officer Kemp.

23                 MR. SORRELL:  All right.  I'd end,

24   if I could, Judge.  Thank you.

25                 THE COURT:  Redirect?

447

1           MS.  BOOTH:   No, Your Honor.

2           THE COURT:   You may step down.

3           (Witness Excused.)

4           THE COURT:   Any other witnesses?

5           MS.  BOOTH:   No, sir.

6           THE COURT:   Does the defense rest

7    then?

8           MS.  BOOTH:   Yes, sir.

9           THE COURT:   Do you have any

10   rebuttal?

11          MR.  SORRELL:   Yes, I do.   One.

12   Officer Fodde.   He was the second officer at the

13   scene of the Florissant traffic stop.

14          THE COURT:   Ladies and gentlemen,

15   there's just one more witness.   Why don't we try

16   to do that, and then we'll have an extended

17   recess for lunch.

18          Is that all right with everybody?

19   Do you want to break first, or are you ready to

20   go?

21          Okay.   Call your next witness.

22          MR.  SORRELL:   It's short.

23          THE COURT:   That's fine.

24          This is the last witness.   What

25   we'll probably do then is have about an hour and

1    a half lunch break to allow us to prepare the

2    final instructions to the jury, and we'll have

3    oral arguments after lunch.

4                        KEVIN FODDE,

5    being produced and sworn, testified as follows:

6                  THE COURT:  You may proceed.

7                    DIRECT EXAMINATION

8    BY MR. SORRELL:

9         Q.   Would you state your name, please.

10        A.   Yes.  It's Kevin Fodde.

11        Q.   What agency do you work for?

12        A.   The Florissant Police Department.

13        Q.   How long have you worked for them?

14        A.   Oh, about five and a half years.

15        Q.   And were you present at a traffic stop

16   in Florissant, Missouri on August 1st, 2018, when

17   Mr. Swan was arrested?

18        A.   Yes.

19        Q.   And do you remember that night?

20        A.   Yes.

21        Q.   How were you told of the stop?  How did

22   you learn of it?

23        A.   Officer Kemp called out with a traffic

24   stop, so once I heard that over the radio, I

25   continued to his location.

1      Q.   Okay.  So that was just over the radio

2   dispatch, or, that is, he called it out, and you

3   heard the communication?

4      A.   Yes.

5      Q.   Okay.  And what did you do upon getting

6   that communication?

7      A.   I responded to the scene.

8      Q.   And so you arrived at the scene.  What

9   did you see when you first arrived at the scene?

10      A.   Officer Kemp was still located inside

11   his vehicle.

12      Q.   Okay.  What did you do?

13      A.   I got out of my car and approached.

14      Q.   And did you take a position between the

15   cars?

16      A.   Yes.

17      Q.   And did you make any contact with the

18   occupants of the stopped car at that time?

19      A.   No.

20      Q.   Where were the occupants of the stopped

21   car?

22      A.   They were still located inside the

23   vehicle.

24      Q.   At this time had a gun been found?

25      A.   No.

1          Q.    And did Officer Kemp eventually get out

2     of his car and walk up to the Edge?

3          A.    Yes.

4          Q.    Which side did he walk up to?

5          A.    The passenger side.

6          Q.    And what happened when he walked up to

7     the passenger side?

8          A.    He got Mr. Swan out and advised him that

9     he had an arrest warrant.

10          Q.    And did -- who took custody of Mr. Swan

11     after he was taken out of the car?

12          A.    I did.

13          Q.    And what did you do with Mr. Swan?

14          A.    We responded back to the rear of the

15     vehicle.

16          Q.    Did Officer Kemp ask the person driving

17     car to do anything?

18          A.    Yes, to step out as well.

19          Q.    At the same time?

20          A.    Shortly after he asked Mr. Swan to.

21          Q.    Okay.

22          A.    Yeah.

23          Q.    Were both you and Mr. Swan and

24     Ms. Thorpe then at the back of the Ford Edge?

25          A.    Yes.

1    Q.   And what's the next thing you saw

2    Officer Kemp do?

3    A.   He was walking back towards his patrol

4    car with the firearm.

5    Q.   The handgun?

6    A.   Yes.

7    Q.   And he hadn't carried that up to the

8    car, I suppose?

9    A.   No.

10    Q.   And you weren't in a position to see

11    where that gun came from, were you?

12    A.   No.

13    Q.   How much time elapsed do you think

14    between the time that you walked to the back of

15    the car with Mr. Swan and then Mr. Kemp came back

16    carrying the handgun?

17    A.   It was a couple of seconds.

18    Q.   Just a little bit of time?

19    A.   Yeah.

20    Q.   Did you have any conversation that night

21    with the driver of the car, a Ms. Tiara Thorpe?

22    A.   No.

23    Q.   Did you ever ask her if she had any

24    firearms in the car?

25    A.   No.

1          Q.   Did you ever search that car for

2     firearms?

3          A.   No.

4          Q.   Did you ever search the console of that

5     car?

6          A.   No.

7          Q.   At any point?

8          A.   No.

9               MR. SORRELL:   Nothing further.

10                   CROSS-EXAMINATION

11     BY MS. BOOTH:

12          Q.   Officer Fodde, in preparation for your

13     testimony here today did you speak with anyone?

14          A.   No -- or, yeah, I spoke with the

15     prosecutor.

16          Q.   When did the prosecutor call you to

17     speak to you?

18          A.   I believe it was Friday.

19          Q.   And prior to this past Friday, no

20     prosecution official had called to speak to you?

21          A.   No.

22          Q.   And, Officer Fodde, this was a situation

23     where a man was arrested who had an ATF federal

24     warrant for his arrest and a firearm was found;

25     correct?

1          A.    Correct.

2          Q.    All firearm matters are serious matters,

3    but with an ATF warrant involved that's pretty

4    serious, wouldn't you say?

5          A.    Yeah.

6          Q.    And you witnessed this event?

7          A.    Correct.

8          Q.    And your police report, did you bring

9    that with you here today?

10         A.    No, I did not.

11         Q.    Did you create a police report in this

12   matter?

13         A.    No.

14         Q.    Have you had a chance to review Officer

15   Kemp's report in preparation for your testimony

16   here today?

17         A.    I reviewed it earlier, not since like

18   during the trial.

19         Q.    And you're not even mentioned in this

20   police report, are you?

21         A.    No.

22              MS. BOOTH:  Your Honor, I have

23   nothing further for Officer Fodde.

24              MR. SORRELL:  No, sir.

25              THE COURT:  All right.  You may step

1    down.

2              THE WITNESS:  Thank you.

3              (Witness Excused.)

4              MR. SORRELL:  Nothing further.

5              THE COURT:  For the Defendant?

6              MS. BOOTH:  No, sir.

7              THE COURT:  All right.  Ladies and

8    gentlemen, all the evidence has been presented.

9    And so, as I mentioned, we'll need an extended

10   recess to prepare the final instructions, and

11   it's lunchtime.  So why don't we do this:  Why

12   don't we reconvene -- it's 10 after 12:00 --

13   reconvene at 1:30.  That will give you extra time

14   for lunch.

15             And, again, you'll be on your own

16   for lunch.  You can visit one of the downtown

17   restaurants -- they're only three minutes away or

18   so -- and then be back here, if you would, at

19   1:30, and we'll start with the final

20   instructions.

21             Please remember the admonition I've

22   given you not to discuss the case among

23   yourselves or with others or permit anyone to

24   discuss it in your presence.  Do not form or

25   express any opinion about the case until it's

1    finally given to you to decide.

2              So you're excused, and report back

3    to the jury assembly room at 1:30.  Thank you for

4    your patience.

5              (Proceedings resumed in open court

6    outside the presence of the jury.)

7              THE COURT:  Actually, I meant to

8    have the CSOs keep everybody in the courtroom

9    until they're gone, but we need to do that,

10   though.  It's too late.  My fault.

11             Okay.  This is off the record then.

12             (A discussion was held off the

13   record.)

14             THE COURT:  We'll be in recess until

15   let's say 10 minutes to 1:00.

16             MR. SORRELL:  Yes, sir.

17             THE COURT:  Actually, 1 o'clock is

18   probably enough, don't you think?

19             MR. SORRELL:  If I may, yes, but

20   we'll be back when you say.

21             THE COURT:  Let's do it at 1

22   o'clock.  That's plenty of time.

23             MR. SORRELL:  Thank you.

24             (Lunch recess was taken.)

25             (Proceedings resumed in open court

1   outside the presence of the jury.)

2              (Instruction conference.)

3              THE COURT:  We'll go on the record

4   now.  Counsel, this is our instruction

5   conference.  And what I propose to do since

6   everybody has indicated to the Court that you're

7   in agreement with all of the proposed

8   instructions and that you have worked out any

9   differences that you have, I propose that I will

10   number each of them one by one, and then I will

11   just ask at the conclusion whether there are any

12   objections at all by either party --

13              MR. SORRELL:  Yes, Your Honor.

14              THE COURT:  -- instead of going

15   through each one one by one.

16              MR. SORRELL:  There are two

17   alternates in the instructions.

18              THE COURT:  Yes.  I'm aware of that.

19              MR. SORRELL:  Yes.  Okay.  Thank

20   you.

21              THE COURT:  So Instruction Number 1

22   will be Eighth Circuit 3.01.  Instruction Number

23   2 will be Eighth Circuit 3.02.  Instruction

24   Number 3 is 3.03.  Instruction Number 4 is 3.04,

25   the alternate instruction, which references that

1    you should judge the testimony of the Defendant

2    in the same manner as you should judge the

3    testimony of any other witnesses.  Instruction

4    Number 5 is 3.06.

5            MR. SORRELL:  I think you'll use the

6    first one there.

7            THE COURT:  Yes.  Yes.

8            MR. SORRELL:  Okay.

9            THE COURT:  So I will discard the --

10           MR. SORRELL:  Alternate.

11           THE COURT:   -- 3.06 instruction

12   that references the fact that the Defendant did

13   not testify.

14           MR. SORRELL:  Right.

15           THE COURT:  Instruction Number 6 is

16   Eighth Circuit 2.07.  Now, on this -- what is --

17   is this something that's required and necessary

18   in the case?

19           MR. SORRELL:  It's not required,

20   Judge, but Ms. Booth requested it, and I included

21   at her request.

22           THE COURT:  Okay.

23           MR. SORRELL:  And I don't have an

24   objection to it.

25           THE COURT:  Okay.

1           MR. TILSEN:  The stipulation?

2           MS. BOOTH:  No, 2.07.

3           THE COURT:  So otherwise it's an

4    optional instruction, but since both of you

5    requested it --

6           MR. SORRELL:  Yes, Your Honor.

7           THE COURT:  -- I'll agree.

8    Instruction Number 7 is Eighth Circuit 2.08.

9           MR. SORRELL:  And, Your Honor,

10   that's the one that says, You have heard?

11          THE COURT:  Yes.

12          MR. SORRELL:  As opposed to -- yeah.

13          THE COURT:  Instruction 8 then will

14   be the Statute 922(g)(1).  9 is the verdict

15   director for Count 1.  10 is the verdict director

16   for Count 2.  11 is the Eighth Circuit 7.05, the

17   intent or knowledge instruction.  12 is the

18   constructive possession instruction, Eighth

19   Circuit 8.02.  13 is the reasonable doubt

20   instruction.  And 14 is the rules for the jury

21   instruction 3.12.

22          And then attached to those

23   instructions are the forms of verdict.  So

24   Count 1 will reference Instruction Number 9, and

25   Count 2 will reference Instruction Number 10.

1          MR. SORRELL:  Yes, Your Honor.

2          THE COURT:  Any objections by the

3   Government?

4          MR. SORRELL:  No, Your Honor.

5          THE COURT:  Do you wish to tender

6   any other instructions?

7          MR. SORRELL:  No, Your Honor.

8          THE COURT:  Any objections by

9   Defendant?

10          MS. BOOTH:  No, sir.

11          THE COURT:  Do you wish to tender

12   any other instructions?

13          MS. BOOTH:  No, Your Honor.

14          THE COURT:  How much time would you

15   like for oral argument?

16          MR. SORRELL:  20 minutes.

17          THE COURT:  How do you want to have

18   your time split?

19          MR. SORRELL:  13 and 7 with a

20   two-minute warning.

21          THE COURT:  What?

22          MR. SORRELL:  13 and 7.

23          THE COURT:  Oh, 13 and -- I thought

24   you -- yeah, 13 and 7.

25          MR. SORRELL:  With a two-minute

1   warning.

2                   MS.  BOOTH:   20 minutes, sir.

3                   THE COURT:   And how much --

4   two-minute warning for both of you; is that

5   right?

6                   MS.  BOOTH:   How about a five-minute

7   warning, if I may.

8                   THE COURT:   Five-minute warning and

9   then two minutes both ways for you?

10                   MR.  SORRELL:  Yes.

11                   THE COURT:   All right.  Anything

12   else you want to take up before the closing

13   arguments?  And then we'll take another 10-minute

14   break.

15                   MR.  SORRELL:  No, Your Honor.

16                   MS.  BOOTH:   No, sir.

17                   THE COURT:   Okay.

18                   MR.  TILSEN:  No, Your Honor.

19                   THE COURT:   All right.  We'll be in

20   recess for another 10 minutes or so until 1:30,

21   and we'll call everybody in at that time.

22                   We'll go off the record.

23                   (A discussion was held off the

24   record.)

25                   (Proceedings stood in temporary

1    recess.)

2              (Proceedings resumed in open court

3    outside the presence of the jury.)

4              THE COURT:  Any preliminary matters

5    before we bring the jury in?

6              MR. SORRELL:  Nope.

7              MS. BOOTH:  No, sir.

8              THE COURT:  Okay.  You can bring

9    them in then.

10             (Proceedings resumed in open court.)

11             THE COURT:  Please be seated.  This

12   is Instruction Number 1:  Members of the jury,

13   the instructions I gave you at the beginning of

14   the trial and during the trial remain in effect.

15   I now give you some additional instructions.  You

16   must, of course, continue to follow the

17   instructions I gave you earlier as well as those

18   I give you now.

19             You must not single out some

20   instructions and ignore others, because all are

21   important.  This is true even though some of

22   those I gave you at the beginning of and during

23   trial are not repeated here.  The instructions

24   I'm going to give you now are in writing and will

25   be available to you in the jury room.

1        I emphasize, however, that this does

2    not mean that they are more important than my

3    earlier instructions.  Again, all instructions,

4    whether given and whether in writing or not, must

5    be followed.

6        Instruction 2:  It is your duty to

7    find from the evidence what the facts are.  You

8    will then apply the law as I give it to you to

9    those facts.  You must follow my instructions on

10   the law even if you thought the law was different

11   or should be different.

12       Do not allow sympathy or prejudice

13   to influence you.  The law demands of you a just

14   verdict unaffected by anything except the

15   evidence, your common sense and the law as I give

16   it to you.

17       Instruction Number 3:  I have

18   mentioned the word evidence.  The evidence in

19   this case consists of the testimony of witnesses,

20   the documents and the other things received as

21   exhibits.  You may use reason and common sense to

22   draw deductions or conclusions from facts which

23   have been established by the evidence in the

24   case.

25       Certain things are not evidence.  I

1     shall list those things again for you now.  One,

2     statements, arguments, questions and comments by

3     lawyers representing the parties in the case are

4     not evidence.

5          Two, objections are not evidence.

6     Lawyers have a right to object when they believe

7     something is improper.  You should not be

8     influenced by the objection.  If I sustained an

9     objection to a question, you must ignore the

10    question and must not try to guess what the

11    answer might have been.

12         Three, testimony that I struck from

13    the record or told you to disregard is not

14    evidence and must not be considered.

15         Four, anything you saw or heard

16    about this case outside the courtroom is not

17    evidence.

18         Finally, if you were instructed that

19    some evidence was received for a limited purpose

20    only, you must follow that instruction.

21         Instruction Number 4:  In deciding

22    what the facts are you may have to decide what

23    testimony you believe and what testimony you do

24    not believe.  You may believe all of what a

25    witness said or only part of it or none of it.

1                       In deciding what testimony to

2      believe, consider the witness's intelligence, the

3      opportunity the witness had to have seen or heard

4      the things testified about, the witness's memory,

5      any motives that witness may have for testifying

6      a certain way, the manner of the witness while

7      testifying, whether that witness said something

8      different at an earlier time, the general

9      reasonableness of the testimony and the extent to

10     which the testimony is consistent with any

11     evidence that you believe.

12                      In deciding whether or not to

13     believe a witness, keep in mind that people

14     sometimes hear or see things differently and

15     sometimes forget things.  You need to consider,

16     therefore, whether a contradiction is an innocent

17     misrecollection or a lapse of memory or an

18     intentional falsehood, and that may depend on

19     whether it has to do with an important fact or

20     only a small detail.

21                      You should judge the testimony of

22     the Defendant in the same manner as you judge the

23     testimony of any other witnesses.

24                      Instruction Number 5:   The

25     indictment in this case charges the Defendant

1   with two different crimes.  Count 1 charges that

2   the Defendant committed the crime of felon in

3   possession of a firearm.  Count 2 also charges

4   that the Defendant committed the crime of felon

5   in possession of a firearm, but charges

6   possession of a different firearm.  The Defendant

7   has pleaded not guilty to each of those charges.

8            The indictment is simply the

9   document that formally charges the Defendant with

10  the crimes for which he is on trial.  The

11  indictment is not evidence.

12           At the beginning of the trial I

13  instructed you that you must presume the

14  Defendant to be innocent.  Thus, the Defendant

15  began the trial with a clean slate with no

16  evidence against him.

17           The presumption of innocence alone

18  is sufficient to find the Defendant not guilty

19  and can be overcome only if the Government proved

20  beyond a reasonable doubt each element of the

21  crimes charged.

22           Keep in mind that each count charges

23  a separate crime.  You must consider each count

24  separately and return a separate verdict for each

25  count.

1            There is no burden upon a Defendant

2     to prove that he or she is innocent.  Instead,

3     the burden of proof remains on the Government

4     through throughout the trial.

5            Instruction No.  6:  You have heard

6     testimony that the Barrett C. Swan made a

7     statement to Jonathan Kemp.  It is for you to

8     decide, first, whether Barrett C. Swan made the

9     statement; and, second, if so, how much weight

10    you should give to it.

11           In making these two decisions you

12    should consider all of the evidence, including

13    the circumstances under which the statement may

14    have been made.

15           Instruction Number 7:  You've heard

16    evidence that the Defendant was previously

17    convicted of the crime of felon in possession of

18    a firearm.  You may consider this evidence only

19    if you unanimously find it is more likely true

20    than not true.

21           You decide that by considering all

22    of the evidence and deciding what evidence is

23    more believable.  This is a lower standard than

24    proof beyond reasonable doubt.

25           If you find this evidence has been

1    proved, then you may consider it to help you

2    decide the issues of motive, opportunity, intent,

3    preparation, plan, knowledge, absence of mistake

4    or lack of accident.  You should give it the

5    weight and value you believe it is entitled to

6    receive.  If you were to find that this evidence

7    has not been proved, you must disregard it.

8                  Remember, even if you find that the

9    Defendant may have committed a similar act in the

10   past, this is not evidence that he committed such

11   an act in this case.  You may not convict a

12   person simply because you believe he may have

13   committed similar acts in the past.

14                  The Defendant is on trial only for

15   the crimes charged, and you may consider the

16   evidence of prior acts only on the issues stated

17   above.

18                  Instruction Number 8:  The charges

19   in the indictment are based on statutes, which

20   are federal law.  The statute for Counts 1 and 2

21   is Section 922(g)(1) of Title 18, United States

22   Code, which provides in part as follows:  It

23   shall be unlawful for any person who has been

24   convicted in any court of a crime punishable by

25   imprisonment for a term exceeding one year to

1   possess any firearm which has been shipped or

2   transported in interstate or foreign commerce.

3                   Instruction Number 9:  It is a crime

4   for a felon to possess a firearm as charged in

5   Count 1 of the indictment.  This crime has four

6   elements.  One, the Defendant had been convicted

7   of a crime punishable by imprisonment for more

8   than one year.

9                   Two, the Defendant knew that he had

10  been convicted of a crime punishable by

11  imprisonment for more than one year.

12                  Three, after that the Defendant

13  knowingly possessed a firearm; that is, a Smith &

14  Wesson Model SD9VE nine-millimeter handgun

15  bearing Serial Number HEN9114.

16                  And, four, the firearm was

17  transported across a state line at some time

18  during or before the Defendant's possession of

19  it.

20                  You are instructed that the

21  Government and the Defendant have agreed that the

22  Defendant has been convicted of a crime

23  punishable by imprisonment for more than one year

24  under the laws of the State of Missouri, and you

25  must consider the first element as proven.

1          You are instructed that the

2    Government and the Defendant have agreed that the

3    Defendant knew he had been convicted of a crime

4    punishable by imprisonment for more than one year

5    under the laws of the State of Missouri, and you

6    must consider the second element as proven.

7          You are instructed that the

8    Government and the Defendant have agreed that the

9    Smith & Wesson firearm mentioned above is a

10   firearm as defined by federal statutes and that

11   it affected interstate commerce, and you must

12   consider the fourth element as proven.

13         The term firearm means any weapon

14   which will or is designed to be or may be readily

15   converted to expel a projectile by the action of

16   an explosive.

17         If all of these elements have been

18   proved beyond a reasonable doubt as to the

19   Defendant, Barrett C. Swan, then you must find

20   the Defendant guilty of the crime charged under

21   Count 1.  Otherwise, you must find the Defendant

22   not guilty of this crime under Count 1.

23         Instruction Number 10:  It is a

24   crime for a felon to possess a firearm as charged

25   in Count 2 of the indictment.  This crime has

1    four elements.  One, the Defendant had been

2    convicted of a crime punishable by imprisonment

3    for more than one year.

4           Two, the Defendant knew that he had

5    been convicted of a crime punishable by

6    imprisonment for more than one year.

7           Three, after that the Defendant

8    knowingly possessed a firearm; that is, a Smith &

9    Wesson Model M&P9 Shield nine-millimeter handgun

10   bearing Serial Number LDE1400.

11          And, four, the firearm was

12   transported across a state line at some time

13   during or before the Defendant's possession of

14   it.

15          You are instructed that the

16   Government and the Defendant have agreed that the

17   Defendant has been convicted of a crime

18   punishable by imprisonment for more than one year

19   under the laws of the State of Missouri, and you

20   must consider that first element as proven.

21          You are instructed that the

22   Government and the Defendant have agreed that the

23   Defendant knew that he had been convicted of a

24   crime punishable by imprisonment for more than

25   one year under the laws of the State of Missouri,

1  and you must consider the second element as
2  proven.
3            You are instructed that the
4  Government and the Defendant have agreed that the
5  Smith & Wesson firearm mentioned above is a
6  firearm as defined by federal statutes and that
7  it affected interstate commerce, and you must
8  consider the fourth element as proven.
9            The term firearm means any weapon
10  which will or is designed to or may be readily
11  converted to expel a projectile by the action of
12  an explosive.
13            If all of these elements have been
14  proved beyond a reasonable doubt as to Defendant
15  Barrett C. Swan, then you must find the Defendant
16  guilty of the crime charged under Count 2.
17  Otherwise, you must find the Defendant not guilty
18  of this crime under Count 2.
19            Instruction Number 11:  Intent or
20  knowledge may be proved like anything else.  You
21  may consider any statements made and acts done by
22  the Defendant and all the facts and circumstances
23  in evidence which may aid in a determination of
24  Defendant's knowledge or intent.
25            You may but are not required to

1    infer that a person intends the natural and
2    probable consequences of acts knowingly done or
3    knowingly omitted.
4                   Instruction Number 12:   The law
5    recognizes several kinds of possession.   A person
6    may have actual possession or constructive
7    possession.   A person may have sole or joint
8    possession.
9                   A person who knowingly has direct
10   physical control over a thing at a given time is
11   then in actual possession of it.
12                  A person who, although not in actual
13   possession, has both the power and the intention
14   at a given time to exercise dominion or control
15   over a thing either directly or through another
16   person or persons is then in constructive
17   possession of it.
18                  If one person alone has actual or
19   constructive possession of a thing, possession is
20   sole.   If two or more persons share actual or
21   constructive possession of a thing, possession is
22   joint.
23                  Whenever the word possession has
24   been used in these instructions, it includes
25   actual as well as constructive possession and

1    also sole as well as joint possession.

2              Instruction Number 13:  Reasonable

3    doubt reasonable is doubt based upon reason and

4    common sense and not doubt based on speculation.

5    A reasonable doubt may arise from careful and

6    impartial consideration of all the evidence or

7    from a lack of evidence.

8              Proof beyond a reasonable doubt is

9    proof of such a convincing character that a

10   reasonable person, after careful consideration,

11   would not hesitate to rely and act upon that

12   proof in life's most important decisions.

13             Proof beyond a reasonable doubt is

14   proof that leaves you firmly convinced of the

15   Defendant's guilt.  Proof beyond a reasonable

16   doubt does not mean proof beyond all possible

17   doubt.

18             Instruction Number 14:  In

19   conducting your deliberations and returning your

20   verdict there are certain rules you must follow.

21   I will list those rules for you now.

22             First, when you go to the jury room,

23   you must select one of your members as your

24   foreperson.  That person will preside over your

25   discussions and speak for you here in court.

1          Second, it is your duty as jurors to

2     discuss this case with one another in the jury

3     room.  You should try to reach agreement if you

4     can do so without violence to individual

5     judgment, because a verdict, whether guilty or

6     not guilty, must be unanimous.

7          Each of you must make your own

8     conscientious decision, but only after you have

9     considered all the evidence, discussed it fully

10    with your fellow jurors and listened to the views

11    of your fellow jurors.

12         Do not be afraid to change your

13    opinions if the discussion persuades you that you

14    should.  But do not come to a decision simply

15    because other jurors think it is right or simply

16    to reach a verdict.

17         Third, if the Defendant is found

18    guilty, the sentence to be imposed is my

19    responsibility.  You may not consider punishment

20    in any way in deciding whether the Government has

21    proved its case beyond a reasonable doubt.

22         Fourth, if you need to communicate

23    with me during your deliberations, you may send a

24    note to me through the marshal or bailiff signed

25    by one or more jurors.  I will respond as soon as

1    possible either in writing or orally in open
2    court.

3              Remember that you should not tell
4    anyone, including me, how your votes stand
5    numerically.

6              Fifth, your verdict should be based
7    solely on the evidence and on the law which I
8    have given you to you in my instructions.  The
9    verdict, whether guilty or not guilty, must be
10   unanimous.  Nothing I have said or done is
11   intended to suggest what your verdict should be.
12   That is entirely for you to decide.

13             Finally, the verdict form is simply
14   the written notice of the decision that you reach
15   in this case.  You will take this form to the
16   jury room, and when each of you has agreed on the
17   verdicts, your foreperson will fill in the forms,
18   sign and date it and advise the marshal or
19   bailiff you are ready to return to the courtroom.

20             And then attached to these
21   instructions is the verdict form itself.

22             The lawyers have asked that I give
23   them a warning about the time that their
24   allotment for argument is about to expire, and
25   I'll do that.

1          So, Ms. Woodruff.

2          (Government's Closing Argument by

3      Ms. Woodruff.)

4          MS. WOODRUFF:  Thank you.  May it

5      please the Court.

6          Ladies and gentlemen, first I want

7      to thank you for your attention over the past

8      couple of days.  I know that your time is

9      valuable, and on behalf of the Government we

10     thank you for being here and for paying such

11     close attention.

12         In the very beginning of this trial

13     I told you that when the evidence is boiled down

14     to its bare bones it's all about one man, and

15     that man is Barrett Swan.  It's not about the

16     police officers.  It's not about his girlfriends.

17     It's about Barrett Swan.

18         Now, you heard evidence, and the

19     Judge read you an instruction that Mr. Swan has a

20     prior conviction -- a prior felony conviction for

21     felon in possession of a firearm.  Just as the

22     Judge instructed you, you may consider that

23     evidence to show his intent to possess these two

24     guns as well as the lack of mistake or accident

25     in his intent to possess these two guns.

1          Mr. Swan knew he was not allowed to

2    possess firearms.  He testified himself and told

3    you he knew he was not allowed to possess

4    firearms.  And yet twice within the space of just

5    a couple of months last year he was found to be

6    in possession of guns each time.  That is not a

7    coincidence.

8          Let's talk about the evidence that

9    you heard for each of these counts.  Count 1,

10   Mr. Swan is charged with felon in possession of a

11   firearm for events that occurred actually just

12   blocks from here on May 26th of 2018. In that

13   case what should have just been a simple traffic

14   stop for speeding turned into something much

15   more.

16          Mr. Swan did not resist arrest that

17   night and get into a car pursuit and a foot

18   pursuit and end up being arrested at gunpoint

19   with the police because he was afraid of a DWI.

20   He ran because he had a gun.  He says he had

21   plenty of time to get rid of everything.

22          Well, if he was so afraid of a DWI,

23   he didn't throw out that bottle of Remy in the

24   front passenger seat.  He didn't throw out that

25   little marijuana cigarette.  And he didn't throw

1     out the gun.

2                    Now, I will admit he probably didn't

3     have time to do any of that.  Those things

4     happened so fast.  From start to finish on

5     Count 1 it was 3 minutes.  I would say Mr. Swan

6     probably had his hands pretty full.  He was

7     driving that Dodge Charger that he proudly stated

8     gets up to 160 at about 90 or 100 miles an hour

9     coming across the Mississippi River bridge.

10                    Then he gets into residential areas.

11    He's got police chasing him, and he's going

12    70 miles an hour.  He ends up sliding and

13    crashing his car hitting another parked car.  He

14    had his hands full.  He didn't have time to get

15    rid of anything.

16                    The best he could do was just try to

17    distance himself from that gun, and that's

18    exactly what he did.  He tried to get as far away

19    as he possibly could from that Smith & Wesson

20    semi-automatic nine-millimeter handgun.

21                    And that gun, when Officer Yoder

22    found it in the car, it was right there, right in

23    that driver's side open pocket.  You know that

24    kind we all have in our cars where things bump

25    around when you open or you slam the door, and

1    guns are heavy.  They're not -- it wasn't in a

2    holster.  It was just out there.  That's going to

3    bump around a bit.  You're going to hear it.  So

4    for him to claim that he didn't know it was there

5    is just not believable.

6                    And the other thing about where that

7    gun was located, Mr. Swan is left handed.  It was

8    located, and it was positioned in such a way that

9    he could easily reach down with his dominant hand

10   and pull it right up if he were to need it.

11                   That was not Ebony Stigall's gun.  I

12   know that she came in and she testified and she

13   said she bought that gun at a trade show or

14   something down in Poplar Bluff, but you have to

15   consider why she would say something like that.

16                   She claimed today that their

17   relationship is over.  She's still here.  She

18   still cares enough to stick around and see what

19   happens.  She testified that she would help him

20   out if she could, and that's exactly what she

21   tried to do today.

22                   Now, when she found out that

23   Mr. Swan had another girlfriend, she said she was

24   angry.  She said she went to confront him, and

25   that is very understandable.  Any person in a

1  loving relationship is going to want to find out

2  what is going on with that.

3         But what is not loving is leaving

4  him to sit for over a year for a charge that she

5  says he's not guilty of, but she could have

6  contacted any law enforcement and said that gun

7  belonged to me, but she did not do that.  She did

8  not contact the Cape Girardeau Police Department.

9  She did not contact ATF.  She did not contact the

10  U.S. Attorney's Office.  Instead, she saved that

11  story until today to tell you, and I understand

12  that as well.

13         You-all saw how Tiara Thorpe fell

14  apart when we had a chance to question her about

15  her story, when we had a chance to investigate

16  her version of events.  That is why Ebony didn't

17  tell us her story.  She didn't want us to have a

18  chance to look into it, and we didn't.  We didn't

19  have a chance to look into it.  We heard it for

20  the first time when you heard it.

21         This is not a case about girlfriend

22  drama.  This is a case about a convicted felon

23  who possessed two firearms.  Now, Mr. Swan seems

24  to suggest that his failure to get rid of items

25  weighs in his favor.  But that just is not common

1    sense, ladies and gentlemen, and this case is all
2    about common sense.

3              Ms. Booth told you in her opening
4    statements that there's an old saying that
5    ignorance is bliss.  Well, I have another old
6    saying for you, and it's if it looks like a duck
7    and it quacks like a duck, it's a duck.  And here
8    we have a situation that is just so obvious.
9    Mr. Swan is for sure guilty of Count 1.

10             Now, as to Count 2, that one
11   occurred August 1st, 2018, in Florissant,
12   Missouri just a bare two months later, and it's
13   another simple traffic stop except this time
14   Mr. Swan does not run.  Instead he lies.

15             And he testified today that he has
16   lied to protect himself in the past.  He lied to
17   his girlfriends, and, ladies and gentlemen, I
18   would say that he lied to you today.

19             He lied to Officer Kemp on
20   August 1st not because he knew for sure he had a
21   warrant.  He didn't know.  Instead, he lied
22   because he had another gun, except this time it
23   wasn't just beside him on his left side, it was
24   underneath him on his left side.  He was sitting
25   right on top of it.

1              And what kind of gun was that?  It

2     was another Smith & Wesson semi-automatic

3     nine-millimeter handgun.  Now, we don't just have

4     the officer's word for it about that gun and

5     Mr. Swan's possession of it.  We also have

6     Mr. Swan's words.  He told Tiara Thorpe when he

7     was sitting in the back of that patrol car, I'm

8     done.

9              He told Officer Kemp, we both know

10    what you found in that car.  He also told Officer

11    Kemp that he would rather be in this situation

12    right here than the one he had been in in the

13    past when he was shot, and he didn't have

14    anything on him, and I get that.  I understand.

15             And I am sorry that Mr. Swan was

16    shot three times in the back.  That's horrible.

17    I can also completely appreciate why he would

18    want to have a gun on him from that time going

19    forward.  That makes sense.

20             Now, Tiara Thorpe, she came in,

21    another girlfriend, to say that that gun belonged

22    to her, that he didn't even know that it was

23    there.  He was a hot mess.

24             Now, Tiara Thorpe wants you to

25    believe that she's so afraid for her safety

1  living in St. Louis because she's been victimized

2  in crimes many times that she always has a gun

3  with her and that she carries it with her, and

4  she has it for her own personal protection and

5  that it is necessary for herself as a single

6  woman and a mother and somebody who's had

7  horrible things happen.

8           But she also testified that she

9  didn't replace that gun.  This is the only gun

10  she's ever bought.  And she didn't keep it

11  conveniently right next to her dominant hand like

12  Barrett Swan did in his car in May.  Instead,

13  Tiara Thorpe says she buried it down beneath a

14  couple of compartments in her center console.

15  That is just not believable.

16           And then she didn't even replace it.

17  She talked a lot about how so afraid she was for

18  herself, but she didn't go out and immediately

19  buy herself another gun.  Common sense, ladies

20  and gentlemen.

21           I will say Tiara Thorpe, she bought

22  that gun.  I don't doubt it.  We have the ATF

23  trace.  There was some squabble about when she

24  bought it, but she bought it. But buying it

25  doesn't mean that she possessed it.  Purchasing

1    it doesn't mean ownership.

2              The Judge read you an instruction,

3    and it was Instruction Number 12, and it gives

4    you the legal definition for possession.  I would

5    encourage you to take a look at it if you have

6    any question about what that means.  Because

7    possession can be actual or constructive.  It can

8    be joint or sole.  It's all laid out in that

9    instruction for you.

10             And in this case Mr. Swan possessed

11   both of those guns as that term is defined under

12   the law.  He knew they were both there.  Of

13   course, he knew they were both there.  Mr. Swan

14   is a convicted felon.  That's what brought him

15   here today --

16             THE COURT:  Two minutes.

17             MS. WOODRUFF:   Thank you --

18   possessing those two guns.  He knew he couldn't

19   have guns.  He knew if he got caught with a gun

20   again, that it would not be good for him.

21             So each time -- each arrest he was

22   looking for a way out.  On May 26th he tried to

23   find his way out by running from police in his

24   car, running from police on foot, and it didn't

25   work.

1          On August 1st he knew running

2     wouldn't work, so that time he tried to lie his

3     way out.  He gave a false name.  That didn't work

4     either.  Today Tiara Thorpe and Ebony Stigall

5     came in, and they tried to give Mr. Swan a way

6     out by saying those guns belong to them, and he,

7     of course, had no idea about them.

8          But there's no way out this time,

9     ladies and gentlemen.  This is not a case about a

10    man who just so happens to be plagued with

11    multiple gun-toting girlfriends.  That is not

12    common sense.  Because really when you think

13    about it, if that were true, then Barrett Swan is

14    either the unluckiest man alive or he's guilty.

15         Use your common sense, ladies and

16    gentlemen.  Consider the evidence that you heard,

17    the times that everything went down, the location

18    of those guns and Barrett Swan's own words.

19         Use your common sense and return a

20    verdict of guilty on both counts.  Thank you.

21              THE COURT:  Ms. Booth.

22              (Defendant's Closing Argument by Ms.

23    Booth.)

24              MS. BOOTH:  Ladies and gentlemen, I

25    too thank you for paying attention -- close

1    attention these past few days.  So much is on

2    this line for Mr. Swan.  And coming into this he

3    and I both knew it would be an uphill battle.

4              Let's be honest.  He's a convicted

5    felon.  He has a prior for felon in possession of

6    a firearm, and he's accused of possessing

7    firearms on two different occasions last summer.

8    That's an uphill battle.

9              All we have for Mr. Swan is his

10   truth, and we laid it down here in front of you

11   today.  And we knew it would have blemishes, but

12   we laid it down.  He got on the stand.  He told

13   you about his felony past.  He was honest about

14   lying to the women in his life.  And that doesn't

15   escape my attention.  I'm a woman.

16             He's made many mistakes, but he did

17   not know that those firearms were there.  If

18   Ebony Stigall and Shavion Reed wanted to come in

19   and lie and give a really good lie, they wouldn't

20   have admitted on the stand that Barrett is a liar

21   to women.  They could have come up with something

22   different.  But they told the truth, and the

23   truth was ugly to them too.

24             And Ms. Stigall about coming forward

25   with the truth, she did come forward with the

1    truth.  And, as you saw, with Tiara Thorpe, who

2    immediately began calling the Florissant Police

3    Department, the truth didn't matter.  You come

4    forward with the truth in a trial.

5              If Ms. Stigall had come to the U.S.

6    Attorney's Office a year ago and knocked on their

7    door and said, I'm Ebony Stigall, and that gun

8    was mine, and Barrett knew nothing about it, is

9    the U.S. Government just going to back down and

10   say, oh, we're very sorry, we'll just go ahead

11   and dismiss the case?  That's not how it works.

12   You bring your evidence to trial, and you present

13   it to the jury, so you-all can decide who is

14   telling the truth and who is lying.

15             Proof beyond a reasonable doubt, in

16   this case, here's what it would like look on

17   Count 1 and even on Count 2, fingerprints.

18   There's no forensic evidence that Mr. Swan ever

19   touched either of these guns.  And we heard the

20   police officer Officer Hellmann talk about well,

21   you know, we don't usually get prints off of

22   guns, but there are some smooth areas where we

23   could fingerprint if we wanted to.  He admitted

24   that the slide of the gun -- I'm sorry, magazine

25   of the gun where you insert it if the gun is

1    plastic and its surface is rough, but

2    fingerprints can be taken off the magazine.

3              And he said in his Direct

4    Examination, but the gun was in Mr. Swan's car.

5    It's expensive to do those tests.  It takes a

6    long time.  Why do it?  And typically we don't

7    get fingerprints.

8              Well, if that was true, why did the

9    police officers take such care of putting their

10   gloves on to handle the firearm in the first

11   place?  Fingerprints could have been obtained in

12   this case and examined, but it's just not

13   important to them to do that.  It's important to

14   Mr. Swan.  He's the one that has to pay for the

15   time with his liberty and a significant amount of

16   time for a wrongful conviction.

17             Returning to Count 2 as well with

18   Officer Kemp.  So many things don't make sense.

19   It's very simple.  It was a simple traffic stop.

20   Why not have all the information in his police

21   report accurately?  The stop happened on August

22   the 1st.  Officer Kemp admitted his evidence

23   sheets, his booking sheets, everything indicates

24   that correct date of August 1st of 2018.  But

25   when it comes to the police narrative, and he

1    told us he wrote it on the same day, that date is

2    wrong, August 8th of 2018.

3              And I cross-examined him about all

4    the people who proofread his narrative for him

5    and nobody caught it.  His secretary who

6    proofreads for grammar and spelling mistakes.

7    His supervisors.  No one caught it.  Because the

8    real report did indicate the truth at the

9    beginning.

10             Ms. Thorpe did say that firearm was

11   hers, and it was in the console, and that's what

12   the first report did say.  You saw Tiara Thorpe

13   here today.  How do you think she interacted with

14   the Florissant Police Department when she started

15   immediately calling and demanding you took my

16   firearm away from me, which I can legally possess

17   for no reason?  Do you think, perhaps, she

18   threatened to sue?

19             You witnessed her today.  She is a

20   fireball.  And if a police officer takes a

21   firearm away from someone who can legally possess

22   it, they could be sued.  The police department

23   could be sued.  Especially if it's in Florissant,

24   Missouri, which is next to Ferguson, Missouri.

25   There's race relations.  Ms. Thorpe is black.

1    The officers are white.

2                   Officer Fodde testified on rebuttal

3    that he was there and everything went as Officer

4    Kemp said, but Officer Fodde never even wrote a

5    police report.  Arresting a man on a federal ATF

6    warrant for a gun charge, and he's apparently

7    sitting on a firearm, and officer Fodde doesn't

8    write a report, nor is he even mentioned in

9    Officer Kemp's report.

10                   Officer Kemp didn't even put in his

11   report the amount of time that Mr. Swan sat in

12   the car unattended.  He didn't put it in his

13   report, because it wouldn't make sense the man

14   who knows he's about to be arrested on a federal

15   arrest warrant who has a prior for felon in

16   possession of a firearm would just sit on a

17   firearm.  It makes no sense.

18                   And Mr. Swan had plenty of time to

19   get rid of the firearm in his Dodge Charger when

20   the police were chasing him, and he didn't

21   because he didn't know it was there.  He's not

22   proud of his criminal past.  But if there's one

23   thing he has learned from that, you do not get

24   caught with a firearm. He had plenty of time to

25   get rid of it in the first instance.

1              And with Ms. Thorpe, if that firearm
2    had been out in the car, he would have said,
3    Tiara, put that in your purse.  It's her gun.
4    She knows it.  She bought it legally.  The trace
5    report goes back to her.
6              All we can bring to you today is
7    Mr. Swan's truth, and we've laid it down for you.
8    There isn't proof beyond a reasonable doubt that
9    he knew about either of these firearms and
10   intended to possess them.  There is reasonable
11   doubt and a significant amount of it.
12             I ask that you find Barrett Swan not
13   guilty on both counts.
14             THE COURT:  Mr. Sorrell.
15             MR. SORRELL:  Thank you, Your Honor.
16             (Government's Closing Argument
17   Continued by Mr. Sorrell.)
18             MR. SORRELL:  Counsel, Mr. Swan.
19             Ladies and gentlemen, we're just
20   about to the end of the day, and I appreciate
21   your attention and your patience in dealing with
22   us while we weed our way through this.
23             If I can, I'd like to talk about
24   some of the things that Ms. Booth raised in her
25   argument.  Ms. Booth mentioned well, why -- or

1    why is everybody so concerned about Ms. Reed and

2    Ms. Stigall not actually coming forward and

3    saying, Hey, that's really my gun like

4    Ms. Stigall could have.

5              The problem is this:  She says,

6    well, would the U.S. Attorney's Office have

7    dismissed it?  Well, who knows.  We never -- we

8    didn't get a chance to see.  But what you can do

9    if you get that information is actually to

10   investigate it.

11             At that point if we'd have known a

12   few months ago, we could have gone out to the car

13   rental agency to see if there actually was a car

14   that had been rented.  Who knows.  You haven't

15   seen it today.  No one knows anything about this

16   car.  It just magically appears at Mr. Swan's

17   convenience and disappears the same way.  We sure

18   could have investigated that.

19             If she'd have said I bought it at

20   the sale barn over there on a Friday afternoon

21   from some gentleman named whatever he was or

22   here's their station, we could have gone over

23   there with her and tried to find out who this

24   person was, because we're always interested in

25   finding out who's in possession of a stolen

1    handgun.

2              That handgun belonged to Mr. Fowler.

3    It didn't belong to Ms. Stigall.  I don't care

4    who she bought it from.  And Mr. Fowler will get

5    his gun back at the end of this case just like

6    Ms. Thorpe will.  We're not thieves.  We return

7    guns to their rightful owners.

8              But Ms. Stigall didn't lawfully own

9    that gun, and she should have come forward and

10   said something, and we could have taken some

11   action then to find out what her version of the

12   facts were.

13             Ms. Booth is critical of the fact

14   that there's no fingerprints or DNA evidence for

15   you to consider, but the officer explained that.

16   Officer Hellmann said he's never received a

17   positive result back on a DNA test or a

18   fingerprint match on the gun.  The surfaces don't

19   work.  The fingerprints just simply don't appear.

20   The DNA is not there.  It just doesn't work.

21             It's in his experience.  Now, he's

22   an experienced officer.  He's seen lots and lots

23   of these cases.  Far more than I'll ever see.

24   And Ms. Booth also asked you, well, then why do

25   officers put on gloves?  Why do they take such

1    good care of the evidence?  That's part of their
2    training, of course.

3              And you should always remember the
4    Government has the burden of proof, and that
5    never changes.  No matter what in this trial we
6    always have the burden of proof to show Mr. Swan
7    possessed that gun.

8              The reason the officers put on
9    gloves and preserve it is because they don't know
10   who might want to test this gun.  Anybody could.
11   Who knows later on who might want to take a look
12   at the gun and do whatever with it.  That way
13   they've done their job.  That's what they're
14   trained to do.  And they did what they were
15   trained to do.

16             Ms. Booth says that the August 8
17   date is wrong on Mr. Kemp's report, and that must
18   mean that everything else about that report is
19   wrong.  My goodness, who could meet that
20   standard?  I'll be the first to fail.  If a
21   typographical error means that you're wrong on
22   everything you do, then I'll have to just confess
23   right now that I couldn't meet that not on any
24   day of my life.  And I doubt that Mr. Kemp can or
25   anyone else in this room, but that simply is not

1  the way this works.

2  The Court read you an instruction

3  and then asked you to consider whether a

4  statement made by an officer -- or a witness,

5  rather, could contain a slight misrecollection.

6  That's the instruction that we have here.  Is

7  that a slight misrecollection?  It's certainly

8  not in dispute.  This event happened on

9  August 1st, and everybody knows it.

10  But then Ms. Booth goes on to say

11  there's a real report, that there's another

12  police report out there that shows what Ms.

13  Thorpe said was true.  And yet have you even it?

14  I've looked for it.  I can't find it.

15  Has anybody seen this report that

16  she told you there was?  She stood right here

17  where I'm standing and told you there's another

18  police report.  And yet she's had all the

19  opportunity to investigate, all the resources

20  that she has.

21  There's no other report.  There's no

22  need for another report.  Do you think if there

23  was another report, the officer would have left

24  any mistakes in it, that if he'd had the chance

25  to go back if he would have known it was going to

1  be a federal investigation?

2          How is he supposed to know that this

3  is going to turn into a case where he's going to

4  come to Cape Girardeau and testify?  He's a

5  Florissant police officer.  His case is the

6  traffic stop, and that's the end of it.  Anything

7  else that happens to that gun case is going to be

8  at the result of Officer Eggers' work or some

9  other person.

10          THE COURT:  Two minutes.

11          MR. SORRELL:  Thank you.

12          There are many defects talked about

13  in the officers' reports in Florissant, but what

14  evidence have you heard today that can't be

15  manufactured?  And one of the things is that

16  radio log and the calls that the officer made,

17  they're all timed.

18          The officer testified about his

19  seizing the firearm, that at 3:32:58, almost

20  3:33, that the dispatch acknowledged a warrant.

21  And three and a half minutes later he's calling

22  back with the number of that gun.  It fits his --

23  that exhibit fits exactly what Officer Kemp

24  testified to with no exceptions.

25          That radio log is kept by the County

1    of St. Louis.  Florissant has no ability to

2    change it.  It's irrefutable.  It backs up

3    Officer Kemp's words exactly because Officer Kemp

4    was telling the truth and so have all the other

5    officers that you heard from today.

6              Instead of finding that Mr. Kemp --

7    or Mr. Swan is simply an unlucky man we ask that

8    you find him guilty of both counts.  Thank you.

9              THE COURT:  The bailiff will be

10   sworn.

11             (Bailiff Sworn by Clerk.)

12             THE COURT:  Here are the

13   instructions.

14             All right.  Go now with the bailiff

15   to the jury room to begin your deliberations.

16   Court is in recess.

17             (The jury went out to deliberate at

18   2:22 p.m.)

19             (Proceedings stood in temporary

20   recess.)

21             (Proceedings resumed in open court

22   outside the presence of the jury.)

23             THE COURT:  Do you want to make a

24   motion?

25             MR. TILSEN:  I do, Your Honor.

1   Apart from contraband or the weapons in this case

2   I would move that you direct the Court's Clerk to

3   deliver the photographic exhibits received in

4   evidence for the jury so they will have them

5   during their deliberations.

6              THE COURT:  Okay.  It's been my

7   practice in more than 40 years of trial work that

8   I only do that if there's a request from the

9   jury.

10             What's the Government's position?

11             MR. SORRELL:  The same.  We just

12  request that you send them back to the extent

13  that you can if they request them whenever they

14  request them except for the two firearms.

15             THE COURT:  So if they request it,

16  I'll certainly do that.

17             MR. TILSEN:  I contend that

18  Mr. Swan's right to a fair trial is at least

19  dependent on the jury having access while during

20  their deliberations to the evidence that was

21  received by the Court, and it denies him his

22  right to a fair trial to prevent them from having

23  it at any time they want.

24             THE COURT:  Okay.  Your motion is

25  overruled for now.  Like I said, if they request

1  the exhibits, I will have them delivered to the

2  jury room.

3              MR. TILSEN:  Do they have a list of

4  the exhibits?

5              THE COURT:  What's that?

6              MR. TILSEN:  Do they have a list?

7              THE COURT:  Nope, not to my

8  knowledge.

9              MR. TILSEN:  That's a lot of

10  exhibits for them to remember.

11              THE COURT:  Okay.  I made my ruling.

12  Okay.

13              Anything else?

14              MR. SORRELL:  No, Your Honor.  Thank

15  you.

16              (Proceedings stood in temporary

17  recess.)

18              (Proceedings resumed in open court

19  outside the presence of the jury.)

20              (Question by the jury.)

21              THE COURT:  All right.  Let's go on

22  the record.  The jury has sent a note:  "Can we

23  see the evidence?"  "Can we see the Kemp report?"

24  And then there's a question, "What hand do the

25  girls use?"

1              So I propose to send all the

2    evidence back except for the firearms.  And then

3    in response to the question, "What hand do the

4    girls use?" I would write, "You are to be guided

5    solely by the evidence that was introduced in

6    trial."

7              Any objections to that?

8              MS. WOODRUFF:  No, sir.

9              My only question is we have a couple

10   of DVDs.  There's one, I believe.  Do you want to

11   send that back as well?

12             THE COURT:  No, not unless they

13   request that specifically.

14             MS. WOODRUFF:  Okay.

15             THE COURT:  And not the firearms, of

16   course.

17             MS. WOODRUFF:  Right.

18             MS. BOOTH:  Your Honor, as to the

19   Kemp report, I don't know if they formally

20   entered the Kemp report into evidence.  I know I

21   asked him about it.  I did enter my first page of

22   one of his reports.

23             MS. WOODRUFF:  And, Judge, I believe

24   that it was Defendant's Exhibit O.

25             MS. BOOTH:  Yeah.

1          MS. WOODRUFF:  I believe that Mr.

2    Sorrell read from the attached pages, so I would

3    ask the entire thing go back.

4          MS. BOOTH:  Well, the only issue is,

5    Judge, is that if we could redact some of it, but

6    then the jury is going to wonder why it has

7    Barrett's entire arrest record in that report,

8    not the conviction report but arrest record.

9          THE COURT:  Well, I think that could

10   probably be redacted.

11         MS. BOOTH:  Okay.

12         THE COURT:  What about that?

13         MS. WOODRUFF:  I have no objection

14   to redacting it.

15         THE COURT:  And it wasn't introduced

16   into evidence, on the other hand.  That's the

17   concern I have.

18          So is this by way of stipulation or

19   what?

20         MS. WOODRUFF:  It's my understanding

21   at the beginning was that we each stipulated to

22   the other's exhibits.

23          And then when Ms. Booth used

24   Defendant's Exhibit O, the reports were attached

25   to that, and then Mr. Sorrell used that exhibit

1   and read from it to the jury.  So we took that as

2   being the entire attachment.

3                  THE COURT:  Well, so what about is

4   there an agreement that you can redact some of

5   that stuff then?

6                  MS. BOOTH:  I believe that we can.

7                  MS. WOODRUFF:  I don't have any

8   objection to redacting the Defendant's criminal

9   history, of course.

10                  THE COURT:  Okay.  Why don't we do

11   that.  In the meantime, any other objection to

12   the response?

13                  MS. WOODRUFF:  Not from the

14   Government.

15                  MS. BOOTH:  No, sir.

16                  THE COURT:  Okay.  All right.  And

17   so we'll send all the evidence back now except

18   for the Kemp report.  When that is redacted, that

19   can go back too.  And not the firearms.

20                  THE DEFENDANT:  Excuse me, Judge.

21   They just sent some things back.  I don't know

22   exactly what they're sending back there.

23                  THE COURT:  It doesn't matter.  You

24   have a lawyer that's making those decisions for

25   you.  That's not your decision.

1               MS. BOOTH:  I'll talk to you about

2      it, Barrett.  It's all right.

3               THE CLERK:  Court is in recess.

4               (Proceedings stood in temporary

5      recess.)

6               (Proceedings resumed in open court.)

7               (Verdict received at 4:20 p.m. and

8      Jury Not Polled.)

9               THE COURT:  All right.  You may be

10     seated.

11              The Court will enter judgment in

12     accordance with the verdict handed down by the

13     jury today.  The Court will also order a

14     presentence investigation.  And a sentencing date

15     will be set for Tuesday, October 15th at

16     1:40 p.m.

17              And with that, ladies and gentlemen,

18     I want to thank you for your service.  The

19     admonition I gave you earlier not to discuss the

20     case is now lifted, and you may discuss the case

21     with whoever you wish, including the lawyers in

22     the case.

23              But I appreciate the patience that

24     you've shown throughout the trial.  It's been

25     difficult at times.  And I will ask for the Court

1    Security Officers to assist you to your vehicles,

2    if you wish.  And otherwise, I thank you again.

3              So with that is there anything

4    further for the Government?

5              MR. SORRELL:  No, Your Honor.  Thank

6    you.

7              THE COURT:  Or for Defendant?

8              MS. BOOTH:  No, sir.

9              THE COURT:  All right.  I want to

10   thank counsel too in front of the jury that the

11   Court is grateful for the professionalism shown

12   by both sides during the course of the trial.

13             So with that you're excused at this

14   time, and the court is adjourned.

15             (PROCEEDINGS CONCLUDED AT 4:25 P.M.)

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T E

2

3               I, Alison M. Garagnani, Registered

4    Merit Reporter and Certified Realtime Reporter,

5    hereby certify that I am a duly appointed

6    Official Court Reporter of the United States

7    District Court for the Eastern District of

8    Missouri.

9               I further certify that the foregoing

10   is a true and accurate transcript of the

11   proceedings held in the above-entitled case and

12   that said transcript is a true and correct

13   transcription of my stenographic notes.

14               I further certify that this

15   transcript contains pages 295 through 506

16   inclusive and that this reporter takes no

17   responsibility for missing or damaged pages of

18   this transcript when same transcript is copied by

19   any party other than this reporter.

20               Dated Cape Girardeau, Missouri, this

21   13th day of January, 2020.

22

23

     -------------------------------------------
24   /s/Alison M. Garagnani
     Alison M. Garagnani, CCR, CSR, RMR.
25   Official Court Reporter